# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| CHARLOTTE LOQUASTO, MICHAEL IUBELT, SHELBY IUBELT, INDIVIDUALLY, ON BEHALF OF THE ESTATE OF PFC TYLER IUBELT, AND AS NEXT FRIEND OF V.I., MINOR, JULIANNE PERRY, INDIVIDUALLY, ON BEHALF OF THE ESTATE OF STAFF SGT. JOHN PERRY, DECEASED, AND AS NEXT FRIEND OF L.P. AND G.P., MINORS, KATHLEEN PERRY, STEWART PERRY, MARISSA BROWN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SGT. FIRST CLASS ALLAN E. BROWN, DECEASED, GAIL PROVOST, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF PETER PROVOST, DECEASED, MEGHAN HOLLINGSWORTH, SARAH PETERSON, BRIAN PROVOST, SPENCER PROVOST, LOUIS PROVOST, GERTRUDE PROVOST, KATRINA REEVES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF COL. JARROLD REEVES (RET.), DECEASED, AND AS NEXT FRIEND OF J.R., A MINOR, SUMMER DUNN, HANNAH MASON, MALLORY REEVES, CHARLOTTE REEVES, CHRIS COLOVITA, SAMUEL GABARA, LAKEIA STOKES, MAGGIE BILYEU, INDIA SELLERS, ADDIE FORD, ROBERT HEALY, and HAYLEE RODRIGUEZ, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. _____ |
| VS. | § § | |
| FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC., FLUOR GOVERNMENT GROUP, INC., FLUOR INTERCONTINENTAL, INC., and ALLIANCE PROJECT SERVICES, INC. | § § § § § § | JURY |

**DEFENDANTS FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC., FLUOR GOVERNMENT GROUP INTERNATIONAL, INC., AND FLUOR INTERCONTINENTAL, INC.'S STATE COURT FILINGS INDEX**

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE**:

Defendants Flour Corporation, Inc., Flour Enterprises, Inc., Flour Government Group International, Inc., and Flour Intercontinental, Inc. file this state court filings index and would respectfully show the Court as follows:

The following items were filed in the matter styled *Charlotte Loquasto, et al. v. Flouor Corporation, et al.,* Cause No. DC19-06872, in the 14th District Court for Dallas County, Texas:

|     | **Date Filed** | **Document** |
| --- | --- | --- |
| 1. | 05/14/19 | Plaintiffs' Original Petition |
| 2. | 05/14/19 | Request for Service |
| 3. | 05/14/19 | Citation – Flour Corporation, Inc. |
| 4. | 05/14/19 | Citation – Flour Enterprises, Inc. |
| 5. | 05/14/19 | Citation – Flour Intercontinental Inc. |
| 6. | 05/14/19 | Citation – Flour Government Group, Inc. |
| 7. | 05/14/19 | Citation – Alliance Project Services, Inc. |
| 8. | 06/10/19 | Flour Government Group International, Inc.'s Original Answer |
| 9. | 06/10/19 | Defendant Alliance Project Services, Inc.'s Verified Special Appearance |
| 10. | 06/17/19 | Return of Service – Flour Government Group, Inc. |
| 11. | 06/17/19 | Return of Service – Alliance Project Services, Inc. |
| 12. | 06/17/19 | Fluor Government Group International, Inc.'s First Amended Answer |
| 13. | 06/17/19 | Fluor Corporation, Inc., Fluor Enterprises, Inc., and Fluor Intercontinental, Inc.'s Original Answer |

| 14. | 06/18/19 | Fluor Government Group International, Inc., Fluor Corporation, Inc., Fluor Enterprises, Inc., and Fluor Intercontinental, Inc.'s Supplement to their Original and First Amended Answers |
|-----|----------|---|

Respectfully submitted,

**HARTLINE BARGER LLP**

*/s/ Darrell L. Barger*

Darrell L. Barger (*Attorney-in-charge*)
State Bar No. 01733800
Adam L. Anthony (*Pro Hac Vice to be filed*)
State Bar No. 24087109
1980 Post Oak Blvd., Suite 1800
Houston, Texas 77056
(713) 759-1990
(713) 652-2419 (Fax)
dbarger@hartlinebarger.com
aanthony@hartlinebarger.com

AND

Brian Rawson
State Bar No. 24041754
brawson@hartlinebarger.com
8750 N. Central Expy., Suite 1600
Dallas, Texas 75231
(214) 369-2100
(214) 369-2118 (Fax)

AND

J. Reid Simpson (*Pro Hac Vice to be filed*)
State Bar No. 24072343
800 N. Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401
(361) 866-8000
(361) 866-8037 (Fax)
rsimpson@hartlinebarger.com

**COUNSEL FOR DEFENDANTS**
**FLOUR CORPORATION, INC., FLOUR**
**ENTERPRISES, INC., FLOUR**
**GOVERNMENT GROUP INTERNATIONAL,**
**INC., AND FLOUR INTERCONTINENTAL,**
**INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on June 19, 2019, Defendants served a true and correct copy of the foregoing State Court Filing Index on all known counsel of record via the Northern District of Texas' CM/ECF filing system and/or Certified Mail Return Receipt Requested.


*/s/ Darrell L. Barger*
Darrell L. Barger

FILED
DALLAS COUNTY
5/14/2019 9:49 AM
FELICIA PITRE
DISTRICT CLERK

Case 3:19-cv-01455-B   Document 1-3   Filed 06/19/19   Page 6 of 198   PageID 35

Christi Underwood

NO. DC-19-06872 _____

| | | |
|---|---|---|
| CHARLOTTE LOQUASTO, | § | IN THE DISTRICT COURT |
| MICHAEL IUBELT, SHELBY IUBELT, | § | |
| INDIVIDUALLY, ON BEHALF OF THE | § | |
| ESTATE OF PFC TYLER IUBELT, AND | § | |
| AS NEXT FRIEND OF V.I., MINOR, | § | |
| JULIANNE PERRY, INDIVIDUALLY, ON | § | |
| BEHALF OF THE ESTATE OF | § | |
| STAFF SGT. JOHN PERRY, DECEASED, | § | |
| AND AS NEXT FRIEND OF | § | |
| L.P. AND G.P., MINORS, KATHLEEN PERRY, | § | |
| STEWART PERRY, | § | |
| MARISSA BROWN, INDIVIDUALLY AND | § | |
| ON BEHALF OF THE ESTATE OF | § | |
| SGT. FIRST CLASS ALLAN E. BROWN, | § | |
| DECEASED, GAIL PROVOST, | § | |
| INDIVIDUALLY AND ON BEHALF OF | § | |
| THE ESTATE OF PETER PROVOST, | § | |
| DECEASED, MEGHAN HOLLINGSWORTH, | § | |
| SARAH PETERSON, | § | |
| BRIAN PROVOST, SPENCER PROVOST, | § | |
| LOUIS PROVOST, GERTRUDE PROVOST, | § | |
| KATRINA REEVES, INDIVIDUALLY AND | § | |
| ON BEHALF OF THE ESTATE OF | § | |
| COL. JARROLD REEVES (RET.), | § | |
| DECEASED, AND AS NEXT FRIEND OF | § | |
| J.R., A MINOR, SUMMER DUNN, | § | |
| HANNAH MASON, MALLORY REEVES, | § | |
| CHARLOTTE REEVES, CHRIS COLOVITA, | § | |
| SAMUEL GABARA, LAKEIA STOKES, | § | |
| MAGGIE BILYEU, INDIA SELLERS, | § | |
| ADDIE FORD, ROBERT HEALY and | § | |
| HAYLEE RODRIGUEZ | § | |
| | § | |
| | § | |
| VS. | § | DALLAS  COUNTY, TEXAS |
| | § | |
| FLUOR CORPORATION, INC., | § | A-14 |
| FLUOR ENTERPRISES, INC., | § | _____ JUDICIAL DISTRICT |
| FLUOR GOVERNMENT GROUP, INC., | § | |
| FLUOR INTERCONTINENTAL, INC. and | § | |
| ALLIANCE PROJECT SERVICES, INC. | § | **JURY TRIAL DEMANDED** |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs Charlotte Loquasto, Michael Iubelt, Shelby Iubelt, individually, on behalf of the estate of PFC Tyler Iubelt, and as next friend of V.I., a minor, Julianne Perry, individually, on behalf of the estate of Staff Sgt. John Perry, deceased, and as next friend of L.P. and G.P., minors, Kathleen Perry, Stewart Perry, Marissa Brown, individually and on behalf of the estate of Sgt. First Class Allan E. Brown, deceased, Gail Provost, individually and on behalf of the estate of Peter Provost, Meghan Hollingsworth, Sarah Peterson, Brian Provost, Spencer Provost, Louis Provost, Gertrude Provost, Katrina Reeves, individually and on behalf of the estate of Col. Jarrold Reeves (Ret.), deceased, and as next friend of J.R., a minor, Summer Dunn, Hannah Mason, Mallory Reeves, Charlotte Reeves, Chris Colovita, Samuel Gabara, Lakeia Stokes, Maggie Bilyeu, India Sellers, Addie Ford, Robert Healy and Haylee Rodriguez file this Original Petition against Defendants Fluor Corporation, Inc., Fluor Enterprises, Inc., Fluor Intercontinental, Inc., Fluor Government Group, Inc. ("Fluor Defendants"), and Alliance Project Services, Inc. ("APS"), and, for cause of action, would respectfully show this Honorable Court the following:

## OVERVIEW OF LAWSUIT

On Veterans Day 2016, a man detonated a bomb at the Bagram Air Base in Afghanistan. Five men were killed and 17 soldiers were badly injured.  The bomber was employed and managed by the Defendants. The Defendants failed to supervise or manage him.  They allowed him access to tools and material that he used to build the bomb.  They failed to escort him on the base, as required.

2

As a result, he made a bomb and he was allowed to detonate it.  The family members of the dead and the survivors of the bombing seek accountability of the Defendants for their negligence in causing this horrible tragedy.

On Saturday morning of November 12, 2016, more than 200 personnel residing at the Bagram Air Field (the "Base") in Afghanistan were gathering for a Veterans Day 5k race set to begin at 6:15 a.m.   The meeting point for the race was an area called the "Disney Clamshell."  Also on the Base was man named Ahmad Nayeb.  Nayeb was an employee of Defendant APS and was primarily supervised and managed by the Fluor Defendants.

Nayeb worked at Fluor's HAZMAT work center within Fluor's Non-Tactical Vehicle Yard at the Base.  Nayeb was not supposed to be on the Base on the morning of November 12, 2016.   Defendants were required to ensure that employees like Nayeb were physically escorted off the Base at the end of their work shifts.  Nayeb was supposed to have been escorted off the Base by bus at 4:45 a.m. that morning.  However, on the morning in question, Nayeb was not escorted off the Base at the end of his work shift.

Prior to November 12, 2016, Nayeb had constructed an explosive vest bomb at Fluor's facility on the Base—a facility Fluor had a duty to supervise and manage.  Nayeb used materials owned by Fluor and tools owned by Fluor to construct the explosive vest bomb at Fluor's work location on Base.

 On November 12, 2016, instead of being escorted off the Base by bus, Nayeb walked, totally unsupervised by the Defendants, toward the assembly point for the Veterans Day 5k race.

That morning, a group of soldiers had gathered at the Clamshell, intending to conduct a combatives training class.  Upon arrival, they saw that the 5k run would be taking place, as the

3

organizers were preparing for the event.   The soldiers decided to hold their training at another facility, so left the Clamshell and began walking alongside Disney Drive towards the alternate location.   Meanwhile, Fluor employees Jarrold Reeves and Peter Provost, both avid runners, left their quarters and headed towards the Clamshell for the 5k run.   They also traveled alongside Disney Drive towards the Clamshell.   It was still early in the morning, and it was dark.

By all accounts, the bomber intended to travel to the Clamshell and detonate his bomb among the hundreds of people who would be gathering there later that morning for the race. The bomber attempted to hide between several concrete bunkers along the walkway.   The soldiers and Reeves/Provost were approaching the bomber from different directions and, unbeknownst to them, were converging on the bomber.   At some point, the bomber realized that he would be caught and would not reach his intended target.   Reeves and Provost were closest to the bomber when he jumped up, faced them, and detonated his bomb.   Reeves and Provost sustained a direct hit and likely died immediately.   The soldiers, also within 15 feet of the bomber, took shrapnel directly from the bomb and also from shrapnel ricocheting off of the concrete bunkers.   PFC Tyler Iubelt sustained extensive wounds and burns from the bombing. Witnesses report that he survived the bombing but was close to death.   EMTs who arrived on the scene described difficulty performing CPR on him because of the extent of burns to his body. Staff Sgt. John Perry was struck with shrapnel in his eye, which continued to his brain.  He died on the scene.   Staff Sgt. Allan Brown sustained extensive shrapnel wounds and burns. Witnesses tell of him directing EMTs to take care of other soldiers and constantly encouraging his fellow soldiers, as he held his intestines in his body with his hands.   Sgt. Brown received care at Bagram, then Germany, then at Walter Reed Hospital.   After several weeks, he finally succumbed to his injuries.   Other soldiers sustained severe and life-altering injuries.

This incident has caused the loss of fathers, sons, and spouses. This incident has dramatically altered the lives of several men and women who devoted their lives to military service.

This incident was completely the result of Defendants' negligence and gross negligence. This lawsuit seeks to hold those responsible those who allowed this incident, Fluor and APS, and to give them an opportunity to take responsibility for their grievous mistakes. Any attempt by Defendants to place any blame on the U.S. Army or any other U.S. governmental entity for this tragedy would be shameful.

## II.    DISCOVERY CONTROL PLAN

Plaintiffs request a Level 3 discovery control plan pursuant to the Texas Rules of Civil Procedure.

## III.   RULE 47 STATEMENT

Pursuant to TEX. R. CIV. P. 47, Plaintiffs state that each seeks more than $1 million in monetary relief.

## IV.    PARTIES

### PLAINITIFFS

#### A.    Family of PFC Tyler Iubelt

**Plaintiff Charlotte Loquasto**, surviving mother of PFC Tyler Iubelt, is an individual and resident of the State of Illinois.

**Plaintiff Michael Iubelt**, surviving father of PFC Tyler Iubelt, is an individual and resident of the State of Indiana.

5

**Plaintiff Shelby Iubelt,** surviving spouse of PFC Tyler Iubelt, is an individual and resident of the State of Illinois.  She brings claims individually, on behalf of the estate of Tyler Iubelt, and as next friend of V.I., her child with Tyler Iubelt.



**About Tyler Iubelt**:  At the time of his death, Tyler was 20 years old.  He was born and raised in Illinois.  He joined the United States Army on October 21, 2015, as a motor transport operator.  Tyler and Shelby were married on October 30, 2015.  In April 2016, he was assigned to Fort Hood.  He was a member of the 1st Cavalry Division Sustainment Brigade.  Shelby gave birth to Violet on May 7, 2016, at Fort Hood.  In August 2016, Tyler received deployment orders and he deployed to Afghanistan on September 7, 2016.  In October 2016, Tyler was promoted to Private First Class.

By all accounts, at the time of the incident, Tyler was at the front of the group of soldiers walking down Disney Drive.  They were approximately 15 feet from the bomber at time of detonation. Witness reports indicate that Tyler initially survived the blast.  He was attended to by medics on the scene, but they had difficulty administering CPR because of the extensive burns to his body.  Tyler was pronounced dead at the scene.    Tyler's body was returned to the U.S. at Dover Air Force Base on November 15, 2016.  Tyler was buried at Sunset Memorial Park at Du Quoin, Illinois, on November 23, 2016.  In 2017, the State of Illinois renamed a section of Illinois Route 51 the PFC Tyler Iubelt Memorial Highway.

6

B.      **Family of Staff Sgt. John Perry**

**Plaintiff Julianne Perry,** surviving spouse Staff Sgt. John Perry, deceased, is an individual and resident of Bell County, Texas.  She brings claims individually, on behalf of the estate of John Perry and as next friend of her children with John Perry, L.P. and G.P., minors.

**Plaintiff Kathleen Perry**, surviving mother of John Perry, is an individual and resident of the State of New Jersey.

**Plaintiff Stewart Perry**, surviving father of John Perry, is an individual and resident of the State of California.



**About John Perry:**  At the time of his death, John had just turned 30.  He was born in California and was raised in New Jersey and California. John entered the U.S. Army in January 2008.   He and Julianne married shortly thereafter.   He served in Korea from February 2009 to February 2010, and from June 2013 to June 2014.    He was deployed to Afghanistan from August 2010 to July 2011, before deploying again in September 2016.  John was also a member of the 1st Cavalry Division Sustainment Brigade in Afghanistan.  John was likely killed instantly from shrapnel that entered his head, right below his eye.  John was buried at Arlington National Cemetery.

7

C.      **Family of SFC Allan E. Brown**

**Plaintiff Marissa Brown** is an individual and resident of the State of California.  She brings claims individually and on behalf of the estate of Allan E. Brown.



**About Allan E. Brown**:  Allan was 46 years old when he died.  Allan was raised in Maryland and entered the Army on September 16, 1988, as a petroleum supply specialist.  He transferred into the United States Army Reserves in June of 1990.  In December of 2000, Allan reclassified to a mobile subscriber equipment network switching systems operator.  On Nov. 20, 2007, he reenlisted into the active component as an information technology specialist.  He was deployed in Operation Iraqi Freedom three times: from August 2006 to August 2007, November 2008 to October 2009, and December 2010 to December 2011.  Allan was deployed in support of Operation Enduring Freedom from July 2014 to September 2014, and in Operation Freedom's Sentinel from September to December 2016.  Allan was also a member of the 1st Cavalry Division Sustainment Brigade in Afghanistan. Allan and Marissa married in Hawaii on July 1, 2000.

After the bombing, Allan was treated at Bagram and then was transferred to Germany, and ultimately to Walter Reed hospital.  Allan was conscious but in severe pain for three weeks after the incident.  He was not able to speak, but was able to squeeze family members' hands and communicate by blinking his eyes.  Despite the efforts of his doctors, Allan's condition worsened and he fell into a coma and died on December 6, 2016.  Allan was buried at Arlington National Cemetery.  The Secretary of the Army was present when Allan died, and was present at his funeral.

      **D.**      <u>**Family of Peter Provost**</u>

**Plaintiff Gail Provost**, surviving spouse of Peter Provost, is an individual and resident of the State of South Carolina.  She brings claims individually and on behalf of the estate of Peter Provost.

**Plaintiff Meghan Hollingsworth**, surviving daughter of Peter Provost, is an individual and resident of the State of South Carolina.

**Plaintiff Sarah Peterson**, surviving daughter of Peter Provost, is an individual and resident of the State of South Carolina.

**Plaintiff Brian Provost**, surviving son of Peter Provost, is an individual and resident of the State of South Carolina.

**Plaintiff Spencer Provost**, surviving son of Peter Provost, is an individual and resident of the State of California.

**Plaintiff Louis Provost**, surviving father of Peter Provost is an individual and resident of the State of Massachusetts.

**Plaintiff Gertrude Provost**, the surviving mother of Peter Provost, is an individual and resident of the State of Massachusetts.



**About Peter Provost:**   Peter was 62 years old at time of death.  He grew up in Massachusetts and received a BS in environmental health from UMass-Amherst in 1979.  During his studies, he also served as a research assistant at Harvard University's Graduate School of Public Health.  After Amherst, he went to work in the environmental health and safety field.  This included a five year stint with OSHA and as corporate manager for health and safety at a semiconductor company.  He spent the largest part of his professional career (15 years) at Pirelli North America, where he rose to Corporate Director, Environmental Health & Safety, and served as a member of the Board of Directors.  He received numerous certifications in his field and authored several articles on subjects related to safety.   Peter went to work for Fluor in 2011.  Peter and Gail were married in 1990 and had two sons, Brian and Spencer.   Peter also had two daughters, Meghan and Sarah, from a prior marriage.

E.      **Family of Jarrold Reeves**

**Plaintiff Katrina Reeves**, surviving spouse of Col. Jarrold Reeves (Ret.), is an individual and resident of the State of Kentucky.  She brings claims individually, on behalf of the estate of Jarrold Reeves and as next friend of J.R., a minor, her daughter with Jarrold Reeves.

**Plaintiff Summer Dunn**, surviving daughter of Jarrold Reeves, is an individual and resident of the State of Georgia.

**Plaintiff Hannah Mason**, surviving daughter of Jarrold Reeves, is an individual and resident of the State of Georgia.

**Plaintiff Mallory Reeves**, surviving daughter of Jarrold Reeves, is an individual and resident of the State of Georgia.

**Plaintiff Charlotte Reeves**, surviving mother of Jarrold Reeves, is an individual and resident of the State of Florida.



<u>**About Jarrold Reeves:**</u>  Jarrold was 57 years old at time of death.  He was raised in Avondale Estates, Georgia.  In high school, he played football and won a state championship in 1976.  He attended college at Presbyterian College in South Carolina, where he played football and participated in the ROTC.  He graduated in 1982.  In 1982, he was commissioned as a second lieutenant in the U.S. Army and embarked upon a 29-year career of distinguished military service primarily in the Logistics Corps.   He is the recipient of the following distinguished military medals: 2016: Secretary of Defense Medal for the Defense of Freedom (posthumously); 2011: Legion of Merit; 2008: Bronze Star; 2008: Iraqi Campaign Medal;   2007: Legion of Merit Medal;  2003: Defense Meritorious Service Medal; 2003: Joint Service Commendation Medal, 2003: Army Service Commendation Medal; 2003: Joint Service Achievement Service Medal; 2003: Global War on Terrorism Medal; 2001 National Defense Service Medal; 1998: Humanitarian Service Medal; 1992: Armed Forces Reserve Medal.

11

He held numerous senior leadership positions in the U.S. Army.  In 2008, his unit was deployed to Iraq to oversee the sustainment and distribution of logistics support and to lead the initial planning and execution for the drawdown of military forces and associated equipment.   In 2010, his unit was deployed to Haiti to lead the initial planning for humanitarian assistance and disaster relief support to over a million Haitians affected by the earthquake.  In addition to his degree from Presbyterian College, Jarrold attended the U.S. Army Command and General Staff College and was awarded a master's degree in Military Arts and Science. He also received a Masters of Strategic Leadership degree from the Army War College.  Jarrold retired from the Army in May 2011, at Fort Knox.

Jarrold was married previously and had three daughters.  In May 2000, Jarrold married Katrina in Louisville.  They moved together to Fort Hood.  Their daughter Jennifer was born at Fort Hood in 2001.  Jarrold began working for Fluor in July 2011, shortly after his retirement from the Army.  His initial contract was for two years.  In 2013, the country manager asked him to stay and he agreed to do so.   At the time of his death, Jarrold was Fluor's deputy project manager for logistics and public works in Afghanistan.  Jarrold was laid to rest on November 30, 2016, at Kentucky Veterans Cemetery-Central in Radcliff, Kentucky.

### F.    Survivors

**Plaintiff Chris Colovita** is an individual and resident of the State of Alabama**.**

Colonel Chris Colovita was born and raised in Falls Church, Virginia.  He is married and the father of three children. He graduated from Marshall University in 1994 and was commissioned as a Second Lieutenant in the United States Army in 1994.   He has a long and commendable record with the U.S. Army, which includes multiple deployments to Iraq and Afghanistan.  In 2016, he was assigned to Fort Hood, and served as Commander of the First

12

Cavalry Sustainment Brigade.   He deployed to Afghanistan in September 2016.

On the day of the incident, he recalls walking down Disney Drive, with Chief Gabara to his left and Sgt. Perry to his right.     He recalls a large explosion and a huge orange flash.  He woke up on the ground and drew his pistol and yelled for everyone to stay down.  As he surveyed the scene, he thought that everyone else was dead.  He recalls seeing the bodies of Peter Provost and Jerry Reeves.  He recalls seeing Sgt. Perry slumped over, and clearly deceased.  As medics arrived, he assisted loading the victims into medivacs.  He then went to the hospital to treat his injuries.   Colonel Colovita sustained shrapnel wounds to his right knee.  He has been diagnosed with a moderate to severe TBI.  He sustained injuries to his neck, causing nerve damage, and pain and numbness to his extremities, for which he has received physical therapy and injections.  He is a candidate for cervical surgery.  He suffered a hyperextended right elbow.  He has been diagnosed with PTSD.  He returned from Afghanistan in June 2017, and was assigned to Redstone AMC, where he is currently stationed.  He is currently in the process of medically retiring from the Army, for injuries associated with the November 2016 explosion.

**Plaintiff Samuel Gabara** is an individual and resident of the State of Texas.

Sam Gabara is 37 years old.  He was born and raised in Rogers City, Michigan.  He is married and is the father of two children.  He enlisted in the U.S. Army on August 16, 2000, at age 18.  He was assigned to Fort Hood, then Fort Campbell, then Fort Knox, and finally to Fort Hood.   Over the course of his career, he was deployed overseas six times – serving four tours in Iraq and two tours in Afghanistan

On the day of the bombing, Chief Gabara recalls walking with his fellow soldiers.  After the explosion, he recalls coming to, and lying face down on the ground.  He got up and directed his fellow soldiers to stay down.   He then attended to the wounded.  Chief Gabara was treated at

the Bagram ER, then taken to Landstuhl, Germany, then to Walter Reed and finally to Darnell Medical Center.   He sustained shrapnel wounds to his left wrist, which severed his ECU tendon and injured his ulna bone.   He sustained multiple smaller shrapnel wounds to his neck, chest, and thighs.   He also suffered a traumatic brain injury.   He was cleared for redeployment on January 10, 2017, and returned to Afghanistan from January 20, 2017 until June 2017.   He then returned to Fort Hood.   Chief Gabara medically retired from the U.S. Army on October 30, 2018. Currently, he suffers from post-traumatic arthritis in his left wrist, chronic migraines, chronic back and neck pain, PTSD, insomnia and issues surrounding the TBI.   He currently receives weekly counseling, botox injections for migraines, and pain management for his back injury. He is scheduled to undergo nerve repair surgery for his left wrist.   He still has pieces of shrapnel in his body.

**Plaintiff Lakeia Stokes** is an individual and resident of the State of Texas.

Lakeia Stokes is 37 years old.   Lakeia attended college at Clemson, where she played basketball, and where she still holds records in five categories.   She graduated with a degree in sports management and played briefly in Greece and Switzerland.   She enlisted in the Army in January 2014.   She was assigned to Fort Hood.   Her initial deployment was to Kuwait, from October 2014 to June 2015, and then she returned to Fort Hood.   She deployed to Afghanistan in September 2016.

On the day of the incident, she recalls walking down the road with her fellow soldiers. After the explosion, the first thing she recalls was Chief Gabara yelling for everyone to get down on the ground.   She recalls Addie Peters in pain because of her hip and leg.   She tried to go to Peters but realized that her arm had severe damage and was almost severed.   She recalls Col. Colovita attending to her and urging her to hang on.   She recalls riding in an ambulance with

India Sellers and Allan Brown, and Brown holding his intestines in his body.  But, still, he was encouraging both of them the entire time.

After the incident, she underwent surgery at Bagram to her arm, to place an external fixator. She was later transferred to Walter Reed and then to San Antonio, where she has had the majority of her surgeries.  Lakeia was medically retired from Army in March 2018.  She still undergoes therapy to her left arm, and has permanent nerve damage – she will never regain full use of her arm.  Her left eye has not recovered from retinal detachment.   She has permanent nerve damage to her left knee.  She suffered a broken right foot.  She still has shrapnel all over her body.  She has a skin graft on her leg.  She has undergone over 15 surgeries and has been advised that she has several more to go.

**Plaintiff Maggie Bilyeu** is an individual and resident of the State of Texas.

Maggie Bilyeu is 28 years old and grew up in Southern Illinois. She enlisted in the U.S. Army in October 2015.   In June 2016, she was assigned to Fort Hood.  She deployed to Afghanistan in September 2016.

On the date of incident, she recalls walking alongside Lakeia Stokes, India Sellers, and Addie Peters.  She recalls seeing the bomber for the first time, just as he detonated. She recalls awaking from the explosion and trying to drag herself to safety.  At some point, she realized that her intestines were exposed.  She also noted that her leg had received extensive damage.  She waited in place until she was attended to by medics and taken from the scene by ambulance.  She was initially treated and stabilized at Bagram, then taken to Germany and ultimately to Walter Reed Hospital.  She awoke from a coma while at Walter Reed.  She was later transferred to a facility in Minnesota to focus on repair of her leg.  She was relocated to Fort Hood in January

15

2017, where she stayed for most of the year.  In December 2017, she was assigned to Fort Sam Houston where she is part of a Warrior Transition Unit.

Maggie received extensive injuries from shrapnel.  She has had over 23 surgeries, to her leg, breast and abdomen.  She will undergo several additional scar revision surgeries to her breast, and abdomen.   She received a plate to stabilize several broken ribs. Her most significant problems are with her left leg.   After years of hoping to save her leg, her doctors ultimately recommended that it be amputated, which it was in 2019.  She also suffers from post-concussive syndrome and suffers from memory loss.  She must take pain medicine every day, particularly in order to complete physical therapy.  She also takes medication for anxiety and to sleep.  She also suffers from tinnitus and hearing loss, and requires hearing aids.

**Plaintiff India Sellers** is an individual and resident of the State of Texas.

India Sellers is 27 years old.  Both of her parents served in the military. She is a single mother of a six year old son.  India enlisted in the Army in July 2010.   She deployed to Afghanistan from Fort Hood in September 2016.  On the day of the incident, she recalls walking with Lakeia Stokes, Maggie Bilyeu and Addie Peters.  She recalls waking up after the detonation, on the ground.  Medics immediately attended to her.  She recalls being placed in a neck brace, being heavily wrapped in gauze and placed in an ambulance.  She recalls being in the ambulance with Stokes and Sgt. Brown, and Sgt. Brown giving words of encouragement to her and Stokes, demanding that the medics focus on them.

She was taken to the Bagram hospital where she was stabilized and then flown to Germany.  She next remembers waking up at Walter Reed Hospital.   She was at Walter Reed until July 2017, where she received numerous surgeries to treat shrapnel wounds to her head, arm, abdomen, groin, leg, back, and eye.  She has undergone 30 surgeries and is awaiting another

16

surgery to her eye.  At this time, she has major damage to her leg, resulting in constant swelling and difficulty walking.  She is blind in her left eye.  Her left shoulder has metal rods holding it together and has limited range of motion.  She suffered a TBI and suffers from recurring headaches.

After leaving Walter Reed, she was assigned to Fort Bragg, where her family is located. She was assigned to a wounded warrior unit and continued to receive extensive therapy.  She retired from the Army on June 2, 2018, and resides in Killen, Texas.

**Plaintiff Addie Ford** is an individual and resident of the State of Texas.

Addie Ford is 24 years old and was raised in California.  She enlisted in the Army at age 18 and intended to make a career in the Army.  She was assigned to Fort Hood in July 2013 and was deployed to Afghanistan in April 2014.  She returned in November 2014, to Fort Hood.  She deployed again to Afghanistan in September 2016.

On the day of the incident, she recalls walking with her follow soldiers, most closely to Lakeia Stokes and Maggie Bilyeu.  After the explosion, she recalls coming to and standing.  She looked around and saw all of her colleagues on the ground.  She heard yelling from others to get down.  As she went towards Stokes, she felt sharp pain in her hip.  She remembers medics coming onto the scene and watching them attend to Tyler Iubelt.  She recalls that Tyler was conscious but burned badly – so badly that the medics could not perform CPR on him because his skin was so damaged.    She recalls the moment when the medics indicated that Tyler was gone.

She began to assess her own injuries and found that, in addition to her hip injuries, her intestines were exposed, and her right pinky finger was severed.  She recalls being loaded onto an ambulance and taken to the Bagram hospital.  She had lost so much blood that the doctors

17

determined that they would have do a bone marrow IV.  This required them to drill into her bones.  At first they tried her shin, then her femur, then finally were successful in her shoulder. She passed out from the pain.  She was in and out of consciousness and recalls waking up in Germany.  She was told that she had undergone several surgeries in that timeframe.  She was later transferred to Walter Reed Hospital.

At Walter Reed, she had multiple surgeries to treat her hip; shrapnel had shattered her iliac wing in her hip and her L3 vertebrae, where the shrapnel had exited her body.    She underwent other surgeries to remove several feet of her small intestine, part of her colon, and her appendix.  In December 2016, she was transferred to the VA hospital in San Antonio and was discharged in January 2017.  She was sent back to Fort Hood, where she attempted to go back to work.  Because of her injuries and PTSD, she was not able to work in a standard setting and was transferred to a Warrior Transition Unit.   She was discharged from the Army in April 2018, and currently resides in Houston.

She still suffers radiating pain in her leg and pain in her back. She has difficulty standing for long periods of time.  She has post-concussive syndrome and associated headaches.  She continues to suffer from PTSD.

**Plaintiff Robert Healy** is an individual and resident of the State of Texas.

Robert is 25 years old and is originally from Florida.   He enlisted in the U.S. Army in 2014.  He deployed to Afghanistan in September 2016.   At Bagram, he worked with Sgt. John Perry, in logistical support.

On the date of the incident, Robert recalls walking with his fellow soldiers; he was towards the back of the group.  As a result of the explosion, he was knocked unconscious for a few moments.  He recalls all of his fellow soldiers on the ground and dirt falling to the ground.

18

He could not hear and had difficulty seeing.  He turned around and walked a few steps and was grabbed and attended to medically. He recalls a tourniquet being placed on his arm and that his arm, at the bicep, was bleeding badly.

He recalls being placed in a car and taken to the hospital.   He was stabilized at the hospital at Bagram and then flown to Germany for two days. He was then sent to Walter Reed where he was treated for 30 days.  He was then sent to Audie Murphy Memorial VA Hospital, where he was treated for 15 days.  He was discharged to Fort Hood, where he continued to receive physical and occupational therapy and counseling.   He continued therapy until March 2018, when he was discharged from the Army.   He now resides in Austin, Texas.

Robert sustained several shrapnel wounds all over his body.  With respect to one arm, at one point in his treatment, his doctors considered amputating his arm but were able to save it. Still, he has permanent nerve damage to his arm and has loss of sensation in his arm and fingers. He has nerve damage to one leg, from his shin to his ankle.  He still has shrapnel in one knee, which causes ongoing pain.  Shrapnel also tore into his abdomen, damaging his colon and requiring two surgeries.  He has been diagnosed with a traumatic brain injury.   He suffers from memory loss. He has issues swallowing from repeated intubation and is being treated at the VA in Temple, Texas for this.

**Plaintiff Haylee Rodriguez** is an individual and resident of the State of Texas.

Haylee Rodriguez is 25 years old and was born and raised in the Dallas area.   She enlisted in the U.S. Army in 2014.    She was part of the 154th Composite Transportation Company, Fort Hood, Texas, and deployed to Afghanistan in September 2016.

On the morning in question, she recalls walking with her fellow soldiers, closest to Chief Gabara. Her first memory after the bombing is hearing the screaming of Maggie Bilyeu, and the

19

smell of burnt flesh. She sustained injuries primarily to her lower legs and left hip and also suffered a traumatic brain injury. She was treated at the Bagram ER, then in Germany and finally in Maryland. She then returned to Fort Hood in January 2017.  Currently, she suffers from numbness in her legs and PTSD-associated symptoms. She continues to participate in physical and behavior health therapy.

### **DEFENDANTS**

**Defendant Fluor Corporation, Inc**. is a Delaware corporation with its principal place of business in Irving, Dallas County, Texas.  It may be served through its registered agent for service in Texas: Corporation Service Company dba CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

**Defendant Fluor Enterprises, Inc** . is a California corporation with its principal place of business in Irving, Dallas County, Texas.  It may be served through its registered agent for service in Texas: Corporation Service Company dba CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

**Defendant Fluor Intercontinental, Inc.** is a California corporation with its principal place of business in Irving, Dallas County, Texas.  It may be served through its registered agent for service in Texas: Corporation Service Company dba CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

**Defendant Fluor Government Group, Inc.** is a Delaware corporation, with its principal place of business in either Irving, Dallas County, Texas, or the State of South Carolina.  Although this defendant does and continues to do extensive business in the State of Texas, it has not designated a registered agent for service in this state.  Therefore, the Texas Secretary of State is deemed its agent for service of this lawsuit.  Fluor Government Group,

Inc. may thus be served with Service of Process through the Texas Secretary of State, P.O. Box 12079, Austin, Texas 78711-2079, via certified mail.  Plaintiffs request that the Secretary of State forward copies to Fluor Government Group, Inc. via its registered agent in South Carolina: Corporation Service Company, 1703 Laurel Street, Columbia, SC 29201.

