# EXHIBIT J

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### GREENVILLE DIVISION

| | | |
|---|---|---|
| Winston Tyler Hencely, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | Civil Action No. _____ |
| Fluor Corporation, Inc., Fluor Enterprises, Inc., | § | |
| Fluor Intercontinental, Inc., Fluor Government | § | |
| Group International, Inc. | § | |
| | § | |
| Defendants. | § | |

## DECLARATION IN SUPPORT OF DEFENDANTS FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC., FLUOR INTERCONTINENTAL, INC., AND FLUOR GOVERNMENT GROUP INTERNATIONAL, INC.'S RULE 12(b)(1) MOTION TO DISMISS UNDER THE POLITICAL QUESTION DOCTRINE

Fluor Declaration in Support of 12(b)(1) Motion to Dismiss

I, Bryan K. Wilson, pursuant to 28 U.S.C. § 1746, hereby declare:

My name is: Bryan K. Wilson. I am Security Director for Fluor Government Group Contingency Operations. I am over age of eighteen years, have never been convicted of a felony or crime of moral turpitude and am otherwise competent to make this Declaration. I am authorized to make this Declaration, I have personal knowledge of the facts stated below, and those facts are true and correct.

1.      I have held my current position since September, 2013. In my current role, I am responsible for managing Fluor security operations within multiple countries and projects in accordance with local conditions and contract requirements. Depending on the country and Fluor project, my responsibilities include staffing and professionally developing project Security Managers in all aspects of departmental operations including: employee protection, asset protection, and formal inquiries. I review Contingency Operational Area proposal requests and

contractual data in order to ascertain Fluor Security related requirements, risk, threat areas and employee, company and customer exposure; formulate and recommend Fluor Security execution strategies and assists in the development of subcontracted Statements of Work.

2.      Prior to assuming my current role I served as the Fluor Afghanistan Country Security Manager from July, 2010 through September, 2013. As the Country Security Manager, I was responsible for implementing and overseeing all applicable Fluor security operations (Personnel, Loss Prevention, and subcontracted Force Protection Screening Cells & Entry Control Point operations of augmentees).   In concert with Greenville Corporate Security Management and Afghanistan LOGCAP Country Manager; I planned, resourced and directed security operations, ensuring proper application and enforcement of governing corporate, project, theater and client policy, rules and regulations.

3.      From November, 2004 through July, 2010 I was employed by KBR in various Security related subject matter expert and management positions in Afghanistan.  Prior to my KBR work, I was a Law Enforcement Officer for the State of Louisiana.

4.      I landed on Bagram on November 14, 2016, two days after the bombing incident and reviewed the facts and circumstances on the ground in real time.  I reviewed the Fluor and Government records associated with the incident and the perpetrator identified by the United States Government (Nayeb) immediately after the incident and during the Government bombing investigation.  I did not leave Bagram until January 20, 2017.

**LOGCAP**

5.      Fluor provides base operations support to U.S. military facilities around the world.  In 2007, the U.S. Army awarded Fluor Task Order 0005 under contract W52P1J-07-D-0008 ("Task Order") pursuant to the Logistics Civil Augmentation Program ("LOGCAP") IV

2

contract. Under the Task Order, Fluor provides life support services to U.S. and coalition forces in north and eastern Afghanistan, at Bagram Airfield, Afghanistan ("BAF") and several other bases (many referred to as Forward Operating Bases ("FOBs")). Fluor provided these base operation to support the U.S. Military prior to, at the time of, and following the incident in question.

6.      Fluor's services include a spectrum of civil services required by any sizable population center. Fluor provides such typical base operations support services as facilities management, hazardous material and hazardous waste management, pest control services, laundry services, food service operations, morale welfare and recreation, power generation and distribution, water supply, sewage, sanitation, and waste management, maintenance operations, and motor pool, among other services. *See* Ex. 3 (Performance Work Statement).

7.      Notably, Fluor has never been engaged to provide any security services under LOGCAP. In fact, Fluor is not authorized to carry firearms pursuant to Army Regulation. Ex. 10 (AR § 700-137), at Section 6-3.d. ("LOGCAP will not be used to provide armed security services"). No Fluor employee or subcontractor's employee was authorized to carry a firearm, for self-defense or otherwise. While the regulation mentions only armed security, the Military's LOGCAP contracting office has unequivocally interpreted this direction as a ban on Fluor performing any kind of physical security. *See* Ex. 13 (Re: LOGCAP Security (UNCLASSIFIED)). A Military LOGCAP planner (U.S. military employee) then forwarded this direction to Fluor representatives, observing "The LOGCAP leadership [is] sticking with security is security whether armed or not." *See* Ex. 13 (Re: LOGCAP Security (UNCLASSIFIED)).

8.      The services Fluor agreed to provide under the Task Order are not functionally different from the services it provides at other installations around the world. However, the Task

3

Order is unusual in that it contracts for these services to be furnished in Afghanistan, an area of active hostilities, with the mandated utilization of Afghan nationals.

9.      Pursuant to well-established military doctrine, given the threats posed by operating in Afghanistan, the Military provided the security necessary to facilitate Fluor's performance of its contract obligations for base operations. This longstanding principle is reflected in the contract and Bagram base policy, in which the Military expressly assumed a contractual duty to provide security. *See* Ex. 2 (Basic Contract) ("[T]he Service Theater Commander will provide force protection to contractor employees commensurate with that given to Service/Agency (e.g. Army, Navy, Air Force, Marine, DLA) civilians in the operations area unless otherwise stated in each task order."); *see also* Ex. 9 (Basic Contract DFAR 252.225-7040(c)) (Basic Contract (DFAR 252.225-7040(c)) ("The Combatant Commander will develop a security plan for protection of Contractor personnel" in all locations where there is not sufficient or legitimate civil authority)); *see also* Ex. 4 (BAF Access Policy), at Section 4(a) ("The Directorate of Emergency Services (DES) under the authority of the USFOR-A BSG Commander will execute this [and] will secure and establish a safe operating environment for all personnel assigned to or in support of operations at Bagram Airfield."); Ex. 4 (BAF Access Policy), at § 4(b)(2) (The DES is "responsible for execution and implementation of [the BAF Access Policy]."); *see also* Ex. 3 (Performance Work Statement), at § 1.04; at p.44 (defining "Force Protection").

10.     As part of its express obligation to provide security to coalition forces and Fluor's civilian personnel, the Military conducted the full spectrum of security functions at BAF. Those security functions encompassed several discrete categories of activity, including among others: background vetting of potential LN hires; ongoing counterintelligence screenings of LNs once

they are working on the base; physical searches of LNs every day they enter Bagram; random inspections of base facilities with bomb-sniffing dogs; roving patrols; badge checks; security, health and welfare inspections; among other things, and prescribing rules for the escorting of LNs on base and training and certifying LN escorts. *See* Ex. 4 (BAF Access Policy).

11.     There is a difference between supervision for LOGCAP job performance and supervision for security purposes. LOGCAP requires oversight sufficient to ensure that employees are satisfying PWS work requirements in a manner that adheres to applicable quality and safety standards. To this end, Fluor's actual supervisory responsibilities were limited to those outlined in PWS paragraphs 01.07[1], 03.03.a.[2], 05.00[3], and 08.09[4]. Fluor has and continues to fulfill its hazmat and hazwaste management responsibilities under PWS 5.03.

