**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| Charlotte Loquasto, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 3:19-cv-01455-B |
| v. | § | **(Consolidated with Civil Action No.** |
| | § | **3:19-cv-01624-B)** |
| Fluor Corporation, Inc., et al. | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC.,
FLUOR GOVERNMENT GROUP INTERNATIONAL, INC., AND FLUOR
INTERCONTINENTAL, INC.'S OPPOSED MOTION FOR LEAVE TO DESIGNATE
THE UNITED STATES MILITARY, AHMED NAYEB, AND UNKNOWN
<u>CRIMINAL ACTORS AS RESPONSIBLE THIRD PARTIES</u>**

Darrell L. Barger
J. Reid Simpson
Adam L. Anthony
**HARTLINE BARGER LLP**
1980 Post Oak Blvd., Suite 1800
Houston, Texas 77010
(713) 951-4116
(713) 652-2419 (Fax)
dbarger@hartlinebarger.com
rsimpson@hartlinebarger.com
aanthony@hartlinebarger.com

Brian S. Rawson
**HARTLINE BARGER LLP**
8750 N. Central Expy., Suite 1600
Dallas, Texas 75231
(214) 346-3727
(214) 267-4227 (Fax)
brawson@hartlinebarger.com

**COUNSEL FOR THE FLUOR DEFENDANTS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

INTRODUCTION ................................................................................................................ 1

PROCEDURAL HISTORY .................................................................................................. 2

ARGUMENT AND AUTHORITIES ................................................................................... 3

I.   RESPONSIBLE THIRD PARTY DESIGNATION STANDARDS ................................. 3

II.  THE MILITARY IS PROPERLY DESIGNATED AS A RESPONSIBLE THIRD
     PARTY. ...................................................................................................................... 7

     The Military Negligently Sponsored and Approved Nayeb for Vocational
     Training and LOGCAP Work. ................................................................................ 7

     The Military Negligently Failed to Detect and Report Nayeb's Re-Radicalization. .......... 9

     The Military Failed to Prevent Nayeb from Smuggling Explosives into BAF ................ 12

     The Military Negligently Directed LN Security Supervision and Escort. ...................... 14

     The Military Negligently Failed to Restrict Nayeb's Equipment Access ....................... 16

     The Court Should Grant Leave to Designate the Military as a Responsible Third
     Party. ...................................................................................................................... 18

III. AHMED NAYEB AND UNIDENTIFIED "JOHN DOES" ARE PROPERLY
     DESIGNATED AS RESPONSIBLE THIRD PARTIES. .............................................. 18

     1.  Ahmed Nayeb is Properly Designated as a Responsible Third Party. ................. 18

     2.  Unidentified "John Does" are Properly Designated as a Responsible Third
         Party. ................................................................................................................ 20

CONCLUSION AND PRAYER .......................................................................................... 24

CERTIFICATE OF CONFERENCE .................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................................. 25

# TABLE OF AUTHORITIES

CASES

*Am. K-9 Detection Servs., LLC v. Freeman*, 556 S.W.3d 246 (Tex. 2018), *cert. denied* 139 S. Ct. 1344 (2019) ............................................................................ 5

*Arceneaux v. Pinnacle Entm't, Inc.*, 523 S.W.3d 746 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ................................................................................... 19

*Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886 (1961 ................................................................................... 2, 12

*Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274 (Tex. 1979) .................................. 19

*City of Houston v. Howard*, 786 S.W.2d 391, 393 (Tex. App.—Houston [14th Dist.] 1990, writ denied) ................................................................................... 6, 24

*Coffey v. Johnson*, 142 S.W.3d 414 (Tex. App.—Eastland 2004, no pet.) .................... 6, 7, 23, 24

*Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863 (Tex. 2009) .................. 5, 6, 18

*In re CVR Energy, Inc.*, 500 S.W.3d 67, 80 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding) ................................................................................... 6

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798 (S.D. Tex. 2009) ................................................................................... 4

*In re Greyhound Lines, Inc.*, No. 05-13-01646-CV, 2014 WL 1022329, at *2 (Tex. App.—Dallas Feb. 21, 2014, orig. proceeding) .................................... 6, 24

*In re Manon*, No. 04-18-00311-CV, 2018 WL 2943562, at *3 (Tex. App.—San Antonio June 13, 2018, orig. proceeding) .................................... 6, 24

*Isaacs v. Bishop*, 249 S.W.3d 100 (Tex. App.—Texarkana 2008, pet. denied) ........................... 19

*JCW Elec., Inc. v. Garza*, 257 S.W.3d 701 (Tex. 2008) ................................................ 19

*Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008) ................................................ 5

*Low v. Henry*, 221 S.W.3d 609, 612 (Tex. 2007) ................................................ 6, 24

*Nuñez v. City of Corpus Christi, Tex.*, No. 2:12-CV-00092, 2013 WL 164045, at *1 (S.D. Tex. Jan. 14, 2013) ................................................................................... 19

*Reeder v. Daniel*, 61 S.W.3d 359 (Tex. 2001) ................................................ 19

**STATUTES**

Tex. Civ. Prac. & Rem. Code § 33 ........................................................................ passim

Tex. Civ. Prac. & Rem. Code § 33.002 ............................................................................ 3

Tex. Civ. Prac. & Rem. Code § 33.003(a) ........................................................................ 5

Tex. Civ. Prac. & Rem. Code § 33.004 ................................................................ 1, 4, 24

Tex. Civ. Prac. & Rem. Code § 33.004(a) .......................................................... passim

Tex. Civ. Prac. & Rem. Code § 33.004(j) ..................................................... 3, 6, 20, 24

Tex. Civ. Prac. & Rem. Code § 33.004(j)(1) .......................................................... 20, 23

Tex. Civ. Prac. & Rem. Code § 33.004(j)(2) .......................................................... 20, 23

Tex. Civ. Prac. & Rem. Code § 33.004(j)(3) .......................................................... 20, 23

Tex. Civ. Prac. & Rem. Code § 33.011(6) ............................................................ passim

Tex. Civ. Prac. & Rem. Code § 33.011(6)(A)(iii) .......................................................... 4

Tex. Penal Code § 15.02 ................................................................................... 23, 24

Tex. Penal Code § 15.02 (a)(1) ...................................................................................... 23

Tex. Penal Code § 15.02(a)(2) ....................................................................................... 23

Tex. Penal Code § 19.02(b) ........................................................................................... 19

Tex. Penal Code § 19.04 ................................................................................................. 19

Tex. Penal Code § 19.05 ................................................................................................. 19

Tex. Penal Code § 22.01(a)(1) ....................................................................................... 19

Tex. Penal Code § 22.02(a)(1) ....................................................................................... 19

Tex. Penal Code § 22.02(a)(2) ....................................................................................... 19

