IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Charlotte Loquasto, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 3:19-cv-01455-B |
| | § | **(Consolidated with Civil Action No.** |
| Fluor Corporation, Inc., et al. | § | **3:19-cv-01624-B)** |
| | § | |
| Defendants. | § | |

## DEFENDANTS FLUOR CORPORATION, INC., FLUOR ENTERPRISES, INC., FLUOR INTERCONTINENTAL, INC., AND FLUOR GOVERNMENT GROUP INTERNATIONAL, INC.'S REPLY IN SUPPORT OF THE RULE 12(B)(1) MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT [DOC. 45]

TO THE HONORABLE JANE J. BOYLE, UNITED STATES DISTRICT JUDGE:

In their opposition, Plaintiffs argue: (i) this suit is justiciable because "the military's liability will not have to be considered," and (ii) "combatant activities" preemption does not exist or does not apply.[1] These arguments are meritless. The Military's own investigation—which points the finger at numerous *Military failures*—proves that this litigation would necessarily require scrutiny of sensitive military judgments. This is inevitable because the Military is a properly designated responsible third party, which requires apportionment of fault.[2]

As to "combatant activities" preemption, Plaintiffs brush aside the legal test for preemption adopted by numerous federal appellate courts, which requires dismissal if a "contractor is integrated into combatant activities over which the military retains command authority."[3] Plaintiffs

---

[1] Doc. 57 (Plaintiffs' Response, at pp. 17-25)
[2] *See* Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004.
[3] *See Saleh v. Titan Corp.*, 580 F.3d 1, 7 (D.C. Cir. 2009); *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 480 (3d Cir. 2013); *In re KBR, Inc. Burn Pit Litig.*, 744 F.3d 326, 346-51 (4th Cir. 2014); *see also Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992) (holding suit against contractor preempted by "combatant activities" exception).

disregard this precedent even though the United States in other similar cases embraced its own broad "combatant activities" test, which requires the contractor was acting within the scope of its contract. This suit is preempted under either test. Indeed, the undisputed facts establishing preemption have now been confirmed in a sworn declaration from the top U.S. Army Contracting Officer charged with administering Fluor's LOGCAP IV Contract at the time of the November 2016 incident. The Contracting Officer explained: "Fluor augmented and was integrated within the military at Bagram Airfield" and was acting "within the scope of the LOGCAP IV contract."[4]

This suit arises out of hostile attack by a Taliban operative on a U.S. military base on foreign soil. This is the quintessential example of a lawsuit barred by both the political question doctrine and "combatant activities" preemption.

## I. THE MILITARY'S OWN INVESTIGATION DEMONSTRATES THAT POLITICAL QUESTIONS ARE UNAVOIDABLE.

The Court should dismiss this case under the political question doctrine because it is apparent—in examining "how the Plaintiffs might prove their claims *and* how [Defendants] would defend"—that this case requires reexamination of Military decisions. *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008) (emphasis in original); Doc. 45 (Motion to Dismiss at § II-III).

At this stage in the case, the single most compelling evidence that the political question doctrine "looms large" is the Military's own internal investigation ("AR 15-6").[5] The AR 15-6 included "eight major findings" detailing failures *by the Military itself* that were causal factors in the bombing at issue. Those failures include: (i) Local national access and supervision was not

---

[4] *Please see* Declaration of Ms. Lindsay Weindruch, Contracting Officer, for the U.S. Army, Army Contracting Command—Rock Island, in Rock Island, Illinois ("Weindruch Declaration"), at ¶ 3. Fluor is filing the Weindruch Declaration and the Declarations of Lieutenant General (Retired) Mick Bednarek and Mr. Ronald Riley with a motion for leave to supplement the summary judgment record under Rule 56(e), filed immediately after this Reply.

[5] Even the heavily redacted version of the AR 15-6 demonstrates the suit is non-justiciable; it also raises the specter of the State Secrets doctrine, given the classified information contained therein.

properly enforced; (ii) Unity of effort, unity of command, and interoperability challenges were compounded by multi-national and contracted security providers; (iii) The Bagram Airfield security forces' span of control was too broad and lacked adequate forces; (iv) Counterintelligence shortages impaired Coalition Forces' capability to screen Local National employees and to identify Nayeb's threat indicators; (v) Complexity of intelligence and force protection mission command and interoperability of networks, architecture, and analytical tools impaired intelligence fusion; (vi) Disjointed antiterrorism and force protection efforts increased susceptibility to attacks; (vii) Contracting Officer's Representatives were not aligned by location, duties, or experience; and, (viii) Commanders and supervisors of Contracting Officer's Representatives were not appropriately engaged in contract formation, administration, and oversight.[6] Based on this, the Military's own findings, any trier of fact would need to review, scrutinize, and second-guess whether the Military acted reasonably in carrying out its security responsibilities at BAF.