Defendants Fluor Corporation, Inc., Fluor Enterprises, Inc., Fluor Intercontinental, Inc. and Fluor Government Group, Inc. are referred to herein as the "Fluor Defendants."

**Defendant Alliance Project Services, Inc**. is a Delaware corporation, with its principal place of business in the State of Virginia.  Although this defendant does and continues to do extensive business in the State of Texas, it has not designated a registered agent for service in this state.  Therefore, the Texas Secretary of State is deemed its agent for service of this lawsuit. Alliance Project Services, Inc. may thus be served with Service of Process through the Texas Secretary of State, P.O. Box 12079, Austin, Texas 78711-2079, via certified mail.  Plaintiffs request that the Secretary of State forward copies to Alliance Project Services, Inc.  via its President, Tod E. Nickles, 19440 Golf Vista Plaza, Suite 360, Leesburg, VA 20176.

In the event any parties are misnamed or are not included herein, it is Plaintiffs' contention that such was a misidentification or misnomer.   To the extent any of the defendants are conducting business pursuant to a trade name or assumed name, then suit is brought against such Defendant pursuant to TEX. R. CIV. P. 28 and Plaintiffs demand that, upon answer to the Petition, that Defendants answer in their correct legal and assumed names.

## V.    JURISDICTION AND VENUE

The amount in controversy exceeds the jurisdictional minimum of this Court.  Venue is proper in Dallas County, Texas, because one or more of the defendants has its principal place of business in Dallas County, Texas.

## VI.     **FACTUAL BACKGROUND**

Plaintiffs incorporate the above paragraphs as if set forth in full below.

In the early morning hours of November 12, 2016, a man named Ahmad Nayeb detonated a bomb at the Bagram Air Base in Afghanistan.  As a result of the incident, three U.S. soldiers were killed (Tyler Iubelt, John Perry and Allan E. Brown), two contractors were killed (Jarrold Reeves and Peter Provost), sixteen U.S. soldiers were injured and one Polish solider was injured.  The incident was a result of the negligence and gross negligence of the Defendants.  Nayeb was employed by Defendant APS and was generally managed and supervised by the Fluor Defendants.

As part of various agreements with the U.S. government, the Fluor Defendants agreed to provide certain services at the Base.  APS was a subcontractor of the Fluor Defendants.  In order to perform their work, Fluor and APS retained many employees who worked onsite at the Base, including Nayeb.  At this point, it is clear that the Defendants negligently managed and supervised Nayeb.  As a result, he was able to construct a bomb, using equipment and material provided by the Defendants.  He was also able to roam the Base unsupervised, despite Fluor's contractual agreement to monitor and escort him on the Base, and to ensure he left the Base when his work shift ended.

The incident has absolutely zero to do with the U.S. Government's provision of security on the Base.  The U.S. Army did not have complete, direct, or actual control over the supervision of Nayeb – Defendants did.  The U.S. Army did not direct Defendants in any way with respect to their negligent retention, management, and supervision of Nayeb.

22

Any attempt by Defendants to blame the U.S. Army or any other U.S. governmental entity for this tragedy would be shameful.   This incident was completely the result of Defendants' negligence and gross negligence.

In the months leading up to the incident, Nayeb worked at Fluor's "HAZMAT" work center.   For much of the time, he was unsupervised by the Defendants.   At times, he had wandered away from his worksite, and was unaccounted for.   He had been caught doing personal work during work hours.   He had been caught sleeping on the job.

Despite this, Defendants did not fire Nayeb, but instead retained him.   It does not appear that he was ever reprimanded for his poor work performance. As a result of Defendants' negligence, Nayeb was allowed to keep his job, remain on the Base and was permitted to continue his efforts to build, and ultimately detonate, a bomb.   The U.S. Army had no involvement in the hiring, managing, supervising or retaining Nayeb.

Defendants also allowed Nayeb to check out certain tools and equipment, including tools and equipment that were not remotely necessary for his job.  The evidence will show that Nayeb checked out a "multimeter" at least nine times in the three months before the incident. A multimeter is a tool used to measure electrical voltage, current, and resistance.   Nayeb had no need to use a multimeter for his actual job.   Instead, he used this multimeter to build a bomb. Nayeb used other material from the Fluor worksite to construct the bomb.   Defendants negligently provided Nayeb with access to tools and materials used to construct the bomb.  The U.S. Army had no involvement in the decision to allow Nayeb access to these tools and materials.

Defendants were also responsible for transporting their employees on the Base.  Workers like Nayeb were required to be taken from the Base entry point directly to their work area, and

then back to the entry point at the end of their shift.  However, Defendants failed to do this, with respect to Nayeb.  Defendants' negligence and gross negligence allowed Nayeb to travel alone towards the Disney Clamshell with a bomb on November 11, 2016, and to ultimately detonate the bomb.  The U.S. Army had no involvement in the failure to properly escort Nayeb.

Defendant's acts and omissions allowed Nayeb to construct and detonate a bomb which killed five people and grievously injured seventeen more.

## V.     CAUSES OF ACTION AGAINST FLUOR DEFENDANTS

## NEGLIGENCE/GROSS NEGLIGENCE

Plaintiffs incorporate the above paragraphs as if set forth in full below.

The Fluor Defendants owed the Decedents and the Survivors a duty of ordinary care.  On the lead up to the explosion, the Fluor Defendants, by and through their officers, employees, agents and representatives, committed acts of omission and commission, which collectively and severally constituted negligence and gross negligence.  The Fluor Defendants' imprudent acts and omissions included, but were not limited to:

1.   failing to use ordinary care in employing, supervising, managing and/or retaining Nayeb;

2.   failing to properly escort Nayeb to and from his work station and the exit point of the Base;

3.   failing to control access of its equipment and material;

4.   negligently permitting Nayeb access to tool and equipment; and

5.   such other acts of negligence and gross negligence as will be shown at trial.

Said acts of negligence and gross negligence were the proximate cause of the injuries and damages sustained by the Plaintiffs.

Further, the Fluor Defendants actions were knowing, reckless, and/or malicious and, when viewed objectively from the Fluor Defendants' standpoint, involve an extreme degree of

risk considering the probability and magnitude of potential harm to others.   The Fluor Defendants had subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety and/or welfare of others.   Therefore, Plaintiffs seek punitive damages against the Fluor Defendants

## VI.   DAMAGES AGAINST THE FLUOR DEFENDANTS

Plaintiffs incorporate the previous allegations.

### A.   Family of PFC Tyler Iubelt

Shelby Iubelt is the surviving spouse of PFC Tyler Iubelt.  She asserts claims individually and on behalf of the estate of Tyler Iubelt, and as next friend of V.I., her child with Tyler Iubelt. Charlotte Loquasto is the surviving mother of Tyler Iubelt.  Michael Iubelt is the surviving father of Tyler Iubelt.

On behalf of the Estate of Tyler Iubelt, Plaintiffs assert a survival cause of action against the Fluor Defendants.   Plaintiffs are either an heir at law or representative of the Estate of Tyler Iubelt and assert such claim for all damages that the Estate may be justly entitled because of the wrongful conduct of the Fluor Defendants, including but not limited to damages for conscious pain and suffering, torment, disfigurement, and mental anguish.

Plaintiffs also assert a wrongful death cause of action against the Fluor Defendants. Plaintiffs are the spouse, parents, and child of Tyler Iubelt.  Plaintiffs seek any and all wrongful death damages to which they may be entitled, including but not limited to grief, bereavement, torment, mental anguish, and pecuniary loss, past and future.

### B.   Family of Staff Sgt. John Perry

Julianne Perry is the surviving spouse of Staff Sgt. John Perry, deceased.  She brings claims individually, on behalf of the estate of John Perry and as next friend of her children with

John Perry, L.P. and G.P., minors.   Kathleen Perry is the surviving mother of John Perry. Stewart Perry is the surviving father of John Perry.

On behalf of the Estate of John Perry, Plaintiffs assert a survival cause of action against the Fluor Defendants.   Plaintiffs are either an heir at law or representative of the Estate of John Perry, and assert such claim for all damages that the Estate may be justly entitled because of the wrongful conduct of the Fluor Defendants, including but not limited to damages for conscious pain and suffering, torment, disfigurement, and mental anguish.

Plaintiffs also assert a wrongful death cause of action against the Fluor Defendants. Plaintiffs are the spouse, parents and children of John Perry.  Plaintiffs seek any and all wrongful death damages to which they may be entitled, including but not limited to grief, bereavement, torment, mental anguish, and pecuniary loss, past and future.

### C.   Family of SFC Allan E. Brown

Marissa Brown, is the surviving spouse of Sgt. First Class Allan E. Brown, deceased. She brings claims individually and on behalf of the estate of Allan E. Brown.

On behalf of the Estate of Allan E. Brown, Plaintiff asserts a survival cause of action against the Fluor Defendants.   Plaintiff is the either an heir at law or representative of the Estate of Allan E. Brown, and asserts such claim for all damages that the Estate may be justly entitled because of the wrongful conduct of the Fluor Defendants, including but not limited to damages for conscious pain and suffering, torment, disfigurement, and mental anguish.

Plaintiff also asserts a wrongful death cause of action against the Fluor Defendants. Plaintiff is the spouse of Allan E. Brown.  Plaintiff seeks any and all wrongful death damages to which she may be entitled, including but not limited to grief, bereavement, torment, mental anguish, and pecuniary loss, past and future.

D.    **Family of Peter Provost**

Gail Provost is the surviving spouse of Peter Provost, deceased.  Meghan Hollingsworth is the surviving daughter of Peter Provost. Sarah Peterson is the surviving daughter of Peter Provost.  Brian Provost is the surviving son of Peter Provost.   Spencer Provost is the surviving son of Peter Provost.

These Plaintiffs are each the heirs at body of the Decedent Peter Provost.  Thus, and pursuant to Section 408.001(b) of the Texas Labor Code, and in accordance with Texas law, these Plaintiffs (in their individual capacity) seek exemplary damages against the Fluor Defendants for their gross negligence in bringing about, causing or contributing to the death of Peter Provost, with exemplary damages being assessed against the Fluor Defendants, in accordance with the relevant factors established under Texas law and as determined by a jury.

E.    **Family of Jarrold Reeves**

Katrina Reeves is the surviving spouse of Col. Jarrold Reeves (Ret), deceased.  She brings claims individually and as next friend of J.R., minor daughter of Jarrold Reeves.  Summer Dunn is the surviving daughter of Jarrold Reeves. Hannah Mason is the surviving daughter of Jarrold Reeves.  Mallory Reeves is the surviving daughter of Jarrold Reeves.

Plaintiffs are each the heirs at body of the Decedent Jarrold Reeves.  Thus, and pursuant to Section 408.001(b) of the Texas Labor Code, and in accordance with Texas law, these Plaintiffs (in their individual capacity) seek exemplary damages against the Fluor Defendants for their gross negligence in bringing about, causing or contributing to the death of Jarrold Reeves, with exemplary damages being assessed against the Fluor Defendants, in accordance with the relevant factors established under Texas law and as determined by a jury.

F.     <u>**Survivors**</u>

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Chris Colovita** has incurred one or more of the following categories of damages: conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Samuel Gabara** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Lakeia Stokes** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

28

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Maggie Bilyeu** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff India Sellers** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Addie Ford** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Robert Healy** has incurred one or more of the following categories of damages:

Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Haylee Rodriguez** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

Plaintiffs also seek exemplary damages in an amount within the jurisdictional limits of this Court.

## VII.    CAUSES OF ACTION AGAINST DEFENDANT APS

### NEGLIGENCE/GROSS NEGLIGENCE

Plaintiffs incorporate the above paragraphs as if set forth in full below.

Defendant APS owed the Decedents and the Survivors a duty of ordinary care.  On the lead-up to the explosion, Defendant APS, by and through its officers, employees, agents, and representatives, committed acts of omission and commission, which collectively and severally constituted negligence and gross negligence.  Defendant APS' imprudent acts and omissions included, but were not limited to:

1. failing to use ordinary care in employing, supervising, managing and/or retaining Nayeb;

30

2. failing to properly escort Nayeb to and from his work station and the exit point of the Base;

3. failing to control access of its equipment and material;

4. negligently permitting Nayeb access to tool and equipment; and

5. such other acts of negligence and gross negligence which will be shown at trial.

Said acts of negligence and gross negligence were the proximate cause of the injuries and damages sustained by the Plaintiffs.

Further, Defendant APS' actions were knowing, reckless, and/or malicious and, when viewed objectively from the Defendant APS' standpoint, involved an extreme degree of risk considering the probability and magnitude of potential harm to others.   Defendant APS had subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety and/or welfare of others.   Therefore, Plaintiffs seek punitive damages against Defendant APS.

VIII.   **DAMAGES AGAINST APS**

Plaintiffs incorporate the previous allegations.

A.   **Family of PFC Tyler Iubelt**

Shelby Iubelt is the surviving spouse of PFC Tyler Iubelt.  She asserts claims individually and on behalf of the estate of Tyler Iubelt, and as next friend of V.I., her child with Tyler Iubelt. Charlotte Loquasto is the surviving mother of Tyler Iubelt.  Michael Iubelt is the surviving father of Tyler Iubelt.

On behalf of the Estate of Tyler Iubelt, Plaintiffs assert a survival cause of action against Defendant APS.   Plaintiffs are either an heir at law or representative of the Estate of Tyler Iubelt, and assert such claim for all damages that the Estate may be justly entitled because of the

wrongful conduct of Defendant APS, including but not limited to damages for conscious pain and suffering, torment, disfigurement, and mental anguish.

Plaintiffs also assert a wrongful death cause of action against Defendant APS.  Plaintiffs are the spouse, parents and child of Tyler Iubelt.  Plaintiffs seek any and all wrongful death damages to which they may be entitled, including but not limited to grief, bereavement, torment, mental anguish, and pecuniary loss, past and future.

### B.      Family of Staff Sgt. John Perry

Plaintiff Julianne Perry is the surviving spouse of Staff Sgt. John Perry, deceased.  She brings claims individually, on behalf of the estate of John Perry and as next friend of their children with John Perry, L.P. and G.P., minors.  Kathleen Perry is the surviving mother of John Perry.  Stewart Perry is the surviving father of John Perry.

On behalf of the Estate of John Perry, Plaintiffs assert a survival cause of action against Defendant APS.   Plaintiffs are either an heir at law or representative of the Estate of John Perry, and assert such claim for all damages that the Estate may be justly entitled because of the wrongful conduct of Defendant APS, including but not limited to damages for conscious pain and suffering, torment, disfigurement, and mental anguish.

Plaintiffs also assert a wrongful death cause of action against Defendant APS.  Plaintiffs are the spouse, parents and children of John Perry.  Plaintiffs seek any and all wrongful death damages to which they may be entitled, including but not limited to grief, bereavement, torment, mental anguish, and pecuniary loss, past and future.

### C.      Family of SFC Allan E. Brown

Plaintiff Marissa Brown, is the surviving spouse of Sgt. First Class Allan E. Brown, deceased.  She brings claims individually and on behalf of the estate of Allan E. Brown.

32

On behalf of the Estate of Allan E. Brown, Plaintiff asserts a survival cause of action against Defendant APS.    Plaintiff is the heir at law or representative of the Estate of Allan E. Brown and asserts such claim for all damages that the Estate may be justly entitled because of the wrongful conduct of Defendant APS, including but not limited to damages for conscious pain and suffering, torment, disfigurement, and mental anguish.

Plaintiff also asserts a wrongful death cause of action against Defendant APS.  Plaintiff is the spouse of Allan E. Brown.  Plaintiff seeks any and all wrongful death damages to which she may be entitled, including but not limited to grief, bereavement, torment, mental anguish, and pecuniary loss, past and future.

### D.    Family of Peter Provost

Plaintiff Gail Provost, is the surviving spouse of Peter Provost, deceased.  She brings claims individually and on behalf of the estate of Peter Provost.      Meghan Hollingsworth is the surviving daughter of Peter Provost.  Sarah Peterson is the surviving daughter of Peter Provost. Brian Provost is the surviving son of Peter Provost.    Spencer Provost is the surviving son of Peter Provost.   Louis Provost is the surviving father of Peter Provost.   Gertrude Provost is the surviving mother of Peter Provost.

On behalf of the Estate of Peter Provost, these Plaintiffs assert a survival cause of action against Defendant APS.   Plaintiffs are either an heir at law or representative of the Estate of Peter Provost, and assert such claim for all damages that the Estate may be justly entitled because of the wrongful conduct of Defendant APS, including but not limited to damages for conscious pain and suffering, torment, disfigurement, and mental anguish.

These Plaintiffs also assert a wrongful death cause of action against Defendant APS. Plaintiffs are the spouse, parents and children of Peter Provost.  Plaintiffs seek any and all

wrongful death damages to which they may be entitled, including but not limited to grief, bereavement, torment, mental anguish, and pecuniary loss, past and future.

### E. Family of Jarrold Reeves

Katrina Reeves is the surviving spouse of Col. Jarrold Reeves (Ret), deceased.  She brings claims individually, on behalf of the estate of Jarrold Reeves, and as next friend of J.R., a minor, daughter of Jarrold Reeves.  Summer Dunn is the surviving daughter of Jarrold Reeves.  Plaintiff Hannah Mason is the surviving daughter of Jarrold Reeves.  Mallory Reeves is the surviving daughter of Jarrold Reeves.   Charlotte Reeves is the surviving mother of Jarrold Reeves.

On behalf of the Estate of Jarrold Reeves, these Plaintiffs assert a survival cause of action against Defendant APS.   Plaintiffs are either an heir at law or representative of the Estate of Jarrold Reeves, and assert such claim for all damages that the Estate may be justly entitled because of the wrongful conduct of Defendant APS, including but not limited to damages for conscious pain and suffering, torment, disfigurement, and mental anguish.

These Plaintiffs also assert a wrongful death cause of action against Defendant APS. Plaintiffs are the spouse, parent and children of Jarrold Reeves.  Plaintiffs seek any and all wrongful death damages to which they may be entitled, including but not limited to grief, bereavement, torment, mental anguish, and pecuniary loss, past and future.

### .    F. Survivors

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Chris Colovita** has incurred one or more of the following categories of damages: conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future;

reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Samuel Gabara** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Lakeia Stokes** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Maggie Bilyeu** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past

and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff India Sellers** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Addie Ford** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Robert Healy** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

As a direct and proximate result of the Fluor Defendants' acts and omissions described above, **Plaintiff Haylee Rodriguez** has incurred one or more of the following categories of damages: Conscious physical and mental pain, and suffering and anguish, past and future; physical impairment, past and future; loss of enjoyment of life and peace of mind, past and future; reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future; loss of earnings and earning capacity; and such other damages that will be shown at trial.

Plaintiffs also seek exemplary damages in an amount within the jurisdictional limits of this Court.

## IX.   PRESERVATION OF EVIDENCE

Plaintiffs request and demand that each Defendant preserve and maintain all evidence pertaining to any claim or defense related to the incident made the basis of this lawsuit or the damages resulting therefrom, including statements, photographs, videotapes, audiotapes, surveillance or security tapes, business or medical records, incident reports, bills, telephone call slips or records, correspondence, facsimiles, email, voicemail, text messages, any evidence involving the incident in question, and any electronic image or information related to the referenced incident or damages.

## X.   REQUEST FOR DISCLOSURE

Pursuant to TEX. R. CIV. P. 194, Plaintiffs request that each defendant disclose within fifty days of service of this Request, the information and/or material described in Rule 194.2.

## XI.   DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a jury trial and have tendered the appropriate fee.

## **PRAYER**

WHEREFORE, Plaintiffs Charlotte Loquasto, Michael Iubelt, Shelby Iubelt, individually, on behalf of the estate of PFC Tyler Iubelt, and as next friend of V.I., a minor, Julianne Perry, individually, on behalf of the estate of Staff Sgt. John Perry, deceased, and as next friend of L.P. and G.P., minors, Kathleen Perry, Stewart Perry, Marissa Brown, individually and on behalf of the estate of Sgt. First Class Allan E. Brown, deceased, Gail Provost, individually and on behalf of the estate of Peter Provost, deceased, Meghan Hollingsworth, Sarah Peterson, Brian Provost, Spencer Provost, Louis Provost, Gertrude Provost, Katrina Reeves, individually and on behalf of the estate of Col. Jarrold Reeves (Ret.), deceased, and as next friend of J.R., a minor, Summer Dunn, Hannah Mason, Mallory Reeves, Charlotte Reeves, Chris Colovita, Samuel Gabara, Lakeia Stokes, Maggie Bilyeu, India Sellers, Addie Ford, Robert Healy and Haylee Rodriguez file this Original Petition against pray for judgment against Defendants Fluor Corporation, Inc., Fluor Enterprises, Inc., Fluor Intercontinental, Inc., Fluor Government Group, Inc., and Alliance Project Services, Inc. for actual damages for pecuniary losses, mental anguish, loss of companionship and society, loss of inheritance, pain and mental anguish, medical expenses and all such other damages they are justly entitled, plus exemplary damages; plus pre- judgment and post-judgment interest as allowed by law; all costs of court; and all such other and further relief, at law and in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

## THE BUZBEE LAW FIRM

*/s/ Anthony G. Buzbee*
Anthony G. Buzbee
State Bar No. 24001820
tbuzbee@txattorneys.com
Peter K. Taaffe
State Bar No. 24003029
ptaaffe@txattorneys.com
JP Morgan Chase Tower
600 Travis, Ste. 7300
Houston, Texas 77002
Telephone:  (713) 223-5393
Facsimile: (713) 223-5909

David George
Texas Bar No. 00793212
BAKER•WOTRING LLP
700 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
Telephone: (713) 980-1700
Fax: (713) 980-1701
dgeorge@bakerwotring.com

**ATTORNEYS FOR PLAINTIFFS**

3 CITS-ESERVE

2 CITS SOS-CERT

Christi Underwood

Case 3:19-cv-01455-B   Document 1-3   Filed 06/19/19   Page 45 of 198   PageID 74

FILED
DALLAS COUNTY
5/14/2019 9:49 AM
FELICIA PITRE
DISTRICT CLERK

## CIVIL PROCESS REQUEST

| FOR EACH PARTY SERVED YOU MUST FURNISH ONE (1) COPY OF THE PLEADING |
|---|
| FOR WRITS FURNISH TWO (2) COPIES OF THE PLEADING PER PARTY TO BE SERVED |

**CASE NUMBER:** DC-19-06872   **CURRENT COURT:** DALLAS COUNTY DISTRICT COURT

**TYPE OF INSTRUMENT TO BE SERVED** (See Reverse For Types): PLAINTIFFS' ORIGINAL PETITION

**FILE DATE OF MOTION:** 5.14.19

Month/   Day/   Year

**SERVICE TO BE ISSUED ON** (Please List Exactly As The Name Appears In The Pleading To Be Served):

1. NAME: Fluor Corporation, Inc.

   ADDRESS: 211 E. 7th Street, Suite 620, Austin, TX 78701-3218

   AGENT, (if applicable): Corporation Service Company dba CSC - Lawyers Incorporating Service Company

   **TYPE OF SERVICE/PROCESS TO BE ISSUED** (see reverse for specific type): Citation

   **SERVICE BY** (check one):
   - [ ] ATTORNEY PICK-UP          [ ] CONSTABLE
   - [x] CIVIL PROCESS SERVER - Authorized Person to Pick-up: Court Records Research   Phone: 713-227-3353
   - [ ] MAIL                      [ ] CERTIFIED MAIL
   - [ ] PUBLICATION:
        Type of Publication:     [ ] COURTHOUSE DOOR, or
                                 [ ] NEWSPAPER OF YOUR CHOICE: _____
   - [ ] OTHER, explain _____

   *********************************************************************************
   ****

2. NAME: Fluor Enterprises, Inc.

   ADDRESS: 211 E. 7th Street, Suite 620, Austin, TX 78701-3218

   AGENT, (if applicable): Corporation Service Company dba CSC - Lawyers Incorporating Service Company,

   **TYPE OF SERVICE/PROCESS TO BE ISSUED** (see reverse for specific type): citation

   **SERVICE BY** (check one):
   - [ ] ATTORNEY PICK-UP          [ ] CONSTABLE
   - [x] CIVIL PROCESS SERVER - Authorized Person to Pick-up: Court Records Research   Phone: 713-227-3353
   - [ ] MAIL                      [ ] CERTIFIED MAIL
   - [ ] PUBLICATION:
        Type of Publication:     [ ] COURTHOUSE DOOR, or
                                 [ ] NEWSPAPER OF YOUR CHOICE: _____
   - [ ] OTHER, explain _____

**ATTORNEY (OR ATTORNEY'S AGENT) REQUESTING SERVICE:**

NAME: Peter K. Taaffe   TEXAS BAR NO./ID NO. 24003029

MAILING ADDRESS: 600 Travis St. Suite 7300

PHONE NUMBER: 713   223-5393            FAX NUMBER: 713-   223-5909
              area code   phone number                area code   fax number

EMAIL ADDRESS: ptaaffe@txattorneys.com

CIVIC108 Revised 9/2/09

# CIVIL PROCESS REQUEST

| FOR EACH PARTY SERVED YOU MUST FURNISH ONE (1) COPY OF THE PLEADING |
|---|
| FOR WRITS FURNISH TWO (2) COPIES OF THE PLEADING PER PARTY TO BE SERVED |

**CASE NUMBER:** _____  **CURRENT COURT:** DALLAS COUNTY DISTRICT COURT

**TYPE OF INSTRUMENT TO BE SERVED** (See Reverse For Types): PLAINTIFFS' ORIGINAL PETITION

**FILE DATE OF MOTION:** 5.14.19

Month/     Day/     Year

**SERVICE TO BE ISSUED ON** (Please List Exactly As The Name Appears In The Pleading To Be Served):

3.   NAME: Fluor Intercontinental, Inc.

ADDRESS: 211 E. 7th Street, Suite 620, Austin, TX 78701-3218

AGENT, (if applicable): Corporation Service Company dba CSC - Lawyers Incorporating Service Company

**TYPE OF SERVICE/PROCESS TO BE ISSUED** (see reverse for specific type): Citation

**SERVICE BY** (check one):
- [ ] **ATTORNEY PICK-UP**          [ ] **CONSTABLE**
- [x] **CIVIL PROCESS SERVER** - Authorized Person to Pick-up: Court Records Research          Phone: 713-227-3353
- [ ] **MAIL**                [ ] **CERTIFIED MAIL**
- [ ] **PUBLICATION:**
      Type of Publication:    [ ] **COURTHOUSE DOOR, or**
                              [ ] **NEWSPAPER OF YOUR CHOICE:** _____
- [ ] **OTHER,** explain _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*

4.   NAME: Fluor Government Group, Inc.

ADDRESS: _____

AGENT, (if applicable): Texas Secretary of State, P.O. Box 12079, Austin, Texas 78711-2079

**TYPE OF SERVICE/PROCESS TO BE ISSUED** (see reverse for specific type): Citation

**SERVICE BY** (check one):
- [ ] **ATTORNEY PICK-UP**          [ ] **CONSTABLE**
- [x] **CIVIL PROCESS SERVER** - Authorized Person to Pick-up: Court records research          Phone: 713-227-3353
- [ ] **MAIL**                [ ] **CERTIFIED MAIL**
- [ ] **PUBLICATION:**
      Type of Publication:    [ ] **COURTHOUSE DOOR, or**
                              [ ] **NEWSPAPER OF YOUR CHOICE:** _____
- [ ] **OTHER,** explain _____

**ATTORNEY (OR ATTORNEY'S AGENT) REQUESTING SERVICE:**

NAME: Peter K. Taaffe          TEXAS BAR NO./ID NO. 24003029

MAILING ADDRESS: 600 Travis St. Suite 7300

PHONE NUMBER: 713   223-5393          FAX NUMBER: 713-   223-5909
              area code   phone  number                    area code   fax number

EMAIL ADDRESS: ptaaffe@txattorneys.com

CIVC108 Revised 9/3/99

# CIVIL PROCESS REQUEST

| FOR EACH PARTY SERVED YOU MUST FURNISH ONE (1) COPY OF THE PLEADING |
|---|
| FOR WRITS FURNISH TWO (2) COPIES OF THE PLEADING PER PARTY TO BE SERVED |

**CASE NUMBER:** _____   **CURRENT COURT:** DALLAS COUNTY DISTRICT COURT

**TYPE OF INSTRUMENT TO BE SERVED** (See Reverse For Types): PLAINTIFFS' ORIGINAL PETITION

**FILE DATE OF MOTION:** 5.14.19

Month/       Day/       Year

**SERVICE TO BE ISSUED ON** (Please List Exactly As The Name Appears In The Pleading To Be Served):

5.   NAME: Alliance Project Services, Inc.

ADDRESS: _____

AGENT, (if applicable): Texas Secretary of State, P.O. Box 12079, Austin, Texas 78711-2079

**TYPE OF SERVICE/PROCESS TO BE ISSUED** (see reverse for specific type): Citation

**SERVICE BY** (check one):

- ☐ **ATTORNEY PICK-UP**          ☐ **CONSTABLE**
- ☑ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: Court Records Research       Phone: 713-227-3353
- ☐ **MAIL**                          ☐ **CERTIFIED MAIL**
- ☐ **PUBLICATION:**
     Type of Publication:  ☐ **COURTHOUSE DOOR,  or**
                           ☐ **NEWSPAPER OF YOUR CHOICE:** _____
- ☐ **OTHER,** explain _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*

6.   NAME: _____

ADDRESS: _____

AGENT, (if applicable): _____

**TYPE OF SERVICE/PROCESS TO BE ISSUED** (see reverse for specific type): _____

**SERVICE BY** (check one):

- ☐ **ATTORNEY PICK-UP**          ☐ **CONSTABLE**
- ☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: _____   Phone: _____
- ☐ **MAIL**                          ☐ **CERTIFIED MAIL**
- ☐ **PUBLICATION:**
     Type of Publication:  ☐ **COURTHOUSE DOOR,  or**
                           ☐ **NEWSPAPER OF YOUR CHOICE:** _____
- ☐ **OTHER,** explain _____

**ATTORNEY (OR ATTORNEY'S AGENT) REQUESTING SERVICE:**

NAME: Peter K. Taaffe                    TEXAS BAR NO./ID NO. 24003029

MAILING ADDRESS: 600 Travis St. Suite 7300

PHONE NUMBER: 713   223-5393          FAX NUMBER: 713-   223-5909
                area code   phone  number                    area code   fax  number

EMAIL ADDRESS: ptaaffe@txattorneys.com

CIVIC108 Revised 9/3/09

# FORM NO. 353-3 - CITATION
# THE STATE OF TEXAS

To:    FLUOR CORPORATION, INC.
       BY SERVING ITS REGISTERED AGENT CORPORATION SERVICE COMPANY
       DBA CSC-LAWYERS INCORPORATING SERVICE COMPANY
       211 E 7TH ST STE 620
       AUSTIN TX 78701-3218

GREETINGS:
You have been sued. You may employ an attorney. If you or your attorney do not file a written
answer with the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty days after you were
served this citation and petition, a default judgment may be taken against you. Your answer should be addressed to the clerk of the **14th District
Court** at 600 Commerce Street, Ste. 101, Dallas, Texas 75202.

Said Plaintiff being
 **CHARLOTTE LOQUASTO, MICHAEL IUBELT, SHELBY IUBELT,INDIVIDUALLY, ON BEHALF OF THE ESTATE OF PFC
TYLER IUBELT, AND AS NEXT FRIEND OF V.I., MINOR, JULIANNE PERRY, INDIVIDUALLY, ON BEHALF OF THE ESTATE
OF STAFF SGT. JOHN PERRY, DECEASED, AND AS NEXT FRIEND OF L.P. AND G.P., MINORS, KATHLEEN PERRY,
STEWART PERRY, MARISSA BROWN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SGT. FIRST CLASS ALLAN E.
BROWN, DECEASED, GAIL PROVOST, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF PETER PROVOST,
DECEASED, MEGHAN HOLLINGSWORTH, SARAH PETERSON, BRIAN PROVOST, SPENCER PROVOST, LOUIS PROVOST,
GERTRUDE PROVOST, KATRINA REEVES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF COL. JARROLD REEVES
(RET.), DECEASED, AND AS NEXT FRIEND OF J.R., A MINOR, SUMMER DUNN, HANNAH MASON, MALLORY REEVES,
CHARLOTTE REEVES, CHRIS COLOVITA, SAMUEL GABARA, LAKEIA STOKES, MAGGIE BILYEU, INDIA SELLERS, ADDIE
FORD, ROBERT HEALY and HAYLEE RODRIGUEZ**

Filed in said Court **14th day of May, 2019** against

**FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC.,FLUOR GOVERNMENT GROUP, INC., FLUOR
INTERCONTINENTAL, INC. ALLIANCE PROJECT SERVICES, INC**

For Suit, said suit being numbered **DC-19-06872,** the nature of which demand is as follows:
Suit on **OTHER PERSONAL INJURY** etc. as shown on said petition **REQUEST FOR DISCLOSURE**, a copy of which accompanies this
citation. If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
Given under my hand and the Seal of said Court at office this 16th day of May, 2019.

ATTEST: FELICIA PITRE, Clerk of the District Courts of Dallas, County, Texas

By_____ , Deputy
         GAY LANE



---

**ESERVE**

**CITATION**

DC-19-06872

**CHARLOTTE LOQUASTO, et al
vs.
FLUOR CORPORATION, INC., et al**

ISSUED THIS
**16th day of May, 2019**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By: GAY LANE, Deputy

_____

**Attorney for Plaintiff**
ANTHONY G BUZBEE
JP MORGAN CHASE TOWER
600 TRAVIS STE 7300
HOUSTON          TX 77002
713-223-5393

**DALLAS COUNTY
SERVICE FEES
NOT PAID**

# OFFICER'S RETURN

Case No. :  DC-19-06872

Court No.14th District Court

Style: CHARLOTTE LOQUASTO, et al

  vs.

FLUOR CORPORATION, INC., et al

Came to hand on the _____day of _____, 20_____, at _____o'clock_____.M. Executed at _____,

within the County of _____ at _____ o'clock _____ .M. on the _____day of_____,

20_____, by delivering to the within named

_____

_____

each, in person, a true copy of this Citation together with the accompanying copy of this pleading, having first endorsed on same date of delivery.  The distance actually traveled by

me in serving such process was _____miles and my fees are as follows:   To certify which witness my hand.

|                        |              |                                                   |
|------------------------|--------------|---------------------------------------------------|
| For serving Citation   | $_____  | _____    |
| For mileage            | $_____  | of_____County,_____      |
| For Notary             | $_____  | By_____Deputy          |

(Must be verified if served outside the State of Texas.)

Signed and sworn to by the said_____before me this_____day of _____, 20_____,

to certify which witness my hand and seal of office.

_____

Notary Public_____County_____

# FORM NO.  353-3 - CITATION
# THE STATE OF TEXAS

**To:**    **FLUOR ENTERPRISES, INC**
**BY SERVING ITS REGISTERED AGENT CORPORATION SERVICE COMPANY**
**DBA CSC-LAWYERS INCORPORATING SERVICE COMPANY**
**211 E 7TH ST STE 620**
**AUSTIN TX  78701-3218**

GREETINGS:
You have been sued.  You may employ an attorney.  If you or your attorney do not file a written
answer with  the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty   days after you were
served this citation and  petition, a default judgment may be taken against you.  Your answer should be addressed to the clerk of the **14th District
Court** at 600 Commerce Street, Ste. 101, Dallas, Texas 75202.