12.     In addition, most LN subcontractors do not share a Western understanding of professional workplace decorum.   At the time of the November 12, 2016 incident, LN onboarding training included such rudimentary topics as basic personal hygiene and respecting

---

[1]     [Fluor] is responsible for ensuring all personnel supporting this TO comply with the standards of conduct, and all terms/conditions set forth in this PWS and the Basic Contract.  [Fluor] shall provide the necessary supervision for personnel required to perform this contract.  Ex. 3 (Performance Work Statement), 01.07.a.
     [Fluor] shall hire [Host Country Nationals ("HCN")] personnel and Subcontractors to the maximum extent possible in performance of this contract when such recruitment practices meet legal requirements.   [Fluor] is responsible for oversight of such personnel or Subcontractors to ensure compliance with all terms of the Basic Contract and this PWS. Ex. 3 (Performance Work Statement). 01.07.b.

[2]     Contractor Furnished Items and Services.   [Fluor] shall provide all necessary personnel, supervision, management, equipment, materials, communications, transportation, facilities, supplies, and cost estimates in support of this TO, unless stated in Technical Exhibit C.1-4.  .  Ex. 3 (Performance Work Statement), 03.03.a.

[3]     Base Life Support (BLS).   [Fluor] shall plan for and provide all personnel, equipment, maintenance, tools, materials, transportation, supervision and other items and services necessary to accomplish the requirements of the TO. … [Fluor] shall make full use of [HCN] materials, products, labor, and equipment. Ex. 3 (Performance Work Statement), 05.00.

[4]     Host Nation Support.   [Fluor] shall use its best efforts to hire [HCN] personnel and Subcontractors when such resources meet Contractor's performance and legal requirements.  Oversight and compliance with all terms of the contract remain the responsibility of the contractor. Ex. 3 (Performance Work Statement), 08.09.

personal space; it focused largely on education about and prevention of assault and sexual harassment. Given this context, if occasional instances of LNs engaging in non-work activities, such as sleeping or reading the Quran, were considered automatic disqualification for employment, Fluor would not have been able to deliver the quality and quantity of services expected while also satisfying the PWS requirement to hire LNs "to the maximum extent possible." *See* Ex. 3 (Performance Work Statement), §§ 1.07b, 8.09. Enforcing an appropriate "work-related standard of performance" among LN employees does not compel the termination of every LN that occasionally engages in non-violent, non-offensive, non-work activities, while also completing his job duties.

### Base Access Policy

13. Under Fluor's LOGCAP Contract and Task Order, the United States Military ("Military") was responsible for force protection at Bagram Airfield ("BAF"). The Military's Force Protection obligation included issuing security badges to Local Nationals ("LNs"), like Ahmed Nayeb, who worked at BAF. No LN could access BAF without a Military-issued access badge. The United States Forces-Afghanistan ("USFOR-A"), Bagram Support Group's ("BSG") BAF Access Policy existed to "clearly identify who may enter and remain on BAF, [and] to control access and privileges for Local Nationals (LNs)." *See* Ex. 4 (BAF Access Policy), at § 1.0; *see also* §§ 3(i)-(iv).

14. The Military enacted the "Bagram Airfield Screening, and Access Policy" (December 5, 2015) (Ex. 4 (BAF Access Policy))[5], which was applicable at the time of the November 12, 2016 incident and governed who received an access badge; and what criteria he or

---

[5]     The Military enacted new Base Access Policies after the November 12, 2016 incident. *See* ¶¶ 36-39.

she had to satisfy in order to receive a badge. The Military's Access Policy similarly prescribed how and where a badge holder would be supervised for security purposes.

15.     Fluor did not participate in the formulation of the Military's Access Policy. The Military did not consult with Fluor in developing any portion of the Access Policy.[6] Fluor did not provide any input into the Access Policy's terms, conditions, or restrictions. The Access Policy was exclusively a Military policy.

16.     Through the Access Policy, the Military—not Fluor—decided to whom it would grant or deny access to BAF. The Military made its decision in this regard through extensive security screenings of prospective LN access badge holders. The Military's Force Protection Screening Cell ("Military FPSC")[7] performed those screenings. *See* Ex. 50 (Delegation of Authority to Michael Biddy) ("Mr. Michael Biddy was appointed as Military Oversight Officer and of USFOR-A-Garrison Force Protection to include its subordinate supporting elements, to which was delegated the authority to approve, suspend or disapprove actions related to the Force Protection Screening Cell and enforcement of the Bagram Airfield Badge and Access Control policy.").

17.     As part of that process, among other things, the Military FPSC[8] checked the potential LN hire's name and identification, performed iris scan for biometric check against a

---

[6]    *See* FN 8 for further discussion of "Fluor" versus Fluor's subcontractors and/or Fluor employees provided to the Military as augmentees to the FPSC.

[7]    After the attack, the Military renamed the FPSC the "Access Control Screening Cell." "FPSC" is used throughout this document for consistency.

[8]    Some Fluor personnel are "provide[d]" to the Military to support work under the authority, direction, and control of the Military at the FPSC. Ex. 3 (Performance Work Statement), at 26, para. 5.22.03. However, those individuals report to U.S. military officers and not to Fluor. It is the Military— not the Fluor personnel who may be detailed to the FPSC—that makes all decisions whether to grant base access to any LN. Ex. 3 (Performance Work Statement), at 26, para. 5.22.03(a) ("The Government will maintain authority for badge issuance/denial"). Fluor had no discretion in or control over any aspect of the screening process specifically, or base security generally.

watchlist, recorded the LN's biometric identification (photographs, fingerprints, and DNA collection) utilizing the military's Biometrics Automated Toolset ("BATS") to cross-check individual's information against watch lists for derogatory information. The Military FPSC interviewed the LN in person to prepare a biographical workup and conduct a security screening. The BATS dossier—created exclusively by the Military—prescribed what information to be obtained and recorded. Fluor did not participate in the formulation of the BATS dossier. The Military did not consult with Fluor to create the BATS dossier either. Within 24 to 36 hours after submission of a screening package, the Military reviews the screening package and decides whether to grant or deny base access to the LN.

---

This is so because Fluor subcontractor personnel detailed to the Force Protection Screening Cell did not report to Fluor and could not have shared screening information from the FPSC with Fluor personnel. *See* Ex. 31 (Desktop Guide to Personnel Services (Badging & Screening), at section 4.9 ("All information and data utilized, exposed and/or obtained during the FPSC mission is For Official Use Only and belongs to the Department of Defense (DoD). Access to, or disclosure of, information/data will not be given to any . . . individual not directly associated with the Military FPSC mission unless specifically authorized in writing."). Fluor never received any such authorization concerning Nayeb or received any information absent such an authorization.

Under the terms of the Task Order, Fluor "provide[s] personnel to operate Military Force Protection Screening." *See* Ex. 3 (Performance Work Statement), § 5.22.03. Pursuant to this requirement, Fluor provides augmentees who report to the Military oversight authority that manages and oversees the Screening Cell, and who report to the Military Oversight authority on all substantive matters related to their work, such as what questions to ask during LN screening.

Though augmentees "operate and support" the Screening Cell by inputting LN applicant biographical and biometric data and conducting screening interviews, the Military "maintain[s] authority for badge issuance or denial." *See* Ex. 3 (Performance Work Statement), 5.22.03a. *See also* Ex. 4 (BAF Access Policy), Section 4(b)(1) ("The BSG Commander via the Force Protection Screening Cell is the designated badge granting authority."); Ex. 45 (Army 15-6 Report, Exhibit 4S), at 1 ("I am the military oversight at ECP [redacted]. As the [Area Support Group] commander's representative, I am the final authority for anything that has to do with the badge screening and access.").

Moreover, as the Military, not Fluor, supervises augmentees in their work at the FPSC; any alleged failure to make a subsequent administrative note in Nayeb's record would be a reflection on the Military's poor supervision, not Fluor's. Neither does the PWS require augmentees to "notify a counterintelligence element for advisement," though as a matter of practice augmentees have the option to refer applicants to CI for additional screening. Further, as an interviewee from Task Force Biometrics told MG James, "There is not an official memorandum . . . directing the placement of reintegrated LNs on the Afghanistan Biometrically Enabled Watch list." *See* Ex. 19 (15-6 Report, Exhibit 4Q), at 3.