Tex. Penal Code § 22.05 ................................................................................................. 19

**OTHER AUTHORITIES**

19 William V. Dorsaneo III, Texas Litig. Guide § 291.03[2][b][i] at 291-24.1
    (2009) ......................................................................................................................... 5

Gregory L. Lensing, *Proportionate Responsibility and Contribution Before and After the Tort Reform of 2003*, 35 Tex. Tech. L. Rev. 1125, 1129 (2004)..............................4

III Scott A. Sherman, *Texas Tort Reform: The Legislative History*, at II-121 (1995)........................................................................................................................................4

TO THE HONORABLE JUDGE BOYLE, UNITED STATES DISTRICT JUDGE:

Defendants Fluor Corporation, Inc., Fluor Enterprises, Inc., Fluor Government Group International, Inc., and Fluor Intercontinental, Inc. (collectively, "Fluor") file this Motion for Leave to Designate the United States Military, Ahmed Nayeb, and Unknown Criminal Actors as Responsible Third Parties under Texas Civil Practice and Remedies Code § 33.004, *et seq.*, respectfully showing this Court the following:

## **<u>INTRODUCTION</u>**

1.      Plaintiffs' suit arises from a suicide attack at Bagram Airfield ("BAF"), a United States Military base in Bagram, Afghanistan. On November 12, 2016, an Afghan insurgent named Ahmed Nayeb[1] ("Nayeb") detonated a suicide-vest bomb in a crowd gathered for a Veteran's Day Event at BAF.

2.      At the time of Nayeb's attack, Fluor provided base operations support to the Military[2] under Task Order 0005, contract W52P1J-07-D-0008, as part of the Army's Logistics Civil Augmentation Program ("LOGCAP") IV. Under its LOGCAP contract, Fluor provided a wide range of civil services required by any sizeable population center, including *inter alia* facilities management, laundry services, sanitation services, and motor pool services.

3.      The Military was aware that Nayeb was a former[3] member of the Taliban, but sponsored Nayeb for vocational training and LOGCAP work at BAF under its "Afghan First"

---

[1] Variants of Nayeb's name include: Qari Nayab, Ahmad Naib Hafzi, Hafezi Nieb, Abdul Zuhoor.
[2] Fluor uses "Military" to collectively refer to the United States Department of Defense and all departments, services, agencies, commands, and components of the United States Department of Defense, including but not limited to United States Central Command and United States Forces—Afghanistan.
[3] *See* App'x at 167 (Ex. 6 (Letter from Commander, TF Red Bulls, to Parwan ROK)). The Military represented that Nayeb had renounced his Taliban membership, but Nayeb's conduct and the Taliban's public claim of responsibility for its "fighter" [*See* App'x at 508 (Ex. 10)] seriously call into question any notion that Nayeb had truly renounced his Taliban ties.

initiative. *See* pp. 7-9, *infra.* The Military never shared intelligence indicating that Nayeb was a former member of the Taliban, and Nayeb's work behavior did not generate any basis for Fluor to suspect that he intended to commit a suicide bombing at BAF.

4.      It is well established that "[t]he control of access to a military base is clearly within the constitutional powers granted to both Congress and the President." *Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 890 (1961); *accord* App'x at 15 (Ex. 2 (AR 700-137), at §§ 6-3(d), 6-4(e)); App'x at 50 (Ex. 3 (AR 715-9), at § 4-9). Correspondingly, Fluor's LOGCAP contract reserved to the Military all security functions at BAF, including perimeter security; personnel screening and access; security badge issuance; and Local National ("LN") security escort and supervision, among other functions. *See* App'x at 78 (Ex. 4 (Performance Work Statement ("PWS")), at § 1.04); *see also* App'x at 157, 160, and 162 (Ex. 5 (Basic Contract DFAR 252.225-7040(c)), and App'x at 1 (Ex. 1 (BAF Access Policy), at §§ 7, 9-11).

5.      Even though the Military controlled all aspects of security at BAF, Plaintiffs allege that Fluor negligently caused Nayeb's attack through purported negligent supervision, management, and/or retention of Nayeb. *See Loquasto* Petition, at pp. 22-25, and *Branch* Petition, at pp. 6-9.

## PROCEDURAL HISTORY

6.      Plaintiffs originally made their claims in two separate lawsuits filed in Dallas County District Court—(1) *Charlotte Loquasto, et al. v. Fluor Corporation, Inc., et al.* ("*Loquasto*") and (2) *Marvin T. Branch v. Fluor Corporation, Inc., et al.* ("*Branch*"). Fluor timely removed both the *Loquasto* and *Branch* cases under cause numbers 3:19-cv-01455-B and 3:19-cv-01624-B, respectively. *See* Doc. 1 (Notices of Removal). This Court subsequently

consolidated those matters into cause number 3:19-cv-01455-B. *See* Doc. 10 (Order re Fluor's Unopposed Motion to Consolidate).

7.      Fluor answered both the *Loquasto* and *Branch* suits before removing each case to this Court. *See* Doc. 1 (Notices of Removal, Ex. C (State Court File), Fluor's Answers[4]). In its state court answers, Fluor invoked all rights, privileges, and protections provided under Chapter 33 of the Texas Civil Practice and Remedies Code, including comparative negligence, and the right to apportion responsibility to timely designated responsible third parties. *See* Fluor's Answers, at ¶ 8.

8.      Under Texas Civil Practice and Remedies Code § 33.004(j), Fluor's Answers also collectively designate unidentified co-conspirators to Nayeb as responsible "John Does." *See id.* at ¶¶ 23-43, *supra*. Because each Fluor entity made those pleadings in its respective original or amended answers before removing, Fluor is entitled to move this Court for leave to designate the John Does as responsible third parties. *See* Tex. Civ. Prac. & Rem. Code § 33.004(j).

9.      This Motion is otherwise timely because a defendant may move for leave to designate responsible third parties sixty or more days from the date of trial. *See id.* Presently, there is no trial date for this case.

## ARGUMENT AND AUTHORITIES

## I.      RESPONSIBLE THIRD PARTY DESIGNATION STANDARDS.

Chapter 33 of the Texas Civil Practice and Remedies Code applies to all torts governed under Texas law, whether the underlying case is pending in state or federal court. *See* Tex. Civ. Prac. & Rem. Code § 33.002, and *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F.

---

[4] Fluor intends for "Fluor's Answers" to encompass—(1) Fluor Government Group International, Inc.'s Amended Answer (*Loquasto*), (2) Fluor Corporation, Inc., Fluor Enterprises, Inc., and Fluor Intercontinental, Inc.'s Original Answer (*Loquasto*), and (3) Fluor's collective Original Answer (*Branch*).