As the Army AR 15-6 demonstrates, it is already clear that Military personnel will be placed in the inappropriate position in this litigation of testifying against each other, a result which the political question doctrine is designed to prevent. More specifically, numerous Military officials and personnel at BAF who were interviewed during the investigation have *already* begun to question the Military's readiness leading up to and during the November 2016 incident. For instance, one AR 15-6 interviewee—a member of Task Force Tiger—averred under oath that there was known "facilitation going on" at perimeter entry control points ("ECPs"), general "disorganization in BAF Force Protection," and "confusion about who would control ECPs."[7] Another 15-6 interviewee confirmed that "complacency c[oming] from the top-down" had

---

[6] *See* Doc. 1 (Fluor's Notice of Removal, Ex. I (AR 15-6 Report and Exhibits, at pp. 2-3, para. 7.a.-h.)); *see also* Doc. 20 (Motion for Leave to Designate Responsible Third Parties, *supra*).
[7] *See* Doc. 45 (Motion to Dismiss, App'x at 958-59 (Ex. 42 (15-6 Report, Exhibit 2J, at 3-4))).

"diminished" the Military's LN security mission focus,[8] and that there was such dysfunction that even "[s]imple requests for increased force protection" resources "t[ook] weeks or even months to complete" because the "DPW and ASG respond[ed] slowly or not at all."[9] One of the core purposes of the political question doctrine is to protect Military discipline and avoid this type of finger pointing among Military personnel.

Further, because the Military is a properly designated responsible third party, *see* Doc. 20, 30-31, the trier of fact will have to compare and apportion the Military's responsibility. The AR 15-6 alone demonstrates that the Military's acts or omissions easily meet the standard of having caused or contributed to cause "in any way" Plaintiffs' alleged injuries. *See* Tex. Civ. Prac. & Rem. Code § 33.003(a). And where, as here, the trier of fact must assess the Military's contribution to causation, political question "loom[s] large." *Lane*, 529 F.3d at 558-61; *Am. K-9 Detection Serv., LLC v. Freeman*, 556 S.W.3d 246, 258 (Tex. 2018), *cert. denied*, 139 S. Ct. 1344 (2019).

Plaintiffs agree that submitting the Military for apportionment raises political questions, but they argue that the Military did not proximately cause the incident because it merely "created the condition that allowed the Defendants' [alleged] negligence to cause the injury[.]" *See* Doc. 57 (Response, at p. 1, and § II, pp. 9, 13). Plaintiffs cite three cases in which third party conduct was "too attenuated" to the accident, and thus merely a "causal" factor in the "philosophic sense."[10]

There is nothing attenuated or philosophic about the connection between Nayeb's suicide bombing and the Military allowing Nayeb, a former Taliban fighter, to access the base with explosives. In fact, the AR 15-6 findings regarding the Military's failures are concrete "causes of the bombing in the popular sense of the word, in which there lurks the idea of [Military]

---

[8] *See* Doc. 45 (Motion to Dismiss, App'x at 952 (Ex. 41 (Army 15-6 Report, Exhibit 2H, at 6))).
[9] *Id.*
[10] Doc 57 (Plaintiff's Response, at pp. 17-19 (citing cases)).

responsibility."[11] Moreover, "common sense shows that no [bombing] would have [occurred]" had the Military not allowed Nayeb to access the base with explosives.[12] The Military gave Nayeb such access even though it knew he was a former Taliban insurgent who was giving "trained and coached" responses during counterintelligence screenings just months before the bombing.[13] The Military also decreed—despite exclusive knowledge of his Taliban ties—that Nayeb would have no security escort in the HAZMAT work center, and that he would have unrestricted access to materials that Plaintiffs claim he used to (purportedly) construct the suicide vest.[14] Far from "philosophic," these military activities are concrete, substantial causative factors, which, if this case is allowed to proceed will require inappropriate judicial second-guessing of sensitive military judgments in violation of the political question doctrine. *Cf. Pike*, 727 S.W.2d at 518.