Said Plaintiff being
**CHARLOTTE LOQUASTO, MICHAEL IUBELT, SHELBY IUBELT,INDIVIDUALLY, ON BEHALF OF THE ESTATE OF PFC
TYLER IUBELT, AND AS NEXT FRIEND OF V.I., MINOR, JULIANNE PERRY, INDIVIDUALLY, ON BEHALF OF THE ESTATE
OF  STAFF SGT. JOHN PERRY, DECEASED,  AND AS NEXT FRIEND OF  L.P. AND G.P., MINORS, KATHLEEN PERRY,
STEWART PERRY,  MARISSA BROWN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SGT. FIRST CLASS ALLAN E.
BROWN, DECEASED, GAIL PROVOST, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF PETER PROVOST,
DECEASED, MEGHAN HOLLINGSWORTH, SARAH PETERSON, BRIAN PROVOST, SPENCER PROVOST, LOUIS PROVOST,
GERTRUDE PROVOST, KATRINA REEVES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF COL. JARROLD REEVES
(RET.),  DECEASED, AND AS NEXT FRIEND OF J.R., A MINOR, SUMMER DUNN, HANNAH MASON, MALLORY REEVES,
CHARLOTTE REEVES, CHRIS COLOVITA, SAMUEL GABARA, LAKEIA STOKES, MAGGIE BILYEU, INDIA SELLERS, ADDIE
FORD, ROBERT HEALY and HAYLEE RODRIGUEZ**

Filed in said Court  **14th day of May, 2019** against

**FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC.,FLUOR GOVERNMENT GROUP, INC., FLUOR
INTERCONTINENTAL, INC. ALLIANCE PROJECT SERVICES, INC**

For Suit, said suit being numbered **DC-19-06872,** the nature of which demand is as follows:
Suit on **OTHER PERSONAL INJURY** etc. as shown on said petition **REQUEST FOR DISCLOSURE**, a copy of which accompanies this
citation.  If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
Given under my hand and the Seal of said Court at office this 16th day of May, 2019.

ATTEST: FELICIA PITRE, Clerk of the District Courts of Dallas, County, Texas

By_____, Deputy
                            GAY LANE



**ESERVE**

**CITATION**

**DC-19-06872**

**CHARLOTTE LOQUASTO, et al
vs.
FLUOR CORPORATION, INC., et al**

**ISSUED THIS
16th day of May, 2019**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By:  GAY LANE, Deputy

**Attorney for Plaintiff**
ANTHONY G BUZBEE
JP MORGAN CHASE TOWER
600 TRAVIS STE 7300
HOUSTON          TX  77002
713-223-5393

**DALLAS COUNTY
SERVICE FEES
NOT PAID**

# OFFICER'S RETURN

Case No. :  DC-19-06872

Court No.14th District Court

Style: CHARLOTTE LOQUASTO, et al

 vs.

FLUOR CORPORATION, INC., et al

Came to hand on the _____day of _____, 20_____, at _____o'clock_____.M. Executed at _____,

within the County of _____ at _____ o'clock _____ .M. on the _____day of_____,

20_____, by delivering to the within named

_____

_____

each, in person, a true copy of this Citation together with the accompanying copy of this pleading, having first endorsed on same date of delivery.  The distance actually traveled by

me in serving such process was _____miles and my fees are as follows:   To certify which witness my hand.

|  |  |  |  |
|---|---|---|---|
| For serving Citation | $_____ | _____ | |
| For mileage | $_____ | of_____County, _____ | |
| For Notary | $_____ | By_____Deputy | |

(Must be verified if served outside the State of Texas.)

Signed and sworn to by the said_____before me this_____day of _____, 20_____,

to certify which witness my hand and seal of office.

_____

Notary Public_____County_____

# FORM NO. 353-3 - CITATION
# THE STATE OF TEXAS

**To:**   FLUOR INTERCONTINENTAL INC
BY SERVING ITS REGISTERED AGENT CORPORATION SERVICE COMPANY
DBA CSC-LAWYERS INCORPORATING SERVICE COMPANY
211 E 7TH ST STE 620
AUSTIN TX 78701-3218

GREETINGS:
You have been sued. You may employ an attorney. If you or your attorney do not file a written
answer with the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty days after you were
served this citation and petition, a default judgment may be taken against you. Your answer should be addressed to the clerk of the **14th District
Court** at 600 Commerce Street, Ste. 101, Dallas, Texas 75202.

Said Plaintiff being
**CHARLOTTE LOQUASTO, MICHAEL IUBELT, SHELBY IUBELT,INDIVIDUALLY, ON BEHALF OF THE ESTATE OF PFC
TYLER IUBELT, AND AS NEXT FRIEND OF V.I., MINOR, JULIANNE PERRY, INDIVIDUALLY, ON BEHALF OF THE ESTATE
OF STAFF SGT. JOHN PERRY, DECEASED, AND AS NEXT FRIEND OF L.P. AND G.P., MINORS, KATHLEEN PERRY,
STEWART PERRY, MARISSA BROWN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SGT. FIRST CLASS ALLAN E.
BROWN, DECEASED, GAIL PROVOST, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF PETER PROVOST,
DECEASED, MEGHAN HOLLINGSWORTH, SARAH PETERSON, BRIAN PROVOST, SPENCER PROVOST, LOUIS PROVOST,
GERTRUDE PROVOST, KATRINA REEVES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF COL. JARROLD REEVES
(RET.), DECEASED, AND AS NEXT FRIEND OF J.R., A MINOR, SUMMER DUNN, HANNAH MASON, MALLORY REEVES,
CHARLOTTE REEVES, CHRIS COLOVITA, SAMUEL GABARA, LAKEIA STOKES, MAGGIE BILYEU, INDIA SELLERS, ADDIE
FORD, ROBERT HEALY and HAYLEE RODRIGUEZ**

Filed in said Court **14th day of May, 2019** against

**FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC.,FLUOR GOVERNMENT GROUP, INC., FLUOR
INTERCONTINENTAL, INC. ALLIANCE PROJECT SERVICES, INC**

For Suit, said suit being numbered **DC-19-06872,** the nature of which demand is as follows:
Suit on **OTHER PERSONAL INJURY** etc. as shown on said petition **REQUEST FOR DISCLOSURE**, a copy of which accompanies this
citation. If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
Given under my hand and the Seal of said Court at office this 16th day of May, 2019.

ATTEST: FELICIA PITRE, Clerk of the District Courts of Dallas, County, Texas

By_____, Deputy
        GAY LANE




**ESERVE**

**CITATION**

**DC-19-06872**

**CHARLOTTE LOQUASTO, et al
vs.
FLUOR CORPORATION, INC., et al**

**ISSUED THIS
16th day of May, 2019**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By: GAY LANE, Deputy
_____

**Attorney for Plaintiff**
ANTHONY G BUZBEE
JP MORGAN CHASE TOWER
600 TRAVIS STE 7300
HOUSTON        TX 77002
713-223-5393

**DALLAS COUNTY
SERVICE FEES
NOT PAID**

# OFFICER'S RETURN

Case No. :  DC-19-06872

Court No.14th District Court

Style: CHARLOTTE LOQUASTO, et al

 vs.

FLUOR CORPORATION, INC., et al

Came to hand on the _____day of _____, 20_____, at _____o'clock_____.M. Executed at _____,

within the County of _____ at _____ o'clock _____ .M. on the _____day of_____,

20_____, by delivering to the within named

_____

_____

each, in person, a true copy of this Citation together with the accompanying copy of this pleading, having first endorsed on same date of delivery.  The distance actually traveled by

me in serving such process was _____miles and my fees are as follows:   To certify which witness my hand.

|  |  |  |
|---|---|---|
| For serving Citation | $_____ | _____ |
| For mileage | $_____ | of_____County,_____ |
| For Notary | $_____ | By_____Deputy |

(Must be verified if served outside the State of Texas.)

Signed and sworn to by the said_____before me this_____day of _____, 20_____,

to certify which witness my hand and seal of office.

_____

Notary Public_____County_____

FORM NO. 3534  CITATION
THE STATE OF TEXAS

To:     FLUOR GOVERNMENT GROUP, INC.
        BY SERVING THE SECRETARY OF STATE
        OFFICE OF THE SECRETARY OF STATE
        CITATIONS UNIT - P.O. BOX 12079
        AUSTIN, TEXAS, 78711

GREETINGS:

You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with   the
clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty days after you
were served this citation and  petition, a default judgment may be taken against you.
   Your answer should be addressed to the clerk of the **14th District Court**   at 600 Commerce Street, Dallas, Texas, 75202.

Said **PLAINTIFF** being   CHARLOTTE LOQUASTO; MICHAEL IUBELT; SHELBY IUBELT; JULIANNE PERRY; KATHLEEN
PERRY; STEWART PERRY; MARISSA BROWN; GAIL PROVOST; MEGHAN HOLLINGSWORTH; SARAH PETERSON; BRIAN
PROVOST; SPENCER PROVOST; LOUIS PROVOST; GERTRUDE PROVOST; KATRINA REEVES; SUMMER DUNN; HANNAH MASON;
MALLORY REEVES; CHARLOTTE REEVES; CHRIS COLOVITA; SAMUEL GABARA; LAKEIA STOKES; MAGGIE BILYEU; INDIA
SELLERS; ADDIE FORD; ROBERT HEALEY; HAYLEE RODRIGUEZ

Filed in said Court **14th day of May, 2019** against
   FLUOR CORPORATION, INC.
   FLUOR ENTERPRISES, INC.
   FLUOR GOVERNMENT GROUP, INC.
   ALLIANCE PROJECT SERVICES, INC.
   FLUOR INTERCONTINENTAL, INC.

For suit, said suit being numbered   **DC-19-06872**   the nature of which demand is as follows:
   Suit On  **OTHER PERSONAL INJURY** etc.
as shown on said petition **& REQUEST FOR DISCLOSURE** a copy of which accompanies this citation. If this citation is not
served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
   Given under my hand and the Seal of said Court at office **on this the 16th day of May, 2019**
ATTEST: FELICIA PITRE
Clerk of the District Courts of Dallas, County, Texas

        By_____, Deputy
                ANGELA CONEJO

---

**CERT MAIL (SOS)**

**CITATION**

No.: **DC-19-06872**

<u>CHARLOTTE LOQUASTO; MICHAEL IUBELT;
SHELBY IUBELT; JULIANNE PERRY; KATHLEEN
PERRY; STEWART PERRY; MARISSA BROWN;
GAIL PROVOST; MEGHAN HOLLINGSWORTH;
SARAH PETERSON; BRIAN PROVOST; SPENCER
PROVOST; LOUIS PROVOST; GERTRUDE
PROVOST; KATRINA REEVES; SUMMER DUNN;
HANNAH MASON; MALLORY REEVES;
CHARLOTTE REEVES; CHRIS COLOVITA;
SAMUEL GABARA; LAKEIA STOKES; MAGGIE
BILYEU; INDIA SELLERS; ADDIE FORD; ROBERT
HEALEY; HAYLEE RODRIGUEZ</u>
VS.
<u>FLUOR CORPORATION, INC.; FLUOR
ENTERPRISES, INC.; FLUOR GOVERNMENT
GROUP, INC.; ALLIANCE PROJECT SERVICES,
INC.; FLUOR INTERCONTINENTAL, INC.</u>

**ISSUED**
**ON THIS THE 16TH DAY OF MAY, 2019**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By **ANGELA CONEJO**, Deputy

Attorney for : Plaintiff
**ANTHONY G BUZBEE**
**JP MORGAN CHASE TOWER**
**600 TRAVIS, STE., 7300**
**HOUSTON, TEXAS 77002**
713-223-5393

**DALLAS COUNTY CONSTABLE**

FEES
PAID

FEES NOT
PAID

**OFFICER'S RETURN
FOR INDIVIDUALS**

Cause No. DC-19-06872
Court No: 14th District Court
Style: CHARLOTTE LOQUASTO, et al vs. FLUOR CORPORATION, INC., et al

Received this Citation the _____ day of _____, 20____ at _____ o'clock. Executed at _____, within the County of _____, State of _____, on the _____ day of _____, 20____, at _____ o'clock, by

delivering to the within named _____ each in person, a copy of this Citation together with the accompanying copy of
Plaintiff's original petition, having first indorsed on same the date of delivery.

----------000000----------
**OFFICER'S RETURN
FOR CORPORATIONS**

Received this Citation the _____ day of _____, 20____ at _____ o'clock ____.M. Executed at _____, within the County of _____, State of _____, on the _____ day of _____, 20____, at _____ o'clock ____ .M.

by summoning the within named Corporation, _____ by delivering to _____
_____ President - Vice President - Registered Agent - in person, of the said

a true copy of this citation together with the accompanying copy of PLAINTIFF'S ORIGINAL PETITION & REQUEST FOR DISCLOSURE, having first indorsed on same the date of delivery.

----------000000----------

The distance actually traveled by me in serving such process was _____ miles and my fees are as follows:   To certify which witness by my hand.

For Serving Citation    $_____         Sheriff _____
For Mileage             $_____         County of _____
For Notary              $_____         State of _____
     Total Fees         $_____         By _____

(Must be verified if served outside the State of Texas)
State of _____
County of _____
     Signed and sworn to me by the said _____ before me this _____
day of _____, 20_____, to certify which witness my hand and seal of office.

_____

Seal                                            State & County of

_____

FELICIA PITRE
DISTRICT CLERK
GEORGE L. ALLEN, SR. COURTS BU
600 COMMERCE ST STE 101
DALLAS, TX 75202-4604

9214 8901 0661 5400 0138 2467 89

RETURN RECEIPT (ELECTRONIC)

DC-19-06872 FLUOR GOVERNMENT GROUP, INC.

FLUOR GOVERNMENT GROUP, INC.
OFFICE OF THE SECRETARY OF STATE
CITATIONS UNIT
PO BOX 12079
AUSTIN, TX  78711-2079

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - CUT / FOLD HERE - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Zone 3

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - 6"X9" ENVELOPE - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
CUT / FOLD HERE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - CUT / FOLD HERE - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

IMnbCertified9x5Label v1.2.10.0

FORM NO. 3534  CITATION
THE STATE OF TEXAS

To:     **ALLIANCE PROJECT SERVICES, INC.**
        **BY SERVING THE SECRETARY OF STATE**
        **OFFICE OF THE SECRETARY OF STATE**
        **CITATIONS UNIT - P.O. BOX 12079**
        **AUSTIN, TEXAS, 78711**

GREETINGS:
You have been sued. You may employ an attorney.  If you or your attorney do not file a written answer with   the
clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty days after you
were served this citation and  petition, a default judgment may be taken against you.
    Your answer should be addressed to the clerk of the **14th District Court**   at 600 Commerce Street, Dallas, Texas, 75202.

Said **PLAINTIFF** being  CHARLOTTE LOQUASTO; MICHAEL IUBELT; SHELBY IUBELT; JULIANNE PERRY; KATHLEEN
PERRY; STEWART PERRY; MARISSA BROWN; GAIL PROVOST; MEGHAN HOLLINGSWORTH; SARAH PETERSON; BRIAN
PROVOST; SPENCER PROVOST; LOUIS PROVOST; GERTRUDE PROVOST; KATRINA REEVES; SUMMER DUNN; HANNAH MASON;
MALLORY REEVES; CHARLOTTE REEVES; CHRIS COLOVITA; SAMUEL GABARA; LAKEIA STOKES; MAGGIE BILYEU; INDIA
SELLERS; ADDIE FORD; ROBERT HEALEY; HAYLEE RODRIGUEZ

Filed in said Court **14th day of May, 2019** against
    **FLUOR CORPORATION, INC.**
    **FLUOR ENTERPRISES, INC.**
    **FLUOR GOVERNMENT GROUP, INC.**
    **ALLIANCE PROJECT SERVICES, INC.**
    **FLUOR INTERCONTINENTAL, INC.**

For suit, said suit being numbered   **DC-19-06872**  the nature of which demand is as follows:
    Suit On  **OTHER PERSONAL INJURY** etc.
as shown on said petition **& REQUEST FOR DISCLOSURE** a copy of which accompanies this citation.  If this citation is not
served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
    Given under my hand and the Seal of said Court at office **on this the 16th day of May, 20**
ATTEST: FELICIA PITRE
Clerk of the District Courts of Dallas, County, Texas

                By_____, Deputy
                        ANGELA CONEJO

---

CERT MAIL  (SOS)

**CITATION**

No.: DC-19-06872

CHARLOTTE LOQUASTO; MICHAEL IUBELT;
SHELBY IUBELT; JULIANNE PERRY; KATHLEEN
PERRY; STEWART PERRY; MARISSA BROWN;
GAIL PROVOST; MEGHAN HOLLINGSWORTH;
SARAH PETERSON; BRIAN PROVOST; SPENCER
PROVOST; LOUIS PROVOST; GERTRUDE
PROVOST; KATRINA REEVES; SUMMER DUNN;
HANNAH MASON; MALLORY REEVES;
CHARLOTTE REEVES; CHRIS COLOVITA;
SAMUEL GABARA; LAKEIA STOKES; MAGGIE
BILYEU; INDIA SELLERS; ADDIE FORD; ROBERT
HEALEY; HAYLEE RODRIGUEZ
VS.
FLUOR CORPORATION, INC.; FLUOR
ENTERPRISES, INC.; FLUOR GOVERNMENT
GROUP, INC.; ALLIANCE PROJECT SERVICES,
INC.; FLUOR INTERCONTINENTAL, INC.

ISSUED
ON THIS THE 16TH DAY OF MAY, 2019

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By **ANGELA CONEJO**, Deputy

Attorney for : Plaintiff
**ANTHONY G BUZBEE**
**JP MORGAN CHASE TOWER**
**600 TRAVIS, STE., 7300**
**HOUSTON, TEXAS 77002**
**713-223-5393**

DALLAS COUNTY CONSTABLE
FEES PAID     FEES NOT PAID

**OFFICER'S RETURN**
**FOR INDIVIDUALS**

Cause No. DC-19-06872
Court No: 14th District Court
Style: CHARLOTTE LOQUASTO, et al vs. FLUOR CORPORATION, INC., et al

Received this Citation the _____ day of _____, 20_____ at _____ o'clock. Executed at _____, within the County of
_____, State of_____, on the _____ day of _____, 20_____, at _____ o'clock, by
delivering to the within named_____ each in person, a copy of this Citation together with the accompanying copy of
Plaintiff's original petition, having first indorsed on same the date of delivery.

----------000000----------
**OFFICER'S RETURN**
**FOR CORPORATIONS**

Received this Citation the _____ day of _____, 20_____ at _____ o'clock ____.M. Executed at _____, within the County of
_____, State of_____, on the _____ day of _____, 20_____, at _____ o'clock ____ .M.
by summoning the within named Corporation, _____ by delivering to _____
_____ President - Vice President - Registered Agent - in person, of the said

a true copy of this citation together with the accompanying copy of **PLAINTIFF'S ORIGINAL PETITION & REQUEST FOR DISCLOSURE**, having first indorsed on same the date of
delivery.
----------000000----------

The distance actually traveled by me in serving such process was _____ miles and my fees are as follows:   To certify which witness by my hand.
For Serving Citation    $_____          Sheriff _____
For Mileage             $_____          County of_____
For Notary              $_____          State of_____
     Total Fees         $_____          By_____

(Must be verified if served outside the State of Texas)
State of_____
County of_____
     Signed and sworn to me by the said_____ before me this_____
day of _____, 20_____, to certify which witness my hand and seal of office.

_____

                    Seal                                          State & County of

                              _____

FELICIA PITRE
DISTRICT CLERK
GEORGE L. ALLEN, SR. COURTS BU
600 COMMERCE ST STE 101
DALLAS, TX 75202-4604



9214 8901 0661 5400 0138 2468 88

RETURN RECEIPT (ELECTRONIC)

DC-19-06872 ALLIANCE PROJECT SERVICES, INC.

ALLIANCE PROJECT SERVICES, INC.
OFFICE OF THE SECRETARY OF STATE
CITATIONS UNIT
PO BOX 12079
AUSTIN, TX 78711-2079

........................................ CUT / FOLD HERE ........................................ Zone 3

........................................ 6"X9" ENVELOPE
CUT / FOLD HERE ........................................

........................................ CUT / FOLD HERE ........................................

IMobCertified8x5Label v1.2.10.0

FILED
DALLAS COUNTY
6/10/2019 8:53 AM
FELICIA PITRE
DISTRICT CLERK

Case 3:19-cv-01455-B   Document 1-3   Filed 06/19/19   Page 60 of 198   PageID 89

Shirley Montgomery

NO. DC19-06872

| | | |
|---|---|---|
| CHARLOTTE LOQUASTO, ET AL., | § | IN THE DISTRICT COURT |
| | § | |
| PLAINTIFFS, | § | |
| V. | § | |
| | § | |
| FLUOR CORPORATION, INC., FLUOR | § | DALLAS COUNTY, TEXAS |
| ENTERPRISES, INC., FLUOR | § | |
| GOVERNMENT GROUP, INC., FLUOR | § | |
| INTERCONTINENTAL, INC., AND | § | |
| ALLIANCE PROJECT SERVICES, INC., | § | |
| | § | A-14 JUDICIAL DISTRICT |
| DEFENDANTS. | | |

## FLUOR GOVERNMENT GROUP INTERNATIONAL, INC.'S[1] ORIGINAL ANSWER

TO THE HONORABLE JUDGE MOYÉ:

Defendant FLUOR GOVERNMENT GROUP INTERNATIONAL, INC. ("Fluor") files this Original Answer to Plaintiffs' Original Petition, respectfully showing this Court the following:

### GENERAL DENIAL

1.     Under Rule 92 of the Texas Rules of Civil Procedure, Fluor generally denies all material allegations contained within Plaintiffs' Original Petition, as well as any amendments or supplements thereto.

### AFFIRMATIVE OR ADDITIONAL DEFENSES

2.     This Court lacks subject matter jurisdiction because Plaintiffs' claims raise nonjusticiable political questions under *Baker v. Carr*, 369 U.S. 186 (1962), and its progeny. Plaintiffs' suit questions the reasonableness of force protection and security at a United States Military base in an active conflict zone. Such military matters are quintessential sources of

---

[1] Plaintiff improperly names Fluor Government Group International, Inc. as "Fluor Government Group, Inc."

political questions. *See Taylor v. Kellogg Brown & Root Serv., Inc.*, 658 F.3d 402, 411-12 (4th Cir. 2011), *Smith v. Halliburton Co.*, No. H-06-0462, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006), and *Am. K-9 Detection Servs., Inc. v. Freeman*, 556 S.W.3d 246 (Tex. 2018).

3.      The political question doctrine bars Plaintiffs' claims because the Military exercised plenary control over Fluor's alleged conduct at issue. "When a contractor operates under the military's plenary control, the contractor's decisions may be considered de facto military decisions." *Freeman*, 556 S.W.3d at 255 (citing *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1276-77 (11th Cir. 2009)).

4.      Even assuming *arguendo* that Fluor shared responsibilities regarding the base security or force protection matters at issue—though Fluor did not do so—Plaintiffs' suit implicates sensitive Military decisions and judgments because Fluor was invariably "operating pursuant to the military's orders, instructions, and regulations." *Smith*, 2006 WL 2521326, at *5. When a plaintiff claims that a contractor performed paradigmatic military functions like force protection or base security, his or her suit will raise "the same political questions." *See id.* at *5 (quoting *Whitaker v. Kellogg, Brown & Root, Inc.*, 444 F. Supp. 2d 1277, 1281 (M.D. Ga. 2006)). "[T]he use of [ ] civilian contractors to accomplish [a] military objective does not lessen the deference due to the political branches in this area." *Whitaker*, 444 F. Supp. 2d at 1281.

5.      Plaintiffs' suit—both on its face and in substance—raises political questions because it implicates the reasonableness of Military decisions and judgments that directly "contribut[ed] to causation." *Freeman*, 556 S.W.3d at 255 (quoting *Lane v. Halliburton*, 529 F.3d 548, 561 (5th Cir. 2008)). Where the Military's acts or omissions contribute to causation, a "political question will loom large." *Id.*

6.     Absent explosive material, there could be no bombing. The Military's negligent failure to prevent Ahmed Nayeb from bringing explosive material into BAF was the sole proximate cause of the incident in question, or alternatively, a superseding, intervening, and/or new and independent cause of the incident.

7.     Fluor's causation defenses will "pose political questions [because] the court must disentangle the military's and the contractor's respective causal roles." *Freeman*, 556 S.W.3d at 255. Doing so will require the Court to question the reasonableness of Military decisions and judgments. *See id.* at 255-57.

8.     Fluor invokes all rights, privileges, protections, and immunities under Chapters 32 and 33 of the Texas Civil Practice and Remedies Code. Fluor's invocation includes *inter alia* comparative responsibility; contributory negligence; and apportionment of responsibility to parties designated as responsible third parties under § 33.004. *See* Tex. Civ. Prac. & Rem. Code § 33.001 *et seq.*

9.     The Military is subject to designation and apportionment under Chapter 33 of the Texas Civil Practice and Remedies Code. *See id.* "[T]he jury should allocate responsibility among all persons who are responsible for the claimant's injury, regardless of whether they are subject to the court's jurisdiction or whether there is some other impediment to the imposition of liability on them, such as statutory immunity." *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 29 S.W.3d 863, 868 (Tex. 2009). .

10.     Because the suicide bomber ("Nayeb") managed to enter the base with explosives, "the court would [ ] have to examine base perimeter security," as well as screening measures, security badge issuance protocols, and escort procedures. *Smith*, 2006 WL 2521326, at *6. Perimeter security at a United States Military base is textually committed to coordinate branches

of the Government. *Cafeteria and Restaurant Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 890 (1961). The Military is in fact responsible for these—and all other—base security/force protection measures even in the absence of LOGCAP directives. *Smith*, 2006 WL 2521326, at *3 (citing DoD Instruction 2000.16, Enclosure 3, at § E3.1.1.14.1 (June 14, 2001), and Army Field Manual 100-21 (Contractors on the Battlefield, at § 6-3 (Jan. 2003)).

11.     The Military[2] knew in March of 2011 that Nayeb had ties to the Taliban. Nevertheless, the Military sponsored Nayeb's admittance to the Provincial Reconstruction Team *Parwan* (ROK)'s Vocational Training Center at BAF ("Parwan"). The Military granted Nayeb access to work at BAF because it believed that vocational training and employment would provide Nayeb "with the skills necessary to obtain honest employment and allow him to reject the insurgency's promise of money."

12.     That Military action was part and parcel of the Military's larger "Afghan First" strategy to counter the Afghan insurgency. Through developing the Afghan economy, the Military believed that it would effectively "reduc[e] the pool of frustrated, unemployed men and women from which insurgents can readily recruit." *See* U.S. Government Counterinsurgency Guide, at p. 3 (Jan. 2009). "In times of turmoil, political, social, security, and economic benefits can often entice people to support one side or the other." *See* Army Field Manual 3-24 (Counterinsurgency), at 1-9, § 1-42 (Dec. 2006).

13.     The Afghan First program was a direct outgrowth of these Military strategies, judgments, and beliefs that were at the heart of the Military's strategy in fighting an asymmetric war in Afghanistan. Correspondingly, Nayeb's employment and presence at BAF under Afghan First was a direct result of strategic and sensitive Military decisions and judgments.

---

[2] Fluor was not aware before the bombing that Nayeb had previous ties to the Taliban because the Military did not share this intelligence with Fluor.

14.    The Military—not Fluor—dictated and controlled all aspects of Nayeb's screening and access to BAF. Nonexclusive examples include—

- The Military's "Task Force Red Bulls" decided that, pursuant Afghan First, sponsoring Nayeb for training and LOGCAP employment would further the Military's COIN strategies.

- The Military decided to sponsor Nayeb for training and LOGCAP employment even though it knew that Nayeb had ties to the Taliban.

- The Military contractually required Fluor to hire and retain Afghan nationals cleared for LOGCAP work, even requiring quarterly progress reports on the percentage of Afghans employed through LOGCAP contracts.

- The Military's Force Protection Screening Cell ("FPSC") vetted Nayeb and cleared him for enrollment at Parwan.

- The Military issued Nayeb the access badge that allowed him to enter BAF.

- After Nayeb completed training at Parwan, the Military again screened, interviewed, and approved Nayeb for LOGCAP work on December 11, 2011.

- The Military's screening and approval of Nayeb for LOGCAP employment resulted in Nayeb's placement in the pool of Military-approved Afghan nationals to support LOGCAP work under the Military's Afghan First initiative.

- The Military subsequently screened, interviewed, and continued to approve Nayeb for LOGCAP work on *six* occasions before the bombing, including a March 2016 Preliminary Credibility Assessment Screening System ("PCASS") screening—a field expedient lie detector.

- The Military alone operated and directed *daily* perimeter security at BAF, to include searching Nayeb and all other Afghan nationals that entered BAF through its quarter-mile long Entry Control Point 1 ("ECP-1") and/or other entry control points at BAF.

15.    The Military negligently directed and approved Nayeb's employment for LOGCAP contract work when it alone had actual knowledge of Nayeb's ties to the Taliban. The

Military negligently failed to detect and report Nayeb's apparent re-radicalization. The Military negligently failed to prevent Nayeb from bringing explosive material into BAF.

16.     Each of these nonexclusive acts and/or omissions constituted negligence that proximately caused the subject incident and injuries. The Military's negligence will bar Plaintiffs' claims in whole, or alternatively, in part, under §§ 33.003 and 33.012 of the Texas Civil Practice and Remedies Code.

17.     Fluor's proportionate liability defense will inject political questions into this case. *Freeman*, 556 S.W.3d at 255-57 (citing *Harris v. Kellogg, Brown & Root Servs., Inc.*, 724 F.3d 458, 466 (3d Cir. 2013), and *Fisher v. Halliburton*, 667 F.3d 602, 621 (5th Cir. 2012)). "Courts lack the facts, expertise, and standards necessary to evaluate whether reasonable care was taken in these circumstances." *Smith*, 2006 WL 2521326, at *6; *see also Freeman*, 556 S.W.3d at 256 (citing *Harris*, 724 F.3d at 474).   This is especially true where—as here—the Military's decision-making relates to battlefield strategy and intelligence gathering. *Smith*, 2006 WL 2521326, at *5.

18.     Deciding these issues would require the fact-finder to adjudicate the reasonableness of Military strategy and judgments in an active conflict zone. This Court cannot review such subject matter because it impermissibly concerns "how the executive, or executive officers, perform duties in which they have discretion." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 177 (1803).

19.     Pleading further, Fluor asserts that this court lacks subject matter jurisdiction in regard to the claims of the families of Peter Provost and Jarrold Reeves, as these claims are subject to the exclusive remedy provisions of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905, as extended by the Defense Base Act , 42 U.S.C. §§ 1651-1654.

**THEREFORE**, Defendant FLUOR GOVERNMENT GROUP INTERNATIONAL, INC. respectfully requests that Plaintiffs take nothing by way of their suit, and that Fluor have judgment for costs of suit, general relief, and such other and further relief to which it may show itself entitled in law or in equity.

Respectfully submitted,

**HARTLINE BARGER LLP**

*/s/ J. Reid Simpson*

Darrell L. Barger
State Bar No. 01733800
Adam L. Anthony
State Bar No. 24087109
1980 Post Oak Blvd.
Suite 1800
Houston, Texas 77056
(713) 759-1990
(713) 652-2419 (Fax)
dbarger@hdbdlaw.com
aanthony@hdbdlaw.com

AND

J. Reid Simpson
State Bar No. 24072343
800 N. Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401
(361) 866-8000
(361) 866-8037 (Fax)
rsimpson@hdbdlaw.com

**Counsel for Fluor Government Group International, Inc.**

**Certificate of Service**

The undersigned certifies that on June 10, 2019, Defendant Fluor Government Group International, Inc. served a true and correct copy of the foregoing document on all known counsel of record under the Texas Rules of Civil Procedure.


*/s/ J. Reid Simpson*
Darrell L. Barger

FILED
DALLAS COUNTY
6/10/2019 1:54 PM
FELICIA PITRE
DISTRICT CLERK
Kellie Juricek

Case 3:19-cv-01455-B   Document 1-3   Filed 06/19/19   Page 68 of 198   PageID 97

## CAUSE NO. DC-19-06872

| | | |
|---|---|---|
| CHARLOTTE LOQUASTO, MICHAEL IUBELT, SHELBY IUBELT, INDIVIDUALLY, ON BEHALF OF THE ESTATE OF PFC TYLER IUBELT, AND AS NEXT FRIEND OF V.I., MINOR, JULIANNE PERRY, INDIVIDUALLY, ON BEHALF OF THE ESTATE OF STAFF SGT. JOHN PERRY, DECEASED, AND AS NEXT FRIEND OF L.P. AND G.P., MINORS, KATHLEEN PERRY, STEWART PERRY, MARISSA BROWN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SGT. FIRST CLASS ALLAN E. BROWN, DECEASED, GAIL PROVOST, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF PETER PROVOST, DECEASED, MEGHAN HOLLINGSWORTH, SARAH PETERSON, BRIAN PROVOST, SPENCER PROVOST, LOUIS PROVOST, GERTRUDE PROVOST, KATRINA REEVES, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF COL. JARROLD REEVES (RET.), DECEASED, AND AS NEXT FRIEND OF J.R., A MINOR, SUMMER DUNN, HANNAH MASON, MALLORY REEVES, CHARLOTTE REEVES, CHRIS COLOVITA, SAMUEL GABARA, LAKEIA STOKES, MAGGIE BILYEU, INDIA SELLERS, ADDIE FORD, ROBERT HEALY and HAYLEE RODRIGUEZ | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | IN THE DISTRICT COURT |
| | | |
| VS. | § § | |
| | | |
| FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC., FLUOR GOVERNMENT GROUP, INC., FLUOR INTERCONTINENTAL, INC. and ALLIANCE PROJECT SERVICES, INC. | § § § § § | 14 JUDICIAL DISTRICT COURT |

Note: "OF DALLAS COUNTY, TEXAS" appears in the right column aligned with the middle of the plaintiffs' block.

1

## DEFENDANT ALLIANCE PROJECT SERVICES, INC.'S
## VERIFIED SPECIAL APPEARANCE

Defendant Alliance Project Services, Inc. ("APS") asks the Court to sustain its Verified Special Appearance and dismiss the above-named Plaintiffs' suit as to APS.  This special appearance is made to the entire proceeding asserted by Plaintiffs, as against APS.

### INTRODUCTION

1.      Texas courts may not exercise either general personal jurisdiction over APS or specific personal jurisdiction over APS.    The evidence filed with this Special Appearance demonstrates that: (1) Texas cannot exercise specific personal jurisdiction over APS because the tort causes of action asserted against APS have no connection to Texas; and (2) APS is not "at home" in the State of Texas—Texas courts may not exercise general personal jurisdiction over APS.

2.      Defendant APS is a Delaware corporation with its principal place of business in Virginia.

3.      On information and belief, Defendant Fluor Corporation, Inc. is a Delaware corporation.

4.      On information and belief, Defendant Fluor Enterprises, Inc. is a California corporation.

5.      On information and belief, Defendant Fluor Intercontinental, Inc. ("Fluor Intercontinental") is a California corporation.

6.      On information and belief, Defendant Fluor Government Group, Inc. is a Delaware corporation.

7.      Plaintiffs sued Defendant APS alleging negligence and gross negligence arising out of a November 12, 2016 suicide bombing at Bagram Air Field ("BAF") in Bagram, Afghanistan.

8.      The suicide bomber was an Afghan national who worked in a vehicle yard at BAF.

9.      Pursuant to a contract between APS and Defendant Fluor Intercontinental (the "Contract"), APS provided labor supply management services with respect to Host Country National (HCN) employees for Fluor Intercontinental's operations in Afghanistan.

10.     The Contract was formed, performed, and administered between Virginia, South Carolina, and Bagram, Afghanistan.  No performance by APS under the Contract was due or rendered within the State of Texas.

11.     The Plaintiffs' Petition fails to allege specific facts that their cause of action against APS has any relation to Texas.

12.     This motion is supported by the Verification ("Verification") and the Affidavit of Tod E. Nickles ("Nickles' Affidavit"), attached as Exhibit 1, which demonstrate jurisdiction against APS in Texas fails because:  an assertion of personal jurisdiction over APS by Texas courts would violate APS's due process rights, APS lacks minimum contacts, and Texas lacks personal jurisdiction, either general or specific, over APS.

13.     This special appearance motion is filed before any motion or any other plea, pleading, or motion filed by APS.

## JURISDICTIONAL FACTS

14.     APS is a corporation organized under Delaware law.  Its principal place of business is located in Leesburg, Virginia.  See Exhibit 1, Nickles' Affidavit, ¶3.