Finally, no Fluor employee and/or subcontractor, augementee or direct report, performs, works for or works under counterintelligence.

18.     It is also the Military's responsibility to determine whether an access badge holder may continue to access BAF using his or her issued access badge. This continues after the LNs have been vetted for employment, approved for base access, and hired.  The Military continues to conduct interviews and screenings of all LN workers every six months. The Military also conducts random counterintelligence screenings, at its discretion. This additional screening includes meeting with counterintelligence officers and/or undergoing a Preliminary Credibility Assessment Screening System ("PCASS") screening, which is a field expedient lie detector. *See* Ex. 4 (BAF Access Policy), Annex A.

19.     Fluor did not participate in counterintelligence gathering.  In counterintelligence interviews, the Military interviewer bases his questions on U.S. Military information, which the Military designed to look for signs that the LN is connected to insurgent networks.  All of these activities are inherently military functions, and contractors such as Fluor are not privy to what is asked or assessed in the counterintelligence interview, nor does any Fluor employee and/or subcontractor, augmentee or otherwise, perform any such counterintelligence work.

20.     Fluor is not privy to the contents of these interviews or the reasons for conducting them. Fluor does not have advance notice of when they will occur either. If the Military advises Fluor that an LN subcontractor is required to attend a military screening interview, the LN is escorted from his work facility to attend the interview. Sometimes, the Military FPSC interviews an LN and the Military immediately terminates his or her access for reasons unknown to Fluor. In such a case, the Military escorts the LN off of the base. Fluor does not have any input into such a matter and has no right to protest the expulsion or discover its underlying reasons. The Military would simply alert APS that the LN had been escorted off the base, and APS would then notify Fluor. From Fluor's perspective, the content of the FPSC's security interviews is a black

box: the Military does not share with Fluor the information it learns from its personnel vetting and security screenings.

21.     The Military also completely and exclusively controls what materials enter BAF through physical searches of all vehicles and personnel entering BAF, specifically including LNs like Ahmed Nayeb. U.S. personnel and other country nationals ("OCNs") enter the base principally by airplane or helicopter. No one can land at Bagram without the Military's approval. And if they land from a non-military installation point of departure, the Military routinely scans and inspects their luggage and takes whatever other security measures it deems necessary. Fluor does not participate in, control, or have any input into such matters.

22.     Likewise, no LN can physically enter BAF without the Military's approval and without navigating the Military-designed and administered entry control procedures. The U.S. Military, with coalition forces and contractors operating at its direction, secures the BAF perimeter and controls all ingress of LNs onto the base. No LNs subcontracted to Fluor through APS stay at BAF full-time, so all entering LNs must traverse the Military-run security control points every day.

23.     LNs typically enter BAF through Entry Control Point 1 ("ECP-1"). It is the responsibility of the Military to physically search, pat down, and inspect all LNs upon entering the base through ECP-1. *See* Ex. 4 (BAF Access Policy), at § 7. Fluor understands that steps in the security procedure include both hands-on pat-downs and electronic countermeasures, including x-ray machines and counter-bomber scanners. At the time of the incident, some of these procedures were run by LN security guards provided by REED subcontractors, working for and under the supervision of the U.S. Military. The effect was LN security guards were searching LN base employees upon entry into BAF.

10

24.     At the very end of the multilayered, Military-run security control system, after at least six prior security checks whereby an LN has shown his identification badge several times, been patted down, and been scanned electronically, he scans his iris to validate his credentials and confirm base access at a booth directly before a turnstile that allows him, if clear, entrance to the base.[9]

25.     The Military routinely performed random security measures, including physical searches of LNs and areas, utilizing bomb-sniffing dogs, intermediary checkpoints, security health and welfare checks, and armed Military guards at buildings to enforce force protection measures. Fluor does not know and does not have any input as to when, where, or how the Military performs these random physical searches of LNs or areas.

26.     The Military prescribes the rules under which LNs are escorted while on base, generally from ECP-1 to their places of work, and back. The Military, not Fluor, trains and certifies all escorts. The Military also controls when and where LNs would receive escorts.

27.     At the time of the November 2016 attack, the Military's escort policy differentiated by color among the types of badges issued to contractor and subcontractor personnel. The colors were—(1) green, (2) yellow, and (3) red. Access badges are issued by the Military and administered by APS HCN & HR Departments for LNs on BAF. Ex. 28 (Alliance Project Services, Security Policy, HCN Labor Support), at § 5 (Oct. 24, 2013).

28.     The Military issued *green badges* only to personnel that lived on BAF premises. Ex. 4 (BAF Access Policy), at § 11.c. No Fluor-subcontracted LNs lived on BAF premises.

29.     Prior to and at the time of the incident, the Military issued *yellow badges* to some LNs, which allowed them to traverse the base unescorted *and to escort other LNs* who had red

---

[9]      A Fluor employee provided to the Military and working under the Military's authority, direction, and control, operates the iris-scanning machine.

badges. Yellow badges were issued to "responsible worker[s]" who met several criteria. *See* Ex. 4 (BAF Access Policy), Section 11(b)(1). To receive a yellow badge with escort privileges, an LN had to be sponsored by a U.S. officer of the rank of Colonel (Army/Air Force/Marine Corps) or Captain (Navy) or U.S. Government equivalent. An applicant had to renew his or her badge every six months and undergo a new screening and interview by the Military's FPSC, receive an annual medical exam, and file new paperwork. LNs were eligible for yellow badges if they had worked for a minimum of 12 consecutive months at BAF without derogatory incidents.

30.    The Military's BAF Access Policy reserved to the Base Support Group Commander ("BSG"), or his or her designee, final authorization for an LN to receive a yellow badge. Fluor could not authorize any LN to receive a yellow badge or have escort privileges.

31.    Once the BSG approved issuance of a yellow badge to an LN, the LN yellow badge holder was eligible to be considered for escort privileges. If the Military granted a yellow badge holder escort privileges, he or she was permitted to escort up to ten fellow LN employees. *See* Ex. 4 (BAF Access Policy), Section 11(b)(1).

32.    The Military gave all other LNs on BAF *red badges*. Critically, at the time of the November 2016 attack, the Military's escort policy required LNs with red badges like Ahmed Nayeb ("Nayeb"),[10] the attacker, to be escorted "in all areas *except work facility*." *See* Ex. 4 (BAF Access Policy), Dec. 5, 2015, Section 11(a)(1) (emphasis added). Nayeb worked at the Non-Tactical Vehicle Yard ("NTV yard"), and pursuant to existing policy, there was no requirement that he be escorted for security purposes once he was inside the work facility.

33.    The Military describes and restricts the duty to monitor (or "escort") LNs for security purposes through the express terms of its BAF Access Policy: "Escorts must remain in close proximity and remain in constant view of the individuals they are escorting. Escorts will

---

[10]    Variants of his name include: Qari Nayab, Ahmad Naib Hafzi, Hafezi Nieb, Abdul Zuhoor.

continuously monitor all escorted personnel and direct them during any Base security operations." *See* Ex. 4 (BAF Access Policy), Section 12(c). The Military policy in effect at the time of the November 2016 attack did not require escorting inside the work facility: "Red badge [LN] personnel require an escort in *all areas except work facility*." *See* Ex. 4 (BAF Access Policy), Section 11(a)(1) (emphasis added). Therefore, the duty to remain in close proximity and conduct eyes-on monitoring for security purposes stopped at the work facility.[11] The Military, not Fluor, issued the force protection policy that did not require eyes-on supervision in the workplace. The Military then restricted security supervision/escort to the terms of the BAF Access Policy; no LOGCAP provision provided Fluor any discretion or authorization to provide security supervision or escort over and above that for which the BAF Access Policy and PWS allowed or provided. Such was the province of the Military.