Supp. 2d 798, 832 (S.D. Tex. 2009) ("Chapter 33 applies to any tort cause of action governed by Texas law.") (citing Gregory L. Lensing, *Proportionate Responsibility and Contribution Before and After the Tort Reform of 2003*, 35 Tex. Tech. L. Rev. 1125, 1129 (2004), which in turn cites III Scott A. Sherman, *Texas Tort Reform: The Legislative History*, at II-121 (1995)).

Responsible third party practice is one of several rights, protections, and immunities that Chapter 33 provides to litigants in tort actions under Texas law. *See* Tex. Civ. Prac. & Rem. Code §§ 33.011(6), 33.004. Subject to certain limited restrictions, a defendant may designate any third party as a "responsible third party," thereby allowing the trier of fact to apportion responsibility to that third party, without formal joinder to the litigation. *See* Tex. Civ. Prac. & Rem. Code § 33.011(6).

At one time, Texas law required defendants to establish that a proposed responsible third party is subject to liability under the plaintiff's claims. *See* Tex. Civ. Prac. & Rem. Code § 33.011(6)(A)(iii) (Vernon 1997). That is no longer true. In 2003, the Texas Legislature amended § 33.011(6) to remove any reference to "liab[ility]," in favor of defining a responsible third party as "any person who is alleged to have caused or contributed to causing in *any way* the harm for which recovery is sought." *See* Tex. Civ. Prac. & Rem. Code § 33.011(6) (Vernon Supp. 2004) (emphasis added).

Under a plain reading of the current version of § 33.011(6), a potential responsible third party need not be subject to civil liability in order for a defendant to designate him or her as a responsible third party. *See* Lensing, *supra* at 1184. Thus, the extant version of Chapter 33 authorizes defendants to designate responsible third parties who may have a valid defense to liability, or may even be immune from liability. *See id.*

In 2009, the Texas Supreme Court removed any lingering doubt by expressly confirming that fact in *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 868 (Tex. 2009). The Court clarified that Chapter 33 no longer conflates responsible third party status with liability to the plaintiff or claimant. *Id.* Rather, as established above, a defendant may designate a responsible third party that "caused or contributed to causing in any way the harm for which recovery is sought," even if the third party possesses a valid defense, or is immune from suit—

> Although the scheme initially equated responsibility with liability to the plaintiff or claimant, this is no longer the case. Thus, a defendant may designate a responsible third party even though that party possesses a defense to liability, or cannot be formally joined as a defendant, or both. Chapter 33 then is apparently unconcerned with the substantive defenses of responsible third parties[.]
>
> . . .
>
> "The thrust of the 2003 statute is that the jury should allocate responsibility among all persons who are responsible for the claimant's injury, regardless of whether they are subject to the court's jurisdiction or whether there is some other impediment to the imposition of liability on them, such as statutory immunity."

*Id.* at 868-69, and n.6 (quoting 19 William V. Dorsaneo III, Texas Litig. Guide § 291.03[2][b][i] at 291-24.1 (2009)); *cf. Am. K-9 Detection Servs., LLC v. Freeman*, 556 S.W.3d 246, 258-59[5] (Tex. 2018), *cert. denied* 139 S. Ct. 1344 (2019); Tex. Civ. Prac. & Rem. Code § 33.011(6).

Consequently, the fact that the Military could raise immunity or another valid defense to substantive liability in the case *sub judice* does not preclude Fluor from designating the Military as a responsible third party under § 33.004(a). *Galbraith Eng'g*, 290 S.W.3d at 868-69, and n.6; *see also* Tex. Civ. Prac. & Rem. Code § 33.011(6) (Vernon Supp. 2004). Chapter 33 is

---

[5] "The trial court granted AMK9's motion to designate the Department and the Army as responsible third parties, thereby requiring '[t]he trier of fact . . . [to] determine [their] percentage of responsibility . . . for . . . causing or contributing to cause' Freeman's injury. Thus, as one court has observed, the political question doctrine 'looms large.'" (quoting Tex. Civ. Prac. & Rem. Code § 33.003(a), and *Lane v. Halliburton*, 529 F.3d 548, 561 (5th Cir. 2008)).

unconcerned with the Military's substantive defenses or immunities. *Galbraith Eng'g*, 290 S.W.3d at 868-69, and n.6.

Like a plaintiff's petition or complaint, Fluor's responsible third party pleading is subject to the "fair notice" pleading standard. *In re CVR Energy, Inc.*, 500 S.W.3d 67, 80 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding) (citing *In re Greyhound Lines, Inc.*, No. 05-13-01646-CV, 2014 WL 1022329, at *2 (Tex. App.—Dallas Feb. 21, 2014, orig. proceeding)). That fair notice pleading standard applies to both designation of known parties under § 33.004(a), and designation of unknown criminal actors under § 33.004(j)[6]. No presentation of evidence is necessary for designation in either context. *CVR*, 500 S.W.3d at 80; Tex. Civ. Prac. & Rem. Code § 33.004(j).

The pleading requirements to satisfy fair notice "are not stringent." *Greyhound Lines*, 2014 WL 1022329, at *2. "The test of fair notice is whether an opposing attorney of reasonable competence, with the pleadings before him, can determine the nature of the controversy and the testimony that would probably be relevant." *Coffey v. Johnson*, 142 S.W.3d 414, 418 (Tex. App.—Eastland 2004, no pet.) (citing *City of Houston v. Howard*, 786 S.W.2d 391, 393 (Tex. App.—Houston [14th Dist.] 1990, writ denied)); *see also Low v. Henry*, 221 S.W.3d 609, 612 (Tex. 2007), and *In re Manon*, No. 04-18-00311-CV, 2018 WL 2943562, at *3 (Tex. App.—San Antonio June 13, 2018, orig. proceeding). Fluor's Motion and pleadings meet that standard. *See* §§ II-III, *infra*, and Fluor's Answers, at ¶¶ 9-16, 23-43.

---

[6] "[T]he court shall grant a motion for leave to designate the unknown person as a responsible third party if . . . the allegation satisfies the pleading requirements of the Texas Rules of Civil Procedure."

## II.     THE MILITARY IS PROPERLY DESIGNATED AS A RESPONSIBLE THIRD PARTY.

Fluor moves for leave to designate the United States Military as a responsible third party. The Military's negligent acts and omissions proximately caused Nayeb's suicide bombing and Plaintiffs' alleged damages in several ways—

- The Military negligently sponsored and approved Nayeb for vocational training and LOGCAP work at BAF.

- The Military negligently failed to detect and report Nayeb's re-radicalization.

- The Military negligently failed to prevent Nayeb from smuggling explosive material into BAF.

- The Military negligently directed that Nayeb would not receive security supervision or escort in his work area at BAF.

- The Military negligently trained and certified security escorts that were responsible for Nayeb on the morning of the attack.

- The Military negligently failed to restrict Nayeb's access to materials that he purportedly utilized to create his suicide vest.