## II.   INDISPUTABLE EVIDENCE, INCLUDING A SWORN DECLARATION FROM THE ARMY'S LEAD CONTRACTING OFFICER AND SETTLED MILITARY DOCTRINE, ESTABLISHES THAT THIS SUIT IS PREEMPTED.

Plaintiffs ignore the legal test for "combatant activities" preemption outlined in Fluor's motion, and instead primarily argue that such preemption does not exist, or has no application within the context of this suit. But the stark reality is that this case arose out of a hostile attack by

---

[11] *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 & n.1 (Tex. 1991); Doc. 20, *supra.*; *see also, e.g., City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987); Doc. 45 (Motion to Dismiss, App'x at 855 (Ex. 27 (Army 15-6 Report, at 49, ¶ 18.b(2))))

[12] *See Pike*, 727 S.W.2d at 518 ("Had the City kept proper records, then common sense shows that no problem could have arisen here.").

[13] *See* Doc. 45 (Motion to Dismiss, App'x at 915 (Ex. 35 (Army 15-6 Report Excerpts, at 33, para. 15.b(2)))); Doc. 20, at § II.

[14] *See* Doc. 45 (Motion to Dismiss, App'x at 119 (Ex. 4 (BAF Access Policy, at § 11.a(1)))), which provided that LNs would have no escorts in work centers. The Military changed this after the bombing, eliminating LN escorts and requiring security escort for LNs in their respective work facilities. *Id.* (App'x at 847 (Ex. 24 (Badge, Screening and Access Standard Operating Procedures for BAF, § 11(a)(1)(i), (iii) (Dec. 2, 2016))). *Id.* (App'x at 40, 45 (Ex. 3 (PWS, at §§ 1.08, 3.03, 5.00))) (tool access requirements). The Military restricted access to certain items, but its restrictions did not include multimeters, nuts and bolts. *Id.* (App'x at 119 (Ex. 4 (BAF Access Policy, at § 15.00)), App'x at 26-28 (Ex. 1 (Wilson Declaration, at ¶¶ 73-79))).

a Taliban operative on a U.S. military base in Afghanistan. As such, Plaintiffs' arguments are meritless. This suit is preempted, as confirmed by the sworn declaration of the top U.S. Army Contracting Officer; and declarations from Fluor's contract lead and a retired U.S. Army Lieutenant General with extensive knowledge of the LOGCAP program and doctrine.

Under the Federal Tort Claims Act, the United States is immune from any tort claim arising out of "combatant activities." Every federal appellate court that has considered this issue has extended this protection to bar tort claims by third parties against contractors performing work for the military, under the following test: "During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted."[15]

Beyond those courts, the United States itself, in briefs filed by the Solicitor General before the Supreme Court, has agreed that the "combatant activities" exception bar should be extended to contractors performing essential support activities. In fact, the United States took the extraordinary step of advocating for a specific preemption test, as applied to contractors, in multiple recent suits.[16] Under the United States' test, "claims against a contractor are generally preempted if (i) a similar claim against the United States would be within the FTCA's combatant-activities exception because it arises out of the military's combatant activities, and (ii) the contractor was acting within the scope of its contractual relationship with the federal government at the time of the incident out of which the claim arose." *Id*. at 15. "Under that approach, federal preemption would generally apply even if an employee of a contractor allegedly violated the terms of the contract, as long as the alleged conduct at issue was within the general scope of the contractual relationship between

---

[15] *See Saleh*, 580 F.3d at 7; *Harris*, 724 F.3d at 480 ; *In re KBR*, 744 F.3d at 346-51; *see also Koohi*, *supra* (holding suit against contractor preempted by "combatant activities" exception).
[16] *See*, *e.g.*, Br. for the U.S. as Amicus Curiae, *KBR, Inc. v. Metzgar*, 2014 WL 7185601 (U.S).

the contractor and the federal government." *Id*. According to the United States, such a broad preemption rule is essential to protect the paramount federal interests implicated in suits involving foreign hostilities, because allowing the vagaries of state tort law to govern the conduct of support contractors "*would be detrimental to military effectiveness*." *Id*. at *21 (emphasis added).[17]