3

15.     On November 12, 2016, Ahmed Nayeb ("Nayeb"), an Afghan national who worked in a vehicle yard at BAF in Bagram, Afghanistan, conducted a suicide bombing at BAF. *See* <u>Exhibit 1</u>, Nickles' Affidavit, ¶4.

16.     Pursuant to a contract between APS and Fluor Intercontinental (the "Contract"), APS provided labor supply management services with respect to Host Country National (HCN) employees for Fluor's operations in Afghanistan, including services related to Nayeb's employment. *See* <u>Exhibit 1</u>, Nickles' Affidavit, ¶5.

17.     APS was awarded the Contract after it responded to a request for proposal (RFP) generated out of Bagram, Afghanistan.  The Contract was awarded out of Fluor Intercontinental's Greenville, South Carolina office.   The Contract was performed and administered by APS employees located in Virginia and Bagram, and Fluor employees located in South Carolina and Bagram.  No performance by APS under the Contract was due or rendered within the State of Texas.  APS did not have any contacts with the State of Texas that relate to Nayeb, the Contract, or Plaintiff.  *See* <u>Exhibit 1</u>, Nickles' Affidavit, ¶6.

18.     APS has no offices in Texas.  *See* <u>Exhibit 1</u>, Nickles' Affidavit, ¶7.

19.     APS has no employees in Texas.  *See* <u>Exhibit 1</u>, Nickles' Affidavit, ¶8.

20.     APS is not registered to do business in Texas.  *See* <u>Exhibit 1</u>, Nickles' Affidavit, ¶9.

21.     APS has not appointed an agent for service of process in Texas.  *See* <u>Exhibit 1</u>, Nickles' Affidavit, ¶10.

22.     APS does not direct advertising to the State of Texas.  *See* <u>Exhibit 1</u>, Nickles' Affidavit, ¶11.

4

23.     APS operates a "passive" website used only for providing information, advertising, and allowing a potential customer to contact APS. The APS website does not allow a user to consummate a transaction with APS for its products or services. *See* Exhibit 1, Nickles' Affidavit, ¶12.

24.     APS made a single product sale delivered to Texas for goods valued at $659.92. That product sale had no connection with Nayeb, the Contract, or Plaintiffs. *See* Exhibit 1, Nickles' Affidavit, ¶13.

## ARGUMENT & AUTHORITIES

25.     Plaintiffs' Petition acknowledges that APS is a Delaware corporation with its principal place of business in Virginia. Plaintiffs' sole jurisdictional allegation against APS is that "[APS] does and continues to do extensive business in the State of Texas[.]" (Petition p. 21.) Plaintiffs' jurisdictional allegation as to APS is not only false, it is facially insufficient to establish specific or general jurisdiction over APS in Texas. APS's *de minimus* business activities in Texas have no connection to the injuries suffered by Plaintiffs and cannot give rise to specific jurisdiction over APS in Texas. Nor are they even close to sufficient to make APS "at home" in Texas under controlling Supreme Court precedent. As a result, personal jurisdiction is lacking over APS and the court should dismiss APS.

26.     Texas courts do not have jurisdiction over a nonresident defendant unless the defendant has purposefully established "minimum contacts" with Texas and the court's exercise of jurisdiction comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76 (1985); *TV Azteca, S.A.B. de C.V. v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016); *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

5

## NO MINIMUM CONTACTS

27.     Texas courts must determine whether a nonresident defendant has purposefully established minimum contacts with Texas.  *Moki Mac*, 221 S.W.3d at 575–76; *CSR Ltd. v. Link*, 925 S.W.2d 591, 594, 596 (Tex. 1996); *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).  To prove it had no minimum contacts with Texas, the defendant must show that (1) it did not purposefully avail itself of the privilege of conducting activities within Texas, and (2) any contacts it may have had with Texas do not give rise to specific or general jurisdiction.  *See M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 886 (Tex. 2017); *Moki Mac*, 221 S.W.3d at 575–76; *Commonwealth Gen. Corp. v. York*, 177 S.W.3d 923, 925 (Tex. 2005); *BMC Software*, 83 S.W.3d at 795–96.

28.     To establish purposeful availment, a defendant's acts must be purposeful rather than random, isolated, or fortuitous, and the defendant must have sought some benefit, advantage, or profit in availing itself of Texas jurisdiction. *M&F Worldwide,* 512 S.W.3d at 886; *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016); *TV Azteca*, 490 S.W.3d at 37–38; *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338–39 (Tex. 2009); *Moki Mac*, 221 S.W.3d at 575; *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005).  Specifically, APS did not purposefully avail itself of the privilege of conducting activities within Texas for the following reasons:

    a.      APS does not direct advertising to the State of Texas.

    b.      APS operates a "passive" website used only for providing information, advertising, and allowing a potential customer to contact APS.  The APS website does not allow a user to consummate a transaction with APS for its products or services.

6

     c.    APS made one product sale delivered to Texas for goods valued at $659.92, which was unrelated to Nayeb, the Contract, or Plaintiffs.

**NO SPECIFIC JURISDICTION**

29.    Texas courts cannot exercise specific jurisdiction over a nonresident defendant unless the plaintiff's litigation results from injuries that are alleged to arise from or relate to the defendant's contacts with Texas. *M&F Worldwide*, 512 S.W.3d at 886; *Moncrief Oil Int'l v. OAO Gazprom*, 414 S.W.3d 142, 156 (Tex. 2013); *Moki Mac*, 221 S.W.3d at 575–76; *BMC Software*, 83 S.W.3d at 796; *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 (1984); *TV Azteca*, 490 S.W.3d at 52; *Michiana*, 168 S.W.3d at 784–85. The defendant's acts must have a substantial connection with the operative facts of the litigation. *M&F Worldwide*, 512 S.W.3d at 890; *TV Azteca*, 490 S.W.3d at 52; *Spir Star AG v. Kimich*, 310 S.W.3d 868, 874 (Tex. 2010); *Retamco Operating*, 278 S.W.3d at 340; *Moki Mac*, 221 S.W.3d at 585. This Court does not have specific jurisdiction over APS because Plaintiffs' cause of action does not arise from or relate to APS's limited contact with Texas. Plaintiffs' cause of action arises from APS's contacts with South Carolina and Bagram, Afghanistan. Plaintiffs allege no lawsuit-related contacts with the State of Texas, and no such contacts exist. Accordingly, there is no basis for specific personal jurisdiction over APS.

**NO GENERAL JURISDICTION**

30.    Texas courts cannot exercise general jurisdiction over a nonresident defendant unless the defendant has affiliations with Texas that are so continuous and systematic as to render the defendant essentially "at home" in Texas. *See Daimler AG v. Bauman*, 571 U.S. 117, 138–39, 134 S. Ct. 746, 761 (2014); *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 169 (Tex. 2007); *Booth v. Kontomitras*, 485 S.W.3d 461, 478 (Tex. App.—Beaumont 2016,

no pet.); *Bautista v. Trinidad Drilling Ltd.*, 484 S.W.3d 491, 499 (Tex. App.—Houston [1st Dist.] 2016, no pet.).  A corporation is considered at home where it is incorporated or where it has its principal place of business.  *Daimler AG*, 571 U.S. at 137, 134 S. Ct. at 760; *Bautista*, 484 S.W.3d at 500.  A corporate defendant will be subject to general jurisdiction in a forum other than its place of incorporation or principal place of business only in an exceptional case in which its affiliations with that forum are so substantial to render it at home there.  *See Daimler AG*, 571 U.S. at 139 n.19, 134 S. Ct. at 761; *Searcy*, 496 S.W.3d at 73; *Booth*, 485 S.W.3d at 479; *In re Deutsche Bank Sec. Inc.*, No. 03-14-00744-CV (Tex. App.—Austin 2015, orig. proceeding) (memo op.; 7-3-15).  This Court does not have general jurisdiction over APS because APS is not incorporated in Texas and does not have its principal place of business in Texas.  Moreover, APS has no offices in Texas, no employees in Texas, is not registered to do business in Texas, directs no advertising towards Texas, and has made only one product sale that was delivered to Texas, which was valued at $659.92.  Under these facts, this is not an exceptional case in which APS's affiliations with Texas are so substantial as to render it at home in Texas.  Accordingly, general jurisdiction is lacking over APS in Texas.

### NO FAIR PLAY AND SUBSTANTIAL JUSTICE

31.     An assertion of jurisdiction over APS by this Court will offend traditional notions of fair play and substantial justice and will be inconsistent with the constitutional requirements of due process; therefore, the Court should decline to exercise jurisdiction over APS. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *TV Azteca*, 490 S.W.3d at 55; *Moncrief*, 414 S.W.3d at 154-55; *Spir Star*, 310 S.W.3d at 878; *Guardian Royal*, 815 S.W.2d at 231.

32.     However, given the insufficient bases for personal jurisdiction over APS based on either general or specific jurisdiction, the Court actually need not reach a fair play and substantial

justice analysis in order to dismiss APS from this case.  To the extent the Court is inclined to do so, hailing APS into court in Texas offends due process because APS has had no interaction with Texas relevant to the facts of this case.  Given the existence of other suitable domestic forums in which jurisdiction could be established over all parties, it would offend traditional notions of fair play and substantial justice to force APS to litigate in a forum to which it has no relevant connection.

## CONCLUSION

33.     APS does not have the minimum contacts with the State of Texas to justify a Texas court's assertion of jurisdiction.  If this Court asserts jurisdiction over APS, it will offend traditional notions of fair play and substantial justice.

## PRAYER

34.     For these reasons, APS asks the Court to set its special appearance for hearing and, after the hearing, sustain APS's special appearance and sign a final judgment dismissing Plaintiffs' cause of action as asserted against APS.

9

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By:   /s/ C. Dunham Biles
       David Grant Crooks
       State Bar No. 24028168
       C. Dunham Biles
       State Bar No. 24042407
Two Lincoln Centre
5420 LBJ Freeway, Suite 1200
Dallas, Texas 75240
972-991-0889 – Phone
972-404-0516 – Fax
dcrooks@foxrothschild.com
cbiles@foxrothschild.com

**ATTORNEY FOR DEFENDANT
ALLIANCE PROJECT SERVICES, INC.**

10

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of June, 2019, a true and correct copy of the above and foregoing document was served upon all counsel of record through the electronic filing service.

/s/  C. Dunham Biles
C. Dunham Biles

11

## **VERIFICATION**

STATE OF VIRGINIA          §
                           §
COUNTY OF LOUDOUN          §

Before me, the undersigned Notary Public, on this day personally appeared Tod E. Nickles, and after being duly sworn stated under oath that he is an authorized representative of Defendant Alliance Project Services, Inc. and has read the above Special Appearance Motion and that every factual statement contained in the Special Appearance Motion in paragraphs 14-24 is within his personal knowledge and is true and correct.

By: Tod E. Nickles
For: Alliance Project Services, Inc.
Its: President & CEO

On this the 7th day of June, 2019, before me, a Notary Public, personally appeared Tod E. Nickles, known to me to be the person whose name is subscribed to the within instrument, and acknowledged executing the same.

Lisa Gaito Mowery
Commonwealth of Virginia
Notary Public
Commission No. 7503034
My Commission Expires 1/31/2023

Notary Public in and for the
State of Virginia
My Commission Expires: 1/31/23

# EXHIBIT 1

## CAUSE NO. DC-19-06872

| | | |
|---|---|---|
| CHARLOTTE LOQUASTO, MICHAEL | § | IN THE DISTRICT COURT |
| IUBELT, SHELBY IUBELT, | § | |
| INDIVIDUALLY, ON BEHALF OF THE | § | |
| ESTATE OF PFC TYLER IUBELT, AND AS | § | |
| NEXT FRIEND OF V.I., MINOR, | § | |
| JULIANNE PERRY, INDIVIDUALLY, ON | § | |
| BEHALF OF THE ESTATE OF STAFF SGT. | § | |
| JOHN PERRY, DECEASED, AND AS NEXT | § | |
| FRIEND OF L.P. AND G.P., MINORS, | § | |
| KATHLEEN PERRY, STEWART PERRY, | § | |
| MARISSA BROWN, INDIVIDUALLY AND | § | |
| ON BEHALF OF THE ESTATE OF SGT. | § | |
| FIRST CLASS ALLAN E. BROWN, | § | |
| DECEASED, GAIL PROVOST, | § | |
| INDIVIDUALLY AND ON BEHALF OF | § | |
| THE ESTATE OF PETER PROVOST, | § | |
| DECEASED, MEGHAN | § | |
| HOLLINGSWORTH, SARAH PETERSON, | § | |
| BRIAN PROVOST, SPENCER PROVOST, | § | OF DALLAS COUNTY, TEXAS |
| LOUIS PROVOST, GERTRUDE PROVOST, | § | |
| KATRINA REEVES, INDIVIDUALLY AND | § | |
| ON BEHALF OF THE ESTATE OF COL. | § | |
| JARROLD REEVES (RET.), DECEASED, | § | |
| AND AS NEXT FRIEND OF J.R., A MINOR, | § | |
| SUMMER DUNN, HANNAH MASON, | § | |
| MALLORY REEVES, CHARLOTTE | § | |
| REEVES, CHRIS COLOVITA, SAMUEL | § | |
| GABARA, LAKEIA STOKES, MAGGIE | § | |
| BILYEU, INDIA SELLERS, ADDIE FORD, | § | |
| ROBERT HEALY and HAYLEE | § | |
| RODRIGUEZ | § | |
| | § | |
| VS. | § | |
| | § | |
| FLUOR CORPORATION, INC., | § | |
| FLUOR ENTERPRISES, INC., | § | |
| FLUOR GOVERNMENT GROUP, INC., | § | |
| FLUOR INTERCONTINENTAL, INC. and | § | |
| ALLIANCE PROJECT SERVICES, INC. | § | 14 JUDICIAL DISTRICT COURT |

## AFFIDAVIT OF TOD E. NICKLES

STATE OF VIRGINIA      §
                            §
COUNTY OF LOUDOUN    §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Tod E. Nickles, known to me to be the person whose name is subscribed below, who being duly sworn, deposed and states as follows:

1.     My name is Tod E. Nickles. I am over eighteen (18) years of age of sound mind and am competent to make this affidavit. I have personal knowledge of the facts contained in this affidavit and they are true and correct.

2.     I am the President and Chief Executive Officer of Alliance Project Services, Inc. ("APS"). I have personal knowledge of APS's business and dealings described in this affidavit.

3.     APS is a corporation organized under the Delaware law. Its principal place of business is located in Leesburg, Virginia.

4.     On November 12, 2016, Ahmed Nayeb ("Nayeb"), an Afghan national who worked in a vehicle yard at Bagram Air Field ("BAF") in Bagram, Afghanistan, conducted a suicide bombing at BAF.

5.     Pursuant to a contract between APS and Fluor Intercontinental, Inc. ("Fluor Intercontinental") (the "Contract"), APS provided labor supply management services with respect to Host Country National (HCN) employees for Fluor's operations in Afghanistan, including services related to Nayeb's employment.

6.     APS was awarded the Contract after it responded to a request for proposal (RFP) generated out of Bagram, Afghanistan. The Contract was awarded out of Fluor Intercontinental's Greenville, South Carolina office. The Contract was performed and

administered by APS employees located in Virginia and Bagram, and Fluor employees located in South Carolina and Bagram. No performance by APS under the Contract was due or rendered within the State of Texas. To my knowledge, APS did not have any contacts with the State of Texas that relate to Nayeb, the Contract, or Plaintiff.

7.    APS has no offices in Texas.

8.    APS has no employees in Texas.

9.    APS is not registered to do business in Texas.

10.    APS has not appointed an agent for service of process in Texas.

11.    APS does not direct advertising to the State of Texas.

12.    APS operates a website used only for providing information, advertising, and allowing a potential customer to contact APS. The APS website does not allow a user to consummate a transaction with APS for its products or services.

13.    APS made a single product sale delivered to Texas for goods valued at $659.92. That product sale had no connection with Nayeb, the Contract, or Plaintiffs.

FURTHER AFFIANT SAYETH NOT.

TOD E. NICKLES

SUBSCRIBED AND SWORN TO before me this 7th day of June, 2019.

Lisa Gaito Mowery
Commonwealth of Virginia
Notary Public
Commission No. 7503034
My Commission Expires 1/31/2023

Notary Public, State of Virginia
My Commission Expires: 1/31/23

9214 8901 0661 5400 0138 2467 89

**FORM NO. 3534 CITATION**
**THE STATE OF TEXAS**

CERT MAIL (SOS)

To:  FLUOR GOVERNMENT GROUP, INC.
     BY SERVING THE SECRETARY OF STATE
     OFFICE OF THE SECRETARY OF STATE
     CITATIONS UNIT - P.O. BOX 12079
     AUSTIN, TEXAS, 78711



**CITATION**

No.: DC-19-06872

CHARLOTTE LOQUASTO; MICHAEL IUBELT;
SHELBY IUBELT; JULIANNE PERRY; KATHLEEN
PERRY; STEWART PERRY; MARISSA BROWN;
GAIL PROVOST; MEGHAN HOLLINGSWORTH;
SARAH PETERSON; BRIAN PROVOST; SPENCER
PROVOST; LOUIS PROVOST; GERTRUDE
PROVOST; KATRINA REEVES; SUMMER DUNN;
HANNAH MASON; MALLORY REEVES;
CHARLOTTE REEVES; CHRIS COLOVITA;
SAMUEL GABARA; LAKEIA STOKES; MAGGIE
BILYEU; INDIA SELLERS; ADDIE FORD; ROBERT
HEALEY; HAYLEE RODRIGUEZ

VS.

FLUOR CORPORATION, INC.; FLUOR
ENTERPRISES, INC.; FLUOR GOVERNMENT
GROUP, INC.; ALLIANCE PROJECT SERVICES,
INC.; FLUOR INTERCONTINENTAL, INC.

**GREETINGS:**

You have been sued. You may employ an attorney.  If you or your attorney do not file a written answer with   the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty days after you were served this citation and  petition, a default judgment may be taken against you.
   Your answer should be addressed to the clerk of the **14th District Court**   at 600 Commerce Street, Dallas Texas, 75202.

Said **PLAINTIFF** being   CHARLOTTE LOQUASTO; MICHAEL IUBELT; SHELBY IUBELT; JULIANNE PERRY; KATHLEEN PERRY; STEWART PERRY; MARISSA BROWN; GAIL PROVOST; MEGHAN HOLLINGSWORTH; SARAH PETERSON; BRIAN PROVOST; SPENCER PROVOST; LOUIS PROVOST; GERTRUDE PROVOST; KATRINA REEVES; SUMMER DUNN; HANNAH MASON; MALLORY REEVES; CHARLOTTE REEVES; CHRIS COLOVITA; SAMUEL GABARA; LAKEIA STOKES; MAGGIE BILYEU; INDIA SELLERS; ADDIE FORD; ROBERT HEALEY; HAYLEE RODRIGUEZ

Filed in said Court **14th day of May, 2019** against
   FLUOR CORPORATION, INC.
   FLUOR ENTERPRISES, INC.
   FLUOR GOVERNMENT GROUP, INC.
   ALLIANCE PROJECT SERVICES, INC.
   FLUOR INTERCONTINENTAL, INC.

For suit, said suit being numbered   DC-19-06872   the nature of which demand is as follows:
   Suit On  OTHER PERSONAL INJURY etc.
as shown on said petition **& REQUEST FOR DISCLOSURE** a copy of which accompanies this citation. If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
   Given under my hand and the Seal of said Court at office **on this the 16th day of May, 2019**
ATTEST: FELICIA PITRE
Clerk of the District Courts of Dallas, County, Texas

         By_____ , Deputy
                  ANGELA CONEJO

**ISSUED**
**ON THIS THE 16TH DAY OF MAY, 2019**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By **ANGELA CONEJO**, Deputy

Attorney for : Plaintiff
**ANTHONY G BUZBEE**
**JP MORGAN CHASE TOWER**
**600 TRAVIS, STE., 7300**
**HOUSTON, TEXAS 77002**
713-223-5393



**DALLAS COUNTY CONSTABLE**

FEES
PAID

FEES NOT
PAID

**OFFICER'S RETURN**
**FOR INDIVIDUALS**

Cause No. DC-19-06872
Court No: 14th District Court
Style: CHARLOTTE LOQUASTO, et al vs. FLUOR CORPORATION, INC., et al

Received this Citation the _____ day of _____, 20 _____ at _____ o'clock. Executed at _____, within the County of _____, State of_____, on the _____ day of _____, 20 _____, at _____ o'clock, by delivering to the within named _____ each in person, a copy of this Citation together with the accompanying copy of Plaintiff's original petition, having first indorsed on same the date of delivery.

----------000000----------

**OFFICER'S RETURN**
**FOR CORPORATIONS**

Received this Citation the _16th_ day of _May_ , 20 _19_ at _12:30_ o'clock _P_ .M. Executed at _PO BOX 1289 Austin_ , within the County of _Austin_ , State of _Texas_ , on the _20th_ day of _May_ , 20 _19_ , at _10:17_ o'clock _A_ .M. by summoning the within named Corporation, _____ by delivering to _Fluor Government Group Inc by Serving the office of the Secretary_ President - Vice President - Registered Agent - in person, of the said _of State by US Certified Mail Return Receipt Received and Saved_

a true copy of this citation together with the accompanying copy of **PLAINTIFF'S ORIGINAL PETITION & REQUEST FOR DISCLOSURE**, having first indorsed on same the date of delivery.

----------000000----------

The distance actually traveled by me in serving such process was _____ miles and my fees are as follows:   To certify which witness by my hand.

| | | |
|---|---|---|
| For Serving Citation | $ _____ | Sheriff _____ |
| For Mileage | $ _____ | County of _____ |
| For Notary | $ _____ | State of _____ |
| Total Fees | $ _____ | By **ANGELA CONEJO** |

(Must be verified if served outside the State of Texas)
State of _____
County of _____
Signed and sworn to me by the said _____ before me this _____
day of _____, 20 _____, to certify which witness my hand and seal of office.

**FELICIA PITRE**
DISTRICT CLERK
600 COMMERCE STREET
DALLAS, TEXAS 75202-4606

Seal                                                          State & County of

Date Produced: 05/21/2019

THE MAIL GROUP INC - 1 / CONFIRM DELIVERY INC:

The following is the delivery information for Certified Mail™/RRE item number 9214 8901 0661 5400 0138 2467 89. Our records indicate that this item was delivered on 05/20/2019 at 10:17 a.m. in AUSTIN, TX 78711. The scanned image of the recipient information is provided below.

Signature of Recipient :

*Frank Burton*
*FRANK BURTON*

Address of Recipient :

*TP435 Fin Celler*

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

The customer reference information shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Reference ID: 921489010661540001382446789
DC-19-06872 FLUOR GOVERNMENT GROUP, INC.
FLUOR GOVERNMENT GROUP, INC.
OFFICE OF THE SECRETARY OF STATE
Citations Unit
PO Box 12079
Austin, TX 78711-2079



9214 8901 0661 5400 0138 2468 86

---

**FORM NO. 3534 CITATION**
**THE STATE OF TEXAS**

**CERT MAIL (SOS)**

To:   **ALLIANCE PROJECT SERVICES, INC.**
        **BY SERVING THE SECRETARY OF STATE**
        **OFFICE OF THE SECRETARY OF STATE**
        **CITATIONS UNIT - P.O. BOX 12079**
        **AUSTIN, TEXAS, 78711**

2019 MAY 17  AM 11:42

**CITATION**

No.: **DC-19-06872**

**CHARLOTTE LOQUASTO; MICHAEL IUBELT; SHELBY IUBELT; JULIANNE PERRY; KATHLEEN PERRY; STEWART PERRY; MARISSA BROWN; GAIL PROVOST; MEGHAN HOLLINGSWORTH; SARAH PETERSON; BRIAN PROVOST; SPENCER PROVOST; LOUIS PROVOST; GERTRUDE PROVOST; KATRINA REEVES; SUMMER DUNN; HANNAH MASON; MALLORY REEVES; CHARLOTTE REEVES; CHRIS COLOVITA; SAMUEL GABARA; LAKEIA STOKES; MAGGIE BILYEU; INDIA SELLERS; ADDIE FORD; ROBERT HEALEY; HAYLEE RODRIGUEZ**

VS.

**FLUOR CORPORATION, INC.; FLUOR ENTERPRISES, INC.; FLUOR GOVERNMENT GROUP, INC.; ALLIANCE PROJECT SERVICES, INC.; FLUOR INTERCONTINENTAL, INC.**

**ISSUED**
**ON THIS THE 16TH DAY OF MAY, 2019**

**FELICIA PITRE**
Clerk District Courts,
Dallas County, Texas

By **ANGELA CONEJO**, Deputy

Attorney for : Plaintiff
**ANTHONY G BUZBEE**
**JP MORGAN CHASE TOWER**
**600 TRAVIS, STE., 7300**
**HOUSTON, TEXAS 77002**
713-223-5393

**GREETINGS:**

You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with  the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty days after you were served this citation and  petition, a default judgment may be taken against you.
    Your answer should be addressed to the clerk of the **14th District Court**  at 600 Commerce Street, Dallas Texas, 75202.

Said **PLAINTIFF** being   CHARLOTTE LOQUASTO; MICHAEL IUBELT; SHELBY IUBELT; JULIANNE PERRY; KATHLEEN PERRY; STEWART PERRY; MARISSA BROWN; GAIL PROVOST; MEGHAN HOLLINGSWORTH; SARAH PETERSON; BRIAN PROVOST; SPENCER PROVOST; LOUIS PROVOST; GERTRUDE PROVOST; KATRINA REEVES; SUMMER DUNN; HANNAH MASON; MALLORY REEVES; CHARLOTTE REEVES; CHRIS COLOVITA; SAMUEL GABARA; LAKEIA STOKES; MAGGIE BILYEU; INDIA SELLERS; ADDIE FORD; ROBERT HEALEY; HAYLEE RODRIGUEZ

Filed in said Court **14th day of May, 2019** against
    **FLUOR CORPORATION, INC.**
    **FLUOR ENTERPRISES, INC.**
    **FLUOR GOVERNMENT GROUP, INC.**
    **ALLIANCE PROJECT SERVICES, INC.**
    **FLUOR INTERCONTINENTAL, INC.**

For suit, said suit being numbered   **DC-19-06872**  the nature of which demand is as follows:
    Suit On  **OTHER PERSONAL INJURY** etc.
as shown on said petition **& REQUEST FOR DISCLOSURE** a copy of which accompanies this citation.  If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
    Given under my hand and the Seal of said Court at office **on this the 16th day of May, 2019**
ATTEST: FELICIA PITRE
Clerk of the District Courts of Dallas, County, Texas

By_____, Deputy
        ANGELA CONEJO



**DALLAS COUNTY CONSTABLE**

FEES PAID        FEES NOT PAID

**OFFICER'S RETURN**
**FOR INDIVIDUALS**

Cause No. DC-19-06872
Court No: 14th District Court
Style: CHARLOTTE LOQUASTO, et al vs. FLUOR CORPORATION, INC., et al

Received this Citation the _____ day of _____ , 20 ____ at _____ o'clock. Executed at _____ , within the County of _____ , State of _____ , on the _____ day of _____ , 20 ____ , at _____ o'clock, by delivering to the within named _____ each in person, a copy of this Citation together with the accompanying copy of Plaintiff's original petition, having first indorsed on same the date of delivery.

----------000000----------

**OFFICER'S RETURN**
**FOR CORPORATIONS**

Received this Citation the 14th day of May , 20 19 at 12:30 o'clock P.M. Executed at PO Box 12079 Austin within the County of Austin , State of Texas , on the 20th day of May , 20 19 , at 10:17 o'clock A.M. by summoning the within named Corporation, by delivering to Aliene Mogul Stokes Inc by State of Texas by US Certified Mail Return Receipt Received and SunMPresident - Vice President - Registered Agent - in person, of the said

a true copy of this citation together with the accompanying copy of **PLAINTIFF'S ORIGINAL PETITION & REQUEST FOR DISCLOSURE**, having first indorsed on same the date of delivery.

----------000000----------

The distance actually traveled by me in serving such process was _____ miles and my fees are as follows: To certify which witness by my hand.

| | | |
|---|---|---|
| For Serving Citation | $ | Sheriff |
| For Mileage | $ | County of |
| For Notary | $ | State of |
| Total Fees | $ | By ANGELA CONEJO |

**FELICIA PITRE**
DISTRICT CLERK
600 COMMERCE STREET
DALLAS, TEXAS 75202-4606

(Must be verified if served outside the State of Texas)
State of _____
County of _____
Signed and sworn to me by the said _____ before me this _____
day of _____ , 20 _____ , to certify which witness my hand and seal of office.

Seal                                    State & County of

Date Produced: 05/21/2019

THE MAIL GROUP INC - 1 / CONFIRM DELIVERY INC:

The following is the delivery information for Certified Mail™/RRE item number 9214 8901 0661 5400 0138 2468 88. Our records indicate that this item was delivered on 05/20/2019 at 10:17 a.m. in AUSTIN, TX 78711. The scanned image of the recipient information is provided below.

Signature of Recipient :

*Frank Burton*
*FRANK BURTON*

Address of Recipient :

*TP435 Fin Celler*

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

The customer reference information shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Reference ID: 9214890106615400013824688
DC-19-06872 ALLIANCE PROJECT SERVICES, INC.
ALLIANCE PROJECT SERVICES, INC.
OFFICE OF THE SECRETARY OF STATE
Citations Unit
PO Box 12079
Austin, TX 78711-2079

FILED
DALLAS COUNTY
6/17/2019 3:35 PM
FELICIA PITRE
DISTRICT CLERK
Kellie Juricek

No. DC19-06872

| | | |
|---|---|---|
| Charlotte Loquasto, et al., | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| Fluor Corporation, Inc., Fluor Enterprises, Inc., | § | DALLAS COUNTY, TEXAS |
| Fluor Government Group, Inc., Fluor | § | |
| Intercontinental, Inc., and Alliance Project | § | |
| Services, Inc., | § | |
| | § | |
| Defendants. | § | A-14 JUDICIAL DISTRICT |

## FLUOR GOVERNMENT GROUP INTERNATIONAL, INC.'S[1]
## FIRST AMENDED ANSWER

TO THE HONORABLE JUDGE MOYÉ:

Defendant FLUOR GOVERNMENT GROUP INTERNATIONAL, INC. ("Fluor") files this First Amended Answer to Plaintiffs' Original Petition, respectfully showing this Court the following:

### GENERAL DENIAL

1.      Under Rule 92 of the Texas Rules of Civil Procedure, Fluor generally denies all material allegations contained within Plaintiffs' Original Petition, as well as any amendments or supplements thereto.

### AFFIRMATIVE OR ADDITIONAL DEFENSES

2.      This Court lacks subject matter jurisdiction because Plaintiffs' claims raise nonjusticiable political questions under *Baker v. Carr*, 369 U.S. 186 (1962), and its progeny. Plaintiffs' suit questions the reasonableness of force protection and security at a United States Military base in an active conflict zone. Such military matters raise quintessential political

---

[1] Plaintiffs improperly name Fluor Government Group International, Inc. as "Fluor Government Group, Inc."

questions. *See Taylor v. Kellogg Brown & Root Serv., Inc.*, 658 F.3d 402, 411-12 (4th Cir. 2011), *Smith v. Halliburton Co.*, No. H-06-0462, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006), and *Am. K-9 Detection Servs., Inc. v. Freeman*, 556 S.W.3d 246 (Tex. 2018).

3.      The political question doctrine bars Plaintiffs' claims because the Military exercised plenary control over Fluor's alleged conduct at issue. "When a contractor operates under the military's plenary control, the contractor's decisions may be considered de facto military decisions." *Freeman*, 556 S.W.3d at 255 (citing *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1276-77 (11th Cir. 2009)).

4.      Even assuming *arguendo* that Fluor shared responsibilities regarding the base security or force protection matters at issue—though Fluor did not do so—Plaintiffs' suit implicates sensitive Military decisions and judgments because Fluor was invariably "operating pursuant to the military's orders, instructions, and regulations." *Smith*, 2006 WL 2521326, at *5. When a plaintiff claims that a contractor performed paradigmatic military functions like force protection or base security, his or her suit will raise "the same political questions." *See id.* at *5 (quoting *Whitaker v. Kellogg, Brown & Root, Inc.*, 444 F. Supp. 2d 1277, 1281 (M.D. Ga. 2006)). "[T]he use of [ ] civilian contractors to accomplish [a] military objective does not lessen the deference due to the political branches in this area." *Whitaker*, 444 F. Supp. 2d at 1281.

5.      Plaintiffs' suit—both on its face and in substance—raises political questions because it implicates the reasonableness of Military decisions and judgments that directly "contribut[ed] to causation." *Freeman*, 556 S.W.3d at 255 (quoting *Lane v. Halliburton*, 529 F.3d 548, 561 (5th Cir. 2008)). Where the Military's acts or omissions contribute to causation, a "political question will loom large." *Id.*

-2-

6.      Absent explosive material, there could be no bombing. The Military's negligent failure to prevent the suicide bomber, Ahmed Nayeb ("Nayeb"), from bringing explosive material into BAF was the sole proximate cause of the incident in question, or alternatively, a superseding, intervening, and/or new and independent cause of the incident.

7.      Fluor's causation defenses will "pose political questions [because] the court must disentangle the military's and the contractor's respective causal roles." *Freeman*, 556 S.W.3d at 255. Doing so will require the Court to question the reasonableness of Military decisions and judgments. *See id.* at 255-57.

8.      Fluor invokes all rights, privileges, protections, and immunities under Chapters 32 and 33 of the Texas Civil Practice and Remedies Code. Fluor's invocation includes *inter alia* comparative responsibility; contributory negligence; and apportionment of responsibility to parties designated as responsible third parties under § 33.004. *See* Tex. Civ. Prac. & Rem. Code § 33.001 *et seq.*

9.      The Military is subject to designation and apportionment under Chapter 33 of the Texas Civil Practice and Remedies Code. *See id.* "[T]he jury should allocate responsibility among all persons who are responsible for the claimant's injury, regardless of whether they are subject to the court's jurisdiction or whether there is some other impediment to the imposition of liability on them, such as statutory immunity." *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 29 S.W.3d 863, 868 (Tex. 2009).

10.     Because Nayeb managed to enter the base with explosives, "the court would [ ] have to examine base perimeter security," as well as screening measures, security badge issuance protocols, and escort procedures. *Smith*, 2006 WL 2521326, at *6. Perimeter security at a United States Military base is textually committed to coordinate branches of the Government. *Cafeteria*

-3-

*and Restaurant Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 890 (1961). The Military is in fact solely responsible for these—and all other—base security/force protection measures even in the absence of LOGCAP directives. *Smith*, 2006 WL 2521326, at *3 (citing DoD Instruction 2000.16, Enclosure 3, at § E3.1.1.14.1 (June 14, 2001), and Army Field Manual 100-21 (Contractors on the Battlefield), at § 6-3 (Jan. 2003)).

11.     The Military[2] knew in March of 2011 that Nayeb had ties to the Taliban. Nevertheless, the Military sponsored Nayeb's admittance to the Provincial Reconstruction Team *Parwan* (ROK)'s Vocational Training Center at BAF ("Parwan"). The Military granted Nayeb access to work at BAF because it believed that vocational training and employment would provide Nayeb with the skills necessary to obtain honest employment and allow him to reject the insurgency's promise of money.

12.     That Military action was part and parcel of the Military's larger "Afghan First" strategy to counter the Afghan insurgency. Through mandating the employment of Afghans and developing the Afghan economy, the Military believed that it would effectively "reduc[e] the pool of frustrated, unemployed men and women from which insurgents can readily recruit." *See* U.S. Government Counterinsurgency Guide, at p. 3 (Jan. 2009). "In times of turmoil, political, social, security, and economic benefits can often entice people to support one side or the other." *See* Army Field Manual 3-24 (Counterinsurgency), at 1-9, § 1-42 (Dec. 2006).

13.     The Afghan First program was a direct outgrowth of these Military strategies, judgments, and beliefs that were at the heart of the Military's larger strategy to prevail in an asymmetric war in Afghanistan. Thus, Nayeb's employment and presence at BAF pursuant to the

---

[2] Fluor was not aware before the bombing that Nayeb had previous ties to the Taliban because the Military did not share that information with Fluor.