34.    The Military exclusively formulated and provided the escorting requirements applicable to Fluor as of the date of the attack in the PWS and the BAF Access Policy. *See* Ex. 3 (Performance Work Statement), 3.03[12]; 5.00[13]; *See* Ex. 4 (BAF Access Policy), §§ 12(a)[14], 12(c)[15].

---

[11]    The Escort Responsibility Agreement is not to the contrary.  Section 1.b. of that agreement requires escorts to "assume responsibility of the escorted person(s) received at the ECP(s) and continue to do so while the escorted person(s) are on BAF *in accordance with the Base Access Policy*."  Ex. 47 (Escort Responsibility Agreement).  The responsibilities laid out in the Escort Responsibility Agreement are thus co-extensive with those in the BAF Badge, Screening, and Access Policy: they stop at the work facility.

[12]    Contractor Furnished Items and Services. a. The Contractor shall provide all necessary personnel, supervision, management, equipment, materials, communications, transportation, facilities, supplies, and cost estimates required in support of this TO, unless stated in Technical Exhibit C.1-4.

[13]    Base Life Support.  The Contractor shall plan for and provide all personnel, equipment, maintenance, tools, materials, transportation, supervision and other items and services necessary to accomplish the requirements of the TO. . . .

[14]    Personnel with escort privileged may escort up to ten personnel.

[15]    Escorts are responsible for the conduct and safety of the personnel they are escorting.  Escorts must remain in close proximity and remain in constant view of the individuals they are escorting.  Escorts will continuously monitor all escorted personnel and direct them during any Base security operations.

35.     Military-approved escorts alone would escort LNs between ECP-1 and their respective work facilities. Before being assigned escort duty, each escort had to (1) meet the criteria set out in the Military's BAF Access Policy; (2) receive Military training on how to carry out escort responsibilities; (3) sign an escort responsibility agreement; and (4) be approved by the Military. *See* Ex. 4 (BAF Access Policy), Section 12; Bagram Airfield Force Protection Screening Cell Information Pamphlet; Ex. 47 (Escort Responsibility Agreement).

36.     It is important to note that the Military changed its security policies and procedures significantly after Nayeb's November 2016 attack.  Prior to permanent changes being implemented, all LNs were barred from BAF. *See* Ex. 46 (Email, Monica Shoffeitt to Thomas L. Artioli, Nov. 14, 2016, 12:35 p.m., Subj. "[Non-DoD] Source] Re: clarification.").  LNs were gradually reintroduced per the following Military force protection procedures.

37.     First, the Military altered its security procedures to provide that armed guards— either coalition forces or REED OCN security contractors—would be the exclusive means of escorting LNs in all areas. *See* Ex. 24 (Badge, Screening, and Access Standard Operating Procedures for BAF), at § 11.a(1)(ii) (Dec. 2, 2016); *see also* Ex. 25 (Badge Screening, and Access Standard Operating Procedures for BAF), at § 11.a(1)(ii) (Dec. 2, 2016). At BAF, the "Yellow Badge" designation was abolished – *all LNs are Escorted Red Badges. See* Ex. 24 (Badge, Screening, and Access Standard Operating Procedures for BAF), at § 11.a(1)(i) (Dec. 2, 2016); *see also* Ex. 25 (Badge, Screening, and Access Standard Operating Procedures for BAF), at § 11.a(1)(i) (Dec. 28, 2016).  Further, LNs are no longer permitted by the Military to be escorts. *See* Ex. 24 (Badge, Screening, and Access Standard Operating Procedures for BAF), Section 15(k) (Dec. 2, 2016); and Ex. 25 (Badge Screening, and Access Standard Operating Procedures for BAF), Section 15(k) (Dec. 28, 2016).

38.    Second, as discussed, the Military's post-attack BAF Access Policies now require security escort for LNs in their respective work facilities. The new escort policy directs that LNs at Bagram be monitored for security purposes in all areas, not just from the entrance of the base to their worksites. *See* Ex. 24 (Badge, Screening, and Access Standard Operating Procedures for BAF), Section 11(a)(1)(ii) (Dec. 2, 2016).

39.    Third, the Military has increased force protection measures in and around LN work areas. Under the revised practice, the Military directed LNs supporting LOGCAP to work in only two discrete work facilities at Bagram surrounded by fences and watched constantly by armed coalition soldiers. LNs supporting LOGCAP are now limited to the laundry and waste areas. *See* Ex. 48 (Letter, Timothy Compton, Jr. to Steve Anderson, re: Letter of Technical Direction, LOTD FLR-17-0005-AB1-0135, Waste Management Services under ESCAP, Nov. 16, 2016); Ex. 49 (Letter, Timothy Compton, Jr. to Steve Anderson, re: Letter of Technical Direction, LOTD FLR-17-0005-AB1-0138, provide fifty-four (54) Local Nationals for laundry services under ESCAP, Nov. 17, 2016). The Military provides armed guards to secure these areas and prevent LNs from leaving the workplace unescorted. *Id.*

40.    The Military, not Fluor, is responsible for conducting physical security inspections each day before allowing LNs on base. *See* Ex. 4 (BAF Access Policy), Section 7(d) ("Coalition Security Forces in charge of the Bagram Airfield Ground Defense Area (BAF GDA) will be responsible for ensuring that all physical security inspections of personnel and vehicles entering and exiting Bagram Airfield are conducted."). As such, the Military was responsible for detecting the explosive material that Nayeb brought through the Military's security checkpoints over the four months preceding Nayeb's attack. *See* Ex. 27 (15-6 Report) at 49, ¶ 18.b(2).

15

41.    The Military policy that red badge LNs "require an escort *in all areas except [the] work facility*" and allowed yellow badge LNs to escort red badge LNs were flawed.  *See* Ex. 4 (BAF Access Policy), Section 11.a(1) (emphasis added). The fact and seriousness of these deficiencies are underscored by the military's immediate revisions to the BAF Badge, Screening, and Access policy to require eyes-on security escorting in the workspace and discontinuing yellow badges entirely. Indeed, less than three weeks after the attack, the Military issued a revised policy that "Red badge personnel require [a] U.S. CAC holder or Coalition Forces (military) escort *in all areas*."  *See* Ex. 24 (Badge, Screening, and Access Standard Operating Procedures for BAF), Section 11.a(ii) (Dec. 2, 2016) (emphasis added).

## Hiring

42.    Per the terms of Fluor's LOGCAP Contract and Task Order, at the time of the November 12, 2016 incident, Fluor was to utilize Afghan nationals to the "maximum extent possible" while performing its LOGCAP work.  Ex. 3 (Performance Work Statement), para. 1.07(b).  Practically, this meant that the Military required Fluor to use LNs for LOGCAP work. In fact, if Fluor employed persons other than Afghan nationals, the Military usually required Fluor to justify its decision.  The Military then had ultimate authority to allow or not allow the hiring of persons other than Afghan nationals. The Military's ultimate control over Fluor's hiring practices directly stemmed from the LOGCAP Contract's requirement that Fluor utilize LN personnel and services in its hiring/subcontracting decisions "to the maximum extent possible." *Id.*

43.    Utilizing Afghan nationals was not an advisory policy; it was a contractual requirement. Accordingly, if Fluor failed to comply with the Task Order's directive to utilize

16

Afghan nationals to the "maximum extent possible," such a failure would have endangered Fluor's ability to maintain its LOGCAP Contract.

44.     Consistent with the Military's Afghan First directives, Fluor subcontracted with Alliance Project Services ("APS"), a labor broker, to hire Afghan nationals, often referred to as Host Country Nationals ("HCNs") or Local Nationals ("LNs"). Fluor did not before the attack and does not now directly employ any Afghan nationals at BAF.