On these facts, the Military is a "person who is alleged to have [negligently] caused or contributed to causing in any way the harm for which recovery of damages is sought." *See* Tex. Civ. Prac. & Rem. Code § 33.011(6). Fluor's pleadings are also sufficient to provide fair notice of the basis for this designation. *Coffey*, 142 S.W.3d at 418; pp. 8-18, *infra*.

### The Military Negligently Sponsored and Approved Nayeb for Vocational Training and LOGCAP Work.

The Military negligently sponsored, screened, and approved Nayeb for vocational training and LOGCAP work at BAF, despite having actual knowledge of Nayeb's past Taliban membership. *See* App'x at 167 (Ex. 6 (Letter from Commander, TF Red Bulls, to Parwan ROK)); *see also* Fluor's Answers, at ¶¶ 9-16, *supra*.

Ostensibly based on its belief that "[l]ong-term success in COIN[7] depend[ed] on the [Afghan] people taking charge of their own affairs" through a functioning, autonomous Afghan economy, the Military required Fluor to utilize Afghan nationals "to the maximum extent possible." App'x at 79 (Ex. 4 (PWS), at § 1.07(b)); *see also* App'x at 185 (Ex. 7 (Army Field Manual 3-24 (Counterinsurgency)), at § 1-4), and App'x at 455-56 (Ex. 8 (Memo re: Afghan First)). Fluor did not have discretion on that issue; failing to utilize LNs in sufficient numbers for LOGCAP work would have endangered Fluor's LOGCAP contract.

In 2011, the Military had actual and exclusive knowledge of intelligence confirming that Nayeb was a former member of the Taliban. *See* App'x at 167 (Ex. 6 (Letter from Commander, TF Red Bulls, to Parwan ROK)). Then-existing policy dictated that Nayeb's Taliban membership should have immediately disqualified him from training or base access. Nevertheless, under the Military's larger "Afghan First" COIN strategy[8], the Military's "Task Force Red Bulls" ("TF Red Bulls") chose to (1) exempt Nayeb from disqualification, and (2) sponsor Nayeb for admittance to the Provincial Reconstruction Team *Parwan* (ROK)'s Vocational Training Center at BAF ("Parwan ROK" or "Parwan"). *See* App'x at 167 (Ex. 6 (Letter from Commander, TF Red Bulls, to Parwan ROK)).

Consistent with Afghan First, TF Red Bulls represented that providing this alleged "former" Taliban insurgent access to BAF and vocational training would equip him "with the skills necessary to obtain honest employment and allow him to reject the insurgency's promise of money." *Id.*

---

[7] "COIN" is an acronym for counterinsurgency.

[8] *See* App'x at 455-56 (Ex. 8 (Memo re: Afghan First)). The Military enacted Afghan First as a counterinsurgency measure in Afghanistan based on its belief that job creation and economic incentive could overcome the Afghan insurgency.

Upon completion of that training, Military directives ensured that Nayeb entered a pool of Military-approved LNs for LOGCAP work under Afghan First. Because the Military expected LOGCAP contractors to utilize LNs trained via Parwan ROK, TF Red Bulls' sponsorship of Nayeb for vocational training at Parwan directly resulted in Nayeb's presence at BAF as an Afghan subcontractor.

Thus, the Military unilaterally chose to give an Afghan national with known Taliban ties—(1) access to a United States Military base in Afghanistan, (2) vocational training for LOGCAP work at BAF, and (3) upon completion of that vocational training, approval for entrance into the pool of Military-approved LNs to support LOGCAP work under Afghan First. At no time during any of these events did the Military inform Fluor of Nayeb's Taliban ties, or share any intelligence indicating the existence of those ties.

No reasonable person under the same or similar circumstances would sponsor and approve a known Taliban insurgent for access to a United States Military base in Afghanistan, much less fail to inform *anyone* of that person's extremist ties before unleashing him on unsuspecting Military and civilian personnel living or working on the base.

The Military negligently provided Nayeb with access to BAF and negligently failed to inform Fluor of Nayeb's Taliban ties. These acts of negligence proximately caused Nayeb's attack. Nayeb would have had no opportunity to act in any capacity in connection with the LOGCAP contract, but for the Military's clearance permitting him to do so.

### The Military Negligently Failed to Detect and Report Nayeb's Re-Radicalization.

TF Red Bulls recognized that "admitting a former insurgent" to Parwan ROK posed security risks to personnel at BAF. Seemingly undeterred, the Commander advised that TF Red

Bulls would "respond to any security concerns [with regard to Nayeb] promptly and fully." *See* App'x at 167 (Ex. 6 (Letter from Commander, TF Red Bulls, to Parwan ROK)).

That promise aligned with the Military's exclusive screening and security responsibility. Under the Military's Access Policy, the Force Protection Screening Cell ("FPSC") was solely responsible for performing security screenings on prospective LNs seeking to access BAF, both initially and on a continuing basis. *See* App'x at 1 (Ex. 1 (BAF Access Policy), at §§ 9-11, *supra*). If FPSC cleared an LN for access, then "[t]he BSG Commander via [FPSC]"—not Fluor—would issue the LN a security badge that furnished base access privileges. *Id.* at § 4.b(1). FPSC and the BSG Commander were alone responsible for verifying and ensuring each LN's continued fitness to possess a security badge and access BAF. *Id.* at §§ 9-11.

FPSC is a Military operation in which Fluor has no control. The means, methods, and manner in which FPSC screens LNs, and the processes and criteria for analyzing and making decisions based on information obtained through FPSC screenings, are strictly Military matters. As such, the Military carefully controlled and directed each aspect of FPSC operation under the Access Policy [App'x 1 (Ex. 1 (BAF Access Policy), *supra*], and likely other means to which Fluor was not privy.

Exercising that exclusive control, the Military screened, interviewed, and approved Nayeb for his LOGCAP job on December 11, 2011. The BSG Commander, via FPSC, issued Nayeb a red access badge that allowed Nayeb to enter and work on BAF premises. App'x at 1 (Ex. 1 (BAF Access Policy), at §§ 4, 9-11)). Fluor played no role in these—or any related—actions that the Military took to ensure that Nayeb gained access to BAF.

Subsequently, the Military screened, interviewed, and continued to approve Nayeb for employment and base access on six occasions during his work on the LOGCAP project.

Measures that FPSC and Military counterintelligence personnel employed to screen Nayeb included *inter alia* a field expedient lie detector and counterintelligence interviews to which Fluor was not privy. The Military also provided the "Biometric Automated Toolset (BAT) dossier," which was a "list of questions to be included in all [FPSC] screenings." *See* App'x at 100 (Ex. 4 (PWS), at § 05.22.03(d)). Fluor had no authority to approve an LN for a security badge, and had no discretion in or control over any aspect of the LN screening process. *See* App'x at 1 (Ex. 1 (BAF Access Policy), at §§ 4. 9-11).