There is no question that this suit is barred under either the United States' preemption test or the test first set forth in *Saleh*. The Court need look no further than the sworn declaration of the U.S. Army's top Contracting Officer for the LOGCAP IV Contract. The Contracting Officer affirmed that she has "firsthand knowledge of Fluor's *integration* within the military and contractual apparatus at Bagram Airfield as Fluor performed under the LOGCAP IV contract." As she explained, "Fluor augmented and was *integrated* within the military at Bagram Airfield," and Fluor's performance of the support services challenged by Plaintiffs "was *within the scope* of the LOGCAP IV contract."[18] She further detailed this integration, noting that Fluor personnel "worked alongside the military," interfacing with scores of Military officials on a "daily basis."[19]

Fluor's lead contract representative, Mr. Ronald Riley, echoed these facts. Beginning in 2010, Mr. Riley spent nearly a decade in Bagram serving as Fluor's lead interface with the Army contracting apparatus. Based on his extensive on-the-ground experience, Mr. Riley confirmed that Fluor "was integrated into the military's operations," and "Fluor worked closely with the military, on a day-to-day basis, in order to coordinate and synchronize execution of Fluor's essential support services."[20] He further explained that Fluor's was in "constant communication" with the Military;

---

[17] *See also id*. at 14 ("The military's effectiveness would be degraded if its contractors were subject to the tort law of multiple States for actions occurring in the course of performing their contractual duties arising out of combat operations.").
[18] Weindruch Decl., at ¶ 3 (emphasis added).
[19] *See id.* at ¶ 6.
[20] *Please see* Riley Decl., at ¶ 18.

interfaced at meetings "on a daily basis"; engaged in a "continuous dialogue" that was "essential to perform under the contract"; and worked "shoulder to shoulder with military personnel" in supporting the Military Force Protection Screening Cell.[21]

The extensive integration and collaboration described by these officials is entirely consistent with well-established military doctrine, as confirmed by U.S. Army Lt. Gen. (Ret.) Mick Bednarek, who served as a senior commander with responsibilities for Army operations and personnel in Afghanistan and, as such, is intimately familiar with the role of the LOGCAP contractor within U.S. military operations in Afghanistan. As Lt. Gen. (Ret.) Bednarek explained, the "fundamental purpose of the LOGCAP Contract, as set forth in Army Regulations and guidance, is to utilize civilian contractors to augment the military force and to act as 'force multipliers,' thereby freeing up uniformed soldiers to perform combat missions."[22] Lt. Gen. (Ret.) Bednarek further explained that, as a commander, he "viewed contractors as critical to mission success" and "as functionally the equivalent of an Army Component."[23] Plaintiffs argue without any factual support that Fluor's work did not allow "others to swing the sword of battle," but this is refuted by these indisputable facts and unassailable fundamental LOGCAP doctrine.

In reality, Plaintiffs cannot dispute the facts establishing the "combatant activities" preemption under either test, and so they instead pretend the defense is nonexistent or very narrow. But Plaintiffs' casual attempt to narrow the scope of "combatant activities" preemption—e.g., to exclude services contracts—would not only fail to protect federal interests, but also inflict serious

---

[21] *Id.* at ¶¶ 25-26, 29.
[22] *See* Bednarek Decl., at ¶ 15.
[23] *Id.* at ¶ 13.

harms to those interests.[24] Indeed, there are multiple reasons why allowing this suit to proceed would be detrimental to Military effectiveness and harmful to federal interests. As reflected in the AR 15-6, which cited more than 40 Military witnesses, this litigation would divert scores of Military officials from their missions and would impose a massive burden on the Military's resources. At depositions and at trial, Defendants would be compelled to further build and establish the fault of the Military. The Military's internal, limited investigative file is but a glimpse into the type of intense scrutiny that will result in the course of private litigation. The harm to federal interests is obvious. *See Martin v. Halliburton*, 618 F.3d 476, 488 (5th Cir. 2010) ("Because the basis for many of these defenses is a respect for the interests of the Government in military matters, district courts should take care to develop and resolve such defenses at an early stage while avoiding, to the extent possible, any interference with military prerogatives."); *McManaway v. KBR, Inc.*, 554 F. App'x 347, 353-54 (5th Cir. 2014) (Jones, J., dissenting from Denial of Rehearing).[25] That is why, as the United States has explained, regulation of the type of conduct at issue here should be "the responsibility of the United States, through contractual, criminal, or other remedies—not private state-law suits by individual service members or contractor employees."[26]