Afghan First program was a direct result of strategic and sensitive Military decisions and judgments.

14.    The Military—not Fluor—dictated and controlled all aspects of Nayeb's screening and access to BAF. Nonexclusive examples include—

- The Military's "Task Force Red Bulls" decided that, pursuant Afghan First, sponsoring Nayeb for training and LOGCAP employment would further the Military's counterinsurgency ("COIN") strategies.

- The Military decided to sponsor Nayeb for training and LOGCAP employment even though it knew that Nayeb had ties to the Taliban in a failed gambit to rehabilitate him.

- The Military contractually required Fluor to hire and retain Afghan nationals cleared for LOGCAP work, even requiring quarterly progress reports on the percentage of Afghans employed through LOGCAP contracts.

- The Military's Force Protection Screening Cell ("FPSC") vetted Nayeb and cleared him for enrollment at Parwan.

- The Military issued Nayeb the access badge that allowed him to enter BAF.

- After Nayeb completed training at Parwan, the Military again screened, interviewed, and approved Nayeb for LOGCAP work on December 11, 2011.

- The Military's screening and approval of Nayeb for LOGCAP employment resulted in Nayeb's placement in the pool of Military-approved Afghan nationals to support LOGCAP work under the Military's Afghan First initiative.

- The Military subsequently screened, interviewed, and continued to approve Nayeb for LOGCAP work on *six* occasions before the bombing, including a March 2016 Preliminary Credibility Assessment Screening System ("PCASS") screening—a field expedient lie detector.

- The Military alone operated and directed *daily* perimeter security at BAF, to include searching Nayeb and all other Afghan nationals that entered BAF through its quarter-mile long Entry Control Point 1 ("ECP-1") and/or other entry control points at BAF.

15.     The Military negligently directed and approved Nayeb's employment for LOGCAP contract work when it alone had actual knowledge of Nayeb's ties to the Taliban. The Military negligently failed to detect and report Nayeb's apparent re-radicalization. The Military negligently failed to prevent Nayeb from bringing explosive material into BAF.

16.     Each of these nonexclusive acts and/or omissions constituted negligence that proximately caused the subject incident and injuries. The Military's negligence will bar Plaintiffs' claims in whole, or alternatively, in part, under §§ 33.003 and 33.013 of the Texas Civil Practice and Remedies Code.

17.     Fluor's proportionate liability defense will inject political questions into this case. *Freeman*, 556 S.W.3d at 255-57 (citing *Harris v. Kellogg, Brown & Root Servs., Inc.*, 724 F.3d 458, 466 (3d Cir. 2013), and *Fisher v. Halliburton*, 667 F.3d 602, 621 (5th Cir. 2012)). "Courts lack the facts, expertise, and standards necessary to evaluate whether reasonable care was taken in these circumstances." *Smith*, 2006 WL 2521326, at *6; *see also Freeman*, 556 S.W.3d at 256 (citing *Harris*, 724 F.3d at 474).   This is especially true where—as here—the Military's decision-making relates to battlefield strategy, force protection, and intelligence gathering. *Smith*, 2006 WL 2521326, at *5.

18.     Deciding these issues would require the fact-finder to adjudicate the reasonableness of Military strategy and judgments in an active conflict zone. This Court cannot review such subject matter because it impermissibly concerns "how the executive, or executive officers, perform duties in which they have discretion." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 177 (1803).

19.     Fluor further asserts that this Court lacks subject matter jurisdiction in regard to the claims of the families of Peter Provost and Jarrold Reeves, as these claims are subject to the

exclusive remedy provisions of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905, as extended by the Defense Base Act , 42 U.S.C. §§ 1651-1654.

20.     Pleading further, the state secrets doctrine bars Plaintiffs' claims in their entirety. On its face, the case *sub judice* concerns matters with respect to which the Government will assert the state secrets privilege. "[I]f military secrets are 'so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privilege,' dismissal of the case is appropriate." *Zuckerbraun v. Gen. Dynamics Corp.*, 755 F. Supp. 1134, 1138 (D. Conn. 1990), *aff'd* 935 F.2d 544 (2d Cir. 1991) (quoting *Fitzgerald v. Penthouse Internat'l, Ltd.*, 776 F.2d 1236, 1241-42 (4th Cir. 1985)). Such is the case on these facts.

21.     Fluor maintains that no court may exercise subject matter jurisdiction over this case because Plaintiffs' suit raises nonjusticiable political questions. *See* pp. 1-6, ¶¶ 1-18. However, in the unlikely event that the Court does not dismiss this case on political question grounds, the Government's invocation of state secrets privilege with respect to matters central to the determination of this action will so hamper Fluor's defense "that the trier of fact is likely to reach an erroneous conclusion." *See, e.g., Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 547 (2d Cir. 1991) (citing *Molerio v. F.B.I.*, 749 F.2d 815, 825 (D.C. Cir. 1984)). Such circumstances independently warrant dismissal under the state secrets doctrine. *See id.*

## PROPORTIONATE RESPONSIBILITY OF UNKNOWN CRIMINAL ACTORS

22.     Fluor collectively designates unknown criminal actors as responsible "John Does" under Texas Civil Practice and Remedies Code § 33.004(j). The unknown persons are responsible third parties because they committed criminal acts that caused "the loss or injury that is the subject of [Plaintiffs'] lawsuit." *See* Tex. Civ. Prac. & Rem. Code § 33.004(j).

23.     Major General Thomas S. James, Jr., U.S. Army, issued a "Report of Investigation" under Army Regulation ("AR") 15-6 with regard to the incident at issue in this case. Plaintiffs rely on Major General James' AR 15-6 Report in making their alleged liability claims against Fluor in this case. *Compare* Plaintiffs' Petition *with* Ex. 1 (AR 15-6 Report), *supra.*

24.     The Government fashioned the AR 15-6 Report to suit is own interests and purposes and released only a heavily redacted version of the Report. Even the redacted version of the AR 15-6 Report released by the Government confirms that the suicide bombing was perpetrated not by Nayeb acting alone, but by Nayeb acting with unnamed co-conspirators.

25.     The text of the AR 15-6 Report states that "no evidence suggests other Bagram Airfield Local National[s], including Nayeb's cousins, were coconspirators." *See* Ex. 1 (AR 15-6 Report), at p. 7 (para. 11.a(2)). At the same time, the exhibits to the Report also make clear that there were "co-conspirators to the suicide bomber," including *inter alia* a sworn statement by an officer of the Army's Criminal Investigation Division ("CID"). *See* Ex. 1 (AR 15-6 Report) at Exhibit 2A.

27.     The Army CID officer averred under oath that he had "classified exhibits in [his] investigation produced from other military agencies who *identified co-conspirators to the suicide bomber*." *Id.* (emphasis added). He goes on—"[a]t this time, CID does not plan on listing the co-conspirators as subjects in the unclassified LER [Law-Enforcement Report] due to the classified means in which they were identified as subjects/co-conspirators." *Id.*

28.     Other 15-6 interviewees averred that they have actual knowledge of "facilitation" that directly compromised Military-directed security measures and protocols in place at the time of the incident. For example, Afghan nationals were smuggling goods to trade for favors like

"look[ing] away." *See* Ex. 1 (AR 15-6 Report), Exhibit 2J, at 3; and Exhibit 3O, at 7. The redacted report does not identify any persons that accepted payment for "look[ing] away," but it does assert that Nayeb was able to smuggle explosive material into BAF through one or more of BAF's ECPs during a four-month period.

29.     According to a press report, "[t]he Afghan Taliban claimed responsibility soon after the bombing, saying the assailant was one of their fighters and that *they* had been planning it for four months," referring to unnamed Taliban co-conspirators. Harooni & Shams, *Intelligence gaps may have helped Afghan Taliban breach NATO fortress*, Reuters Nov. 23, 2016, https://www.reuters.com/article/us-afghanistan-usa-bomber-insight/intelligence-gaps-may-have-helped-afghan-taliban-breach-nato-fortress-idUSKBN13I2NN (emphasis added).

30.     Fluor collectively designates as "John Does" all persons that assisted Nayeb; conspired with Nayeb; or facilitated Nayeb's suicide bombing attack at BAF, whether they worked at BAF or remained off base, whether such assistance occurred before or during the course of Nayeb's attack. *See* Tex. Civ. Prac. & Rem. Code § 33.004(j). Section 33.004(j) authorizes Fluor's designation of the John Does as responsible third parties because the John Does committed criminal acts that caused the losses and/or injuries that are the subject of this suit. *Id.*

31.     It is beyond dispute that Nayeb's suicide attack constituted criminal behavior. Nayeb intentionally, knowingly, recklessly, and/or negligently caused the deaths of multiple persons. *See* Tex. Penal Code §§ 19.02(b) (Murder), 19.04 (Manslaughter), and 19.05 (Criminally Negligent Homicide). Nayeb intentionally, knowingly, or recklessly caused serious bodily injury to multiple persons through use of a deadly weapon. *See* Tex. Penal Code §§ 22.01(a)(1) (Assault) and 22.02(a)(1), (2) (Aggravated Assault). Nayeb recklessly engaged in

conduct that placed others in imminent danger of serious bodily injury. *See* Tex. Penal Code § 22.05 (Deadly Conduct).

32.     Under Texas Penal Code § 15.02, the John Does committed criminal acts by—(1) agreeing with Nayeb and/or one or more other persons that Nayeb would conduct the suicide attack in question, and (2) performing one or more overt acts in pursuance of their agreement and Nayeb's suicide attack. *See* Tex. Penal Code § 15.02(a)(1), (2) (Criminal Conspiracy).

33.     Nayeb was a low-skilled laborer in the HAZMAT area of BAF's Non-Tactical Vehicle ("NTV") yard. He had access to benign, non-explosive substances pursuant to Military directives. His only formal education or vocational training consisted of training at BAF's Parwan vocation school. The Parwan vocational training school did not teach or instruct its attendees how to make or construct explosive devices such as that which Nayeb used in his attack.

34.     On information and belief, Fluor asserts that one or more of the John Does "perform[ed] an overt act" in furtherance of Nayeb's suicide attack by constructing—or assisting Nayeb in the construction of—his suicide vest. *See* Tex. Penal Code § 15.02(a)(1), (2) (Criminal Conspiracy). Such criminal activity proximately caused the harm for which Plaintiffs seek recovery.

35.     Military and Coalition Security Task Forces in charge of the BAF Ground Area Defense ("BAF GAD") were responsible for ensuring that personnel at ECPs performed physical security inspections on any personnel or vehicles entering or exiting BAF. Fluor had no input into the means, methods, or details of such physical searches of Nayeb or other Afghan Nationals entering or exiting BAF. Fluor also did not have input or control over the Military's random

searches or counterintelligence screenings of Nayeb. The Military—not Fluor—was responsible for ensuring that responsible personnel properly conducted all such searches.

36.     Fluor asserts that one or more of the John Does facilitated and furthered Nayeb's suicide attack by "look[ing] away" and allowing Nayeb to smuggle explosive material through one or more BAF ECPs. *See* Ex. 1 (AR 15-6 Report), at 49 (para. 18.b(2)), Exhibit 2J (p. 3); and Exhibit 3O (p. 7). Further, on information and belief, one or more of the John Does furnished and/or accepted bribes, kickbacks, or payoffs to ensure that persons responsible for searching Nayeb "look[ed] away" and allowed Nayeb to smuggle explosive material into BAF. *See id.* Such activity in furtherance of Nayeb's suicide attack was criminal in nature and proximately caused the harm for which Plaintiffs seek recovery. *See* Tex. Penal Code § 15.02(a)(1), (2) (Criminal Conspiracy).

37.     On the morning of the incident, Nayeb was supposed to take a transport bus or a "Tata" vehicle with other Afghan Nationals to depart BAF via ECP-1. Per the Military's Base Access Policy, three Military-trained escorts with yellow, Military-issued access badges were permitted to transport Nayeb and other Afghan nationals to ECP-1. Despite these Military-provided safety protocols and measures, the Military alleges that Nayeb evaded the escorts and walked from the NTV to the bombing site.

38.     On information and belief, Fluor asserts that one or more of the John Does— including *inter alia* one or more of the John Does on BAF premises—acted as Nayeb's accomplice and facilitated and/or assisted Nayeb in evading escort on the morning of the incident. On information and belief, Fluor further asserts that one or more of the John Does facilitated and/or assisted Nayeb in traveling from the NTV yard to the site of the bombing.

39.     Again, such activity—(1) furthered Nayeb's suicide attack, (2) constituted criminal activity, and (3) proximately caused the harm for which Plaintiffs seek recovery. *See* Tex. Penal Code § 15.02(a)(1), (2) (Criminal Conspiracy), and Tex. Civ. Prac. & Rem. Code § 33.004(j).

40.     At this time, and on information and belief, the following is the only identifying characteristic of the John Does of which Fluor is aware—the John Does are members of or associated with the Taliban. The Government's heavy redaction of the AR 15-6 report—and the classified nature of information supporting the AR 15-6 report—prevent Fluor from providing any other identifying characteristics of one or more of the John Does.

41.     Fluor's designation meets the requirements that the Legislature prescribed under § 33.004(j). Fluor "has pleaded facts sufficient for the court to determine that there is a reasonable probability that the act[s] of the unknown person[s] w[ere] criminal." *See* Tex. Civ. Prac. & Rem. Code § 33.004(j)(1). Fluor has stated in this Answer "all identifying characteristics of the unknown person[s], known at the time of th[is] answer." *Id.* at § 33.004(j)(2). Fluor's pleadings and allegations satisfy the fair notice pleading requirements of the Texas Rules of Civil Procedure. *Id.* at § 33.004(j)(3); *see also* Tex. R. Civ. P. 47, and *In re CVR Energy, Inc.*, 500 S.W.3d 67, 80 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding) ("The applicable Rule of Civil Procedure is Rule 47, which is our 'notice' pleading rule.").

42.     Fluor's designation is also timely. Under § 33.004(j), the defendant must designate unknown criminal actors "not later than 60 days after the filing of the defendant's original answer." Fluor files this Amended Answer and § 33.004(j) designation within seven days of its June 10, 2019 Original Answer.

43.     Accordingly, under § 33.004(j), "the court shall grant" a motion for leave to designate the John Does (collectively) as responsible third parties.

## PRAYER

**THEREFORE**, Defendant FLUOR GOVERNMENT GROUP INTERNATIONAL, INC. respectfully requests that Plaintiffs take nothing by way of their suit, and that Fluor have judgment for costs of suit, general relief, and such other and further relief to which it may show itself entitled in law or in equity.

Respectfully submitted,

**HARTLINE BARGER LLP**

*/s/Darrell L. Barger*

Darrell L. Barger
State Bar No. 01733800
Adam L. Anthony
State Bar No. 24087109
1980 Post Oak Blvd., Suite 1800
Houston, Texas 77056
(713) 759-1990
(713) 652-2419 (Fax)
dbarger@hdbdlaw.com
aanthony@hdbdlaw.com

AND

J. Reid Simpson
State Bar No. 24072343
800 N. Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401
(361) 866-8000
(361) 866-8037 (Fax)
rsimpson@hdbdlaw.com

AND

Brian Rawson
State Bar No. 24041754

-13-

8750 N. Central Expressway
Suite 1600
Dallas, Texas 75231
(214) 369-2100
(214) 369-2118 (Fax)
**Counsel for Fluor Government Group International, Inc.**

### Certificate of Service

The undersigned certifies that on June 17, 2019, Defendant Fluor Government Group International, Inc. served a true and correct copy of the foregoing document on all known counsel of record under the Texas Rules of Civil Procedure.

***Via E-Service***
Mr. Anthony G. Buzbee
Mr. Peter K. Taaffe
The Buzbee Law Firm
600 Travis Street
Suite 7300
Houston, Texas 77002

***Via E-Service***
Mr. David G. Crooks
Fox Rothschild LLP
Two Lincoln Centre
5420 Lyndon B. Johnson Freeway
Suite 1200
Dallas, Texas 75240

*/s/Darrell L. Barger*
Darrell L. Barger

FILED
DALLAS COUNTY
6/17/2019 3:44 PM
FELICIA PITRE
DISTRICT CLERK
Kellie Juricek

Case 3:19-cv-01455-B    Document 1-3    Filed 06/19/19    Page 104 of 198    PageID 133

No. DC19-06872

| | | |
|---|---|---|
| Charlotte Loquasto, et al., | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| Fluor Corporation, Inc., Fluor Enterprises, Inc., | § | DALLAS COUNTY, TEXAS |
| Fluor Government Group, Inc., Fluor | § | |
| Intercontinental, Inc., and Alliance Project | § | |
| Services, Inc., | § | |
| | § | |
| Defendants. | § | A-14 JUDICIAL DISTRICT |

## FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC., AND FLUOR INTERCONTINENTAL, INC.'S ORIGINAL ANSWER

TO THE HONORABLE JUDGE MOYÉ:

Defendant FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC., and FLUOR INTERCONTINENTAL, INC. (collectively, "Fluor") file this Original Answer to Plaintiffs' Original Petition, respectfully showing this Court the following:

### GENERAL DENIAL

1. Under Rule 92 of the Texas Rules of Civil Procedure, Fluor generally denies all material allegations contained within Plaintiffs' Original Petition, as well as any amendments or supplements thereto.

### AFFIRMATIVE OR ADDITIONAL DEFENSES

2. This Court lacks subject matter jurisdiction because Plaintiffs' claims raise nonjusticiable political questions under *Baker v. Carr*, 369 U.S. 186 (1962), and its progeny. Plaintiffs' suit questions the reasonableness of force protection and security at a United States Military base in an active conflict zone. Such military matters raise quintessential political questions. *See Taylor v. Kellogg Brown & Root Serv., Inc.*, 658 F.3d 402, 411-12 (4th Cir. 2011),

-1-

*Smith v. Halliburton Co.*, No. H-06-0462, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006), and

*Am. K-9 Detection Servs., Inc. v. Freeman*, 556 S.W.3d 246 (Tex. 2018).

      3.     The political question doctrine bars Plaintiffs' claims because the Military exercised plenary control over Fluor's alleged conduct at issue. "When a contractor operates under the military's plenary control, the contractor's decisions may be considered de facto military decisions." *Freeman*, 556 S.W.3d at 255 (citing *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1276-77 (11th Cir. 2009)).

      4.     Even assuming *arguendo* that Fluor shared responsibilities regarding the base security or force protection matters at issue—though Fluor did not do so—Plaintiffs' suit implicates sensitive Military decisions and judgments because Fluor was invariably "operating pursuant to the military's orders, instructions, and regulations." *Smith*, 2006 WL 2521326, at *5. When a plaintiff claims that a contractor performed paradigmatic military functions like force protection or base security, his or her suit will raise "the same political questions." *See id.* at *5 (quoting *Whitaker v. Kellogg, Brown & Root, Inc.*, 444 F. Supp. 2d 1277, 1281 (M.D. Ga. 2006)). "[T]he use of [ ] civilian contractors to accomplish [a] military objective does not lessen the deference due to the political branches in this area." *Whitaker*, 444 F. Supp. 2d at 1281.

      5.     Plaintiffs' suit—both on its face and in substance—raises political questions because it implicates the reasonableness of Military decisions and judgments that directly "contribut[ed] to causation." *Freeman*, 556 S.W.3d at 255 (quoting *Lane v. Halliburton*, 529 F.3d 548, 561 (5th Cir. 2008)). Where the Military's acts or omissions contribute to causation, a "political question will loom large." *Id.*

      6.     Absent explosive material, there could be no bombing. The Military's negligent failure to prevent the suicide bomber, Ahmed Nayeb ("Nayeb"), from bringing explosive

material into BAF was the sole proximate cause of the incident in question, or alternatively, a superseding, intervening, and/or new and independent cause of the incident.

7.      Fluor's causation defenses will "pose political questions [because] the court must disentangle the military's and the contractor's respective causal roles." *Freeman*, 556 S.W.3d at 255. Doing so will require the Court to question the reasonableness of Military decisions and judgments. *See id.* at 255-57.

8.      Fluor invokes all rights, privileges, protections, and immunities under Chapters 32 and 33 of the Texas Civil Practice and Remedies Code. Fluor's invocation includes *inter alia* comparative responsibility; contributory negligence; and apportionment of responsibility to parties designated as responsible third parties under § 33.004. *See* Tex. Civ. Prac. & Rem. Code § 33.001 *et seq.*

9.      The Military is subject to designation and apportionment under Chapter 33 of the Texas Civil Practice and Remedies Code. *See id.* "[T]he jury should allocate responsibility among all persons who are responsible for the claimant's injury, regardless of whether they are subject to the court's jurisdiction or whether there is some other impediment to the imposition of liability on them, such as statutory immunity." *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 29 S.W.3d 863, 868 (Tex. 2009).

10.     Because Nayeb managed to enter the base with explosives, "the court would [ ] have to examine base perimeter security," as well as screening measures, security badge issuance protocols, and escort procedures. *Smith*, 2006 WL 2521326, at *6. Perimeter security at a United States Military base is textually committed to coordinate branches of the Government. *Cafeteria and Restaurant Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 890 (1961). The Military is in fact solely responsible for these—and all other—base security/force protection measures

-3-

even in the absence of LOGCAP directives. *Smith*, 2006 WL 2521326, at *3 (citing DoD Instruction 2000.16, Enclosure 3, at § E3.1.1.14.1 (June 14, 2001), and Army Field Manual 100-21 (Contractors on the Battlefield), at § 6-3 (Jan. 2003)).

11.    The Military[1] knew in March of 2011 that Nayeb had ties to the Taliban. Nevertheless, the Military sponsored Nayeb's admittance to the Provincial Reconstruction Team *Parwan* (ROK)'s Vocational Training Center at BAF ("Parwan"). The Military granted Nayeb access to work at BAF because it believed that vocational training and employment would provide Nayeb with the skills necessary to obtain honest employment and allow him to reject the insurgency's promise of money.

12.    That Military action was part and parcel of the Military's larger "Afghan First" strategy to counter the Afghan insurgency. Through mandating the employment of Afghans and developing the Afghan economy, the Military believed that it would effectively "reduc[e] the pool of frustrated, unemployed men and women from which insurgents can readily recruit." *See* U.S. Government Counterinsurgency Guide, at p. 3 (Jan. 2009). "In times of turmoil, political, social, security, and economic benefits can often entice people to support one side or the other." *See* Army Field Manual 3-24 (Counterinsurgency), at 1-9, § 1-42 (Dec. 2006).

13.    The Afghan First program was a direct outgrowth of these Military strategies, judgments, and beliefs that were at the heart of the Military's larger strategy to prevail in an asymmetric war in Afghanistan. Thus, Nayeb's employment and presence at BAF pursuant to the Afghan First program was a direct result of strategic and sensitive Military decisions and judgments.

---

[1] Fluor was not aware before the bombing that Nayeb had previous ties to the Taliban because the Military did not share that information with Fluor.

14.     The Military—not Fluor—dictated and controlled all aspects of Nayeb's screening and access to BAF. Nonexclusive examples include—

- The Military's "Task Force Red Bulls" decided that, pursuant Afghan First, sponsoring Nayeb for training and LOGCAP employment would further the Military's counterinsurgency ("COIN") strategies.

- The Military decided to sponsor Nayeb for training and LOGCAP employment even though it knew that Nayeb had ties to the Taliban in a failed gambit to rehabilitate him.

- The Military contractually required Fluor to hire and retain Afghan nationals cleared for LOGCAP work, even requiring quarterly progress reports on the percentage of Afghans employed through LOGCAP contracts.

- The Military's Force Protection Screening Cell ("FPSC") vetted Nayeb and cleared him for enrollment at Parwan.

- The Military issued Nayeb the access badge that allowed him to enter BAF.

- After Nayeb completed training at Parwan, the Military again screened, interviewed, and approved Nayeb for LOGCAP work on December 11, 2011.

- The Military's screening and approval of Nayeb for LOGCAP employment resulted in Nayeb's placement in the pool of Military-approved Afghan nationals to support LOGCAP work under the Military's Afghan First initiative.

- The Military subsequently screened, interviewed, and continued to approve Nayeb for LOGCAP work on *six* occasions before the bombing, including a March 2016 Preliminary Credibility Assessment Screening System ("PCASS") screening—a field expedient lie detector.

- The Military alone operated and directed *daily* perimeter security at BAF, to include searching Nayeb and all other Afghan nationals that entered BAF through its quarter-mile long Entry Control Point 1 ("ECP-1") and/or other entry control points at BAF.

15.     The Military negligently directed and approved Nayeb's employment for LOGCAP contract work when it alone had actual knowledge of Nayeb's ties to the Taliban. The

-5-

Military negligently failed to detect and report Nayeb's apparent re-radicalization. The Military negligently failed to prevent Nayeb from bringing explosive material into BAF.

16.     Each of these nonexclusive acts and/or omissions constituted negligence that proximately caused the subject incident and injuries. The Military's negligence will bar Plaintiffs' claims in whole, or alternatively, in part, under §§ 33.003 and 33.013 of the Texas Civil Practice and Remedies Code.

17.     Fluor's proportionate liability defense will inject political questions into this case. *Freeman*, 556 S.W.3d at 255-57 (citing *Harris v. Kellogg, Brown & Root Servs., Inc.*, 724 F.3d 458, 466 (3d Cir. 2013), and *Fisher v. Halliburton*, 667 F.3d 602, 621 (5th Cir. 2012)). "Courts lack the facts, expertise, and standards necessary to evaluate whether reasonable care was taken in these circumstances." *Smith*, 2006 WL 2521326, at *6; *see also Freeman*, 556 S.W.3d at 256 (citing *Harris*, 724 F.3d at 474).   This is especially true where—as here—the Military's decision-making relates to battlefield strategy, force protection, and intelligence gathering. *Smith*, 2006 WL 2521326, at *5.

18.     Deciding these issues would require the fact-finder to adjudicate the reasonableness of Military strategy and judgments in an active conflict zone. This Court cannot review such subject matter because it impermissibly concerns "how the executive, or executive officers, perform duties in which they have discretion." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 177 (1803).

19.     Fluor further asserts that this Court lacks subject matter jurisdiction in regard to the claims of the families of Peter Provost and Jarrold Reeves, as these claims are subject to the exclusive remedy provisions of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905, as extended by the Defense Base Act , 42 U.S.C. §§ 1651-1654.

20.     Pleading further, the state secrets doctrine bars Plaintiffs' claims in their entirety. On its face, the case *sub judice* concerns matters with respect to which the Government will assert the state secrets privilege. "[I]f military secrets are 'so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privilege,' dismissal of the case is appropriate." *Zuckerbraun v. Gen. Dynamics Corp.*, 755 F. Supp. 1134, 1138 (D. Conn. 1990), *aff'd* 935 F.2d 544 (2d Cir. 1991) (quoting *Fitzgerald v. Penthouse Internat'l, Ltd.*, 776 F.2d 1236, 1241-42 (4th Cir. 1985)). Such is the case on these facts.

21.     Fluor maintains that no court may exercise subject matter jurisdiction over this case because Plaintiffs' suit raises nonjusticiable political questions. *See* pp. 1-6, ¶¶ 1-18. However, in the unlikely event that the Court does not dismiss this case on political question grounds, the Government's invocation of state secrets privilege with respect to matters central to the determination of this action will so hamper Fluor's defense "that the trier of fact is likely to reach an erroneous conclusion." *See, e.g., Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 547 (2d Cir. 1991) (citing *Molerio v. F.B.I.*, 749 F.2d 815, 825 (D.C. Cir. 1984)). Such circumstances independently warrant dismissal under the state secrets doctrine. *See id.*

**<u>PROPORTIONATE RESPONSIBILITY OF UNKNOWN CRIMINAL ACTORS</u>**

22.     Fluor collectively designates unknown criminal actors as responsible "John Does" under Texas Civil Practice and Remedies Code § 33.004(j). The unknown persons are responsible third parties because they committed criminal acts that caused "the loss or injury that is the subject of [Plaintiffs'] lawsuit." *See* Tex. Civ. Prac. & Rem. Code § 33.004(j).

23.     Major General Thomas S. James, Jr., U.S. Army, issued a "Report of Investigation" under Army Regulation ("AR") 15-6 with regard to the incident at issue in this case. Plaintiffs rely on Major General James' AR 15-6 Report in making their alleged liability

claims against Fluor in this case. *Compare* Plaintiffs' Petition *with* Ex. 1 (AR 15-6 Report), *supra.*

24.     The Government fashioned the AR 15-6 Report to suit is own interests and purposes and released only a heavily redacted version of the Report. Even the redacted version of the AR 15-6 Report released by the Government confirms that the suicide bombing was perpetrated not by Nayeb acting alone, but by Nayeb acting with unnamed co-conspirators.

25.     The text of the AR 15-6 Report states that "no evidence suggests other Bagram Airfield Local National[s], including Nayeb's cousins, were coconspirators." *See* Ex. 1 (AR 15-6 Report), at p. 7 (para. 11.a(2)). At the same time, the exhibits to the Report also make clear that there were "co-conspirators to the suicide bomber," including *inter alia* a sworn statement by an officer of the Army's Criminal Investigation Division ("CID"). *See* Ex. 1 (AR 15-6 Report) at Exhibit 2A.

27.     The Army CID officer averred under oath that he had "classified exhibits in [his] investigation produced from other military agencies who *identified co-conspirators to the suicide bomber.*" *Id.* (emphasis added). He goes on—"[a]t this time, CID does not plan on listing the co-conspirators as subjects in the unclassified LER [Law-Enforcement Report] due to the classified means in which they were identified as subjects/co-conspirators." *Id.*

28.     Other 15-6 interviewees averred that they have actual knowledge of "facilitation" that directly compromised Military-directed security measures and protocols in place at the time of the incident. For example, Afghan nationals were smuggling goods to trade for favors like "look[ing] away." *See* Ex. 1 (AR 15-6 Report), Exhibit 2J, at 3; and Exhibit 3O, at 7. The redacted report does not identify any persons that accepted payment for "look[ing] away," but it

does assert that Nayeb was able to smuggle explosive material into BAF through one or more of BAF's ECPs during a four-month period.

29.     According to a press report, "[t]he Afghan Taliban claimed responsibility soon after the bombing, saying the assailant was one of their fighters and that *they* had been planning it for four months," referring to unnamed Taliban co-conspirators. Harooni & Shams, *Intelligence gaps may have helped Afghan Taliban breach NATO fortress*, Reuters Nov. 23, 2016, https://www.reuters.com/article/us-afghanistan-usa-bomber-insight/intelligence-gaps-may-have-helped-afghan-taliban-breach-nato-fortress-idUSKBN13I2NN (emphasis added).

30.     Fluor collectively designates as "John Does" all persons that assisted Nayeb; conspired with Nayeb; or facilitated Nayeb's suicide bombing attack at BAF, whether they worked at BAF or remained off base, whether such assistance occurred before or during the course of Nayeb's attack. *See* Tex. Civ. Prac. & Rem. Code § 33.004(j). Section 33.004(j) authorizes Fluor's designation of the John Does as responsible third parties because the John Does committed criminal acts that caused the losses and/or injuries that are the subject of this suit. *Id.*

31.     It is beyond dispute that Nayeb's suicide attack constituted criminal behavior. Nayeb intentionally, knowingly, recklessly, and/or negligently caused the deaths of multiple persons. *See* Tex. Penal Code §§ 19.02(b) (Murder), 19.04 (Manslaughter), and 19.05 (Criminally Negligent Homicide). Nayeb intentionally, knowingly, or recklessly caused serious bodily injury to multiple persons through use of a deadly weapon. *See* Tex. Penal Code §§ 22.01(a)(1) (Assault) and 22.02(a)(1), (2) (Aggravated Assault). Nayeb recklessly engaged in conduct that placed others in imminent danger of serious bodily injury. *See* Tex. Penal Code § 22.05 (Deadly Conduct).

Case 3:19-cv-01455-B   Document 1-3   Filed 06/19/19   Page 113 of 198   PageID 142


32.     Under Texas Penal Code § 15.02, the John Does committed criminal acts by—(1) agreeing with Nayeb and/or one or more other persons that Nayeb would conduct the suicide attack in question, and (2) performing one or more overt acts in pursuance of their agreement and Nayeb's suicide attack. *See* Tex. Penal Code § 15.02(a)(1), (2) (Criminal Conspiracy).

33.     Nayeb was a low-skilled laborer in the HAZMAT area of BAF's Non-Tactical Vehicle ("NTV") yard. He had access to benign, non-explosive substances pursuant to Military directives. His only formal education or vocational training consisted of training at BAF's Parwan vocation school. The Parwan vocational training school did not teach or instruct its attendees how to make or construct explosive devices such as that which Nayeb used in his attack.

34.     On information and belief, Fluor asserts that one or more of the John Does "perform[ed] an overt act" in furtherance of Nayeb's suicide attack by constructing—or assisting Nayeb in the construction of—his suicide vest. *See* Tex. Penal Code § 15.02(a)(1), (2) (Criminal Conspiracy). Such criminal activity proximately caused the harm for which Plaintiffs seek recovery.

35.     Military and Coalition Security Task Forces in charge of the BAF Ground Area Defense ("BAF GAD") were responsible for ensuring that personnel at ECPs performed physical security inspections on any personnel or vehicles entering or exiting BAF. Fluor had no input into the means, methods, or details of such physical searches of Nayeb or other Afghan Nationals entering or exiting BAF. Fluor also did not have input or control over the Military's random searches or counterintelligence screenings of Nayeb. The Military—not Fluor—was responsible for ensuring that responsible personnel properly conducted all such searches.

36.     Fluor asserts that one or more of the John Does facilitated and furthered Nayeb's suicide attack by "look[ing] away" and allowing Nayeb to smuggle explosive material through one or more BAF ECPs. *See* Ex. 1 (AR 15-6 Report), at 49 (para. 18.b(2)), Exhibit 2J (p. 3); and Exhibit 3O (p. 7). Further, on information and belief, one or more of the John Does furnished and/or accepted bribes, kickbacks, or payoffs to ensure that persons responsible for searching Nayeb "look[ed] away" and allowed Nayeb to smuggle explosive material into BAF. *See id.* Such activity in furtherance of Nayeb's suicide attack was criminal in nature and proximately caused the harm for which Plaintiffs seek recovery. *See* Tex. Penal Code § 15.02(a)(1), (2) (Criminal Conspiracy).

37.     On the morning of the incident, Nayeb was supposed to take a transport bus or a "Tata" vehicle with other Afghan Nationals to depart BAF via ECP-1. Per the Military's Base Access Policy, three Military-trained escorts with yellow, Military-issued access badges were permitted to transport Nayeb and other Afghan nationals to ECP-1. Despite these Military-provided safety protocols and measures, the Military alleges that Nayeb evaded the escorts and walked from the NTV to the bombing site.

38.     On information and belief, Fluor asserts that one or more of the John Does—including *inter alia* one or more of the John Does on BAF premises—acted as Nayeb's accomplice and facilitated and/or assisted Nayeb in evading escort on the morning of the incident. On information and belief, Fluor further asserts that one or more of the John Does facilitated and/or assisted Nayeb in traveling from the NTV yard to the site of the bombing.

39.     Again, such activity—(1) furthered Nayeb's suicide attack, (2) constituted criminal activity, and (3) proximately caused the harm for which Plaintiffs seek recovery. *See*

Tex. Penal Code § 15.02(a)(1), (2) (Criminal Conspiracy), and Tex. Civ. Prac. & Rem. Code § 33.004(j).

40.     At this time, and on information and belief, the following is the only identifying characteristic of the John Does of which Fluor is aware—the John Does are members of or associated with the Taliban. The Government's heavy redaction of the AR 15-6 report—and the classified nature of information supporting the AR 15-6 report—prevent Fluor from providing any other identifying characteristics of one or more of the John Does.

41.     Fluor's designation meets the requirements that the Legislature prescribed under § 33.004(j). Fluor "has pleaded facts sufficient for the court to determine that there is a reasonable probability that the act[s] of the unknown person[s] w[ere] criminal." *See* Tex. Civ. Prac. & Rem. Code § 33.004(j)(1). Fluor has stated in this Answer "all identifying characteristics of the unknown person[s], known at the time of th[is] answer." *Id.* at § 33.004(j)(2). Fluor's pleadings and allegations satisfy the fair notice pleading requirements of the Texas Rules of Civil Procedure. *Id.* at § 33.004(j)(3); *see also* Tex. R. Civ. P. 47, and *In re CVR Energy, Inc.*, 500 S.W.3d 67, 80 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding) ("The applicable Rule of Civil Procedure is Rule 47, which is our 'notice' pleading rule.").