45.     Fluor required labor broker services to provide the hiring and managing of LN temporary labor service personnel under the terms of the LOGCAP Contract and Task Order. Per the Military's contractual directives to Fluor at the time of the November 12, 2016 incident, LN subcontractors supported Administrative, Logistical, Supply Chain, Materials Management, Facility Maintenance, Transportation, Construction, and other Operational disciplines for Fluor's LOGCAP work in Afghanistan. APS performed its services in accordance with the requirements outlined in the Subcontract Statement of Work. *See* Ex. 21 (Fluor Responses to Questions Received on Dec. 10, 2016), Question 1; *see also* Ex. 5 (LOGCAP Statement of Work).

46.     APS typically recruits and hires individuals who were initially part of the military labor pool who were vetted through local village police departments, tribal elders, and the military. *See* Ex. 22 (Fluor Responses to Questions Received on Dec. 11, 2016); *see also* Ex. 23 (Re: APS—Recruitment/Screening/hiring of HCNs). APS has honored requests from military units and security agencies to hire personnel who have worked closely with the military in the past. *Id.* APS has a work pool of four thousand individuals that APS previously employed at Afghanistan FOBs. *Id.*

47.     The APS hiring process begins when Fluor issues a request to APS describing a requirement for LN personnel. *Id.* APS accommodates name requests (e.g., an LN who was a

17

good worker but released in a reduction of force, or if the military recommends particular LNs). *Id.* Otherwise, APS reviews its pool and selects personnel who had previously performed similar requirements and have the appropriate skills. *Id.* APS maintains records of adverse information in its database to ensure individuals with adverse records are not contacted. *Id.* After a potential employee is identified, employment is based on Medical Screening and passing Military security vetting. *Id.* Security vetting is conducted by the Military Force Protection Screening Cell. *Id.*

48.     During the March 2011 timeframe, the LOGCAP Task Order 5 Areas of Operations ("AOR") were aligned via military Task Forces ("TF"). Each AOR included, but was not limited to, a mandated mission for outside the wire operations as well as ensuring base operations for installations within the AOR. These responsibilities included but were not limited to force protection and life support services. In addition to other staff, each TF had a Commander, Administrative Contracting Officer ("ACO"), Logistics Support Officer ("LSO"), and numerous Contracting Officer Representatives ("COR") and Quality Assurance Representatives ("QAR") providing contractor oversight. During the 2011 timeframe TF Red Bulls had responsibility Bagram and other bases.

49.     Ahmed Nayeb entered APS's LOGCAP-eligible labor pool when the Military— through Task Force Red Bulls—sponsored Nayeb's admittance to the Parwan Vocational Training Center at BAF. Ex. 7, (Letter from Commander, TF Red Bulls, to Parwan ROK). In exception to standard operating procedures, as Nayeb's Taliban connection would have been an immediate disqualifier for base access, the Commander of Task Force Red Bulls submitted his March 2011 letter to Parwan sponsoring Nayeb for admittance to the school. Ex. 7, (Letter from Commander, TF Red Bulls, to Parwan ROK).   At this time, the Military knew that Nayeb was a

Taliban member who claimed to have renounced the Taliban and the insurgency. The Military did not provide this information to Fluor or APS before Nayeb's attack. Per the terms of the LOGCAP Contract and Task Order, Fluor did not—and could not—perform its own security screenings or counterintelligence to ascertain Nayeb's fitness for LOGCAP work and/or BAF access.

50.     The Military alone sponsored Nayeb for the Parwan vocational school despite its admitted knowledge of Nayeb's Taliban past. The Army's 15-6 Report reveals that the Military was in possession of the aforementioned March 25, 2011 letter from the Army's Task Force Red Bulls identifying Nayeb as a "former" Taliban member and yet requesting that he be given access to Bagram. *See also* Ex. 35 (15-6 Report Excerpts), at 9 (para. 12.b(2)). Nayeb's Taliban background and the related security risks were of concern to the Military, yet the Military failed to inform Fluor of Nayeb's Taliban ties.

51.     Nayeb was enrolled in BATs on March 24, 2011. *See* Ex. 19 (15-6 Report, Exhibit 4Q), at 2. The Military's signed letter expressly acknowledging Nayeb's history with the Taliban and vouching that he had "renounced his ties to the insurgency and now desires to rejoin mainstream Afghan society," is dated March 25, 2011. *See* Ex. 32 (15-6 Report, Exhibit 5H: Nayeb FBSC). This "reintegration memo" was then uploaded to another Military database called B12R on April 2, 2011. *See* Ex. 19 (15-6 Report, Exhibit 4Q), at 2. On the same day, Nayeb was approved for Red Badge access to BAF, with the stated justification as "This person will be trained in the Korean Vocational Training Center as a Construction Trainee." *See* Ex. 32 (15-6 Report, Exhibit 5H: Nayeb FBSC). In the reintegration memo, the Military acknowledged "security concerns with admitting a former insurgent to the [training center]" and said it was "committed to ensuring the continued safety of the staff at the Vocation Training Center [on

Bagram]," and would "respond to any security concerns promptly and fully." Ex. 7, (Letter from Commander, TF Red Bulls, to Parwan ROK). The Military accepted responsibility for Nayeb and ensuring base security based on the Military's actions of injecting Nayeb into the approved LN labor pool.

52.    In accordance with the Military's Afghan First policy, the military encouraged Fluor to hire all graduates of the vocational training center. Upon graduation, Nayeb would have entered APS's pool of Military-approved LNs. This is in accordance with APS supporting Fluor in complying with the Military's Afghan First policy. Ex. 5 (LOGCAP Statement of Work), at § 1.0 ("Contractor will directly contribute to the stability and growth of the Afghan workforce. The Contractor shall work in conjunction with the Afghan 1st Program and Local National (LN) relations office.").

53.    Per the terms of Fluor's LOGCAP Contract, Task Order, and the Statement of Work between Fluor and APS, the Military alone was responsible for force protection at BAF, to include security screenings of LNs and approval/denial of each screened LN for a BAF access badge. Neither Fluor nor APS conducted security screenings of potential LNs for LOGCAP work or had any ability to grant or deny any LN access to BAF. *See* Ex. 3 (Performance Work Statement), at § 1.04; *see* Ex. 5 (LOGCAP Statement of Work), at § 4.4.

54.    According to the Military, a memorandum describing Nayeb's Taliban affiliation and requesting his access was placed in Nayeb's file in March 2011 when he was first screened by the FPSC before entering the Parwan Vocational Training Center at Bagram. In order to give Nayeb BAF access to attend Parwan, the Military granted him an access badge as well. *See generally* Ex. 4 (BAF Access Policy), at §§ 10-11.

55.   The FPSC is a Military operation.  Under the BAF Access Policy, the Military's FPSC conducted security screenings of prospective LN hires for LOGCAP work. Ex. 4 (BAF Access Policy), at § 9. Fluor is not involved in or privy to FPSC's screenings of LNs. Per the Military's directive, Fluor provides employees who work under the authority, direction, and control of the Military, but in the course of their work, Fluor augmentees are not to share outside of the FPSC information they learn through those positions[16].  Thus, whatever the FPSC knew about Nayeb through his initial screening (or those that followed) was completely unknown to Fluor, consistent with the clear separation between the Military's security responsibilities and Fluor's service-provision responsibilities under the Task Order.