The Military therefore controlled and directed not just policymaking that required Fluor to utilize LNs generally, but also the decision-making and security screening that facilitated Nayeb's continued employment on the LOGCAP project at BAF. *See id.* Nayeb would have never had access to BAF on the day in question—or at any other time—but for the Military's clearance permitting it.

Unfortunately, the Military failed to detect and report Nayeb's apparent re-radicalization, even when Nayeb's answers during FPSC follow-up screenings and counterintelligence interviews appeared "trained and coached." *See* App'x at 457 (Ex. 9 (Army Regulation 15-6 Investigation Report ("AR 15-6 Report" or "15-6 Report"), at 33 (para. 15.b(2))).

Because of the intensely sensitive nature of both the FPSC's mission and the details and inner-workings of counterintelligence operations, Fluor will likely never know the precise reason(s) why the Military failed to detect and report Nayeb's re-radicalization. One un-redacted 15-6 interviewee statement suggested that complacency "c[oming] from the top-down" diminished the LN security mission's focus "to the point where the Task Force leadership did not feel that [its] primary role was base security/force protection." *See id.* at 472 (Ex. 9 (15-6 Report)

Exhibit 2H). There are almost certainly other reasons, explanations, or salient factors that the Military chose to redact under state secrets privilege.

Whatever the reason(s), the evidence is clear—the Military did not just allow Nayeb to access BAF, it wholly failed to detect and report Nayeb's apparent re-radicalization before the attack. That failure constituted negligence, which proximately caused Nayeb's attack and Plaintiffs' alleged injuries and damages. *See* Fluor's Answers, at ¶¶ 9-16, *supra.*

### **The Military Failed to Prevent Nayeb from Smuggling Explosives into BAF.**

The Military was exclusively responsible for perimeter security at BAF, and it negligently failed to prevent Nayeb from smuggling explosive material into BAF. *See id.* at ¶ 6.

As noted, perimeter security at a United States Military base is constitutionally committed to the political branches of the Government. *See, e.g., McElroy*, 367 U.S. at 890. Under the Access Policy, "Coalition Security Task Forces in charge of the BAF Ground Defense Area ("BAF GDA") w[ere] responsible for ensuring that all physical security inspections of personnel and vehicles entering and exiting BAF [were] conducted." *See* App'x at 1 (Ex. 1 (BAF Access Policy), at § 7(d)).

Once again, Fluor did not have input into the means, methods, or details of the Military's physical searches of Nayeb or other LNs entering BAF. Nor did Fluor have any input or control over the Military's random searches of LNs after they entered BAF. Like the FPSC and counterintelligence screenings, perimeter security and physical searches of vehicles or personnel at BAF are strictly Military operations.

Measures that the Military purportedly employed to ensure perimeter security included pat downs, inspections, x-rays, and iris scans to confirm identity and the absence of derogatory information. *See id.* at § 7, *supra*. Military personnel also performed random physical searches of

LNs and their work areas, to include searches augmented by bomb-sniffing dogs, intermediate checkpoints, and Military guards at buildings to enforce force protection measures.

Despite the myriad personnel and materials security measures at its disposal, the Military negligently failed to prevent Nayeb from bringing explosive materials into BAF. In fact, the Army's 15-6 Report confirms that Nayeb repeatedly managed to smuggle homemade explosives into BAF through one or more Entry Control Points ("ECPs") over a four-month period preceding the attack. *See* App'x at 467 (Ex. 9 (15-6 Report), at 49 (para. 18.b(2))). That timeline coincides with the Taliban's public claims that (1) Nayeb was one of its so-called "fighters[9]," and (2) the Taliban had been planning Nayeb's attack "for four months" before the incident. *See* App'x at 508 (Ex. 10 (Harooni & Shams, *Intelligence gaps may have helped Afghan Taliban breach NATO fortress*, Reuters Nov. 23, 2016[10])).

The Military likewise had access to intelligence regarding potential security threats to BAF before the attack, yet it failed to take reasonable measures to prevent Nayeb's bombing.

The heavily redacted AR 15-6 Report provides some insight as to why and how the Military's perimeter security failed. Similar to lapses in screenings discussed *supra*, one 15-6 interviewee stated under oath that he or she "knew that there was more facilitation going on" at the time of the incident, to the point where "[redacted per (b)(1)1.4a] the night before said there was going to be an attack[,] but that it had been called off." *See* App'x at 478 (Ex. 9 (15-6 Report), Exhibit 2J, at 3). Others confirmed that the Military knew "[t]here was a threat on the base" because "there were drugs being smuggled on, alcohol was probably being smuggled on,"

---

[9] Despite TF Red Bulls' assurances that—(1) Nayeb had renounced his Taliban membership, and (2) providing Nayeb vocational training would prompt him to reject the insurgency. *See* App'x at 167 (Ex. 6 (Letter from Commander, TF Red Bulls, to Parwan ROK)).
[10] https://www.reuters.com/article/us-afghanistan-usa-bomber-insight/intelligence-gaps-may-have-helped-afghan-taliban-breach-nato-fortress-idUSKBN13I2NN

and that inevitably "turn[s] into the day I need you to take a knee and look away, [so that] I [can] bring what I need to bring into the base." *Id.* at 493 (Ex. 9 (15-6 Report), Exhibit 3O at 7).

Ultimately, Fluor cannot explain how Nayeb managed to smuggle homemade explosives through a quarter-mile long Military checkpoint, and then evade intermediate Military security measures. The Military's assertion of state secrets privilege will likely prevent anyone from determining that issue precisely.

However, the Military cannot have properly searched, vetted, and cleared Nayeb on a daily basis at BAF, while allowing him to introduce explosive material into a fortified Military base located in a war zone. And since Nayeb could not have committed his attack without explosive material, the Military's negligent failure to prevent Nayeb from smuggling explosives into BAF was not just a proximate of the attack, it was the *sole* proximate cause of the attack. *See* Fluor's Answers, at ¶ 6.

### The Military Negligently Directed LN Security Supervision and Escort.

Like FPSC screenings and perimeter security, the Military was solely responsible for dictating where, when, and how Nayeb would receive security escort and supervision at BAF. *See, e.g.,* App'x at 1 (Ex. 1 (BAF Access Policy), at § 12). Fluor did not have discretion to provide such supervision or escort where the Military did not direct it.