Plaintiffs' remaining attempts to defeat preemption are meritless. *First*, contrary to Plaintiffs' bald assertion, Defendants timely pleaded combatant activities preemption as an affirmative defense. Fluor pleaded the defense in its state court answer filed in *Branch*, which the

---

[24] *KBR*, 744 F.3d at 351 (citing *Johnson v. U.S.*, 170 F.2d 767, 770 (9th Cir. 1948), *Harris*, 724 F.3d at 480-81, and *Aiello v. Kellogg Brown & Root Servs., Inc.*, 751 F. Supp. 2d 698, 711-12 (S.D.N.Y. 2011)).

[25] ("Because the point of the combatant activities exception is to free military actors engaged in such activities from 'the doubts and uncertainty inherent in potential subjection to civil suit,'… forcing them to participate, as in this case, in lengthy discovery, depositions, and interpretation of the contractual clauses seriously undermines the law.") (internal citation omitted).

[26] Br. for the U.S., *Metzgar*, 2014 WL 7185601 at *14.

Court later consolidated into this action.[27] APS incorporated Fluor's affirmative defense.[28]

*Second*, Plaintiffs pretend that a suicide bombing by a Taliban insurgent at a forward operating base in Afghanistan did not occur at a "time of war" under the FTCA. But Plaintiffs cite no supporting authority for this proposition, and courts—including the *Koohi* decision they rely on—have resoundingly rejected such a myopic view. *See*, *e.g.*, *Koohi*, 976 F.2d at 1334 ("from a practical standpoint 'time of war' has come to mean periods of significant armed conflict rather than times governed by formal declarations of war"); *see also* Bednarek Decl., at ¶ 12.

*Finally*, the Court should reject Plaintiffs' claim of entitlement to more discovery because the Court has already given Plaintiffs the opportunity to conduct discovery on the issues, and any further discovery would be futile. Moreover, Plaintiffs have made no showing that any particular discovery is necessary to decide the issues. *See, e.g., Sec. & Exch. Comm'n v. Spence & Green Chem. Co.*, 612 F.2d 896, 901 (5th Cir. 1980), *cert. denied*, 449 U.S. 1082 (1981).[29]

Plaintiffs make no specific showing because none is possible. Fluor has conclusively established that the incident and alleged activities arose out of a foreign enemy attack on a U.S. military base inside a hostile overseas environment, and the Military integrated Fluor into combatant activities over which the Military retained command authority. *See* Doc. 45 (Motion to Dismiss, at pp. 81-82). Plaintiffs have not cited any contrary evidence, and no further discovery will alter these conclusions. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The Court should dismiss Plaintiffs' claims based on "combatant activities" preemption.

---

[27] *See* Fluor's *Branch* Answer, at ¶ 22, which states: "Fluor asserts that the combatant activities exception under the Federal Tort Claims Act *bars all claims asserted by all claimants in connection with the subject incident*." *See* 28 U.S.C. § 2680(j) (emphasis added).
[28] Doc. 3 (APS Answer, at p. 20, ¶ 10).
[29] The party seeking discovery "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts."

Respectfully submitted,

**HARTLINE BARGER LLP**

*/s/ Darrell L. Barger*
Darrell L. Barger (*Attorney-in-charge*)
State Bar No. 01733800
J. Reid Simpson
State Bar No. 24072343
1980 Post Oak Blvd., Suite 1800
Houston, Texas 77056
(713) 759-1990(713) 652-2419 (Fax)
dbarger@hartlinebarger.com
rsimpson@hartlinebarger.com

Brian Rawson
State Bar No. 24041754
8750 N. Central Expy., Suite 1600
Dallas, Texas 75231
(214) 369-2100
(214) 369-2118 (Fax)
brawson@hartlinebarger.com
***Counsel for the Fluor Defendants***

**Certificate of Service**

The undersigned certifies that on July 10, 2020, Fluor served a true and correct copy of the foregoing document on all known counsel of record via the Northern District's CM/ECF filing service under the Federal Rules of Civil Procedure and the Northern District Local Rules.

*/s/ Darrell L. Barger*
Darrell L. Barger