42.     Fluor's designation is also timely. Under § 33.004(j), the defendant must designate unknown criminal actors "not later than 60 days after the filing of the defendant's original answer." Fluor files this Amended Answer and § 33.004(j) designation within seven days of its June 10, 2019 Original Answer.

43.     Accordingly, under § 33.004(j), "the court shall grant" a motion for leave to designate the John Does (collectively) as responsible third parties.

## PRAYER

**THEREFORE**, Defendant FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC., and FLUOR INTERCONTINENTAL, INC. respectfully request that Plaintiffs take nothing by way of their suit, and that Fluor have judgment for costs of suit, general relief, and such other and further relief to which it may show itself entitled in law or in equity.

Respectfully submitted,

**HARTLINE BARGER LLP**

*/s/Darrell L. Barger*
Darrell L. Barger
State Bar No. 01733800
Adam L. Anthony
State Bar No. 24087109
1980 Post Oak Blvd., Suite 1800
Houston, Texas 77056
(713) 759-1990
(713) 652-2419 (Fax)
dbarger@hartlinebarger.com
aanthony@hartlinebarger.com

AND

J. Reid Simpson
State Bar No. 24072343
800 N. Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401
(361) 866-8000
(361) 866-8037 (Fax)
rsimpson@hartlinebarger.com

AND

Brian Rawson
State Bar No. 24041754
8750 N. Central Expressway
Suite 1600
Dallas, Texas 75231
(214) 369-2100

-13-

(214) 369-2118 (Fax)
brawson@hartlinebarger.com
**Counsel for Fluor Corporation, Inc., Fluor Enterprises, Inc., and Fluor Intercontinental, Inc.**

**Certificate of Service**

The undersigned certifies that on June 17, 2019, Defendant Fluor Government Group International, Inc. served a true and correct copy of the foregoing document on all known counsel of record under the Texas Rules of Civil Procedure.

***Via E-Service***
Mr. Anthony G. Buzbee
Mr. Peter K. Taaffe
The Buzbee Law Firm
600 Travis Street
Suite 7300
Houston, Texas 77002

***Via E-Service***
Mr. David G. Crooks
Fox Rothschild LLP
Two Lincoln Centre
5420 Lyndon B. Johnson Freeway
Suite 1200
Dallas, Texas 75240

*/s/Darrell L. Barger*
Darrell L. Barger

FILED
DALLAS COUNTY
6/18/2019 9:00 AM
FELICIA PITRE
DISTRICT CLERK
Kellie Juricek

No. DC19-06872

| | | |
|---|---|---|
| Charlotte Loquasto, et al., | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| Fluor Corporation, Inc., Fluor Enterprises, Inc., | § | DALLAS COUNTY, TEXAS |
| Fluor Government Group, Inc., Fluor | § | |
| Intercontinental, Inc., and Alliance Project | § | |
| Services, Inc., | § | |
| | § | |
| Defendants. | § | A-14 JUDICIAL DISTRICT |

## FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC., FLUOR INTERCONTINENTAL, INC., AND FLUOR GOVERNMENT GROUP INTERNATIONAL, INC.'S SUPPLEMENT TO THEIR ORIGINAL AND FIRST AMENDED ANSWERS

TO THE HONORABLE JUDGE MOYÉ:

Defendants FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC., FLUOR INTERCONTINENTAL, INC., and FLUOR GOVERNMENT GROUP INTERNATIONAL, INC. (collectively, "Fluor Defendants") file this Supplement to their Original and First Amended Answers in the above-styled cause, respectfully showing this Court the following:

1.      On June 17, 2019, the Fluor Defendants made the following filings—(1) Fluor Government Group International, Inc. filed a First Amended Answer; and (2) Fluor Corporation, Inc., Fluor Enterprises, Inc., and Fluor Intercontinental, Inc. filed an Original Answer.

2.      In both Answers, the Fluor Defendants asserted the responsibility of unknown criminal actors under Texas Civil Practice and Remedies Code § 33.004(j). Although no affirmative evidence is necessary to make such designations, the Fluor Defendants designated the United States Army's AR 15-6 Report—with certain exhibits—as Exhibit 1 to their respective Answers.

-1-

3.      The Fluor Defendants inadvertently omitted Exhibit 1 when they filed their Answers on June 17, 2019. Thus, the Fluor Defendants file this Supplement to those Answers, including the inadvertently omitted Exhibit 1.

4.      The Fluor Defendants hereby supplement for all relevant purposes—(1) Fluor Government Group International, Inc.'s First Amended Answer, and (2) Fluor Corporation, Inc., Fluor Enterprises, Inc., and Fluor Intercontinental, Inc.'s Original Answer.

Respectfully submitted,

**HARTLINE BARGER LLP**

*/s/Darrell L. Barger*
Darrell L. Barger
State Bar No. 01733800
Adam L. Anthony
State Bar No. 24087109
1980 Post Oak Blvd., Suite 1800
Houston, Texas 77056
(713) 759-1990
(713) 652-2419 (Fax)
dbarger@hartlinebarger.com
aanthony@hartlinebarger.com

AND

J. Reid Simpson
State Bar No. 24072343
800 N. Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401
(361) 866-8000
(361) 866-8037 (Fax)
rsimpson@hartlinebarger.com

AND

Brian Rawson
State Bar No. 24041754
8750 N. Central Expressway
Suite 1600
Dallas, Texas 75231

-2-

(214) 369-2100
(214) 369-2118 (Fax)
brawson@hartlinebarger.com
**Counsel for the Fluor Defendants**

**Certificate of Service**

The undersigned certifies that on June 18, 2019, Defendants served a true and correct copy of the foregoing document on all known counsel of record under the Texas Rules of Civil Procedure.

***Via E-Service***
Mr. Anthony G. Buzbee
Mr. Peter K. Taaffe
The Buzbee Law Firm
600 Travis Street
Suite 7300
Houston, Texas 77002

***Via E-Service***
Mr. David G. Crooks
Fox Rothschild LLP
Two Lincoln Centre
5420 Lyndon B. Johnson Freeway
Suite 1200
Dallas, Texas 75240

*/s/Darrell L. Barger*
Darrell L. Barger

**AR 15-6 Memo Final Signed**

EXHIBIT 1

USARCENT FOIA FA-17-0184

~~SECRET//NOFORN~~



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, 7TH INFANTRY DIVISION
BOX 339500, MAIL STOP 59
JOINT BASE LEWIS-MCCHORD, WA 98433-9500

AFZC-CG                                                                31 December 2016

MEMORANDUM FOR Commander, United States Forces – Afghanistan, Kabul, Afghanistan, APO, AE 09356

SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

1. (U//~~FOUO~~) The purpose of this memorandum and its enclosures is to enumerate relevant facts, findings, and recommendations pertaining to the circumstances and events surrounding the suicide vest attack that occurred on Bagram Airfield on 12 November 2016. Based upon the appointment orders dated 25 November 2016, the undersigned and nine other personnel from 7th Infantry Division deployed to Afghanistan and – with the addition of two in-country personnel with theater expertise in force protection and contracting – conducted an administrative investigation from 07 December 2016 to 30 December 2016 in accordance with Chapter 5 of Army Regulation 15-6. The scope of the investigation included six formal site visits and 53 formal interviews reduced to sworn statements utilizing Department of the Army Form 2823, among other informal inquiries and background research, to weigh considerations pertinent to force protection, intelligence, contracting, and combat operations.

2. (U//~~FOUO~~) The suicide attack on Bagram Airfield on 12 November 2016 resulted in the death of six personnel – three U.S. Soldiers, two civilian Fluor employees, and the suicide bomber (a Fluor subcontractor employee) – and the wounding of sixteen U.S. Army Soldiers and one Polish Soldier. At 0538 hours, several hundred personnel residing on the base were preparing for a Veteran's Day five kilometer run, many of them already assembling in the vicinity of the landmark known as the "Disney Clamshell" on Disney Avenue for a 0615 hours start time. The explosion, initiated by a local national employed on the base for over five years and that passed a counterintelligence screening earlier this year, occurred approximately 300 meters southwest of the start point and less than 300 meters northeast of the base headquarters. Though the ultimate target for the attack remains indeterminable, the group of Soldiers and Fluor employees unwittingly induced the assailant to detonate his suicide vest, likely preventing a far greater tragedy at the Disney Clamshell.

3. (U//~~FOUO~~) Close to 2,000 personnel secure Bagram Airfield, the largest international military base in Afghanistan. Though upwards of 15,000 personnel operate from this base – many of them armed as well – the majority of occupants contribute to Base Life Support and sustainment operations or enable operations beyond the Bagram Ground Defense Area. The 1st Cavalry Division Commander, who also serves as 1) the Deputy Commanding General (Support) for United States Forces-Afghanistan, 2) the Commander of the United States National Security Element, 3) the Commander of Bagram Airfield, and 4) the Commander of Joint Task Force 1, has both local and theater-wide responsibilities. While his staff oversees Bagram Airfield

~~SECRET//NOFORN~~

<span style="color:red">**EXHIBIT 1**</span>                        **USARCENT FOIA FA-17-0184**

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

security, the day-to-day security inside and outside of the Bagram Ground Defense Area is
principally orchestrated by 1st Squadron, 3rd Cavalry Regiment's "Task Force Tiger." Also
under the Commander of Bagram Airfield, the Area Support Group – which has responsibility
for base life support on Bagram Airfield and six other major Forward Operating Bases
throughout Afghanistan – manages the installation's emergency services.

4. (U//FOUO) The leadership at Bagram Airfield orchestrates an assortment of multinational
security providers and dozens of military units and contracted agencies that operate on the
installation. Initiatives that began at Bagram Airfield prior to the 12 November 2016 attack and
accelerated thereafter have already mitigated many of the force protection gaps and seams that
enabled the assailant to conduct the attack. Yet, the inherent risks associated with operating in
the midst of force protection threats coupled with evolving capabilities remains, requiring further
analysis and the inculcation of lessons learned from this particular attack.

5. (U//FOUO) Beyond pursuing understanding of the contributing conditions that enabled the
attack, the scope of this investigation includes analysis on the actions taken by the chain of
command to prevent future attacks. The responses that follow answer the specific questions
within the appointment memorandum to present facts and commensurate findings and
recommendations pertinent to security operations at Bagram Airfield. Specifically, they
highlight the presence or absence of 1) published standards, 2) the resources and individual and
collective training required, and 3) the engaged and disciplined leadership empowered to attain
those standards. Inspired by the sacrifice of those lost or forever impacted by the attack on 12
November 2016, this investigation seeks to provide value to the ongoing efforts in Afghanistan,
with hopes that it can contribute to the understanding required to keep Service member and
civilians as safe as possible.

6. (U//FOUO) The investigation determined that the primary contributing factor to the 12
November 2016 attack was Fluor's complacency and its lack of reasonable supervision of its
personnel. These conditions enabled the suicide bomber to construct and employ a suicide vest
inside the Bagram Airfield perimeter.

7. (U//FOUO) There are eight major findings within the investigation that enabled the primary
contributing factor to present risk that was not sufficiently mitigated before the attack:

  a. (U//FOUO) Local National access and supervision was not properly enforced;

  b. (U//FOUO) Unity of effort, unity of command, and interoperability challenges were
compounded by multi-national and contracted security providers;

  c. (U//FOUO) The Bagram Airfield security forces' span of control is too broad and lacks
adequate forces;

2

SECRET//NOFORN

EXHIBIT 1                              USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

d. (U//FOUO) Counterintelligence shortages impaired Coalition Forces' capability to screen
Local National employees and to identify Nayeb's threat indicators;

e. (U//FOUO) Complexity of intelligence and force protection mission command and
interoperability of networks, architecture, and analytical tools impaired intelligence fusion;

f. (U//FOUO) Disjointed antiterrorism and force protection efforts increased susceptibility to
attacks;

g. (U//FOUO) Contracting Officer's Representatives were not aligned by location, duties, or
experience; and

h. (U//FOUO) Commanders and supervisors of Contracting Officer's Representatives were
not appropriately engaged in contract formation, administration, and oversight.

8.  (U//FOUO) Based upon these key findings, the below recommendations may best apply
lessons learned from the 12 November 2016 attack to neutralize future force protection threats:

(b)(5)

3

SECRET//NOFORN

EXHIBIT 1

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(5)

9.  (U//FOUO) In summary, the investigation finds that the current leadership at Bagram Airfield, has pushed since assuming command on 13 September 2016 to reverse a pervasive "culture of complacency" and indiscipline – specifically within the civilian portions of the base – that permeated the forward operating base.  Addressing the key findings delineated above consistent with the corresponding key recommendations will prevent another local national subcontractor employee - with poorly vetted access and unreasonable supervision - from operating with impunity and conducting a similar attack on Bagram Airfield.

4

EXHIBIT 1                          USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

10. (S//NF) **(8a)** Identify the names, ages, country of origin, and status/employer of those killed
in action (KIA) and wounded in action (WIA) from the 12 November 2016 incident.

    a. (S//NF) Identify the names, ages, country of origin, and status/employer of those killed in
action (KIA).

        (1) (U//FOUO) Sergeant First Class Brown, Allan Eric; 46 years old; Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

        (2) (U//FOUO) Staff Sergeant Perry, John William; 30 years old; Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

        (3) (U//FOUO) Private First Class Iubelt, Tyler Ray; 20 years old; Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

        (4) (U//FOUO)      (b)(6)      U.S. Fluor Government
Group International, Inc.

        (5) (U//FOUO)      (b)(6)      U.S. Fluor Government Group
International, Inc.

    b. (S//NF) Identify the names, ages, country of origin, and status/employer of those wounded
in action (WIA).

        (1) (U//FOUO)    (b)(3), (b)(6)    Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

        (2) (U//FOUO)    (b)(3), (b)(6)    Headquarters and
Headquarters Battalion, 1st Cavalry Division; U.S. Army

        (3) (U//FOUO)    (b)(3), (b)(6)    412th
Contracting Support Brigade; U.S. Army

        (4) (U//FOUO)    (b)(3), (b)(6)    Headquarters and Headquarters
Battalion, 1st Cavalry Division; U.S. Army

        (5) (U//FOUO)    (b)(3), (b)(6)    years old; Headquarters
and Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

5

**EXHIBIT 1**

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(6) (U//FOUO)          (b)(3), (b)(6)          36 years old;
Headquarters and Headquarters Battalion, 1st Cavalry Division; U.S. Army

(7) (U//FOUO)          (b)(3), (b)(6)          Detachment 19, 3rd
Medical Command Deployment Support; U.S. Army Reserve

(8) (U//FOUO)          (b)(3), (b)(6)          Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(9) (U//FOUO)          (b)(3), (b)(6)          607th Contracting Team;
412th Contracting Support Brigade; U.S. Army

(10) (U//FOUO)          (b)(3), (b)(6)          901st Contracting
Battalion; 418th Contracting Support Brigade; U.S. Army

(11) (U//FOUO)          (b)(3), (b)(6)          Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(12) (U//FOUO)          (b)(3), (b)(6)          Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(13) (U//FOUO)          (b)(3), (b)(6)          Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(14) (U//FOUO)          (b)(3), (b)(6)          Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(15) (U//FOUO)          (b)(3), (b)(6)          Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(16) (U//FOUO)          (b)(3), (b)(6)          Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(17) (U//FOUO)          (b)(3), (b)(6)          Headquarters and
Headquarters Company, 1st Cavalry Division Sustainment Brigade; U.S. Army

(18) (U//FOUO)          (b)(6)

6

SECRET//NOFORN

EXHIBIT 1          USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

c. (U//~~FOUO~~) Line of duty actions are complete and all service members were found in the line of duty (Exhibits 1E, 1F).

11. (~~S//NF~~) **(8b)** Identify any/all Local Nationals (LNs) involved in the incident.  Were any LNs connected to the Taliban or any other group(s)? Is so, describe the connection.

a. (~~S//NF~~) Identify any/all Local Nationals (LNs) involved in the incident.

(1) (U//~~FOUO~~) The only evidence of Local National involvement in the incident concerns the suicide bomber, Ahmad Nayeb (variant:  Qari Nayab, Ahmad Naib Hafzi, Hafezi Nieb, Abdul Zuhoor), herein referred to as Nayeb, matched using DNA evidence (Exhibits 2Q, 3P, 4P, 4W, and 4AQ).

(2) (U//~~FOUO~~) At this time, no evidence suggests other Bagram Airfield Local National, including Nayeb's cousins, were co-conspirators.  Nayeb had familial ties to three cousins who worked on base (Exhibits 2Q, 4AF, 4CV, and 5A).          (b)(6)          was a cousin of Nayeb and was employed on Bagram Airfield as a day shift worker at the Morale, Welfare, and Recreation Center (Exhibits 4AA, 4AF, 4CV, and 5A).          (b)(6)          was a cousin of Nayeb and was employed on Bagram Airfield as a night shift worker at the Warrior Gym (Exhibits 4AA, 4AF, 4CV, and 5B at 16).          (b)(6)          was a cousin of Nayeb and was employed on Bagram Airfield as a Dining Facility worker (Exhibits 4AA, 4AF, 4CV, and 5A).

(3) (~~S//NF~~)                                        (b)(1)1.4d




                                          (b)(1)1.4d




                              (b)(1)1.4d                              (Exhibits 4CJ, 4BY, 4AK, and 4AL).

b. (~~S//NF~~) Were any LNs connected to the Taliban or any other group(s)? Is so, describe the connection.

SECRET//NOFORN

**EXHIBIT 1**                              USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

    (1) (S//NF)                                             (b)(1)1.4c


                 (b)(1)1.4c


              (b)(1)1.4c                              (Exhibits 4BW, 4BZ, 4CA, 4CC,
4CD, 4CG, 4CH, 4CQ, 4CM, 4CR, and 4CV).

    (2) (S//NF)                                             (b)(1)1.4c


              (b)(1)1.4c


12. (S//NF) **(8c)** Describe the Local Nationals' connection(s) to any US/Coalition Forces (CF).
Were they employed on Bagram Airfield?  If so, by whom and for what position?  When were
they hired?  What were the work days/hours of the involved Local Nationals on Bagram
Airfield?  Were the Local Nationals hired and supervised by Fluor Corporation or a
subcontractor?  Were there any failings by Fluor Corporation or another company in the hiring or
continued employment of the Local Nationals involved in this incident?  You will make
recommendations as appropriate given your findings, on the hiring and supervision of Local
Nationals by Fluor Corporation or involved companies.

    a. (S//NF)                                             (b)(1)1.4a, (b)(1)1.4c
(S//NF)                                                      (b)(1)1.4a, (b)(1)1.4c


                (b)(1)1.4a, (b)(1)1.4c


8

SECRET//NOFORN

EXHIBIT 1                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

   b. (S//NF) Were they employed on Bagram Airfield? If so, by whom and for what position?
When were they hired? What were the work days/hours of the involved Local Nationals on
Bagram Airfield?

   (1) (U//FOUO) Nayeb was employed by Alliance Project Services, Inc. (APS), a
subcontractor to Fluor, on Bagram Airfield in the Non-Tactical Vehicle Yard. At the time of the
bombing, he was working the 1800-0600 shift and was responsible for managing the hazardous
material in the HAZMAT section of the Non-Tactical Vehicle Yard, which Fluor supervises
(Exhibits 5D at 8, 5D at 2).

   (2) (U//FOUO) On 01 April 2011, Nayeb entered the Provincial Reconstruction Team –
Parwan (Republic Of Korea) Vocational Training Center on Bagram Airfield as a construction
trainee (Exhibit 5H). Nayeb was a transitioning Taliban member who went through reintegration
as part of the Afghanistan Peace and Reintegration Program efforts funded by the Commander's
Emergency Response Program pursuant to the FY2010 National Defense Authorization Act
(Exhibits 5K at 331, 5AB). Nayeb was sponsored by Task Force Red Bulls in a memorandum
dated 25 March 2011, which accompanied his request for a Bagram Airfield access badge
(Exhibit 5H).

   (3) (S//NF)

                                    (b)(1)1.4a, (b)(1)1.4c


                          (b)(1)1.4a, (b)(1)1.4c


        (b)(1)1.4a, (b)(1)1.4c            (Exhibits 5D, 5A, and 5H).

   (4) (U//FOUO) During his five years of employment, Nayeb worked varying shifts under
numerous and diverse Fluor supervisors – shift changes are not uncommon among Local
National employees. His first day of work in the Fluor Non-Tactical Vehicle Yard was 11
December 2011, initially on night shift (Exhibits 5D, 5O). Nayeb briefly worked the day shift
from 24 July 2012 until 14 November 2012, then changed back to the night shift (Exhibit 5O).
Nayeb stayed on the night shift until 28 April 2014, then changed to day shift for almost one full
year, transitioning back to night shift on 14 April 2015 (Exhibit 5O). Nayeb then worked the
night shift until 05 June 2016, when he transferred to the day shift from 05 June 2016 until 06
August 2016 (Exhibit 5O). From 06 August 2016 until 12 November 2016, Nayeb worked the
night shift (Exhibit 5O).

SECRET//NOFORN

**EXHIBIT 1**                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

c. (S//NF) Were the Local Nationals hired and supervised by Fluor Corporation or a
subcontractor?

(1) (U//FOUO) Nayeb was hired by Alliance Project Services, Inc. a subcontractor of
Fluor (Exhibits 5D, 5F, 5C). Alliance Project Services, Inc. is a U.S. veteran owned business in
Alexandria, Virginia, which specializes in hiring host nation personnel in a labor broker capacity.
Although Alliance Project Services, Inc. was responsible for administration of Nayeb (payroll,
time and attendance, etc.), Nayeb's work performance was supervised by Fluor while he was
employed at the Bagram Airfield Non-Tactical Vehicle Yard. The paragraphs below will show
that Fluor did not reasonably supervise Nayeb at the work facility, nor reasonably supervise the
transport of Nayeb or other employees between the Entry Control Point and the work facility.

(2) (U//FOUO) Fluor is the prime contractor for LOGCAP IV (Task Order 005), which
encompasses services and base life support for the eastern and northern portions of Afghanistan.
In support of the Afghanistan First Policy – a U.S. Government policy encouraging Afghan
employment (Exhibit 5I) – Local Nationals are hired by Fluor through a subcontract with
Alliance Project Services, Inc. which specializes in labor broker services (Exhibits 5D at 6, 5C at
4, 5E para 01.07). As the prime contractor with the U.S. Government, and as the contractor with
oversight of the Bagram Airfield Non-Tactical Vehicle Yard, Fluor is responsible for all of its
employees, subcontractors, and subcontractor employee actions (Exhibit 5E para 01.07).
Specific to the Non-Tactical Vehicle Yard, Fluor states that "site supervision was accomplished
by Fluor Other Country Nationals and Fluor U.S. National supervisors and foremen in
accordance with the base access control policy" (Exhibit 5D). This supervisory responsibility is
also clearly stated in the Performance Work Statement, paragraphs 01.07a and 01.07b, dated 01
April 2013:

(a) (U//FOUO) 01.07a. "[Fluor is responsible for ensuring all personnel supporting
[LOGCAP IV 005] comply with the standards of conduct, and all terms/conditions set forth in
[the] PWS and the Basic Contract. [Fluor] shall provide the necessary supervision for personnel
required to perform this contract" (5E para 01.07).

(b) (U//FOUO) 01.07b. "[Fluor] shall hire HN personnel and Subcontractors to the
maximum extent possible in performance of this contract when such recruitment practices meet
legal requirements. [Fluor] is responsible for oversight of such personnel or Subcontractors to
ensure compliance with all terms of the Basic Contract and this PWS." (5E para 01.07).

(3) (U//FOUO) Interviews with employees of the Non-Tactical Vehicle Yard conducted
by Counterintelligence Agents from Task Force Odin and Task Force Crimson following the
suicide blast illustrate that Fluor employees (Other Country Nationals, U.S. Nationals, and

10

SECRET//NOFORN

EXHIBIT 1    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

specific Local Nationals) were responsible for the supervision of Local National employees
(Exhibits 5A, 5B).

(4) (U//FOUO) There were at least three areas where Fluor did not reasonably supervise
its employees, to include Nayeb, at the Non-Tactical Vehicle Yard.  The lack of reasonable
supervision includes, but is not limited to:  1) lack of direct supervision over the HAZMAT area,
2) lack of supervising employee performance, and 3) failure to supervise use of tools by
employees.

(a) (U//FOUO) The Non-Tactical Vehicle Yard where Nayeb worked consisted of a Light
Non-Tactical Vehicle work center, a Heavy Non-Tactical Vehicle work center, and a HAZMAT
work center (Exhibit 5A at 67).  All three areas are disassociated sites occupying a larger work
area known as the Non-Tactical Vehicle Yard.  Both the Heavy and Light Non-Tactical Vehicle
work centers are enclosed "clamshell" tents to provide protection from the elements and are
separated by approximately 75 feet (Exhibit 5A at 67).  The HAZMAT work center is a row of
containers placed adjacent to one another and built up with carpentry which adds a stable
walking area, some overhead cover, and two work areas with minimal lighting or visibility from
other work sites (Exhibit 5A at 67).  The HAZMAT area is toward the south side of the Non-
Tactical Vehicle Yard – approximately 75 feet from the Heavy Non-Tactical Vehicle center and
Light Non-Tactical Vehicle center – and otherwise outside and exposed to the elements and
approximately 200 feet from the Non-Tactical Vehicle Yard office (Exhibit 5A at 67).

(b) (U//FOUO) As the only HAZMAT employee on night shift, Nayeb worked at the
HAZMAT work center alone and with sporadic supervision (Exhibit 5B at 30-31).  There was
also confusion by Fluor supervisors as to who was responsible for Nayeb and the HAZMAT
work center (Exhibit 5B at 29).          (b)(6)          was the Fluor Other Country National
Heavy Non-Tactical Vehicle Lead Senior Mechanic for the night shift on 12 November 2016,
and when questioned about Nayeb informed Counterintelligence personnel that he had little
interaction with Nayeb and insisted that "the light vehicle maintenance bay employees were
responsible for ensuring Nayeb was supervised and employed" (Exhibit 5B at 27-29).  When
interviewed by Counterintelligence Agents,       (b)(6)       recognized Nayeb as the HAZMAT
worker but could not recall his name (Exhibit 5B, para 2.18).

(c) (U//FOUO) When HAZMAT responsibilities were reduced, or when Non-Tactical
Vehicle maintenance operations were high, Nayeb would occasionally help out in either the
Heavy Non-Tactical Vehicle Yard or Light Non-Tactical Vehicle Yard as workload dictated
(Exhibit 5C, page 15).     (b)(3), (b)(6)     was the Fluor Other Country National Light Non-Tactical
Vehicle Lead Senior Mechanic for the night shift on 12 November 2016, and – when questioned
about Nayeb – informed Counterintelligence Agents that he "was only accountable for local

11

EXHIBIT 1                                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

national employees when they worked for him in the light vehicle bay" (Exhibit 5B at 27-29).
Rexhep Rexhepi, the Fluor Other Country National Non-Tactical Vehicle Yard General
Foreman, reported to Counterintelligence Agents that once Nayeb's work at HAZMAT was
complete, he would work in the light vehicle bay (Exhibit 5B at 27-29). At a later interview,
Rexhep Rexhepi stated that    (b)(6)    the Heavy Non-Tactical Vehicle Lead, was responsible
for Nayeb.

    (d) (U//FOUO) The statements of Fluor employees obtained by Counterintelligence
Agents, coupled with the statements provided by Fluor, reveals a poor understanding by Fluor
supervisors as to who was responsible for Nayeb's supervision (Exhibits 5A, 5B at 28). This
ambiguity on supervisory responsibility demonstrates an unreasonable complacency by Fluor to
ensure Local National employees were properly supervised at all times, as required by their
contract and non-contractual, generally recognized supervisor responsibility. This lack of
reasonable supervision facilitated Nayeb's ability to freely acquire most of the components
necessary for the construction of the suicide vest and the freedom of movement to complete its
construction (Exhibit 1B, 5B at 28).

    (e) (U//FOUO) According to Alliance Project Services, Inc. Performance and
Disciplinary Policy and the LOGCAP IV Afghanistan HCN Labor Support Statement of Work,
sleeping while at work or unsatisfactory job performance are "cause for disciplinary action up to
and including termination" (Exhibit 5F, Exhibit 5G).    (b)(3), (b)(6)    Fluor Other Country
National Light Non-Tactical Vehicle Lead Senior Mechanic, states that he had caught Nayeb
sleeping in the HAZMAT area in a sleeping bag (Exhibit 5B, pages 27-29). In addition, on
separate occasions, he caught Nayeb reading the Quran during work hours (Exhibit 5B, pages
27-29). Interviews collected by Counterintelligence Agents show that Nayeb was often not
present at the HAZMAT area when workers would go there to drop off oils (Exhibit 5A, para
2.62).    (b)(6)    a Local National who worked in the Light Non-Tactical Vehicle Yard, stated
that "it was normal for [Nayeb] not to be in the work area" (Exhibit 5A, para 2.65). No formal
counseling or disciplinary action can be found for Nayeb despite reported instances of sleeping at
work and absences without authority. This failure to enforce a work-related standard of
performance and the unjustified retention of Nayeb amounts to a lack of reasonable supervision
on behalf of Fluor.

    (f) (U//FOUO) Following the suicide bombing, Counterintelligence Agents collected the
tool room logs from the Non-Tactical Vehicle Yard. Those logs revealed that between 10
August 2016 and 10 November 2016, Nayeb checked out multiple tools not associated with his
duty as the HAZMAT employee, to include checking out a multimeter nine times for up to six
hours at a time (a multimeter is a tool used to measure voltage, current, and resistance) (Exhibit
5A at 49-50, at 129-213). Fluor employees confirmed that there were no tools identified as

SECRET//NOFORN

**EXHIBIT 1**    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

restricted use, or controlled use, by force protection or base policy (Exhibit 5C). Fluor
employees also provided that any employee was able to check out any tool, regardless of where
that employee worked. However, interviews of Non-Tactical Vehicle Yard personnel suggest
that only certain individuals could check out specific tools within the Non-Tactical Vehicle Yard
(Exhibit 5A para 2.49, 2.56, 2.57, 2.62, 2.66).

     (g) (U//FOUO) An interview of Other Country National        (b)(6)        stated that
"HAZMAT workers would only check out tools if one of the maintenance guys requested help"
and that the HAZMAT worker would tell him the name of the mechanic that needed the tool
(Exhibit 5A para 2.56).        (b)(6)        further stated that "HAZMAT workers do not require
any tools in the performance of their job" (Exhibit 5A para 2.56).        (b)(3), (b)(6)        a Fluor
U.S. National employee stated in an interview with Counterintelligence Agents that "he did not
think it was normal for the HAZMAT worker to sign out tools" (Exhibit 5A para 2.57). Another
Fluor employee, Local National        (b)(6)        stated to Counterintelligence Agents that "only the
person who needed the tool could sign the tool in or out from the tool room" (Exhibit 5A para
2.62). A further Fluor employee, Local National        (b)(6)        stated that Nayeb "did not require
the use of any special tools to complete his HAZMAT job" (Exhibit 5A para 2.66). Fluor Local
National        (b)(6)        who ran the Non-Tactical Vehicle Yard tool room at night,
asked Nayeb why he needed a multimeter tool during work, to which Nayeb replied that he
needed it because he was fixing a radio on one occasion and hair clippers on another occasion
(Exhibit 5A para 2.49). This apathy demonstrates that there was general knowledge of who was
properly able to check out tools associated with job performance, but that the standard was
poorly enforced. It also demonstrates Nayeb was not gainfully employed without the issue being
raised to a supervisor's attention. Lastly, it illustrates a work culture of minimal supervision.
This evidence supports complacency and a lack of reasonable supervision by Fluor supervisors
over Nayeb and other Local Nationals at the Non-Tactical Vehicle Yard work facility that
enabled Nayeb's nefarious plan.

     (h) (U//FOUO) Fluor was also deficient in their performance of executing and
supervising escort duties during the transportation of employees, to include Nayeb, between the
Entry Control Point and the Non-Tactical Vehicle Yard. The lack of reasonable supervision is
evidenced by, but is not limited to, a 1) lack of accountability over employees getting on the bus
at the end of each shift, and a 2) lack of positive control while escorting Local National
employees to and from the Entry Control Point. As the contractor responsible for the Non-
Tactical Vehicle Yard, Fluor is responsible to provide "transportation and supervision" necessary
for its employees to accomplish their work (Exhibit 5E paras 03.03 and 05.00). This includes the
supervision and transportation of Local Nationals to and from the work facility. Various Fluor
Non-Tactical Vehicle Yard employees – U.S. Civilians, Other Country Nationals, and Local
Nationals – served as escorts for Local Nationals who worked in the Non-Tactical Vehicle Yard

13

**EXHIBIT 1**        USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(Exhibits 5B at 28, 5D at 5). These Fluor escorts were responsible for supervising the transport
of Local Nationals from the Entry Control Point to the Non-Tactical Vehicle Yard, and from the
Non-Tactical Vehicle Yard back to the Entry Control Point, at shift change (Exhibit 5C). The
Bagram Airfield Badging and Screening Policy requires that escorts remain in close proximity
and remain in constant view of the individuals they are escorting (Exhibits 2AB, 5J).

    (i) (U//FOUO) The mechanism Fluor used to ensure that Local National employees were
on the bus at the end of each shift consisted of a sign in/sign out sheet filled out by the night shift
Local National Team Lead,    (b)(6)    (Exhibit 5A para 2.47). In lieu of a physical or visual
inspection to ensure every Local National employee was on the bus, he would attest to the same
by observing that all the employees had signed out on the sheet (Exhibit 5A para 2.47). The bus
would then move to the Entry Control Point without additional supervisory accountability. The
Fluor U.S. National and Other Country National supervisors relied upon the Local Nationals to
ensure everyone was accounted for and actually on the bus at the end of shift (Exhibit 5C at 7).
On 11 November 2016, Nayeb informed    (b)(6)    – his Local National co-worker – that
he would miss the bus on 12 November 2016 because of a HAZMAT class requirement, despite
having taken the class on 02 October 2016 and not requiring the class for another year (Exhibits
5A at 3 at 215, 5D at 17) and evidence supports that Nayeb never got on the bus (Exhibits 5A at
3, 17, 27, 37 42, 43 47, 51, 55, 58, 80 and 5B at 31).

    (j) (U//FOUO) Fluor Other Country National escorts did not know who they were
responsible for escorting, as evidenced by both    (b)(6)    an Other Country National escort on
the Heavy Non-Tactical Vehicle night shift, and    (b)(6)    an Other Country
National escort for the Light Non-Tactical Vehicle night shift, admitting that they did not know
the names of those they escorted (Exhibits 5A paras 2.25 and 2.26, 5B). Two Local National
employees,    (b)(6)    and    (b)(6)    provided that if a night shift worker missed a ride to
Entry Control Point 1 at the end of shift, a day shift escort would take them at a later time after
the shift change (Exhibit 5A paras 2.52 and 2.54).    (b)(6)    a Local National working in the
Light Non-Tactical Vehicle Yard and authorized unescorted access and escort privileges (yellow
badge), provided a specific example when he shared that there were two Heavy Alliance Project
Services, Inc. Local Nationals –    (b)(6)    and    (b)(6)    – left behind by the
vehicle that transports Heavy Non-Tactical Vehicle Yard employees to the Entry Control Point
on the morning of 12 November 2016 (Exhibit 5A para 2.45). Both men,    (b)(6)    and
    (b)(6)    got on the light bus instead, unbeknownst to    (b)(6)    (Exhibit 5A para 2.45).
Separate statements from    (b)(6)    and by    (b)(6)    both from the Fluor Non-Tactical
Vehicle Yard, confirm that the Fluor Non-Tactical Vehicle Yard changed escorts out every week
(Exhibit 5A para 2.47 and Exhibit 5C).