56.   Accordingly, the 15-6 Report seriously errs when it states, "*Fluor* performed the Biometrics Automated Toolset Services in March 2011, when *Fluor subcontractor employee* [name redacted] put Nayeb into the database along with the Reintegration Memorandum identifying Nayeb's previous Taliban affiliation." Ex. 35 (15-6 Report Excerpts), at 15 (para. 12.d(1)) (emphasis added).  "Fluor" did none of those things, and Fluor knew nothing of Nayeb's past until after the bombing.  Moreover, the fact that the information was not provided to Fluor makes sense only if (as is the case) Fluor had no responsibilities of its own to monitor Nayeb for security risks.

57.   Despite the Military's superior knowledge, Fluor had no knowledge or reason to know of Nayeb's Taliban ties until after the attack.  *See* Ex. 26 (Letter, Eleanor Spector to Lindsay Wingate).

58.   The Military screened Nayeb repeatedly during his five years of employment.  After completing the Parwan school, the Military-run FPSC screened and interviewed Nayeb for

---

[16]     At the time of Nayeb's initial screening by the Military's FPSC, FPSC augmentees would have been Fluor subcontractor employees, not Fluor.

his LOGCAP job on December 11, 2011. *See* Ex. 20 (Fluor's answers to 15-6 Questions Received Dec. 4, 2016), at 3. Subsequent screenings and interviews were conducted by the Military periodically during Nayeb's tenure on the LOGCAP Project, including on November 28, 2012; October 14, 2013; September 15, 2014; August 4, 2015; in May 2016; and on June 21, 2016—a few months before the attack. *See* Ex. 20 (Fluor's answers to 15-6 Questions Received Dec. 4, 2016), at 3.

59.     Military Counterintelligence Support Teams "support and assist the FPSC in order to assess for CI and Force Protection threats." *See* Ex. 4 (BAF Access Policy), Annex A: Counterintelligence and PCASS Screening, Section 1. Following the incident, Fluor now understands the Military conducted a counterintelligence screening of Nayeb in March 2016, just months before the bombing. *See* Ex. 35 (Army 15-6 Report Excerpts) at 33 (para. 15.b(2)). The 15-6 Report concludes that Nayeb's answers in that screening "appear trained and coached." Ex. 35 (Army 15-6 Report Excerpts) at 33 (para. 15.b(2)). Yet the Military never reported any derogatory information about Nayeb to Fluor, and the Military continued to allow him base access. Ex. 26 (Letter, Eleanor Spector to Lindsay Wingate); *see also* Ex. 20 (Fluor's answers to 15-6 Questions Received Dec. 4, 2016), at 3.

60.     Nayeb entered BAF on a near-daily basis for almost five years. In accordance with Military Policy and the Military's force-protection responsibilities, Nayeb and his belongings, like other LN's and their possessions, were subjected to screening and physical searches every single day to prevent the kind of attack that occurred on November 12, 2016. According to the 15-6 Report, the Military repeatedly failed to detect explosive material that Nayeb brought into the base through the Military's entry control point screening procedures during a four-month period. *See* Ex. 27 (15-6 Report) at 49, ¶ 18.b(2).

61.     Nayeb began working at Bagram on December 11, 2011.  He was a low-skilled laborer in the hazmat area of the NTV yard.  He worked both night and day shifts during his years of employment.  From August 2016 until the date of the attack, he worked the night shift in the NTV yard's "heavy shop," which fixed non-tactical vehicles such as trucks and buses.  *See* Ex. 35 (Army 15-6 Report Excerpts) at 9 (para. 12.b(4)).

62.     The hazmat area is a cluster of containers several yards away from the "clamshell" shop where the vehicles are maintained.  Nayeb worked in the area by himself, and mechanics would stop in regularly to pick up and drop off motor oil, windshield fluid, and similar vehicle maintenance materials kept in the hazmat area.  He worked with benign substances and did not have access to explosives at his work facility.  Occasionally, if Nayeb was not busy, he would assist mechanics in the clamshell, as the 15-6 Report acknowledges.  *See* Ex. 35 (15-6 Report Excerpts) at 11 (para. 12.c(4)(c)).

63.     Nayeb's behavior did not generate any basis for Fluor to suspect his malicious intentions.  In his five years of employment, he was disciplined only once in 2014.

64.     At all times there was a known supervisory chain responsible for overseeing Nayeb's job performance in the NTV Yard.  Elver Asani was the night shift Heavy Shop Foreman at the time, and he was responsible for the hazmat area employee, Nayeb's work performance.  Asani reported to NTV Yard General Foreman Bijeshi Asokan, who in turn reported to the Heavy Shop Supervisor, Rexhep "Reggie" Rexhepi.  Rexhepi reported to Will Joslin, the American expatriate serving as NTV Yard manager.

65.     APS supervisors enforced a work-related standard of performance, which did not require or involve eyes-on, constant supervision.  *See* Ex. 4 (BAF Access Policy), at § 11.  LOGCAP requires oversight sufficient to ensure that employees are satisfying PWS work

requirements in manner that adheres to applicable quality and safety standards.  Further, the Military, *even after this incident*, prohibited eyes-on supervision in some areas. Ex. 29 (Re: RANDOM SURVEILLANCE ACTIVITY: PARC/DPARC, Observations (Fluor HAZMAT MDC and Laundry, Waste Water Treatment)). Prior to and at time of incident, this prohibition included two areas within the NTV: the LN break/prayer rooms.

66.    Fluor has and continues to fulfill its hazmat and hazwaste management responsibilities under PWS 5.03.  As discussed, there is no evidence that Nayeb failed to perform the tasks assigned to him in the hazmat area.

67.    At the time of the attack, Fluor's subcontractor APS employed 1,750 Afghans at Bagram. For a devoutly religious population, disciplinary policies that disfavor religious observance could have profoundly negative repercussions, including undercutting the goals of the military's Afghan First policy. The Combatant Commander's General Order 1 expressly prohibits disrespect of Afghan culture and religion. *See* Ex. 37 (General Order 1, Jan. 8, 2015), Section 5(h)(1).  To suggest that Fluor supervisors were complacent for not punishing or firing Nayeb for reading the Quran would be to fault them for abiding by General Order 1, which charges the military and civilian contractors alike with an "individual duty to become familiar with and respect the laws, regulations, and customs of Afghanistan insofar as they do not interfere with the execution of their official duties." *See* Ex. 37 (General Order 1, Jan. 8, 2015), Section 5(h)(1).

68.    APS supervisors enforced APS's disciplinary policy, which called for graduated responses commensurate with the seriousness of the offense. The APS Disciplinary and Grievance Guidelines listed "[s]leeping during working hours," as an offense meriting a "verbal warning," but did not mandate a written warning or outright termination of the subcontractor

employee.  Ex. 38 (APS Disciplinary Guidelines), at 1. This policy was consistent with the requirements agreed upon by Fluor and APS in the LOGCAP IV HCN Labor Support Statement of Work, which made APS responsible for "publish[ing] and administer[ing] a performance policy and discipline program" that "will identify violations which could result in *disciplinary action up to* and including termination." *See* Ex. 5 (LOGCAP Statement of Work), at para. 7 (emphasis added). "Unsatisfactory job performance" and "Sleeping during working time," were expressly listed among the violations addressed in the disciplinary policy, along with more serious offenses, such as sexual harassment, incapacitation by alcohol or drugs, and assault. According to APS' policy, only the more serious offenses called for written warnings or termination.  APS was the hiring, and firing, authority.

69.     There is an APS Incident Report from May 2014 documenting Nayeb's receipt of verbal counseling at the request of Fluor foreman Bijeshi Asokan, after a Fluor supervisor saw Nayeb walking unescorted from the hazmat area to the small engine shop. Per the APS Disciplinary and Grievances Guidelines, verbal counseling is the appropriate disciplinary measure for LNs found walking unescorted. *See* Ex. 38 (APS Disciplinary Guidelines), at 1. Thus, Fluor supervisors' response to this incident was consistent with applicable disciplinary policies at the time.