Nayeb held a red access badge at the time of the incident. For reasons unknown to Fluor, the Military directed that red badge holders would receive security escort in all areas *except* work facilities. Critically, Plaintiffs aver that the absence of security supervision at Nayeb's workstation—per Military directives—allowed Nayeb to construct his explosive device at his workstation. *See Loquasto* Petition, at p. 23; *Branch* Petition, at pp. 7-8. And while Plaintiffs incorrectly attribute the alleged lack of security supervision at Nayeb's workstation to Fluor, they

nevertheless assert that alleged absence of supervision was negligent, and proximately caused the attack. *Id.*

Assuming *arguendo* that Plaintiffs' claims are correct and Nayeb constructed his suicide vest at his workstation, the Military's failure to direct and provide security supervision and escort for Nayeb at his workstation constituted negligence that proximately caused Nayeb's attack. Nayeb would not have been able to (allegedly) construct his suicide vest at his workstation, but for the Military's directives against supervision in work areas. The Military in fact recognized this by revising its Access Policy to require security supervision for LNs in *all* areas—including work areas—after Nayeb's attack. *See* App'x at 510-11 (Ex.11 (Badge, Screening and Access Standard Operating Procedures for BAF), at § 11.a(1)(ii), (iii) (Dec. 2, 2016), and Ex. 12 (Badge, Screening and Access Standard Operating Procedures for BAF), at § 11.a(1)(ii), (iii) (Dec. 28, 2016)).

Plaintiffs also claim that Nayeb evaded escort on the morning of the incident. *See Loquasto* Petition, at pp. 22-24, and *Branch* Petition, at pp. 6-8. There is no definitive evidence to establish what occurred that morning because the Military deems the investigation into the incident classified.

However, it is clear that the Military—not Fluor—trained and certified all personnel with escort privileges. Thus, if any escort on the morning of the incident was ineffective—as Plaintiffs allege—the Military was responsible for negligently training and providing escorts to perform their duties on the morning of the incident.

The Military also allowed LNs to serve as escorts for other LNs—a practice that the 15-6 Report indicated was a security issue. *Cf.* App'x at 463-65 (Ex. 9 (15-6 Report), Exhibit 2AQ, at

1). Military-trained LN escorts purportedly signed Nayeb out on the morning of the incident, and then verified that Nayeb boarded the bus to ECP-1 on the morning of the incident.

Once again, Fluor does not know whether one or more of the LNs at BAF acted as Nayeb's accomplice because the Military considers the investigation into that issue classified. *See id.* at 460 (Ex. 9 (15-6 Report), Exhibit 2A, at 1). However, after the incident, the Military expressly prohibited LNs from serving as security escorts for other LNs. App'x at 510-11 (Ex. 11 (Badge, Screening and Access Standard Operating Procedures for BAF), at §§ 12.f(2), 15.k(2)[11] (Dec. 2, 2016), and Ex. 12 (Badge, Screening and Access Standard Operating Procedures for BAF), at §§ 12.f(2), and 15.k(2)[12] (Dec. 28, 2016)).

If Nayeb was able to avoid the LN escorts that were responsible for him on the morning of the incident[13], or if the Military-trained and certified LN escorts facilitated Nayeb's actions, the Military negligently trained, certified, and provided those escorts, and its negligence proximately caused the incident.

## The Military Negligently Failed to Restrict Nayeb's Equipment Access.

Finally, the Military formulated specific policies that governed LN access to equipment for LOGCAP work, restricting access to certain items that the Military deemed security risks, while otherwise mandating that Fluor provide unimpeded access to all other equipment required for Fluor's PWS work activities.

Plaintiffs claim that Nayeb utilized a "multimeter," and other unspecified equipment, to construct a suicide vest at his workstation. *See Loquasto* Petition, at p. 23 *Branch* Petition, at p. 8. Ostensibly, Plaintiffs are parroting assertions in the AR 15-6 report indicating that Nayeb

---

[11] "Local nationals will not be authorized to escort local nationals."
[12] "Local nationals will not be authorized to escort local nationals."
[13] As Plaintiffs expressly allege in their pleadings. *See Loquasto* Petition, at pp. 3, 22-23, and *Branch* Petition, at pp. 2, 7-8.

accessed a multimeter, "bolts and nuts," switches, and "smuggled small quantities of homemade explosives" to construct the device in question. *Id.*; *compare* App'x at 459 (Ex. 9 (AR 15-6 Report), at 49 (para. 18.(b)(2))).

The Military restricted access to items such as cell phones, two-way radios, and weapons, but did not restrict LN access to any of the items that Plaintiffs and the AR 15-6 Report claim Nayeb utilized to construct his suicide vest. Quite the contrary—the Military contractually required Fluor to "ensure sufficient quantities of all materials [were] available to meet ordinary demands to avoid delays in work execution." *See* App'x at 83 (Ex. 4 (PWS), at § 5.00). And contrary to Plaintiffs' representations, each of the items identified above was required to meet Fluor's ordinary demands under the PWS.

The Military was exclusively responsible for personnel and materials security, and thus the Military alone was responsible for ensuring that Nayeb did not have access to materials with which he could conduct hostile actions against Department of Defense personnel, resources, facilities, and critical information. This is particularly true because the Military alone had knowledge that Nayeb was a former member of the Taliban.

The Military's failure to restrict Nayeb's access to materials that he purportedly utilized to create his suicide vest constituted negligence that—in Plaintiffs' estimation[14]—proximately caused the attack and Plaintiffs' alleged damages and injuries. The Military is appropriately designated as a responsible third party on this basis as well. Tex. Civ. Prac. & Rem. Code §§ 33.011(6), 33.004(a).

---

[14] *See Loquasto* Petition, at p. 23 *Branch* Petition, at p. 8.

**The Court Should Grant Leave to Designate the Military as a Responsible Third Party.**

The foregoing well-pleaded facts fully support Fluor's request for leave to designate the Military as a responsible third party under §§ 33.011(6) and 33.004(a). *See also* Fluor's Answers, at ¶¶ 6, 8-16, *supra.* The Military is a "person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission . . . by other conduct or activity that violates a legal standard, or by any combination of these." *See* Tex. Civ. Prac. & Rem. Code § 33.011(6). That the Military may be immune from liability or may have a valid defense to liability is not of any import in the present context. *Galbraith Eng'g*, 290 S.W.3d at 868 and n.6.

Accordingly, this Court should grant Fluor's request for leave to designate the Military as a responsible third party under Chapter 33 of the Texas Civil Practice and Remedies Code.

## III. AHMED NAYEB AND UNIDENTIFIED "JOHN DOES" ARE PROPERLY DESIGNATED AS RESPONSIBLE THIRD PARTIES.

In addition to the Military, Fluor respectfully asserts that this Court should grant leave to designate as responsible third parties—(1) Ahmed Nayeb, and (2) unidentified "John Does" that acted as Nayeb's accomplices or co-conspirators. *See* Fluor's Answers, at ¶¶ 23-43.