SECRET//NOFORN

EXHIBIT 1        USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(k) (U//FOUO) The preponderance of evidence shows a lack of reasonable supervision
by Fluor while escorting Local Nationals to and from the Non-Tactical Vehicle Yard.  Fluor's
systemic lack of reasonable supervision enabled Nayeb to go undetected from 0445 until 0538 on
12 November 2016, which coincides with the average walking time of 53 minutes from the Non-
Tactical Vehicle Yard to the blast site (Exhibits 2Q, 4CE and Naismith's Rule).

d. (S//NF) Were there any failings by Fluor Corporation or another company in the hiring or
continued employment of the Local Nationals involved in this incident?

(1) (U//FOUO) There were no failings by Fluor in the hiring of local nationals.  Fluor
complied with the Afghan First Program and the Afghan Peace and Reintegration Program in the
hiring of Nayeb through a subcontracted labor broker, Alliance Project Services, Inc.  (Exhibit
5D at 4).  Fluor performed the Biometrics Automated Toolset Services in March 2011, when
Fluor subcontractor employee,      (b)(6)     nput Nayeb into the database along with the
Reintegration Memorandum identifying Nayeb's previous Taliban affiliation (Exhibit 5P Line
5399 of PERSTAT Tab).  The Biometrics Automated Toolset Services entry form has the Fluor
employee's signature for processing (Exhibit 5H).

(2) (U//FOUO) There is evidence to support failings by Fluor in the continued
employment of Nayeb.  See previous analysis concerning Fluor's lack of supervision of
employee performance and unreasonable employee retention of Nayeb.  Fluor did not provide
any information concerning disciplinary action taken against Nayeb.  In fact, Nayeb received a
promotion from Skilled Laborer II to Skilled Laborer III on 05 July 2016 after known poor
performance (Exhibit 4AN).

e. (S//NF) Make recommendations as appropriate given your findings, on the hiring and
supervision of Local Nationals by Fluor Corporation or involved companies.

(b)(5)

15

SECRET//NOFORN

**EXHIBIT 1**

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(5)

(3) (U//FOUO)                                    (b)(5)

(b)(5)

(4)                                    (b)(5)

(b)(5)

(5) (U//FOUO)                                    (b)(5)

(b)(5)

(b)(5)                                    (Exhibit
5W).

(6) (U//FOUO)                                    (b)(5)

(b)(5)

(7) (U//FOUO)                                    (b)(5)

(b)(5)                                    (b)(5)

16

SECRET//NOFORN

EXHIBIT 1                    USARCENT FOIA FA-17-0184

Pages 23 through 24 redacted for the following reasons:
- - - - - - - - - - - - - - - - - - - - - - - - - - -
(b)(5)

**EXHIBIT 1**

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(5)

13. (S//NF) (8d) Did U.S. or Coalition Forces have any intelligence of value or indicators
regarding the planning and execution of this incident before it occurred?  If so, what information
was known and by whom?  Did this incident identify any flaws in communication, tracking of
individuals, situational awareness, etc., between intelligence analysis, dissemination, and those
responsible for force protection on Bagram Airfield?

    a. (S//NF) Did U.S. or Coalition Forces have any intelligence of value or indicators regarding
the planning and execution of this incident before it occurred?

    (1) (S//NF)                              (b)(1)1.4a

                              (b)(1)1.4a

    (b)(1)1.4a        (Exhibits 4B and 4CP).

    (2) (S//NF)                      (b)(1)1.4a, (b)(1)1.4c

                         (b)(1)1.4a, (b)(1)1.4c

              (b)(1)1.4a, (b)(1)1.4c                    (Exhibits 4U, 4BF,
4BG, 4BH, 4BI, 4BJ, 4BK, 4BL, 4BM, 4BN, 4BO, 4BP, 4BQ, 4BS, 4BT, 4BU, and 4BX).

    (3) (S//NF)                      (b)(1)1.4a, (b)(1)1.4c

                         (b)(1)1.4a, (b)(1)1.4c

19

SECRET//NOFORN

EXHIBIT 1                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c                    (Exhibits 4B, 4C, 4E, and 4F).(b)(1)1.4a

(b)(1)1.4a, (b)(1)1.4c                                                                        ,

(b)(1)1.4a, (b)(1)1.4c    (Exhibits 4B, 4C, 4E, and 4F).

(4) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(Exhibits 4BX and 4CE).

(5) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c
(b)(1)1.4a, (b)(1)1.4c    (Exhibits 4B, 4D, 4E, 4F, 4G, 4H, 4J, 4M, and 4O).    (b)(1)1.4a, (b)(1)1.4c
(b)(1)1.4a, (b)(1)1.4c                    (Exhibits 4E, 4G, 4B, 4J and 4O).(b)(1)1.4a, (b)(1)1.4c
(b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c                    (Exhibits 4E, 4F, 4G, and 4BV)(b)(1)1.4a, (b)(1)1.4c
(b)(1)1.4c
(b)(1)1.4a, (b)(1)1.4c    (Exhibit 4AX).                    (b)(1)1.4a, (b)(1)1.4c
(b)(1)1.4a
(Exhibits 4B, 4E, 4G, and 4CS).

   b. (S//NF) If so, what information was known and by whom?

      (1) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

      (2) (S//REL TO USA, FVEY)        (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

20

**EXHIBIT 1**        **USARCENT FOIA FA-17-0184**

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a                    (Exhibits 4CB, 4CR and 4CV).

(3) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(4) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c    to 12 November 2016:

21

SECRET//NOFORN

**EXHIBIT 1**                    USARCENT FOIA FA-17-0184

Pages 28 through 32 redacted for the following reasons:
- - - - - - - - - - - - - - - - - - - - - - - - -
(b)(1)1.4a, (b)(1)1.4c

EXHIBIT 1    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG

SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(10) (S//NF)

(b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(b)(5)

27

SECRET//NOFORN

<span style="color:red">EXHIBIT 1</span>

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

———

(b)(5)

14. (S//~~NF~~) **(8e)**                                    (b)(1)1.4a

                                    (b)(1)1.4a

    a. (~~S//NF~~)                        (b)(1)1.4a
                              (b)(1)1.4a
              (b)(1)1.4a                (Exhibits 4Q, 4U, and 4AF).

    b. (~~S//NF~~)                    (b)(1)1.4a, (b)(1)1.4c
                   (b)(1)1.4a, (b)(1)1.4c              (Exhibits 4Q and 4AB).

    c. (~~S//NF~~)                    (b)(1)1.4a, (b)(1)1.4c
                   (b)(1)1.4a, (b)(1)1.4c              (Exhibits 4Q and 4AB).

    d. (~~S//NF~~) Did the incident highlight any issues or problems with BATS?

        (1) (U//~~FOUO~~) Yes.  Issues with the Biometric Automated Toolset System included
human error, technology limitations and software design, and a lack of familiarity with the
system. Most issues or problems with the Biometric Automated Toolset System are a result of
human error.  These issues or problems can arise from a lack of training (Exhibits 4I and 4U)
lack of attention to detail to ensure proper registration with the biometric system (Exhibits 4I,
4U, and 4AB), and lack of awareness of the system and its capabilities.

        (a) (~~S//NF~~)                        (b)(1)1.4a, (b)(1)1.4c

                              (b)(1)1.4a, (b)(1)1.4c

28

SECRET//NOFORN

EXHIBIT 1                    USARCENT FOIA FA-17-0184

~~SECRET//NOFORN~~

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c

(b) ~~(S//NF)~~                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(2) ~~(S//NF~~                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(3) ~~(S//NF)~~                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

29

~~SECRET//NOFORN~~

EXHIBIT 1                    USARCENT FOIA FA-17-0184

~~SECRET//NOFORN~~

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c

(4) ~~(S//NF)~~                              (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

e. ~~(S//NF)~~ Make recommendations, as appropriate given your findings, with regard to the
base's use of BATS.

(b)(5)

(2) ~~(S//NF)~~                        (b)(1)1.4a, (b)(1)1.4c, (b)(5)

(b)(1)1.4a, (b)(1)1.4c, (b)(5)

30

EXHIBIT 1                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(3) (U//FOUO) Commanders require the most complete view of their operational
environment. Recommend base commanders review the data and information provided by Task
Force Biometrics upon assumption of mission (Exhibits 4I and 4Q). Additionally, a biometrics
expert assigned to the commander's staff will enable the application of all capabilities for the
command and their staff responsible for force protection and base defense. Force protection,
targeting, and all source analysts need to register and employ the Biometric Identity Intelligence
Resource in the execution of their duties to help fill the identity intelligence gap that currently
exists (Exhibit 4AD). Access to identity intelligence should not be a cumbersome process for
non-intelligence analysts. Once they understand their area of operations, commanders should
customize the Biometric Automated Toolset System reports and information relevant to their
battlespace that best feeds their operations. In addition to customized reports focused on their
battlespace, recommend the following reports be pre-programmed and automated across
Afghanistan:

(a) (U//FOUO) Biometric Enabled Watchlist Exit: Any time a Biometric Enabled
Watchlist level 1-5 is biometrically toggled off an installation (Entry Control Point quality
assurance)

(b) (U//FOUO) BEWL Entry: Any time a Biometric Enabled Watchlist level 1 or 2 is
biometrically toggled on an installation (Immediate force protection threat)

(c) (U//FOUO) Squatter Report: A daily report with Local Nationals that have remained
on post longer than 24 hours (Force protection situational awareness)

(d) (U//FOUO) Enrollment Violations: A daily report with Local Nationals that have
been toggled off post with less than a 10-2-1-1 profile (Biometrics situational awareness)

(e) (U//FOUO) Local National population: A monthly report that shows Local Nationals
that checked into post at least 15 days that month (Counterintelligence screening situational
awareness)

(f) (U//FOUO) Local National population: A weekly report that shows Local Nationals
that haven't checked into post in the past seven days (Force protection threat situational
awareness)

(4) (U//FOUO) There are discretionary fields that, if made mandatory, would address
some of the accountability issues. Recommend simply adding the employer name, sponsor
information, and duty location would help facilitate accountability of the Local National

31

EXHIBIT 1                                USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

population.  Requiring employer-provided Local National emergency contact number would
assist cellular phone intelligence exploitation efforts (Exhibits 4I, 4Q, and 4AG).

        (5) (U//FOUO) Finally, Task Force Biometrics and Counterintelligence assets require a
more proactive force protection posture.  Recommend a policy change to allow 48 hours of pre-
screening lead-time before a contractor brings a new hire on base.  The 48 hour lead-time would
allow the counterintelligence and biometrics team to search applicable databases for derogatory
information in support of the Force Protection Screening Cell background search.  An increase in
resources for Task Force Biometrics would also allow them to reengage some of the initiative-
based analysis they conducted prior to their drawdown (Exhibits 4Q and 4AG).  These
techniques could help provide another layer of active defense to mitigate threats that are largely
unimpeded in the Bagram Ground Defense Area.

15.  (S//NF) **(8f)**                          (b)(1)1.4a, (b)(1)1.4c


                                        (b)(1)1.4a, (b)(1)1.4c



        a. (U//FOUO) Did any Local Nationals have security clearances?  If so, at what access and
what date was the clearance granted?  Did they have any verifiable, derogatory information in
their investigation if applicable; or past?  Nayeb did not have a security clearance (Exhibit 4G).
The current policy standard limiting security clearances to a very select subsection of Local
Nationals (e.g. dual-citizenship linguists) does not require adjustment (Exhibits 4G and 4CW).

        b. (S//NF)                           (b)(1)1.4a, (b)(1)1.4c


                                        (b)(1)1.4a, (b)(1)1.4c


        (1) (U//FOUO) Effective screening and vetting of Local Nationals and Other Country
Nationals is of increasing importance.  A tapered force protection capability as Coalition Forces
drawdown occurs may place Coalition Forces at a higher risk for insider threat.  Stringently
enforced screening and vetting processes with Local Nationals and Other Country Nationals are
vital in mitigating these threats.  Although Bagram Airfield has improved its screening and
vetting process, a number of critical vulnerabilities remain.  Vetting is a post-entry reliability

32

SECRET//NOFORN

EXHIBIT 1                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

determination and an important layer of the force protection plan.  Yet the Commander, Bagram
Airfield, needs additional personnel qualified to screen and vet Local National and Other
Country Nationals to ensure full compliance with established procedures and conduct proper
oversight (Exhibits 2AB, 4AR, 4AT, 4AU, 4AV, 4AX, 4AY, 4BA, and 4AO).  Recommend
review of potential sourcing option to meet Bagram Airfield's requirement.

(2) (U//FOUO) Fluor and United States security personnel overlooked a single indicator
during the vetting process.  Nayeb's Biometric Automated Toolset System profile included an
uploaded copy of his registration dossier (Exhibits 4U and 4CF).  This registration dossier
contained a scanned memorandum that detailed his acceptance into the Afghanistan Peace and
Reintegration Program and his prior association as a Taliban insurgent.  The Fluor Force
Protection Screening Cell received and uploaded this memo without making a subsequent
administrative note in his record or notifying a counterintelligence element for advisement.  If
known or discovered, United States security personnel would exploit this background
information in subsequent interviews (Exhibits 4AR, 4AT, and 4AX).  The force protection
screening and counterintelligence support team screening integrates questions that cover
previous insurgent ties, and would leverage this information into more targeted questions
(Exhibits 4L and 4R).  The reintegration memo and data was available for discovery by all
parties who reviewed the Biometric Identity Intelligence Resource file (4AD).  While Nayeb's
answers to the 24 March 2016 Counterintelligence Support Team screening appear trained and
coached, additional background information would enable targeted questioning by
counterintelligence agents to properly assess the risk (Exhibits 4R, 4U, 4AT, 4AX, and 4BA).
This missed indicator represents a lost opportunity to mitigate the threat posed by Nayeb.  The
value and significance of the overlooked reintegration memo may have proved vital in the post-
entry reliability determination.  Recommend the list of reintegrated Taliban and other insurgent
members to be recovered and compared to current Local National workers within Afghanistan
through the Biometrics Automated Toolset System.  United States Forces - Afghanistan should
nominate these individuals for Biometric Enhanced Watchlist level 6 and other appropriate
identifying information in the Biometrics Automated Toolset System and the Biometric Identity
Intelligence Resource (Exhibits 4AC and 4AW).  These members should face additional scrutiny
and targeted screening procedures for continued access.  Counterintelligence Support Team
screeners must be trained and disciplined to ensure they review every file uploaded into a
Biometric Identity Intelligence Resource profile during their preparation for each screening.
Additionally, screeners must meet the Task Force Biometrics standard that requires them to
upload and individually categorize documents that fall outside a normal registration packet
(Exhibit 4Q).

(3) (U//FOUO) Beyond the miss-categorized memorandum that was attached to Nayeb's
Biometrics Automated Toolset System registration file, there was a significant delay at Bagram

33

**EXHIBIT 1**                                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

Airfield (Bagram Airfield) from Nayeb's date of employment until his first Counterintelligence
Support Team screening (Exhibits 4AI and 4AJ). Prior to 12 November 2016 there was no
requirement to screen Local Nationals outside four defined categories: 1) linguists and cultural
advisors, 2) armed security guards or gate processing personnel, 3) those who have recurring
access, escorted or unescorted, to headquarters, computer networks or communications units,
facilities, or buildings, and 4) those determined by the local supported command (Exhibit 4AT).
While there was no requirement, every base except Bagram Airfield was able to conduct annual
Counterintelligence Support Team screenings on their Local National population (Exhibits 4L and
4R). The five-year delay highlights an imbalance in the Counterintelligence Support Team
personnel allocation across the Afghanistan and created risk for Bagram Airfield (Exhibit 4AP).
This risk was not present at any other installation in Afghanistan. This imbalance, coupled with
the lack of a requirement to conduct Counterintelligence Support Team screenings, led to the five-
year delay before Nayeb was screened (Exhibits 4AI, 4AJ, and 4AT).

      (4) (S//NF)                          (b)(1)1.4a, (b)(1)1.4c



                              (b)(1)1.4a, (b)(1)1.4c


34

EXHIBIT 1                         USARCENT FOIA FA-17-0184

~~SECRET//NOFORN~~

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

| Base | Local Nationals | Other Country Nationals | Current CIST Personnel | Required CIST Personnel |
|---|---|---|---|---|
| AP Lightning | | | | |
| Arena | | | | |
| Bagram Airfield | | | | |
| Dwyer | | | | |
| Fenty | | | | |
| Gamberi | | (b)(1)1.4a, (b)(1)1.4c | | |
| HKIA | | | | |
| KAF | | | | |
| Mes/Marmal | | | | |
| New Kabul Compound | | | | |
| RS HQ | | | | |
| Shorab | | | | |

~~(S//NF)~~ Figure 3:  Counterintelligence Support Team Coverage

(5) ~~(S//NF)~~                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(6) ~~(S//NF)~~                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

(7) ~~(S//NF)~~                    (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

35

EXHIBIT 1                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan


(b)(1)1.4a, (b)(1)1.4c


(8) (S//NF)                          (b)(1)1.4a, (b)(1)1.4c



(b)(1)1.4a, (b)(1)1.4c



16. (U//FOUO) **(8g)** Describe in general the force protection measures on Bagram Airfield.  In
your opinion, are those measures sufficient?  If not, you will make recommendations, as
appropriate given your findings, to improve force protection for the forces on the base.

    a. (U//FOUO) Describe in general the force protection measures on Bagram Airfield.

        (1) (S//NF)                      (b)(1)1.4a, (b)(1)1.4c



(b)(1)1.4a, (b)(1)1.4c



        (2) (S//NF)                      (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c


36

SECRET//NOFORN

EXHIBIT 1                          USARCENT FOIA FA-17-0184

~~SECRET//NOFORN~~

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c

(3) ~~(S//NF)~~          (b)(1)1.4a, (b)(1)1.4b, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(4) ~~(S//NF)~~          (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(5) ~~(S//NF)~~          (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

37

~~SECRET//NOFORN~~

<span style="color:red">EXHIBIT 1</span>          USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4g

(6) (S//NF)                    (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(7) (S//NF)                    (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(8) (S//NF)                    (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(9) (S//NF)                    (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

38

SECRET//NOFORN

EXHIBIT 1          USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4g

b. (U//FOUO) In your opinion, are those measures sufficient?

(1) (S//NF)                          (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(2) (S//NF)                          (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(3) (S//NF)                          (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(4) (S//NF)                          (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g
(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

39

SECRET//NOFORN

EXHIBIT 1                          USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

    c. (U//FOUO) If not, you will make recommendations, as appropriate given your findings, to
improve force protection for the forces on the base.

       (1) (S//NF)           (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

       (2) (S//NF)            (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

40

SECRET//NOFORN

EXHIBIT 1

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c

(3) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(4) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(5) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(6) (S//NF)                    (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g
(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

41

SECRET//NOFORN

EXHIBIT 1                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

of action.

17. (U//FOUO) **(8h)** What is Bagram Airfield's base access policy?  When was the last review of
that policy?  You will make recommendations, as appropriate given your findings, regarding that
base access policy.

   a. (U//FOUO) What is Bagram Airfield's base access policy? When was the last review of
that policy?

      (1) (U//FOUO) Bagram Airfield's base access policy is codified in the "Badge,
Screening, and Access Standard Operating Procedures," last revised on 02 December 2016
(Exhibit 2AB).  This Standard Operating Procedure supersedes the 17 February 2015 Bagram
Airfield "Badge and Screening Policy" in effect during the 12 November 2016 attack.  The
policy identifies entrance onto Bagram Airfield and establishes procedures for controlling access
and privileges for Local Nationals, Other Country Nationals, Common Access Card holders, and
Coalition Forces.  This policy also outlines the procedures for barring personnel and enhancing
force protection during military operations.  The Directorate of Emergency Services, under the
authority of the U.S. Forces-Afghanistan Area Support Group Commander, executes this policy
(Exhibits 2AB, at 1 and 2BC).  All personnel requesting access to Bagram Airfield will submit a
badge application, Form 103 (Bagram Airfield Badge Request Form), Form 86 (Visitor
Request), proper identification and medical documentation (Exhibit 2AB, at 2).  The Force
Protection Screening Cell screens and vets all personnel (Local Nationals and Other Country
Nationals) desiring access to Bagram Airfield and enters applicants into the Biometric
Automated Toolset System (Exhibit 2AB, at 3).

      (2) (U//FOUO) The Bagram Airfield Ground Defense Area forces are responsible for
physical inspections of personnel and vehicles entering and exiting Bagram Airfield.  All Local
Nationals and Other Country Nationals entering Bagram Airfield on foot, that are in possession
of a Bagram Airfield badge, will enter through Entry Control Point 1 and undergo personnel and
property searches as well as biometrics verification (Exhibit 2AB).  Furthermore, they will hand-
carry a Form 86, Letter of Authorization and/or Letter of Justification authorizing their entry and

42

SECRET//NOFORN

EXHIBIT 1                              USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

hand-carried items (Exhibit 2AB).  Authorized Local Nationals and Other Country Nationals
arriving at Bagram Airfield via vehicle will enter Entry Control Point 3.  As with Entry Control
Point 1, all Local Nationals and Other Country Nationals must submit the required
documentation, undergo personal and vehicle searches, and enrollment into the Biometric
Automated Toolset System database.  Escorts are required for all Local Nationals entering the
installation to and from the Entry Control Points.  Final approval authority for base access is the
Area Support Group Commander or designee (Exhibit 2AB, at 3).  Entry Control Point 10 is for
U.S. and coalition tactical vehicles only and the Bagram Ground Defense Area Commander is
responsible for security protocol at this Entry Control Point (Exhibit 2AB, at 7).  The post-attack
revision of the Bagram Airfield base access policy (December 2016) made several changes to
mitigate vulnerabilities, principally:

    (a) (U//FOUO) The December 2016 policy states that "All personnel, not in uniform, are
required to maintain and display either a Common Access Card, Bagram Airfield Access Badge
or Resolute Support theater badge" (Exhibit 2AB, at 9).  The previous version did not include
military when out of uniform, and only applied to civilians (Exhibit 2AA, at 9).

    (b) (U//FOUO) The revised policy states all personnel on Bagram Airfield are subject to
be challenged and asked for Identification or Badge at any time (Exhibit 2AB, at 10); the 2015
policy did not include this language.

    (c) (U//FOUO) The 2016 policy eliminated Yellow Badges.  This is significant as the
2015 policy allowed Local Nationals to possess Yellow Badges, authorizing them unescorted
access and the authority to escort up to ten other Local National personnel and five vehicles
(Exhibit 2AA, at 12).

    (d) (U//FOUO) The new policy includes convoy escort requirements for Green Badge
Holders (Resident, non-U.S personnel), to include number of escorts required as well as lead and
trail vehicle requirements if escorting more than one Local National vehicle entering Entry
Control Point 3 (Exhibit 2AB, at 12, 15); the 2015 policy was vague and did not specify number
of escorts required for convoys (Exhibit 2AA, at 15).

    (e) (U//FOUO) The new policy changed Green Badge expiration and renewal timelines
from 12 months to six months to ensure more frequent Force Protection Screening (Exhibit 2AB,
at 13).

    (f) (U//FOUO) The new policy reiterated conditions and restrictions levied upon Red
Badge Holders.  Additionally, this 2016 revision eliminated the exemption that allowed Local
Nationals to operate unescorted within their workplace (Exhibits 2AA, at 11 and 2AB, at 11)

43

SECRET//NOFORN

EXHIBIT 1          USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

    b. Make recommendations, as appropriate given your findings, regarding that base access policy.

        (1) (U//~~FOUO~~) Nayeb was authorized entry to Bagram Airfield as a Red Badge holder (Exhibit 2Q).  Neither the 2015 Bagram Airfield Badging and Access Policy in place on 12 November 2016, nor the December 2016 revised policy, would have prevented the attacker's access to Bagram Airfield (Exhibits 2AA and 2AB).  Recommend re-screening all Local National personnel employed on Bagram Airfield to verify security status and re-issue appropriate color badge based on assessed risk to force protection.  This process is currently underway but is expected to take four to six months to complete.

        (2) (~~S//NF~~)              (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

        (3) (~~S//NF~~)              (b)(1)1.4a, (b)(1)1.4c

(b)(1)1.4a, (b)(1)1.4c

        (4) (U//~~FOUO~~) The 2016 policy no longer contains a reference prohibiting Local Nationals from possessing maps and documents while on Bagram Airfield.  Recommend adding statements similar to the 2015 policy that prohibits Local Nationals from possessing maps and documents except Afghan National Defense Security Forces with justification (Exhibit 2AA, at 17).

SECRET//NOFORN

EXHIBIT 1               USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(5) (U//FOUO) Recommend requiring Counterintelligence and Preliminary Credibility
Assessment Screening System vetting annually for all contractors with weapons privileges.  The
2016 policy states "all contractors will be required to pass a Counterintelligence screening and a
Preliminary Credibility Assessment Screening System examination prior to weapons privileges
being authorized on Bagram Airfield" (Exhibits 2AB, 4CO, 4CQ, 4AU, 4AV).  This indicates
that contractors are only required to be screened once in order to be able to carry weapons.
Considering the number of contract guards that failed vetting since the 12 November 2016
attack, incorporate annual screenings to reduce vulnerability and risk.

(6) (S//NF)                                    (b)(1)1.4a




                                    (b)(1)1.4a




(7) (U//FOUO) Recommend Command Operations Centers at each Entry Control Point
initiate 24-Hour Scan Reports.  The 2016 policy requires a daily 24-hour Scan Report checked to
ensure all Local Nationals who scanned on the installation scanned off the installation over a 24-
hour period (Exhibit 2AB, paragraph 20.a).  However, the current requirement does not indicate
who is responsible for running this report.  While numerous agencies may access the biometrics
report, it is unclear who has the responsibility for ensuring all Local Nationals actually departed.

(8) (U//FOUO) Recommend Task Force Biometrics initiate the 30-day Inactivity Report.
Task Force Biometrics can provide results to the Combined Joint Operations Center for review to
further reduce vulnerabilities.  The 2016 policy directs the generation of a daily 30-day Inactivity
Report in order to identify Local National workers who did not utilize their Bagram Airfield
access badge for entry or exit within the past 30 days (Exhibit 2B, paragraph 20.b).  However,
this paragraph does not specifically task a particular organization nor is there a system of checks
and balances to ensure the report is accomplished.

45

SECRET//NOFORN

**EXHIBIT 1**                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(9) (S//NF)                                    (b)(1)1.4a




                              (b)(1)1.4a




(10) (S//NF)                              (b)(1)1.4a, (b)(1)1.4g



                              (b)(1)1.4a, (b)(1)1.4g



18. (S//NF) (8i) In general, describe Bagram Airfields entry and exit procedures for Local
Nationals.  Are Local Nationals searched upon entry onto Bagram Airfield?  What are the
procedures, if any, to search Local Nationals coming onto Bagram Airfield?  How many s-vests
entered Bagram Airfield via Local Nationals, and by what method(s) did they accomplish this?
You will make suggestions, as appropriate given your findings, regarding the procedures for the
entry/exiting the base.

     a. (S//NF) In general, describe Bagram Airfields entry and exit procedures for Local
Nationals.

     (1) (U//FOUO) Bagram Airfield's base access policy is codified in the "Badge,
Screening, and Access Standard Operating Procedures," last revised on 02 December 2016
(Exhibit 2AB)  This Standard Operating Procedure supersedes the 17 February 2015 Bagram
Airfield "Badge and Screening Policy", in effect during the 12 November 2016 attack.  The

46

SECRET//NOFORN

<span style="color:red">EXHIBIT 1</span>                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

policy identifies entrance onto Bagram Airfield and establishes procedures for controlling access
and privileges for Local Nationals, Other Country Nationals, Common Access Card holders, and
Coalition Forces. This policy also outlines the procedures for barring personnel and enhancing
force protection during military operations. The Directorate of Emergency Services, under the
authority of the U.S. Forces-Afghanistan Area Support Group Commander, executes this policy
(Exhibits 2AB, at 1 and 2BC). All personnel requesting access to Bagram Airfield will submit a
badge application, Form 103 (Bagram Airfield Badge Request Form), Form 86 (Visitor
Request), proper identification and medical documentation (Exhibit 2AB, at 2). The Force
Protection Screening Cell screens and vets all personnel (Local National and Other Country
National) desiring access to Bagram Airfield and enters applicants into the Biometric Automated
Toolset System (Exhibit 2AB, at 3).

(2) (U//FOUO) Local nationals entering Bagram Airfield by foot will use Entry Control
Point 1 and require personnel and property searches, biometric screening, and all proper
documentation (Exhibit 2AB). Local Nationals will process through eight security layers and
five physical searches. In sequence, the stations are as follows:

(a) (S//NF)

(b) (S//NF)

(c) (S//NF)

(d) (S//NF)

(e) (S//NF)                    (b)(1)1.4a, (b)(1)1.4g

(f) (S//NF)

(g) (S//NF)

(h) (S//NF)

(3) (U//FOUO) Local Nationals exiting Bagram Airfield by foot will exit using Entry
Control Point 1 and are subject to personal and property searches in reverse order (Exhibits 2AB
and 2O). Adherence to this standard is corroborated by Task Force Tiger, the Reed Inc. Site
Manager, and the U.S. Marine Corps advisors operating the Entry Control Point (Exhibits 2B,
2C, 2J, and 2N).

47

SECRET//NOFORN

**EXHIBIT 1**                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

    (4) (S//NF)                (b)(1)1.4a


                (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g


    (a) (S//NF)

    (b) (S//NF)
search

    (c) (S//NF)
search

    (d) (S//NF)
                (b)(1)1.4a
    (e) (S//NF)

    (f) (S//NF)

    (g) (S//NF)

    (h) (S//NF)

    (i) (S//NF)

    (5) (U//FOUO) (Exhibits 2AB and 2P, Diagram of Entry Control Point 3).  Local
Nationals exiting Bagram Airfield via vehicle will exit using Entry Control Point 3 and are
subject to personal and vehicle search followed by Z-Backscatter X-Ray scanner before exiting.
Adherence to this standard is corroborated by Task Force Tiger, the Reed, Inc.  Site Manager,
and the U.S. Marine Corps advisors operating the Entry Control Point (Exhibits 2B, 2C, 2J, and
2N).

    b. (S//NF) Are Local Nationals searched upon entry onto Bagram Airfield?  What are the
procedures, if any, to search Local Nationals coming onto Bagram Airfield? How many suicide

48

SECRET//NOFORN

EXHIBIT 1

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

vests entered Bagram Airfield via Local Nationals, and by what method did they accomplish
this?

    (1) (U//FOUO) All Local National employees are searched upon entry onto Bagram
Airfield (Bagram Airfield) through Entry Control Point 1 and Entry Control Point 3 (Exhibits
2B, 2C, and 2AB).  Local Nationals entering Bagram Airfield by foot will enter through Entry
Control Point 1 and are rotated through eight security stations with physical searches being
conducted at five (5) stations as described in Entry Control Point 1 entering and exiting
procedures (Exhibits 2B, 2C, 2N, 2AB, and 2O).  Similar to Entry Control Point 1, Local
National drivers and vehicles entering Bagram Airfield through Entry Control Point 3 are rotated
through nine security stations with physical searches being conducted at three stations as
described in Entry Control Point 3 Entering and Exiting procedures (Exhibits 2B, 2C, 2N, 2AB
and 2P).  In addition to the standards laid out in the Standard Operating Procedure, the 12
November 2016 attack led to the addition of coalition forces at each Entry Control Point search
station to provide oversight of Local National Reed Inc. employees and to conduct secondary
searches (Exhibit 2B, 2C, 2G, 2H, 2J, 2L, and 2N).

    (2) (S//NF) The evidence supports the suicide vest was assembled on Bagram Airfield by
Nayeb at his workplace inside the non-tactical vehicle yard and not preassembled prior to
entering the installation (Exhibit 2Q).  Counterintelligence source reporting indicates Nayeb
likely smuggled small quantities of homemade explosive onto Bagram Airfield over
approximately four months (Exhibits 4CK, 4CI, 5N, and 5A).  Nayeb reportedly smuggled
homemade explosives onto Bagram Airfield utilizing a smokeless tobacco style bag or can which
he then concealed in another container (Exhibits 5N and 5A).  The string used to assemble the
vest was a forensic match to string found at Nayeb's worksite (Exhibit 2Q).  Similar components
of the suicide vest used as projectiles (bolts and nuts) were also found at Nayeb's work facility
(Exhibit 2Q).  In addition, the switch used to trigger the suicide vest was similar to switches that
were readily available and unaccounted for in a trash container at Nayeb's work facility (Exhibit
2Q).  There is no evidence at this time that reveals additional vests were constructed on or
entered Bagram Airfield (Exhibit 2Q).

    c. (S//NF) You will make suggestions, as appropriate given your findings, regarding the
procedures for the entry/exiting the base.

        (1) (S//NF)                        (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g


                        (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g


49

SECRET//NOFORN

**EXHIBIT 1**                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(2) (S//NF)                          (b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4c, (b)(1)1.4g

19. (S//NF) (8i) Did this incident uncover any vulnerabilities as it relates to accountability in
general, of Local Nationals entering and exiting the base?  Are security forces properly
maintaining accountability of the entry and exit of Local Nationals?  You will make
recommendations, as appropriate given your findings, to the procedures or equipment regarding
the entry and exit of Local Nationals onto Bagram Airfield.

a. (S//NF) Did this incident uncover any vulnerabilities as it relates to accountability in
general, of Local Nationals entering and exiting the base?  Are security forces properly
maintaining accountability of the entry and exit of Local Nationals?

(1) (S//NF)                          (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

50

EXHIBIT 1                              USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4g

(2) (U//FOUO) In addition to Local Nationals authorized to perform escort duties, Local
Nationals also held key access control positions at all Entry Control Points (Exhibit 2AX).  The
Local Nationals manned all of the various search stations and often times were supervised by
other Local National supervisory personnel (Exhibits 2B, 2C, 2N, 2AQ, 2AX).  Furthermore, the
Local National guards at several locations within the Entry Control Points were armed and
operated with minimal oversight by coalition personnel (Exhibit 2B).  Georgian Soldiers now
supervise all but the outermost checkpoints within the Entry Control Points, however several
Local Nationals are still authorized to carry weapons (Exhibits 2B, 2C and 2N).

(3) (S//NF)                          (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(4) (S//NF)                          (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

51

SECRET//NOFORN

EXHIBIT 1                          USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(5) (S//NF)                                (b)(1)1.4a, (b)(1)1.4g

                                (b)(1)1.4a, (b)(1)1.4g

(6) (S//NF)                                (b)(1)1.4a, (b)(1)1.4g

                                (b)(1)1.4a, (b)(1)1.4g

(7) (S//NF)                                (b)(1)1.4a, (b)(1)1.4g

                                (b)(1)1.4a, (b)(1)1.4g

52

SECRET//NOFORN

**EXHIBIT 1**                    **USARCENT FOIA FA-17-0184**

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4g

    b. (S//NF) Make recommendations, as appropriate given your findings, to the procedures or
equipment regarding the entry and exit of Local Nationals onto Bagram Airfield.