70.     Nayeb was authorized to leave the hazmat area in order to perform job-related tasks elsewhere within the NTV work facility.

71.     At the time of the November 12, 2016 incident, there was no Military issued list of restricted or controlled mechanics tools. *See* Ex. 36 (15-6 Transcript of Interview with Fluor), at 15; Ex. 35 (15-6 Report Excerpts) at 12-13 (para. 12.c(4)(f)).  Moreover, no LOGCAP provision or Military security procedure restricted LN access to the tools routinely used to

perform NTV maintenance activities.   The Military's limited directives with respect to tool management are noted in PWS 1.08[17], 3.03[18], and 5.00[19].

72.    None of the tool management provisions outlined above requires Fluor to restrict employee access to tools.  To the contrary, Fluor was obligated to "ensure sufficient quantities of all materials are available to meet ordinary demands to avoid delays in work execution." *See* Ex. 3 (Performance Work Statement), § 5.00.  All tools in the Fluor tool room are needed at some point by the mechanics.   The hazmat employee's work responsibilities sometimes included checking out tools for use while assisting other mechanics.  *See* Ex. 36 (15-6 Transcript of Interview with Fluor), at 14.

73.    The Military has provided Force Protection guidance on restricted items that LNs cannot access without Military oversight and approval.   The only restricted items include: cell phones, two-way radios, computers, cameras, USB/Digital media, maps, and Official Use Only and Sensitive But Unclassified documents.  *See* Ex. 4 (BAF Access Policy), Section 15(c)-(h). Restricted items do not include: string, nuts and bolts, switches, or multimeters. Each such item was required "to meet [Fluor's] ordinary demands" pursuant to its PWS. *See* Ex. 4 (BAF Access Policy), at § 5.00.

---

[17]    1.08. Property Control.   The Contractor shall submit a property control plan IAW Technical Exhibit F.  All property shall be inventoried IAW the Contractor's Government approved property control plan and Federal Acquisition Regulation (FAR) Part 45.

[18]    3.03. Contractor Furnished Items and Services. A.   The Contractor shall provide all necessary personnel, supervision, management, equipment, materials, communications, transportation, facilities, supplies, and cost estimated required in support of this TO, unless stated in Technical Exhibit C.1-4.

[19]    5.00 Base Life Support.   The Contractor shall plan for and provide all personnel, equipment, maintenance, tools, materials, transportation, supervision and other items and services necessary to accomplish the requirements of the TO.  The Contractor shall ensure sufficient quantities of all materials are available to meet ordinary demands to avoid delays in work execution. . . .

## Incident

74.     On the morning of November 12, 2016, three Fluor escorts were assigned to transport LNs from Nayeb's worksite, the NTV yard, to ECP-1. All three escorts were trained and certified by the U.S. military. Two escorts were OCNs: Edin Zilic, who worked the night shift in the heavy shop along with Nayeb, and Dalibor Apostolovski, who worked the night shift in the light shop.  The third escort was an Afghan national ("LN") named Asadullah,[20] who worked maintenance at the NTV yard.

75.     That morning, LNs signed out at the NTV yard at the end of their shifts for time-and-attendance purposes. Because many LNs are illiterate, one LN named Abdul Jabar ("AJ") was responsible for signing-out on an APS form for all LNs at the end of the night shift. APS used these forms to ensure that LNs reported to their work facilities promptly after entering the base and exited the base promptly after finishing their shifts. The sign-in/sign-out sheet was collected by APS every day after the change in shifts and it was used, not by Fluor to ensure everyone was on the bus, but by APS to verify the LNs' work hours.

76.     It is now known that AJ and Nayeb attended the Parwan Vocational Training Center at BAF together. On the morning of November 12, AJ signed out all the LNs on the night shift, including Nayeb, at 5:10 a.m.

77.     That morning, local nationals leaving the NTV yard were driven in a bus and a Tata truck to the front gate. Apostolovski and Asadullah were in the bus, and Zilic drove the Tata truck. Light shop workers typically rode the bus with Apostolovski and Asadullah, and heavy shop workers typically split up between the bus and the Tata truck.

---

[20]     Asadullah does not have a second name.

27

78.     At approximately 5:05 a.m. or 5:10 a.m., Zilic noticed that all the LNs were standing outside the LN break room, ready to depart for ECP-1. Zilic asked which of them were going to ride in the Tata, and 4 LNs entered the vehicle. When the Tata was full, Zilic drove to ECP-1, arriving a few minutes earlier than usual and before the bus had departed NTV for ECP-1. Zilic thought the ride and disembarkation at ECP-1 were uneventful.

79.     At around 5:00 am, Apostolovski boarded the bus in the yard between the heavy and light shops. Apostolovski recalled that when he boarded the bus, there were two LNs already on it. This was the first time that Apostolovski could recall that LNs were already on the bus when Apostolovski boarded. Typically, the LNs boarded the bus intermittently with many stragglers, but the morning of the attack, the rest of the LNs boarded the bus together and all were on time. Once the larger group of LNs boarded the bus, Asadullah vouched that all the LNs (including Nayeb) were accounted for, and the bus departed for ECP-1, as usual.

80.     Nayeb was supposed to be on either the Tata or the bus. Further, Nayeb was alleged by AJ and Asadullah to be on the bus. The Military alleges Nayeb evaded the escorts, not getting on either the bus or the Tata, and walked from the NTV Yard to the site of the bombing. Fluor has no evidence Nayeb was *not* transported via escorts to ECP-1 and then evaded Military security personnel. Nayeb may have gotten help in evading the escorts, and/or Military security personnel, from possible accomplices among the LN workforce.

81.     A sworn statement supporting the 15-6 Report by an officer with the Criminal Investigation Division ("CID") states that he has "classified exhibits in my investigation produced from other military agencies who *identified co-conspirators to the suicide bomber*." He goes on: "At this time, CID does not plan on listing the co-conspirators as subjects in the unclassified LER [law-enforcement report] due to the classified means in which they were

identified as subjects/co-conspirators." *See* Ex. 33 (Army 15-6 Report, Exhibit 2A).  Other interviewees told the 15-6 investigators they knew of "facilitation" on the base and that LNs were smuggling in goods to trade for favors like "look[ing] away."  *See* Ex. 42 (15-6 Report, Exhibit 2J), at 3; Ex. 43 (Army 15-6 Report, Exhibit 3O), at 7.

82.    At 5:38 a.m., Nayeb detonated a suicide vest near the Disney Clamshell.  The explosive material in the vest was not available on the base. As the 15-6 Report concedes, the material must have been smuggled undetected through Military entry screening. *See* Ex. 27 (15-6 Report) at 49, ¶ 18.b(2); *see also* Ex. 44 (Army 15-6 Report, Exhibit 4O) ("Question: Are you pretty confident that this is Potassium Chlorate? Answer.  We are for several reasons.")

83.    Fluor does not know all the threat information and intelligence the Military had on Nayeb and his plot, though an inference could be drawn that it was substantial—pages 19-28 of the report are redacted in response to the investigator's questions: "Did U.S. or Coalition Forces have any intelligence of value or indicators regarding the planning and execution of this incident before it occurred? If so, what information was known and by whom?" *See* Ex. 35 (15-6 Report Excerpts) at 19-28 (para. 13). Even aside from the intelligence redacted in the report, the evidence shows the Military had a clear information advantage over Fluor and failed to reasonably act on this information. Regardless of whether Nayeb was a known threat or a "ghost," the Military was charge with knowing and stopping this incident. Ex. 44 (Army 15-6 Report, Exhibit 4O), Pg 3 of 8.