### 1. Ahmed Nayeb is Properly Designated as a Responsible Third Party.

It is undisputed that Ahmed Nayeb committed a suicide bombing at BAF on November 12, 2016. *See Loquasto* Petition, at pp. 2-5, 22-25; *Branch* Petition, at pp. 6-7. It is also undisputed that Nayeb's suicide bombing proximately caused Plaintiffs' alleged injuries and damages. *See Loquasto* Petition, at p. 24, and *Branch* Petition, at p. 8. These undisputed facts merit leave to designate Nayeb as a responsible third party. *See id.*; *see also* Tex. Civ. Prac. & Rem. Code § 33.011(6).

-18-

To the extent that Plaintiffs may contend otherwise, Chapter 33 of the Texas Civil Practice and Remedies Code directs the trier of fact to apportion responsibility amongst negligent *and* intentional tortfeasors alike, including those who have committed criminal assault. *Arceneaux v. Pinnacle Entm't, Inc.*, 523 S.W.3d 746, 748-49 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *JCW Elec., Inc. v. Garza*, 257 S.W.3d 701, 704 (Tex. 2008), and *Isaacs v. Bishop*, 249 S.W.3d 100, 116-17 (Tex. App.—Texarkana 2008, pet. denied)); *accord Nuñez v. City of Corpus Christi, Tex.*, No. 2:12-CV-00092, 2013 WL 164045, at *1 (S.D. Tex. Jan. 14, 2013) ("the Court rejects Nuñez's theory that his assault claim is exempted from the proportionate liability statute."). Thus, the fact that Nayeb's suicide attack constituted criminal conduct on his part does not preclude his designation. *Nuñez*, 2013 WL 164045, at *1.

Alternatively, "[n]egligence per se is a common-law doctrine that allows courts to rely on a penal statute to define a reasonably prudent person's standard of care." *Reeder v. Daniel*, 61 S.W.3d 359, 361-62 (Tex. 2001) (citing *Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 278 (Tex. 1979)).

To that end, it is beyond dispute that Nayeb's attack violated multiple Texas Penal Code statutes. *See Loquasto* Petition, at pp. 2-4, 22-24, and *Branch* Petition, at pp. 1-3, 6-8, *supra*. Specifically—Nayeb's actions constituted murder, criminally negligent homicide, assault, aggravated assault, and deadly conduct. *See* Tex. Penal Code §§ 19.02(b) (Murder), 19.04 (Manslaughter), 19.05 (Criminally Negligent Homicide), 22.01(a)(1) (Assault), 22.02(a)(1), (2) (Aggravated Assault), and 22.05 (Deadly Conduct). None of these facts is in dispute.

Accordingly, Nayeb's criminal actions constituted negligence per se, which proximately caused the harm for which Plaintiffs seek recovery in the case *sub judice*. *Reeder*, 61 S.W.3d at 361-62 (citing *Carter*, 584 S.W.3d at 278). Nayeb is a person that "caused or contributed to

causing in any way the harm for which recovery is sought," and thus the Court should grant Fluor leave to designate Nayeb as a responsible third party under § 33.004(a). *Id.*; *see also* Tex. Civ. Prac. & Rem. Code §§ 33.011(6), and 33.004(a).

**2.      Unidentified "John Does" are Properly Designated as a Responsible Third Party.**

For similar reasons, this Court should grant leave to designate unidentified "John Does" that facilitated or assisted Nayeb in his suicide attack. *See* Tex. Civ. Prac. & Rem. Code § 33.004(j); *see also* Fluor's Answers, at ¶¶ 23-43, *supra.*

A defendant seeking leave to designate unknown or unidentified criminal actors as responsible third parties must allege—in an answer filed within sixty days of appearance—that the "unknown person committed a criminal act that was a cause of the loss or injury that is the subject of the lawsuit." *See* Tex. Civ. Prac. & Rem. Code § 33.004(j). Upon such pleading, the trial court "shall grant" a motion for leave to designate the unknown person as a responsible third party if—

(1)      The court determines that the defendant has pleaded facts sufficient for the court to determine that there is a reasonable probability that the act of the unknown person was criminal;

(2)      The defendant has stated in the answer all identifying characteristics of the unknown person, known at the time of the answer; and

(3)      The allegation satisfies the pleading requirements of the Texas Rules of Civil Procedure.

*See* Tex. Civ. Prac. & Rem. Code § 33.004(j)(1)-(3). Fluor's Answers in both the *Loquasto* and *Branch* matters satisfy each of these requirements.

***First***, Fluor pleads sufficient facts for the Court to determine that there is a reasonable probability that the John Does' collective acts were criminal in nature.

As Fluor pleaded at length in its Answers, the Government released only a heavily redacted AR 15-6 Report, ostensibly to suit its own interests. *See* Answers, at ¶¶ 24-26, *supra.* But even that redacted version confirms Nayeb did not perpetrate the attack without assistance. There were unnamed co-conspirators that the Government and/or the Army refused to identify based on state secrets privilege and/or on grounds that such information was classified[15].

For example, an Army Criminal Investigation Division ("CID") officer averred under oath that he had in his possession "classified exhibits in [his] investigation produced from other military agencies who identified co-conspirators to the suicide bomber." *See* App'x at 460 (Ex. 9 (15-6 Report), Exhibit 2A, at 1). He goes on: "[a]t this time, CID does not plan on listing the co-conspirators as subjects in the unclassified LER [Law-Enforcement Report] due to the classified means in which they were identified as subjects/co-conspirators." *Id.*

Other 15-6 interviewees averred under oath that they had knowledge of facilitation that directly compromised then-existing Military security measures and protocols. Afghan LNs were smuggling goods to trade for favors like "look[ing] away." *See* App'x at 478-80, 493 (Ex. 9 (15-6 Report), Exhibit 2J, at 3-5; and Exhibit 3O, at 7). And while pertinent details are assuredly missing due to the Government's heavy redactions, these sworn statements are imminently relevant because—by the Army's own admission—Nayeb somehow managed to smuggle homemade explosives through Military-controlled and provided ECPs surrounding BAF. *See id.* at 458 (Ex. 9 (15-6 Report), at 49 (para. 18.b(2))).

Moreover, it is important to note that Nayeb was a low-skilled laborer working in a motor pool. His only formal education or training consisted of training at BAF's Parwan ROK

---

[15] The Government's refusal to identify those co-conspirators means that § 33.004(j) is the only means by which Fluor can designate such persons as responsible third parties.

vocational school—per the Military's directive[16]—and Parwan ROK certainly did not teach its attendees how to construct suicide vests such as that which Nayeb used in his attack.

Yet somehow, Plaintiffs assert that Nayeb was able to fashion a working suicide vest, smuggle explosives through Military-controlled and fortified ECPs, and evade Military-trained and certified escorts on the morning of the incident. *See Loquasto* Petition, at pp. 2-5, 22-25, and *Branch* Petition, at pp. 1-3, 6-8.