      (1) (S//NF)                   (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

      (2) (S//NF)                   (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

      (3) (S//NF)                   (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

53

SECRET//NOFORN

EXHIBIT 1                  USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

    (4) (S//NF)          (b)(1)1.4a, (b)(1)1.4g


          (b)(1)1.4a, (b)(1)1.4g


    (5) (S//NF)          (b)(1)1.4a, (b)(1)1.4g


          (b)(1)1.4a, (b)(1)1.4g


    (6) (S//NF)          (b)(1)1.4a, (b)(1)1.4g


          (b)(1)1.4a, (b)(1)1.4g


54

SECRET//NOFORN

**EXHIBIT 1**      USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4g

20. (U//FOUO) (8k) What steps did the command take immediately following the incident?

a. (U//FOUO) Immediately prior to the explosion, over 200 personnel were gathering at the
run start site at an area referred to as the "Disney Clamshell." The Commander and    (b)(3), (b)(6)
    (b)(3), (b)(6)    for Bagram Airfield had departed their quarters at 0530 en route to the run site,
where the commander was scheduled to make the opening remarks (Exhibit 3P). The Resolute
Support Sustainment Brigade    (b)(3), (b)(6)    and over a dozen Soldiers, having realized they could
not conduct planned combatives certification inside the clamshell due to the run, walked past the
Bagram Airfield    (b)(3), (b)(6)    and    (b)(3), (b)(6)    and moments later were within
meters of the explosion (Exhibit 3M). The Area Support Group    (b)(3), (b)(6)    had just signed in
on the roster and initially thought the explosion sound emanated from the loudspeakers playing
music for the Morale, Welfare, and Recreation event. After a hush fell over the assembled
group, leaders began orchestrating efforts to clear the area and to begin treating the wounded
(Exhibit 2L).

b. (U//FOUO) Among the first uninjured on scene were the Bagram Airfield Commander and
(b)(3), (b)(6) the Area Support Group    (b)(3), (b)(6)    and    (b)(3), (b)(6)    as well as the
Romanian Military Police element initially staged for the event. The Bagram Airfield
    (b)(3), (b)(6)    instructed those on scene to "secure the blast site and ensure no threats were in the
area, conduct first aid and CASEVAC, sound the alarm for a ground attack, place the entire base
on full alert with everyone in [Personal Protective Equipment] and locked down except
personnel involved in security and first responder operations, and to gain 100% personnel
accountability" (Exhibit 3P). The Area Support Group    (b)(3), (b)(6)    worked with the Romanian
Military Police element to establish the Incident Command, which the Base Provost Marshal
assumed upon arrival soon thereafter (Exhibits 2L and 2I). The Bagram Airfield and Area
Support Group    (b)(3), (b)(6)    conducted a visual sweep of the surrounding area to
look for secondary devices based upon a known tactic for local threat actors (Exhibit 2L). And
    (b)(3), (b)(6)    a Senior Medical Operations Noncommissioned Officer
preparing for the run, and his medic began serving as first responders and treating the wounded,
many of whom were piled on top of each other upon their arrival (Exhibits 2L, 3M, and 6H).

c. (U//FOUO) Due to the number and severity of the wounded, leadership onsite began
identifying personnel and non-standard evacuation vehicles for transport to the Craig Joint
Theater Hospital approximately 800 meters away from the blast site. Meanwhile, the Area
Support Group    (b)(3), (b)(6)    and    (b)(3), (b)(6)    relocated to the Area Support Group
Headquarters to activate the Emergency Operations Center – from which they coordinated

SECRET//NOFORN

EXHIBIT 1                                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

follow-on actions by first responders still moving towards the site or transporting personnel to
the hospital. The Combined Joint Operations Center, approximately 300 meters away from the
blast site, directed the Persistent Threat Detection System towards the scene of the incident and
received reports from the Emergency Operations Center (primarily via phone) and the Incident
Commander (via Light Mobile Radio) (Exhibits 3G and 3H), relaying reports to the Resolute
Support Headquarters in Kabul.

    d. (U//FOUO) The   (b)(3), (b)(6)  of Bagram Airfield issued guidance to and through the
Combined Joint Operations Center to assume mission command (Exhibits 3P, 3J). Beyond the
confirmed explosion and known casualties – initially seven reported to the Craig Joint Theater
Hospital (Exhibits 6A and 3X) – the headquarters received reports of additional potential force
protection threats (Exhibits 3E, 3G, 3H, 3I, 3J, 3L, 3P, 3X). Perimeter guards reported
unmanned aerial systems sightings at 0632, among other sightings; a suspicious brown box and
crowd massing at Entry Control Point 1 at 0613 and 0635, respectively; small arms fire at 0630
and 0652; and unconfirmed explosions at 1014 and 1157 (Exhibits 3E and 3X).

    e. (S//NF)                 (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

    f. (S//NF) As those outside of the immediate area continued to wait in the bunkers and
casualties underwent treatment at the hospital, the Combined Joint Operations Center began
orchestrating efforts to manage the local national population still on the base (Exhibits 3G, 3H,
3I, 3J, 3T, 3X).             (b)(1)1.4a, (b)(1)1.4d, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4d, (b)(1)1.4g

56

SECRET//NOFORN

EXHIBIT 1

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a, (b)(1)1.4d, (b)(1)1.4g

    g. (U//~~FOUO~~) Were those steps appropriate given the circumstances?

      (1) (U//~~FOUO~~) In light of the circumstances – an unexpected form of inside-the-wire attack followed by sporadic reporting from around the base potentially indicating a complex attack – the chain of command's actions following the incident helped contain and mitigate the effects of the attack.  Despite the limited visibility (zero illumination at the time of the attack) (Exhibit 3Y), and the initial uncertainty on what caused the explosion, the Combined Joint Operations Center and leaders on the ground made sound decisions and directed appropriate actions.  The hospital was notified within two minutes of the blast, a Military Police patrol was on site within three minutes, and rotary wing assets were mobilized within seven minutes (Exhibits 3E and 3X).  Further, the establishment of Incident Command quickly progressed from an ad hoc assortment of leaders and first responders to the Area Support Group Provost Marshal, and medics and others onsite orchestrated first aid and movement of casualties to the hospital in a sequence conducive to life-saving treatment (Exhibits 3E, 3X, 6A, 6B, 6C, and 6H).

      (2) (~~S//NF~~)

(b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

      (3) (U//~~FOUO~~) In the days and weeks that followed, the command took a number of actions to understand the event and to prevent similar insider attacks.  The institution of a base-

57

SECRET//NOFORN

<span style="color:red">EXHIBIT 1</span>

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

wide Operations, Intelligence, and Investigation Update – which has now become an Operations
and Intelligence Update – assembled the right leaders to maximize crosstalk and shared
understanding. Through those sessions, the command identified dozens of initiatives that would
improve perimeter security, address insider threat risks, and better coalesce the community of
practice (Exhibit 3A and 3K). Through concerted command presence, the Bagram Airfield
Commander's leadership has reduced the risk of a similar attack. His "New Normal", with lines
of effort to address 1) Contractors Policies and Practices; 2) Improvement of Layered Security;
and 3) Integrated Base Response roles and responsibilities (Exhibit 3P) has begun addressing the
culture of complacency that may have allowed the community to miss discernible indicators of
or potential for high profile attacks.

    h. (U//FOUO) Are there any suggested improvements to the command's handling of such an
incident in the future?

        (1) (U//FOUO) To an extent, the response to this attack benefitted from proximity to key
leaders and headquarters. The immediate availability of both the Division    (b)(3), (b)(5)    and the
Area Support Group    (b)(3), (b)(6)    minimized the time required for key leaders to acquire
situational understanding. Further, the presence of Romanian Military Police at the run start site
placed them on scene within three minutes of the blast (Exhibits 2L and 3E). Favorable weather,
albeit with no illumination, allowed persistent intelligence, surveillance, and reconnaissance
assets to acquire over watch of the blast site. And the presence of a medical team on site – albeit
no Field Litter Ambulance for this particular event (Exhibits 6A and 6H) – expedited first
responder treatment and medical evacuation via non-standard means (Exhibits 6A, 6B, 6C, and
6H). Further, the incident occurring on an installation with a Role III hospital with robust trauma
capability only 800 meters down the main thoroughfare minimized the time between the point of
injury and surgical-level care (Exhibit 6B).

        (2) (U//FOUO) Most suggested improvements regarding the command's response to the
incident pertain to actions prior to the incident itself. First, for events like the run scheduled for
that morning, recommend commands execute Special Event Vulnerability Risk Assessments –
required for events involving 300 or more people – prior to execution of large events. As per
DoDI 2000.16 (Exhibit 2BE) and the Bagram Airfield Antiterrorism Plan (Exhibit 2V), this
assessment would identify potential threats and risks and then identify and rehearse key actions
required by first responders and unit leaders. Had such an assessment occurred prior to 12
November 2016, emergency management leaders and responders would identify and coordinate
the requirement for an on-site ambulance and the location of the nearest Casualty Collection
Point and associated medical supplies (two Casualty Collection Points are within 200 meters of
the blast site.) Rehearsing contingencies may also have led the medics to more appropriately
tailor their aid bags towards potential threat streams, rather than explicitly for run injuries

58

EXHIBIT 1                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(Exhibit 6H).  Finally, rehearsals would have more clearly delineated the mission command plan
and the appropriate posture consistent with Anti-Terrorism and Force Protection doctrine.

(3) (U//FOUO) Second, recommend further consideration of the "Big Voice" battle drills
and the Base Defense SOP might improve shared understanding and improve responsiveness
throughout the base.  At present, calls exist for indirect fire, an attack on the perimeter, mass
casualty (as determined at the Craig Joint Theater Hospital), and active shooter (Exhibit 2U).  In
this instance, the "Cavalry Charge" call led personnel to seek shelter and may have expedited
Task Force Tiger's mobilization and response to an external threat, but it also left the vast
majority of base personnel under cover for an extended period of time.  This compounded
challenges with accountability both for coalition and local national personnel (Exhibits 2L and
3L).  See PIR 8n for further analysis of "Big Voice" recommendations.

(4) (S//NF) Third, recommend                    (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

(5) (S//NF) Fourth,                    (b)(1)1.4a, (b)(1)1.4g

(b)(1)1.4a, (b)(1)1.4g

59

EXHIBIT 1                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

    (6) (S//NF) Fifth,           (b)(1)1.4a, (b)(1)1.4d, (b)(1)1.4g

                                       (b)(1)1.4a, (b)(1)1.4d, (b)(1)1.4g

21. (U//FOUO) (8l) What steps did PMO take following the incident?  Were those steps
appropriate given the circumstances?  Are there any suggested improvements to PMO's handling
of such an incident in the future?

    a. (S//NF) What steps did PMO take following the incident?  At approximately 0538,
Bagram Airfield Provost Marshal Office responded to a person-borne improvised explosive
device explosion in the vicinity of the Bagram Airfield Disney Post Exchange.  The Bagram
Airfield Provost Marshal's Office dispatched Emergency Medical Service to the scene at 0540 as
additional Military Police patrols arrived to assist with lifesaving procedures, attempt to establish
an initial cordon, and conduct safety sweeps (Exhibit 2AC).      (b)(1)1.4a

                                  (b)(1)1.4a

60

SECRET//NOFORN

EXHIBIT 1

USARCENT FOIA FA-17-0184

Approved for Release

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a

b. (U//FOUO) Were those steps appropriate given the circumstances?  Yes, the PMO steps
were appropriate and complied with Army Field Manual 3-39, "*Military Police Operations*", and
Bagram Airfield standards identified in the First Responders Operation Working Group Standard
Operating Procedure (Exhibit 2AH, 2G).  Field Manual 3-39, "*Military Police Operations*",
Chap. 3-105, establishes guidelines for Military Police responses to terrorist attacks.  These
emergency response actions incorporate measures to treat casualties, apprehend perpetrators,
preserve evidence, minimize property damage, restore operations, and expedite the criminal
investigation and collection of lessons from terrorist incidents (Exhibit 2G).  The Bagram
Airfield Provost Marshal's Office Military Police were one of the first responders to arrive at the
scene and immediately began to conduct lifesaving procedures on the wounded.  Emergency
Medical Services, Military Police patrols, Military Working Dogs and Explosive Ordinance
Disposal worked to establish the initial cordon and search for secondary devices.  Although there
was confusion early in the response, the actions of the Provost Marshal's Office were in line with
Army Field Manual 3-39 and Bagram Airfield's First Responders Working Group.

c. (U//FOUO) Are there any suggested improvements to PMO's handling of such an incident
in the future?

(1) (U//FOUO) Recommend rehearsing the incident response plans and establishing a
concrete incident command reporting chain.  Conduct these events as described in the Bagram
Airfield Base Defense Plan, dated 15 December 2015 (Exhibit 2U).  Include Tactical Exercises
Without Troops (TEWTs) or tabletop exercises, in order to synchronize communication and
improve unity of effort during incident response through incident command.  Despite the
language of the Bagram Airfield Base Defense Plan (Exhibit 2U), the incident response was not
synchronized between first responders.  An initial Incident Command was attempted to be
established by the first arriving patrol however, the responding units of Emergency Management
Services, Fire, and Explosive Ordinance Disposal did not report to an identified incident
commander who could then direct additional assets where needed.  The uncoordinated arrival of
additional personnel to the scene for causality evacuation, secondary explosive device sweeps,
and other activities allowed multiple people to walk and drive through the crime scene and

61

SECRET//NOFORN

EXHIBIT 1    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

possibly distort evidence.  For instance, the        (b)(3), (b)(6)        mentioned, "I don't want to sound coarse, but when the fire trucks showed up, they were driving right down the road and me and the CG were pushing them off so they didn't run over body parts and stuff like that" (Exhibit 2L).  A clearly defined and standardized incident command, in accordance with the National Incident Management System, will enhance first response and crime scene coordination, preventing such instances from occurring (Exhibit 2AJ).  Communication was also an issue at the scene of the incident with multiple agencies and coalition forces responding.  Highlighting the communication challenges,      (b)(3), (b)(6)      stated there needs to be, "better communication with security forces patrolling the roads on Bagram Airfield.  If you are going to have security forces patrolling our streets on Bagram at any hour of the day, they should have communication with either Task Force MED or USFOR-A and they have got to speak English." (Exhibit 6H).  A lack of rehearsals, synchronized communication efforts, and clear leadership roles contributed to an inability to understand the situation from responding assets and coalition security forces.  Incident Response Plan rehearsals could have alleviated some confusion and provided alternatives to language and communication barriers experienced on 12 November 2016.

        (2) (S//NF) Recommend conducting Bagram Airfield-wide emergency management rehearsals to ensure all responding assets are familiar with processes and procedures as described in the Bagram Airfield Base Defense Plan (Exhibit 2U).                    (b)(1)1.4a

(b)(1)1.4a

SECRET//NOFORN

**EXHIBIT 1**                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a

22. (U//FOUO) **(8m)** What steps did Task Force MED take following the incident? Were those
steps appropriate given the circumstances? Are there any suggested improvements to Task Force
MED's handling of such an incident in the future?

   a. (U//FOUO) What steps did Task Force MED take following the incident?

      (1) (U//FOUO) On 12 0538 November 2016, a suicide bomber detonated near the Base
Exchange along Disney Drive on Bagram Air Field (Exhibit 1B).  The emergency room received
notification of the blast and alerted the Trauma Czar and the        (b)(3), (b)(6)        of Clinical
Services on duty that seven patients were inbound to Craig Joint Theater Hospital at which time
an "Extended Trauma" was ordered (Exhibit 6A).  An Extended Trauma requires all surgeons
and nurses to report to Craig Joint Theater Hospital but does not initiate a full hospital recall
(Exhibits 6A, 6B, 6C, 6F).  The first seven patients arrived within minutes of the blast by
vehicles of opportunity and ambulance in an order that was consistent with the severity of their
injuries (Exhibits 6A, 6B).  As the patients arrived they were transported into the trauma bay and
given lifesaving care (Exhibits 6A, 6B).  At 0615 it became apparent to the hospital staff that
more than seven patients were going to require care.  The        (b)(3), (b)(6)        of Craig Joint
Theater Hospital    (b)(3), (b)(6)    ordered an internal MASCAL, which brings all Craig Joint
Theater Hospital staff to the hospital (Exhibits 6A, 6C).

      (2) (U//FOUO) Patients were moved from the Trauma Bay to the Operating Room for
surgery in accordance with the severity of their injuries (Exhibit 6B).  On 12 November 2016,
the operating room teams performed 43 procedures on nine patients, running up to four cases
simultaneously in three operating rooms for over twelve hours (Exhibits 6A, 6B, 6E).  A total of
19 patients received medical care on 12 November 2016 (Exhibit 6E).

      (3) (U//FOUO) Once the patients were stabilized and out of surgery, Craig Joint Theater
Hospital staff prepared them for evacuation from theater via a Critical Care Air Transport
(Exhibit 6A, 6B, 6c).  The Critical Care Air Transport flight left for Landstuhl Regional Medical
Center at approximately 0730 on 13 November 2016 with six intubated patients cared for by
three Critical Care Air Transport teams (Exhibit 6A, 6B, 6C).

      (4) (U//FOUO) Task Force MED conducted four MASCAL rehearsals between 01
October and 12 November 2016 (Exhibits 6A, 6B, 6C).  These rehearsals included all
appropriate hospital staff as well as medical providers external to Craig Joint Theater Hospital
(Exhibits 6A, 6B, 6C).  As a result of these rehearsals, Task Force MED was well prepared for

63

SECRET//NOFORN

EXHIBIT 1                                    USARCENT FOIA FA-17-0184

~~SECRET//NOFORN~~

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

the events of 12 November 2016 and was able to integrate medical professionals from external agencies who arrived to assist (Exhibits 6A, 6B, 6C).

   b. (U//~~FOUO~~) Were those steps appropriate given the circumstances? Yes. The steps taken by Task Force MED on 12 November 2016 were appropriate given the circumstance and are to be commended. The actions of Task Force MED saved the lives of the critically wounded who arrived to Craig Joint Theater Hospital. Every patient who arrived at Craig Joint Theater Hospital alive was stabilized and evacuated from theater alive (Exhibit 6B).

   c. (U//~~FOUO~~) Are there any suggested improvements to Task Force MED's handling of such an incident in the future?

      (1) (U//~~FOUO~~) Task Force MED conducted an extensive after action review with all members of the medical community on Bagram Airfield immediately following the incident (Exhibits 6A, 6B, 6C). In the after action review they captured specific areas where they could improve their operations (Exhibit 6E).

      (2) (~~S//NF~~)                                    (b)(1)1.4a




                                        (b)(1)1.4a




23. (U//~~FOUO~~) **(8n)** Is the knowledge and training on Bagram Airfield regarding the "Big Voice" sufficient? Further, is the knowledge and training sufficient, detailing the actions individuals on Bagram Airfield should take regarding different proposed incidents?

   a. (~~S//NF~~)                                    (b)(1)1.4a

                                        (b)(1)1.4a

~~SECRET//NOFORN~~

**EXHIBIT 1**                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT: Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(b)(1)1.4a

b. (S//NF) Training regarding individual actions upon "Big Voice" alarms is insufficient. Additionally, communication procedures to initiate a "Big Voice" alert are not well understood. Specific findings:

(1) (S//NF) The first "Big Voice" alarm did not sound until 23 minutes following the detonation of a suicide vest on 12 November 2016 (Exhibit 2F, 2I, 2L, 2M).

(2) (S//NF) All new personnel at Bagram Airfield view an instructional video at the passenger terminal upon arrival regarding "Big Voice" warnings and individual responsibilities (Exhibit 2AZ).

(3) (S//NF) A personal response action card is available to personnel that covers individual actions to incidents such as active shooter, bomb threats, shelter-in-place, and indirect fire (Exhibit 2AV).

(4) (S//NF) While indirect fire individual actions are understood due to the frequency of such attacks, no documented Bagram Airfield-wide training or rehearsals were conducted over the past six months to exercise responses to other types of warnings or attacks (Exhibit 2AZ, 2J, 2K).

(5) (S//NF) Little to no coordination occurs between the Combined Joint Operations Center "Big Voice" controllers or military personnel and the Area Support Group Emergency Management Officer, resulting in a lack of mission command and unity of effort (Exhibit 2AZ, 2K, 2L).

c. (U//FOUO) Are there any suggested improvements to enhance knowledge of actions to take for each type of incident?

65

SECRET//NOFORN

EXHIBIT 1

USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG

SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram Airfield, Afghanistan

(1) (S//NF)                                        (b)(1)1.4a

(2) (S//NF)                                        (b)(1)1.4a

                                                   (b)(1)1.4a

66

SECRET//NOFORN

EXHIBIT 1                            USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a

(3) (S//NF)                                (b)(1)1.4a

(b)(1)1.4a

(4) (S//NF)                                (b)(1)1.4a

(b)(1)1.4a

24. (U//FOUO) **(8o and 8p)** You may identify and describe any other processes, procedures,
systems, and/or equipment that could have contributed to or influenced this incident.  You will
make suggested improvements, if any, regarding the same.  Address any other matters pertaining
to this incident that you deem relevant.

a. (S//NF)                                (b)(1)1.4a

(b)(1)1.4a

67

SECRET//NOFORN

<span style="color:red">EXHIBIT 1</span>            USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a

b. (S//NF)                                    (b)(1)1.4a

(b)(1)1.4a

c. (S//NF)                                    (b)(1)1.4a

(b)(1)1.4a

d. (S//NF)                              (b)(1)1.4a

(b)(1)1.4a

68

SECRET//NOFORN

EXHIBIT 1                                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

(b)(1)1.4a

e. (S//NF)                              (b)(1)1.4a

(b)(1)1.4a

f. (S//NF)                              (b)(1)1.4a

(b)(1)1.4a

69

EXHIBIT 1                    USARCENT FOIA FA-17-0184

SECRET//NOFORN

AFZC-CG
SUBJECT:  Army Regulation 15-6 Investigation on the 12 November 2016 Attack on Bagram
Airfield, Afghanistan

25. (U//FOUO) The point of contact for this memorandum is the undersigned at      (b)(6)
or thomas.s.james3.mil/@mail.mil.

(b)(6)


THOMAS S. JAMES, JR.
Major General, USA
Investigating Officer

70

SECRET//NOFORN

**EXHIBIT 1**            USARCENT FOIA FA-17-0184

# Exhibit 2A:

(b)(3), (b)(6)

EXHIBIT 38

# SWORN STATEMENT

For use of this form, see AR 190-45; the proponent agency is PMG.

## PRIVACY ACT STATEMENT

| | |
|---|---|
| **AUTHORITY:** | Title 10, USC Section 301, Title 5, USC Section 2951, E.O. 9397 Social Security Number (SSN) |
| **PRINCIPAL PURPOSE:** | To document potential criminal activity involving the U.S. Army, and to allow Army officials to maintain discipline, law and order through investigation of complaints and incidents. |
| **ROUTINE USES:** | Information provided may be further disclosed to federal, state, local, and foreign government law enforcement agencies, prosecutors, courts, child protective services, victims, witnesses, the Department of Veterans Affairs, and the Office of Personnel Management. Information provided may be used for determinations regarding judicial or non-judicial punishment, other administrative disciplinary actions, security clearances, recruitment, retention, placement, and other personnel actions. |
| **DISCLOSURE:** | Disclosure of your SSN and other information is voluntary. |

| 1. LOCATION | 2. DATE (YYYYMMDD) | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| BAF, Afghanistan | 20161223 | 1530 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| (b)(3), (b)(6) | (b)(6) | (b)(6) |

8. ORGANIZATION OR ADDRESS
Task Force Justice (CID) 16-17, 3rd Military Police Group (CID), Bagram Airfield, Afghanistan, APO AE 09354

9.
  (b)(3), (b)(6)                           WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH

Q. Has your investigation identified any local nationals, other country nationals, coalition forces or US individuals who may have conspired with Nayeb?

A. My unclassified investigation Law Enforcement Report (LER): 00136-2016-CID369-021591, only has the suicide bomber, Mr. Ahmad Nayab Abdul Zuhoor, indexed as a subject for Murder and Attempted Murder. I have classified exhibits in my investigation produced from other military agencies who identified co-conspirators to the suicide bomber. At this time, CID does not plan on listing the co-conspirators as subjects in the unclassified LER due to the classified means in which they were identified as subjects/co-conspirators.

Q. Do you have anything to add that is not included in your official Law Enforcement Report (LER)?

A. This investigation is still open by CID at the time of this statement. All identified investigative activity by CID has been completed to date. CID is pending receipt of Final Autopsy Reports, Final Information Reports from outlining CID Offices, TF Crimson (AFOSI) Report, and Final Lab Reports from ACME & USACIL. I expect to seek a legal opinion from USFOR-A SJA for the offenses listed within the next two weeks. /// NOTHING FURTHER ///

| 10. EXHIBIT | | STATEMENT | |
|---|---|---|---|
| | (b)(3), (b)(6) | PAGE 1 OF 2 PAGES | |

ADDITIONAL PAGES MUST CONTAIN THE HEADING "ST[A    DATED ____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED

**DA FORM 2823, NOV 2006**          PREVIOUS EDITIONS ARE OBSOLETE          APD PE v1.01ES

UNCLASSIFIED// FOR OFFICIAL USE ONLY

# EXHIBIT 1

UNCLASSIFIED //FOR OFFICIAL USE ONLY

| STATEMENT OF (b)(3), (b)(6) | TAKEN AT BAF | DATED 23 DEC 16 |

9. STATEMENT *(Continued)*

(b)(3), (b)(6)

NOT USED

(b)(3), (b)(6)

**AFFIDAVIT**

I (b)(3), (b)(6) HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE 2 . I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFU

(b)(3), (b)(6)

WITNESSES:

(b)(3), (b)(6)

OR

(b)(3), (b)(6)

H

ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 23 day of DECEMBER 2016 at Bagram Airfield, Afghanistan

*(Signature of Person Administering Oath)*

Thomas S. James Jr.
*(Typed Name of Person Administering Oath)*
Article 136 (B)(4), U.C.M.J.
*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING ST/ (b)(3), (b)(6)    PAGE 2 OF 2 PAGES

**DA FORM 2823, NOV 2006**    APD PE v1.01ES

UNCLASSIFIED //FOR OFFICIAL USE ONLY

**EXHIBIT 1**

**Exhibit 3O – Sworn Statement of** (b) (6)
271700DEC16

This exhibit is an 8-page sworn statement and is a scanned copy of the original. (b) (6)
. (b)(3) 10 USC §130b (b)(6)     is the POC for the original document and can be contacted at
. (b)(3) 10 USC §130b (b)(6)

EXHIBIT 43

## SWORN STATEMENT

For use of this form, see AR 190-45; the proponent agency is PMG.

### PRIVACY ACT STATEMENT

| | |
|---|---|
| **AUTHORITY:** | Title 10, USC Section 301; Title 5, USC Section 2951; E.O. 9397 Social Security Number (SSN) |
| **PRINCIPAL PURPOSE:** | To document potential criminal activity involving the U.S. Army and to allow Army officials to maintain discipline, law and order through investigation of complaints and incidents |
| **ROUTINE USES:** | Information provided may be further disclosed to federal, state, local, and foreign government law enforcement agencies, prosecutors, courts, child protective services, victims, witnesses, the Department of Veterans Affairs, and the Office of Personnel Management. Information provided may be used for determinations regarding judicial or non-judicial punishment, other administrative disciplinary actions, security clearances, recruitment, retention, placement, and other personnel actions |
| **DISCLOSURE:** | Disclosure of your SSN and other information is voluntary |

| 1. LOCATION BAF, Afghanistan | 2. DATE (YYYYMMDD) 20161212 | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| 5. LAST NAME, FIRST NAME, MIDDLE NAME (b)(6) | 6. SSN N/A | | 7. GRADE/STATUS (b)(3) 10 USC §130b (b)(6) |

8. ORGANIZATION OR ADDRESS
J 3/5

9.
I, _____ (b)(6) _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH

||FOUO

Q. How long have you been serving in the J3/5?
A. A total of 4 months.

||FOUO

Q. How long have you been here at BAF?
A. I came in on STRAT air, about 2 September. I did not do PDSS here.

||FOUO

Q. Can you describe your duties and responsibilities here?

(b)(1)1.4a

||FOUO

Q. Are you familiar with the task organization of BAF and how it relates to security?
A. Yes, sir. (b)(6) is probably the SME, when we first got here and figure out our authorities and our five hats, he was our action officer for the 3 and because of that he was starting to figure out all the relationships. He is a very smart individual. As we came in, one of the first things we identified was the force protection. So we made him the action officer on FP because he understood the authorities, he understood the security piece at that time.

||FOUO

Q. Did you get specific guidance from General Thompson when he came in?
A. The specific guidance was given as soon as we got here; it wasn't written, mostly VOCOs. But it was the badging, he didn't appreciate the way that either the badges were displayed or the badging policies, so, that was one of the first things we tagged. And then LNs. We understood pretty early on through the CG that there might have been a squatter

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 8 PAGES |
|---|---|---|

*ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF _____ TAKEN AT _____ DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED*

**DA FORM 2823, NOV 2006**      PREVIOUS EDITIONS ARE OBSOLETE      APD PE v1.01ES



**EXHIBIT 1**

USE THIS PAGE IF NEEDED. IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM.

| STATEMENT OF | (b) (6) | TAKEN AT | BAF / Afghanistan | DATED | 12 December 2016 |

9  STATEMENT   *(Continued)*

situation and just the accountability of the LNs. So, what the CG was the most adamant about was there was a culture of "this is not a deployed base, but a base like back in the states." I think you have a lot of contractors and civilians and that to me is the initial friction point with the CG was that the civilians weren't taking this very seriously, that we were deployed, that there was a threat, that they are trying to hurt us. He look hard at the civilian contractors and then I knew that the next piece was going to be the CORs, those Soldiers/green suitors  that were in charge of it. Looking at contracting and how who did what in terms of that relationship.

*(initials)*

(b)(1)1.4a

*(initials)* Q. Is there a clear delineation of who has what?
A. If was an incident.                              (b)(1)1.4a
executing.

*(initials)* Q. Are you well versed in the SOPs and policies involved in FP measures and synchronizing          (b) (1) (A)
                (b) (1) (A)                        related to the LNs?
A. I am not overly familiar with the SOPs. I am familiar with how they were executing because I was on ECP 3 and

(b)(5)

*(initials)* Q. Tell me what you can about that.

(b)(1)1.4a

| INITIALS OF PERSON MAKING STATEMENT | | PAGE 2 | OF 8 | PAGES |

DA FORM 2823, NOV 2006                                                          APD PE v1 01ES

Unclassified//FOUO

**EXHIBIT 1**

Unclassified // for w

USE THIS PAGE IF NEEDED. IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM.

| STATEMENT OF | (b) (6) | TAKEN AT | BAF / Afghanistan | DATED | 12 December 2016 |

9  STATEMENT  *(Continued)*

(b)(1)1.4a

Q.  These were exercises or drills prior to the attack that occurred?
A. Yes.

Q. Did you see any other drills out there?
A. Not that I saw. One of the questions that came up was how do we tie in the DOC to these exercises? That is where the operation with multiple things going on, kind of came out o, they included the DOC, included TF MED and included a lot of other pieces on the base. We just never got there. It was delayed for whatever reason; my understanding and what I remember, it was always TF Tiger that came up on the net with some reason not to. Incidents that Tiger had that kind of pushed things to the right is we had to investigate and figure that out. Then RS came down and said no more dismounted patrols. We were trying to figure out what that looked like at that point. And that led into a lot of the FP issues as well as we struggled with, how do we secure our BJDA without dismounted capabilities?

Q. Do you recall what the reason was for the delays?
A. I know one specific incident had to do with the SIFCAS, it was about three or four days prior to the execution, so I know that delayed it. The other reasons, I do not know. It could be argued that the date was never set in concrete. We never did that for Tiger or for the DOC.

Q. Was that exercise something directed by General Thompson or just something you decided you needed to do?
A. It's funny how things come down, because it comes down through multiple strings. I had the conversation with (b)(3), (b)(6) and ha saw what they had done with        (b)(1) 1.4a        . so we said, we probably need to escalate it to the next level to involve everybody y and that is how I remember it coming out.

Q. Can you describe BAF's entry and exit procedures for LNs?

(b)(1)1.4a

| INITIALS OF PERSON MAKING STATEMENT | | PAGE 3 | OF 8 | PAGES |

DA FORM 2823, NOV 2006

Unclassified // for w

**EXHIBIT 1**

USE THIS PAGE IF NEEDED. IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM.

| STATEMENT OF | (b) (6) | TAKEN AT | BAF / Afghanistan | DATED | 12 December 2016 |

9. STATEMENT *(Continued)*

(b)(1)1.4a

(b)(1)1.4a

(b)(1)1.4a

(b)(1)1.4a

(b)(1)1.4a, (b)(3), (b)(6)

INITIALS OF PERSON MAKING STATEMENT

PAGE 4 OF 8 PAGES

DA FORM 2823, NOV 2006

APD PE v1 01ES

Unclassified // Fouo

**EXHIBIT 1**

unclassified // FOUO

| USE THIS PAGE IF NEEDED. IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM. |

STATEMENT OF (b) (6) _____ TAKEN AT BAF / Afghanistan DATED 12 December 2016

9. STATEMENT *(Continued)*

(b)(1)1 4a, (b)(3), (b)(6)

1//FOUO

(b)(1)1.4a

1//FOUO

(b)(1)1.4a, (b)(5)

1//FOUO

INITIALS OF PERSON MAKING STATEMENT

PAGE 5  OF 8  PAGES

DA FORM 2823, NOV 2006

APD PE V1 LT65

unclassified // FOUO

**EXHIBIT 1**

(b) (1) (A)

USE THIS PAGE IF NEEDED. IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM.

STATEMENT OF _____ (b) (6) _____   TAKEN AT   BAF / Afghanistan   DATED   12 December 2016

9  STATEMENT   *(Continued)*

(b)(1)1.4a

ull four

(b)(1)1.4a

(b)(1)1.4a

Q.                              (b) (1) (A)

INITIALS OF PERSON MAKING STATEMENT

PAGE 6   OF 8   PAGES

*DA FORM 2823, NOV 2006*                              APD PE v1.01ES

**EXHIBIT 1**

Unclassified // fouo

| USE THIS PAGE IF NEEDED. IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM. |
|---|

STATEMENT OF _(b)(3) 10 USC §130b (b)(6)_     TAKEN AT _BAF / Afghanistan_   DATED _12 December 2016_

9. STATEMENT  *(Continued)*

(b)(1)1.4a, (b)(3), (b)(6)

ull Fouo

Q. Anything else we need to know related to this?
A. We looked at the POM kind of incorrectly as well. In our PROM statement we said we knew there would be a threat on the base, but that threat wasn't so much a kinetic threat, it was more of an observation, disruption that they were collecting and that the threat would be on the outside. We focused too much on what could come in from the GDA. We understood that things were moving through our AO to get to Kabul. As things were coming in, it was just a fixing force. They would launch a rocket, we would mass to that one position and that is essentially fixing us and now we are not projecting out to where we need to be looking. I think the J2 shop understood this and they were kind of looking at that pretty well. There was a threat on the base because we knew there were drugs being smuggled on, alcohol was probably being smuggled on; there were nefarious things coming on and that is not for local nationals. Those are for OCN and American Contractors and U.S. Soldiers. So now you have drugs being used on the base, and really what that does is it establishes a relationship and that relationship then turns into the one day I need you to take a knee and look away, is the day I bring what I need to bring into the base. So we kind of understood that was what it was and we kind of look at this as, you know, if this is a prison, things are still being smuggled on and it is used as bartering or a financial system to pay for favors to look away. We were just starting to really get after that when 12 November hit. But I think we framed the problem incorrectly. We never really considered it and that is because of the history as well. We fell into the trap the same as the ASG, because historically, there has never been a kinetic attack on the base from within, we just never really thought there would be. We knew that the REED guards were local nationals and that there would be the possibility of a green on blue. But because they were separated and down south, there is so much separation from the _____(b) (1) (A)_____ , we knew that was a possibility, but we thought we could close it down pretty quickly.

|| Fouo

(b)(1)1.4a

INITIALS OF PERSON MAKING STATEMENT

PAGE 7   OF 8   PAGES

DA FORM 2823, NOV 2006

Unclassified // fouo

**EXHIBIT 1**

Unclassified // Foue

| STATEMENT OF | (b) (6) | | TAKEN AT | BAF / Afghanistan | DATED | 12 December 2016 |

9. STATEMENT  *(Continued)*

(b)(1)1.4a

//Foue

(b)(1)1.4a

\\\\\\\\\\\\\\\\\\\\\\\\\\END OF STATEMENT\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\

**AFFIDAVIT**

I, _____ (b) (6) _____ HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT
WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE  8   I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE
BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE
CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT
THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUE!  , INDUCEMENT

(b) (6)

_____
e of Person Making Statement)

SSES

(b)(3) 10 USC §130b(f)(3) ... in my capacity as a United States Army certified Court Reporter, that this is an accurate representation of interview between these 2 parties.

Subscribed and sworn to before me, a person authorized by law to
administer oaths, this  12th  day of  December  2016
at Bagram Air Field, Afghanistan

_____
(Signature of Person Administering Oath)

(b) (6)

MG THOMAS S. JAMES JR.
(Typed Name of Person Administering Oath)
Article 136(B)(4), U.C.M.J
(Authority To Administer Oaths)

INITIALS OF PERSON MAKING STATEMENT

| | PAGE 8 | OF 8 | PAGES |

**DA FORM 2823, NOV 2006**                              APD PE v1.01ES

Unclassified//Foue

**EXHIBIT 1**