84.    One 15-6 interviewee told MG James that he "knew that there was more facilitation going on. I believe that [redacted per (b)(1)1.4.a] the night before said there was going to be an attack but that it had been called off." *See* Ex. 42 (15-6 Report, Exhibit 2J), at 3. Another interviewee told MJ James, "There was a threat on the base because we knew there were

drugs being smuggled on, alcohol was probably being smuggled on . . . and really what that does is it establishes a relationship and that relationship then turns into the day I need you to take a knee and look away, is the day I bring what I need to bring into the base." *See* Ex. 43 (Army 15-6 Report, Exhibit 3O), at 7. Still another interviewee mentioned a 2013 intelligence report that in "hindsight" could have helped identify Nayeb as a threat. *See* Ex. 44 (Army 15-6 Report, Exhibit 4O), at 1. This testimony and the nine pages of redacted threat information in the report indicate the Military had a clear information advantage over Fluor with respect to insider threats at Bagram generally, and any threat posed by Nayeb specifically.

85.     Exhibits in the 15-6 Report, though heavily redacted, indicate there were known vulnerabilities in the military's physical security screening processes that went unaddressed. For example, military security contractor REED's September 30, 2016 quarterly report observed, "There are Local National Supervisors at the specific posts overseeing the searching procedures that are done by Local National Guards on Local National workers coming onto Bagram. This practice might be a security risk." *See* Ex. 40 (Army 15-6 Report, Exhibit 2AQ), at 1. One 15-6 interviewee told MG James he thought "complacency" regarding the threat posed by LNs "came from the top-down and the focus for the mission was diminished to the point where the Task Force leadership did not feel that our primary role was base security/force protection . . . ." *See* Ex. 41 (Army 15-6 Report, Exhibit 2H), at 6. This evidence suggests the military was not as vigilant in its security screening as it should have been, despite awareness of weaknesses in the procedures.[21]

---

[21] Fluor also notes that the military conducted occasional K-9 sweeps of the NTV Yard prior to the attack and did not identify any explosive material. This represents another missed opportunity to detect and thwart the bomb-maker.

## Exhibits

The following documents attached hereto as Exhibits and/or as Exhibits to Defendants Fluor Corporation, Inc., Fluor Enterprises, Inc., Fluor Intercontinental, Inc., and Fluor Government Group International, Inc.'s Rule 12(b)(1) Motion to Dismiss under the Political Question Doctrine support my statements above. I have personally reviewed the following exhibits and confirm that each is a true and correct copy of its respective original:

Exhibit 2:    LOGCAP IV Basic Contract ("Basic Contract"), at § H-19

Exhibit 3:    Afghanistan North Task Order 0005 ("Task Order 0005"), Performance Work Statement

Exhibit 4:    Bagram Airfield Badge, Screening, and Access Policy (Dec. 5, 2015)

Exhibit 5:    LOGCAP Statement of Work

Exhibit 6:    Memorandum for All Combined Forces Command-Afghanistan (CFC-A) Personnel, Subject: Afghan First Program (Mar. 25, 2006)

Exhibit 7:    Letter from Commander, Task Force Red Bulls, to Parwan ROK regarding reintegration of Qari Naeb Hafezi (Mar. 25, 2011)

Exhibit 8:    Department of Defense Instruction 2000.16, Enclosure 2 (June 14, 2001)

Exhibit 9:    Basic Contract (DFAR 252.225-7040)

Exhibit 10:   Army Regulation 700-137

Exhibit 11:   Contractor Support in the Theater of Operations, Deskbook Supplement (Mar. 28, 2001)

Exhibit 12:   DoD Instruction 3020.41, Contractor Personnel Authorized to Accompany U.S. Forces (Oct. 3, 2005)

Exhibit 13:   Re: LOGCAP Security (UNCLASSIFIED)

Exhibit 14:   DoD Instruction 2000.16, Enclosure 3, § E3.1.1.14.1

31

Exhibit 15:    Army Field Manual 100-21, Contractors on the Battlefield (Jan. 2003)

Exhibit 16:    Army Regulation 715-9

Exhibit 17:    U.S. Government Counterinsurgency Guide (Jan. 2009)

Exhibit 18:    Army Field Manual 3-24, Counterinsurgency (Dec. 15, 2006)

Exhibit 19:    Army 15-6 Report, Exhibit 4Q

Exhibit 20:    Fluor Responses to 15-6 Questions Received Dec. 4, 2016

Exhibit 21:    Fluor Responses to 15-6 Questions Received Dec. 10, 2016

Exhibit 22:    Fluor Responses to 15-6 Questions Received Dec. 11, 2016

Exhibit 23:    RE: APS—Recruitment/Screening/hiring of HCNs (Established Policies and Procedures)

Exhibit 24:    Badge, Screening and Access Standard Operating Procedures for Bagram Airfield (Dec. 2, 2016)

Exhibit 25:    Badge, Screening and Access Standard Operating Procedures for Bagram Airfield (Dec. 28, 2016)

Exhibit 26:    Letter, Eleanor Spector to Lindsay Wingate (Dec. 22, 2016)

Exhibit 27:    Army 15-6 Report at 49, ¶ 18.b.2

Exhibit 28:    Alliance Project Services, Security Policy, HCN Labor Support (Oct. 24, 2013)

Exhibit 29:    Re: RANDOM SURVEILLANCE ACTIVITY: PARC/DPARC, Observations (Fluor HAZMAT MDC and Laundry, Waste Water Treatment)

Exhibit 30:    Moshe Schwartz & Jennifer Church, Cong. Res. Serv., R43074, Department of Defense's Use of Contractors to Support Military Operations: Background, Analysis, and Issues for Congress (2013)

Exhibit 31:    Desktop Guide to Personnel Services (Badging & Screening) (May 18, 2010)

Exhibit 32:    Army 15-6 Report, Exhibit 5H: Nayeb FBSC

32

Exhibit 33:    Army 15-6 Report, Exhibit 2A

Exhibit 34:    "COIN—The strategic, operational, and tactical implications of the economic variable in counterinsurgency" (Aug. 3, 2011)

Exhibit 35:    Army 15-6 Report Excerpts

Exhibit 36:    15-6 Transcript of Interview with Fluor (Dec. 20, 2016)

Exhibit 37:    General Order Number 1 (Jan. 8, 2015)

Exhibit 38:    APS Disciplinary Guidelines

Exhibit 40:    Army 15-6 Report, Exhibit 2AQ

Exhibit 41:    Army 15-6 Report, Exhibit 2H

Exhibit 42:    Army 15-6 Report, Exhibit 2J

Exhibit 43:    Army 15-6 Report, Exhibit 3O

Exhibit 44:    Army 15-6 Report, Exhibit 4O

Exhibit 45:    Army 15-6 Report, Exhibit 4S

Exhibit 46:    Email, Monica Shoffeitt to Thomas L. Artioli, Nov. 14, 2016, 12:35 p.m., Subj. "[Non-DoD] Source] Re: clarification."

Exhibit 47:    Escort Responsibility Agreement

Exhibit 48:    Letter, Timothy Compton, Jr. to Steve Anderson, re: Letter of Technical Direction, LOTD FLR-17-0005-AB1-0135, Waste Management Services Under ESCAP, Nov. 16, 2016

Exhibit 49:    Letter, Timothy Compton, Jr. to Steve Anderson, re: Letter of Technical Direction, LOTD FLR-17-0005-AB1-0138, provide fifty-four (54) Local Nationals for laundry services under ESCAP, Nov. 17, 2016

Exhibit 50:    Delegation of Authority to Michael Biddy (Feb. 4, 2016)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this **18th** day of March, 2019.

_Bryan K. Wilson_

Bryan K. Wilson

SUBSCRIBED AND SWORN to before me on this the **18** day of **March**, 2019.

_Martha Miller_

Notary Public — State of South Carolina

My Commission Expires: **3/20/2025**

34