That Nayeb could have been acting alone defies credulity and all available evidence, from the AR 15-6 Report to the Taliban's public statements asserting responsibility for the execution and planning of the attack. *See* Ex. App'x at 508 (Ex. 10 (Harooni & Shams, *supra*)). As noted, the four-month timeline that the Taliban cited in its public statement claiming responsibility directly coincides with the Army's finding that Nayeb smuggled explosive material through Military ECPs starting approximately four months before the attack. *See* App'x at 458, 478 (Ex. 9 (AR 15-6 Report), at 49 (para. 18.b(2)); Exhibit 2J, at 3).

In sum, therefore, Fluor asserts that the John Does facilitated and furthered Nayeb's attack by—

> (1)    Constructing Nayeb's suicide vest or, alternatively, assisting Nayeb in the construction of his vest.
>
> (2)    Facilitating and furthering Nayeb's suicide attack by "look[ing] away" and allowing Nayeb to smuggle explosive material through one or more BAF ECPs.
>
> (3)    Furnishing and/or accepting bribes, kickbacks, or payoffs to ensure that persons responsible for searching Nayeb "look[ed] away" and allowed Nayeb to smuggle explosives into BAF.
>
> (4)    Facilitating or assisting Nayeb in evading Military-trained escort on the morning of the incident.

---

[16] *See* App'x at 167 (Ex. 6 (Letter from Commander, TF Red Bulls, to Parwan ROK)).

By facilitating and furthering Nayeb's criminal conduct, the John Does engaged in criminal behavior. *See* Tex. Penal Code § 15.02 (Criminal Conspiracy). To wit—the John Does (1) agreed with Nayeb and/or one or more other persons that Nayeb would conduct the suicide attack in question, and (2) performed one or more overt acts to pursue or further their agreement and Nayeb's attack. *See id.* at 15.02 (a)(1), (2).

The foregoing pleadings—and Fluor's pleadings in its Answers on file—are sufficient to allow the Court to determine that there is a reasonable probability that the John Does' collective acts were criminal in nature. *See* Tex. Civil Prac. & Rem. Code § 33.004(j)(1), and Fluor's Answers, at ¶¶ 23-43.

***Second***, Fluor has provided all known identifying characteristics of the John Does in its pleadings on file with this Court. *See* Tex. Civ. Prac. & Rem. Code § 33.004(j)(2); *see also* Fluor's Answers, at  ¶ 40.

The Government's assertion that the identities of the co-conspirators are classified severely limits Fluor's ability to describe such persons to this Court in a pleading. However, based on the Taliban's claim of responsibility in conjunction with the attack, Fluor asserts that the John Does are members of or associated with the Taliban[17]. This is the only descriptive information to which Fluor has access. *Id.*

***Finally***, Fluor's pleadings provide fair notice of the facts and basis on which Fluor seeks to designate the John Does. *See* Tex. Civ. Prac. & Rem. Code § 33.004(j)(3).

As noted, a designating party's pleadings comport with fair notice if he or she pleads facts sufficient to allow an attorney of reasonable competence to "determine the nature of the controversy and the testimony that would probably be relevant." *Coffey*, 142 S.W.3d at 418

---

[17] Because Taliban members are by no means persons strictly from Afghanistan, and in fact can be of multiple nationalities, Fluor cannot state that the co-conspirators are Afghan LNs.

(citing *Howard*, 786 S.W.2d at 393) (defining fair notice); *see also Manon*, 2018 WL 2943562, at *3; *Greyhound*, 2014 WL 1022329, at *2 (citing *Low*, 221 S.W.3d at 612). Fluor has fully described the legal and factual bases on which it seeks to designate John Does. The John Does facilitated and furthered Nayeb's suicide attack in each of the nonexclusive ways in which Fluor enumerated in this Motion and in its Answers. *See* pp. 19-22; Fluor's Answers, at ¶¶ 23-43.

Such overt acts in pursuance of Nayeb's criminal activity constituted criminal conduct that caused or contributed to cause Nayeb's attack and Plaintiffs' injuries or damages. *See* Tex. Penal Code § 15.02, *supra.* There is no reasonable question regarding the nature of the controversy or the testimony that would probably be relevant on Fluor's record pleadings. *See Coffey*, 142 S.W.3d at 418 (citing *Howard*, 786 S.W.2d at 393); *see also Manon*, 2018 WL 2943562, at *3; *Greyhound*, 2014 WL 1022329, at *2 (citing *Low*, 221 S.W.3d at 612).

Accordingly, Fluor respectfully asserts that, in addition to granting leave to designate the Military and Nayeb as responsible third parties, the Court should grant leave for Fluor to collectively name the "John Does" as an unidentified responsible third party under § 33.004(j).

## CONCLUSION AND PRAYER

Fluor's Motion for Leave to Designate the Military, Nayeb, and the John Does is timely in all respects under Chapter 33, and Fluor supports this Motion with ample facts to provide Plaintiffs with fair notice of the claims against each proposed third parties.

**THEREFORE**, Fluor Corporation, Inc., Fluor Enterprises, Inc., Fluor Government Group International, Inc., and Fluor Intercontinental, Inc. respectfully request that the Court GRANT their Motion for Leave to Designate the Military, Nayeb, and the John Does as responsible third parties under § 33.004, *et seq.* Fluor also prays for such other and further relief to which it may show itself in law or in equity.

Respectfully submitted,

**HARTLINE BARGER LLP**

*/s/ Darrell L. Barger*

Darrell L. Barger (*Attorney-in-charge*)
State Bar No. 01733800
J. Reid Simpson
State Bar No. 24072343
Adam L. Anthony (*Admitted Pro Hac Vice*)
State Bar No.
1980 Post Oak Blvd., Suite 1800
Houston, Texas 77056
(713) 759-1990
(713) 652-2419 (Fax)
dbarger@hartlinebarger.com
rsimpson@hartlinebarger.com
aathony@hartlinebarger.com

Brian Rawson
State Bar No. 24041754
8750 N. Central Expy., Suite 1600
Dallas, Texas 75231
(214) 369-2100
(214) 369-2118 (Fax)
brawson@hartlinebarger.com
***Counsel for the Fluor Defendants***

## CERTIFICATE OF CONFERENCE

The undersigned certifies that counsel for Fluor conferred with counsel for Plaintiffs and counsel for APS concerning the foregoing Motion for Leave to Designate Responsible Third Parties. Plaintiffs are opposed to Fluor's Motion; APS is unopposed to Fluor's Motion.

*/s/ Darrell L. Barger*
Darrell L. Barger

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 19, 2019, Fluor served a true and correct copy of the foregoing Motion on counsel of record for Plaintiffs and APS via the Northern District's CM/ECF filing service.

*/s/ Darrell L. Barger*
Darrell L. Barger