**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| Charlotte Loquasto, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 3:19-cv-01455-B |
| | § | **(Consolidated with Civil Action No.** |
| Fluor Corporation, Inc., et al. | § | **3:19-cv-01624-B)** |
| | § | |
| Defendants. | § | |

## <u>REPLY APPENDIX [Doc. 45]</u>

<u>PAGE</u>

Exhibit 1    Declaration of Lindsay Weindruch ................................................................ 1-3

Exhibit 2    Declaration of Lieutenant General (Retired) Mick Bednarek .......................... 4-10

Exhibit 3    Declaration of Ronald Riley ......................................................................... 11-53

# EXHIBIT 1

## DECLARATION OF MS. LINDSAY WEINDRUCH

1.     My name is Lindsay Weindruch. I currently serve as a Contracting Officer for the U.S. Army, Army Contracting Command – Rock Island, in Rock Island, IL. Leading up to and including in November 2016, I served as the LOGCAP IV Contracting Officer.

2.     I have personal knowledge of the facts stated in this declaration, and if called as a witness, could competently testify to them.

3.     Fluor's performance of essential sustainment support services for the U.S. Army in Afghanistan fell within the scope of the LOGCAP IV Contract. Fluor augmented and was integrated within the military at Bagram Airfield, and Fluor worked alongside the military, in performing services under the LOGCAP IV contract.

4.     I have firsthand knowledge of Fluor's integration within the military and contractual apparatus at Bagram Airfield as Fluor performed under the LOGCAP IV contract.

5.     On a daily basis, Fluor personnel interacted with military and civilian Administrative Contracting Officers ("ACOs"), Procuring Contracting Officers ("PCOs"), LOGCAP Support Officers ("LSOs"), and various other military representatives, including personnel within the Defense Contracting Management Agency ("DCMA") and Army Contracting Command ("ACC").

6.     Under the LOGCAP IV Contract Data Requirements List ("CDRLs"), Fluor submitted to the Army a variety of deliverables, on a daily or weekly basis, including personnel status reports, cost reports, forecasts of expenditures, etc., regarding activities at Bagram.

7.     Pursuant to Task Order 0005, PWS Section 5.22.03, Fluor provided personnel to support the Army's Force Protection Screening Cell at Bagram, and this included providing badges to those approved by the Army and providing personnel at Entry Control Points overseen by the military. The Army vetted and was responsible for deciding whether to approve the issuance of

1

**2**

badges. If the Army gave approval, Fluor issued the badges to the particular individual. Fluor's

performance of these functions was within the scope of the LOGCAP IV contract.


      I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


Executed on:  _09 July 2020_

WEINDRUCH.LINDS
AY.ANN.1263735656

Digitally signed by
WEINDRUCH.LINDSAY.ANN.126
3735656
Date: 2020.07.09 14:20:09 -05'00'

Lindsay Weindruch

2

**3**

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Charlotte Loquasto, et al., | § | |
| | § | Civil Action No. 3:19-cv-01455-B |
| v. | § | **(Consolidated with Civil Action No.** |
| | § | **3:19-cv-01624-B)** |
| Fluor Corporation, Inc., et al. | § | |

## DECLARATION OF LIEUTENANT GENERAL (RETIRED) MICK BEDNAREK

1.      My name is Mick Bednarek, Lieutenant General (Retired), U.S. Army. I currently serve as Vice President for Fluor Government Group Contingency Operations.

2.      I have personal knowledge of the facts stated in this declaration, and if called as a witness, could competently testify to them.

3.      I am aware that lawsuits were filed against Fluor arising out of a suicide bombing attack at Bagram Airfield on November 12, 2016. At the time of this attack, Fluor was performing essential support services at Bagram Airfield, including supporting the military's force protection screening cell and security functions, for the U.S. Army under Contract No. W52P1J-07-D-0008, known as the "LOGCAP IV Contract."

4.      In this declaration I provide factual information regarding the essential role that contractors such as Fluor serve for the U.S. military and the integration of the LOGCAP contractor—by design and necessity—within the Army's "total force."

1

## I.     Background

5.      I retired from the U.S. Army in 2015 after nearly 40 years of active commissioned service.  During my career in the Army I served in a number of command roles, including in the recent wars in Iraq and Afghanistan. I highlight below some of my experience.

6.      From May 2013 through my retirement in 2015, I served as the U.S. Army's Chief of the Office of Security Cooperation, U.S. Embassy, Baghdad, Iraq. In this role I was the highest ranking American military official in Iraq.  I led all U.S. military activities, foreign military sales, and foreign military financing in support of strategic investment, foreign policy, and operational readiness of the Iraqi Security Forces. I directed all Security Cooperation activities with U.S. Coalition partners (Middle East, European, Pacific) and Strategic Framework Agreement issues with host nation equities.

7.      From April 2011 through April 2013, I was the Commanding General, First United States Army. I was responsible for the training, readiness, oversight, and deployability of more than one half million men and women assigned to the National Guard and U.S. Army Reserve Forces across the United States and territories. I coordinated with 50 State Governors and State Adjutant Generals for resource requirements and managed a $28M training budget for exercise and simulation development.

8.      From June 2008 through March 2011, I was the Commanding General, Division East, First United States Army. I developed and managed all Army National Guard and U.S. Army Reserve Force training, exercises, and deployments to Iraq, Afghanistan, and other global contingencies for 23 States. I also validated tactical and operational readiness for state and national crisis response capability of all organizations.

9.      From 2005 through 2008, I served as Deputy Commanding General (Operations), and then Commanding General, 25th Infantry Division, Schofield Barracks, Hawaii. I was

responsible for the readiness, welfare, training, and personnel management of 14,000 Soldiers, families, and civilian employees. During this three year tour, the Division served for 15 months in northern Iraq requiring principal oversight of all security, combat operations, complex civil-military activities, crisis response actions, and contingency planning.

## II.      Contractors on the Battlefield Are Essential to Military Success.

10.      Civilian contractors have played a critical role in supporting the U.S. military throughout this country's history. Over the past 30-40 years, however, as the size of the active force has drawn down from well over a million to roughly half a million, contractors have become even more essential to the military's operational readiness.

11.      In today's military, contractors such as Fluor are considered part of the Army "total force." Stated simply, today's military cannot fight and sustain a war or long-term contingency operation without contractor support.

12.      This is especially true in dynamic and unstable environments, such as the hostile environment that has existed in Afghanistan over the past two decades. Since 9/11 and the U.S. invasion of Afghanistan that followed, the United States has had an ongoing presence in Afghanistan, and U.S. troops have faced the constant threat of hostilities from the Taliban and other enemy organizations.

13.      As a senior military commander with responsibilities for Army operations and personnel in Afghanistan during parts of these engagements, I viewed contractors as critical to mission success. In fact, I considered contractor support as functionally the equivalent of an Army Component. In Army parlance, the Army has three Components: Active Duty Army, referred to as "Compo 1"; the National Guard, referred to as "Compo 2;" and the Army Reserve, referred to as "Compo 3." During the military drawdown of forces, there was a deliberate effort to shift functions from Compos 1, 2, and 3 to what is often referred to as "Compo 9"—i.e., contractor

support within the Logistics Augmentation Civil Augmentation Program, or "LOGCAP," which I explain in more detail below.

### III.     The LOGCAP Contract

14.     During my time as a military commander I gained an in-depth understanding of the role played by LOGCAP Contractors in support of military missions in the Middle East, including Afghanistan.

15.     The fundamental purpose of the LOGCAP Contract, as set forth in Army Regulations and guidance, is to utilize civilian contractors to augment the military force and to act as "force multipliers," thereby freeing up uniformed soldiers to perform combat missions.

16.     By its design, the LOGCAP Contract integrates contractor capabilities within the "total force" in order to fulfill an operational commander's requirements. Such requirements can include a wide range of essential logistical support functions.

17.     One example of such a requirement performed by Fluor in Afghanistan is support of the military's "Force Protection Screening" function. Under the LOGCAP IV Contract, Task Order 0005, Fluor personnel augment the military's screening program and work side-by-side with military personnel to carry out the mission. Fluor also provides support personnel at certain Entry Control Points ("ECPs") that are overseen by military personnel. In addition, the U.S. military trains Fluor personnel to act as escorts on the base.

18.     I have personally visited Bagram Airfield and seen firsthand how Fluor personnel carry out this requirement, working closely alongside military personnel at Entry Control Points and other screening facilities. I am also very familiar with the importance of this particular support function to the safety and security of any Forward Operating Base ("FOB"), having traveled to and been stationed at many such FOBs. Under military doctrine, the military alone is responsible for the force protection at each FOB, and the military exercises total control over who is allowed

4

**8**

access to any FOB. But the military cannot successfully carry out its responsibilities, including its force protection responsibilities, without the support provided by contractors such as Fluor.

19.      As a senior military commander, I routinely educated my team members about the critical role of LOGCAP support services. This included during pre-deployment training exercises. In 2003-2005, I was the Commander of the Operations Group that ran the Army's Joint Readiness Training Center, at Ft. Polk, LA. Part of my responsibility was to run mission rehearsal exercises for troops preparing for deployment to the Middle East. Because I understood that the LOGCAP contractor would need to be integrated within the military's operations on the battlefield, I always included contractors/civilians on the battlefield ("COBs") within my training exercises. Doing so forced commanders to recognize the critical role played by contractors, and allowed them to learn to deal with the full picture and complexity of the battlespace—i.e., the entirety of the team they would be utilizing in theater. These training exercises illustrated, again, that contractors were and are a part of the "total force" in contingency environments such as Afghanistan.

20.      As a commander I also educated my team members that mission success requires very close coordination between military commanders and the LOGCAP contractor. While the contractor received direction via appropriate contracting channels, the operational commander's intent and guidance drives the requirements that are fulfilled by the LOGCAP contractor. In my experience, both by design and by necessity, military personnel and LOGCAP contractors, including Fluor personnel at Bagram Airfield, must work closely together, as an integrated unit, with a unity of mission and purpose.

**9**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:   8 July 2020

Mick Bednarek

6

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| Charlotte Loquasto, et al., | § | |
| | § | Civil Action No. 3:19-cv-01455-B |
| v. | § | **(Consolidated with Civil Action No.** |
| | § | **3:19-cv-01624-B)** |
| Fluor Corporation, Inc., et al. | § | |

**DECLARATION OF RONALD RILEY**

1.      My name is Ronald Riley. I am currently employed as the Director, Prime Contract

Management for Fluor.

2.      I have personal knowledge of the facts stated in this declaration, and if called as a

witness, could competently testify to them.

3.      I am aware that lawsuits were filed against Fluor arising out of a suicide bombing attack

at Bagram Airfield on November 12, 2016. I worked for Fluor at Bagram Airfield beginning in

2010, through 2017, and again beginning in 2018 through the present. At the time of this attack, I

was at Bagram, serving in my role as Director, Prime Contract Management for Fluor. Fluor was

performing essential support services at Bagram Airfield, including supporting the military's

force protection screening cell and security functions, for the U.S. Army under Contract No.

W52P1J-07-D-0008, known as the "LOGCAP IV Contract."

4.      In this declaration I provide factual information regarding the LOGCAP IV Contract,

Fluor's performance of essential support services for the U.S. military under that contract at

Bagram Airfield, and Fluor's close coordination with and integration with the U.S. military

during its performance.

1

**12**

### I.   Professional Background

5.      I have worked in the government contracts field since 1997. Prior to my employment

with Fluor, I was a Contracting Officer for the U.S. Air Force.

6.      I have been employed by Fluor since August 2010. I was initially the Contracts Manager,

and later promoted to Director, Prime Contract Management. Across this entire time period, I

was in Bagram (2010 through 2017, and again 2018 through present), and across this entire time

period I have had the same basic contract responsibilities described in this declaration.

7.      At the time of the November 2016 incident, and today, I serve as the Director, Prime

Contract Management for Fluor. In that role I oversee Fluor's contract functions, under the

LOGCAP IV Contract, for the entire Northern Afghanistan region, to include Bagram Airfield.

8.      My job is to interface with government and military personnel and to act as a liaison

between Fluor and the supported military units. To carry out this responsibility, I worked closely,

on a daily basis, with military Administrative Contracting Officers ("ACOs"), Procuring

Contracting Officers ("PCOs"), LOGCAP Support Officers ("LSOs"), and various other military

representatives, including personnel within the Defense Contracting Management Agency

("DCMA") and Army Contracting Command ("ACC").

### II.   The LOGCAP Program and the LOGCAP IV Contract

9.      In 2007, the Army awarded Fluor Task Order 0005 under Contract No. W52P1J-07-D-

0008, the fourth-generation Logistics Civil Augmentation Program contract, which is referred to

as the "LOGCAP IV Contract."

10.     The LOGCAP IV Contract is an indefinite-delivery/indefinite-quantity ("ID/IQ")

contract.  Under the LOGCAP IV Contract, the Army was authorized to issue task orders

("TOs") to Fluor on a cost-plus-award-fee, cost-plus-fixed-fee or fixed-price basis to support the

Army's current and programmed force by performing selected services in wartime and other operations.

11.     Under Task Order 0005, Fluor provides life support and sustainment services to U.S. and Coalition Forces in Afghanistan, including at Bagram Airfield. Fluor provided these services prior to, at the time of, and following the suicide attack on November 12, 2016.

12.     The LOGCAP IV Contract and TOs issued thereunder, including Task Order 0005, were "rated orders" under the Defense Priorities Allocation System ("DPAS") regulations and the Defense Production Act of 1950.  Under the DPAS regulations, Fluor was required to accept and perform LOGCAP IV requirements in accordance with the contractually-specified delivery schedule.

13.     The LOGCAP IV Contract "Scope of Work" (Section 01.00) includes a broad range of essential sustainment support services for the U.S. military and Coalition Forces within Southwest Asia. As the contract states, the Army required Fluor to perform "Base Life Support (BLS) services" and "Theater Transportation Mission (TTM) functions." Consistent with this scope of work, Fluor has performed a variety of essential support services at Forward Operating Bases ("FOBs") in Afghanistan. This includes, for example, augmenting the U.S. military's performance of its force protection screening program, a service that Fluor performed at Bagram Airfield, described further below.

14.     The LOGCAP IV Contract, by its express terms, required very close coordination of efforts between Fluor and U.S. military forces. For example, Section 01.00 of the contract explains that "the ever changing nature of combat support requirements" within a dynamic, contingency environment, necessarily results in frequent changes over the period of performance.

15.    As noted above, the LOGCAP IV Contract is the fourth generation contract within the LOGCAP program. The LOGCAP program was originally created by the Army in 1985. Policy for implementation and execution of LOGCAP was set forth in Army Regulation 700-137 ("AR 700-137"), titled "Logistics Civil Augmentation Program (LOGCAP)."

16.    Attached as Exhibit 1 is a true and correct copy of the 23 March 2017 version of AR 700-137.

17.    AR 700-137 repeatedly refers to the need to "integrate" the LOGCAP contractor within the military operations and overall mission. *See*, *e.g.*, 3-2.b ("Integrate LOGCAP services into [Operations Plans] and [Operations Orders]."); 3-3.d ("[Army Material Command] will establish a [Program Management Office] to integrate, coordinate, and synchronize day-to-day LOGCAP administration, planning, management, training, and execution."); 4-1 ("[Program Management Office] for LOGCAP will develop collaborative plans to manage and integrate LOGCAP contractor capabilities in support of [Army Service Component Command] planning, exercises, and contingency operations."); *id*. ("A key program component is the integration of organizations and agencies to support program planning and contract execution such as DCMA, USACE, USARC, LOGCAP Support Brigade, CSB, Army Field Support Brigade, and the LOGCAP contractors."); 4-2 ("Planning is critical for the integration and management of LOGCAP-contracted sustainment services in support of deployed forces during contingency operations.").

18.    Based on my experience, such integration is a reality during contract execution, and it is critical to the success of the LOGCAP IV Contract. In my experience, Fluor's performance of services under the LOGCAP IV Contract at Bagram Airfield was integrated into the military's

operations. Fluor worked closely with the military, on a day-to-day basis, in order to coordinate and synchronize execution of Fluor's essential support services.

### III.    The Military Ensures LOGCAP IV Requirements Are Within Scope.

19.    The typical manner in which new requirements are added to the LOGCAP IV Contract illustrates Fluor's integration within the military's operations. It also illustrates that Fluor is only directed to perform services within the scope of the contract.

20.    Under the contract, there is a formal process for requesting new services and adding them to the contract, along with necessary funding and formal authorization to proceed. I describe this process, in general terms, below. That said, the practical reality on the ground is that, along with this formal process, there is an informal, real-time sharing of information between U.S. military and Army contract personnel and Fluor, and a constant dialogue between the various members of "Team LOGCAP," which consists of Fluor and various military and Army civilian contract representatives. This constant dialogue and collaboration between Fluor and the military/contractual apparatus enables the process to work smoothly and, ultimately, ensures mission success.

21.    The typical process for adding new requirements under the contract is as follows: When a military unit intends to request an additional LOGCAP support service, even before an official request is made, Fluor is typically notified and immediately engages in a dialogue with the requesting unit to understand the requirement, and to educate the unit as necessary on the range of available LOGCAP capabilities. Fluor typically interfaces with LSOs (military contracting personnel) to facilitate a clear understanding of the proposed new requirement.

22.    Working with an LSO, the military unit must then submit a request to an ACO. In turn, the ACO reviews the request, ensures (among other things) that the request falls within the scope of the contract, and then interfaces with Fluor contracting personnel, including myself, to request

5

**16**

that Fluor develop a cost estimate for the requested service. Fluor develops such estimate. Along the way, Fluor personnel continue to work closely with ACOs and other military personnel to ensure that there is a meeting of the minds regarding the new requirement. If the military decides to proceed with the new requirement, funding is secured and, ultimately, a formal authorization to proceed is issued by the PCO to Fluor. At that point, Fluor begins performance of the new requirement.

23.     As part of this process, it is the role of the ACO to confirm, in the first instance, that a requested service is within the scope of the contract. Later on in the process, it is the ultimate responsibility of the PCO, who provides formal contract direction to proceed, to ensure that all new services are within the scope of the contract.

24.     In my experience, covering almost a decade in Bagram, including the time leading up to, during, and after the November 2016 suicide bombing incident, at no time did any ACO or PCO suggest any service being performed by Fluor was outside the scope of the contract. To the contrary, the only indication from the ACOs and PCOs was that Fluor's performance was always within the scope of the contract. This includes Fluor's performance of screening and related services that are challenged in the above-captioned lawsuit.

25.     In my experience, carrying out the above-described process requires constant communication between Fluor and military personnel. This includes meetings between Fluor and military personnel on a daily basis, as well as frequent discussions over phone and email.

26.     In addition to the process described above for adding new contract requirements, Fluor personnel also work closely with the military for many other purposes to ensure mission success. This includes the monitoring and evaluation of Fluor's performance, which entails daily oversight and communication, as well as frequent meetings. In addition, Fluor submits reports to

6

**17**

the military (some on a daily or weekly basis) to ensure that there is a real-time, free flow of information between Fluor and the military. Again, in my experience this close collaboration between Fluor and the military is essential, especially within a dynamic and hostile environment such as that at Bagram over the past decade. Finally, as further illustration of the close collaboration and integration of Fluor within the military's operations, I and other from the Fluor team at times receive classified briefings from the U.S. military on such topics as troop movement. Such briefings are part of the continuous dialogue between Fluor and the military that is essential to perform under the contract.

## IV.    Fluor's Augmentation of Military Force Protection Screening Cell At Bagram Airfield

27.    Under Task Order 0005, PWS § 5.22.03, Fluor "provide[s] personnel to operate Military Force Protection Screening." Within the scope of the contract provision, Fluor augments the U.S. military's Locally Employed Personnel (LEP) Force Protection Screening Program. In addition, Fluor provides personnel at certain Entry Control Points ("ECPs") that are overseen by military personnel. In addition, the U.S. military trains Fluor personnel to act as escorts on the base.

28.    Fluor's performance of these augmented functions to support the military's force protection responsibility is deemed by the military to be an essential element in the overall force protection plan.

29.    In performing these functions, Fluor personnel work shoulder to shoulder with military personnel. Such close, constant interaction and collaboration between Fluor and the military is required by the contract. It is also a practical necessity in executing the military's Force Protection Screening.

**18**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 8 JUl 20

_____
Ronald Riley

8

**19**

# EXHIBIT 1

**Army Regulation 700–137**

**Logistics**

# Logistics Civil Augmentation Program

**Headquarters**
**Department of the Army**
**Washington, DC**
**23 March 2017**

## UNCLASSIFIED

# *SUMMARY of CHANGE*

AR 700–137
Logistics Civil Augmentation Program

This regulation is certified current as of 23 March 2017. Aside from the following administrative changes, no other changes were made to certify the currency of this regulation—

o      Updates the Department of the Army signature authority (title page).

o      Changes the DALO–ORC to DALO–OPS–C (throughout).

**Headquarters
Department of the Army
Washington, DC
23 March 2017**

**\*Army Regulation 700–137**

**Effective 28 January 2013**

Logistics

# Logistics Civil Augmentation Program

By Order of the Secretary of the Army:

**MARK A. MILLEY**
*General, United States Army
Chief of Staff*

Official:

**GERALD B. O'KEEFE**
*Administrative Assistant to the
Secretary of the Army*

**History.** This regulation was certified current on 23 March 2017. Aside from an updating the Department of the Army signature authority (title page) and changing DALO–ORC to DALO–OPS–C (throughout), no other changes were made to certify currency of this regulation. No content has been changed.

**Summary.** This regulation designates the Logistics Civil Augmentation Program as a Department of the Army Regulatory Program and prescribes policy for implementation and execution. This Program is intended to support U.S. military, and under appropriate circumstances, multinational forces, and other Government and/or non-Government agencies. This regulation describes existing program planning and management concepts, responsibilities, and policy and will evolve as Army doctrine matures. Logistics Civil Augmentation Program tactics, techniques, and procedures are documented in ATTP 4–10 and specific theater policies and procedures. AR 715–9

prescribes policies, procedures, and responsibilities for a disciplined approach to managing and using contractors who deploy to support Army requirements.

**Applicability.** This regulation applies to the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated.

**Proponent and exception authority.** The proponent for this regulation is the Deputy Chief of Staff, G–4. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army internal control process.** This regulation contains internal control provisions in accordance with AR 11–2 and identifies key internal controls that must be evaluated (see appendix D).

**Supplementation.** Supplementation of this regulation and establishment of com-

mand and local forms are prohibited without prior approval from the Headquarters, Department of the Army, Deputy Chief of Staff, G–4 (DALO–OPS–C), 500 Army Pentagon, Washington, DC 20310–0500.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to the Deputy Chief of Staff, G–4 (DALO–OPS–C), 500 Army Pentagon, Washington, DC 20310–0500.

**Committee continuance approval.** AR 15–1 requires the proponent to justify establishing/continuing committee(s), coordinate draft publications, and coordinate changes in committee status with the U.S. Army Resources and Programs Agency, Department of the Army Committee Management Office (AARP–ZA), 9301 Chapek Road, Building 1458, Fort Belvoir, VA 22060–5527. Further, if it is determined that an established "group" identified within this regulation, later takes on the characteristics of a committee, as found in the AR 15–1, then the proponent will follow all AR 15–1 requirements for establishing and continuing the group as a committee.

**Distribution.** This publication is available in electronic media only and is intended for command levels C, D, and E for the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

---

## Contents (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*

---

*This regulation supersedes AR 700–137, 28 December 2012.

**UNCLASSIFIED**

Responsibilities • 1–4, *page 1*

**Chapter 2**
**Responsibilities,** *page 1*
Assistant Secretary of the Army for Installations, Energy and Environment • 2–1, *page 1*
Assistant Secretary of the Army for Acquisition, Logistics and Technology • 2–2, *page 1*
Deputy Chief of Staff, G–1 • 2–3, *page 1*
Deputy Chief of Staff, G–3/5/7 • 2–4, *page 1*
Deputy Chief of Staff, G–4 • 2–5, *page 1*
Deputy Chief of Staff, G–8 • 2–6, *page 2*
Assistant Chief of Staff for Installation Management • 2–7, *page 2*
The Surgeon General and/or Commander, U.S. Army Medical Command • 2–8, *page 2*
Chief of Engineers • 2–9, *page 2*
Chief, Army Reserve • 2–10, *page 2*
The Judge Advocate General • 2–11, *page 2*
Commanding General, U.S. Army Materiel Command • 2–12, *page 2*
Commanding General, U.S. Army Training and Doctrine Command • 2–13, *page 3*
Commanding General, U.S. Army Corps of Engineers • 2–14, *page 3*
Commander, U.S. Army Reserve Command • 2–15, *page 4*
Commanders, Army service component service commands • 2–16, *page 4*

**Chapter 3**
**Program Administration,** *page 4*
Concept • 3–1, *page 4*
Base program objectives • 3–2, *page 4*
Program authority • 3–3, *page 5*
Force structure adjustments • 3–4, *page 5*
Program funding • 3–5, *page 5*

**Chapter 4**
**Planning,** *page 5*
Program planning • 4–1, *page 5*
Execution planning • 4–2, *page 6*
Annual Logistics Civil Augmentation Program Worldwide Requirements Meeting and board of directors • 4–3, *page 6*
Army service component command planning • 4–4, *page 6*
Logistics Civil Augmentation Program plans development process • 4–5, *page 6*
Logistics Civil Augmentation Program support plans validation • 4–6, *page 6*

**Chapter 5**
**Doctrine and Training,** *page 7*
General • 5–1, *page 7*
Doctrine development • 5–2, *page 7*
Collective training • 5–3, *page 7*
Individual training courses • 5–4, *page 7*
Professional military education • 5–5, *page 7*
Contractor training • 5–6, *page 7*

**Chapter 6**
**Execution,** *page 7*
General • 6–1, *page 7*
Requesting use of Logistics Civil Augmentation Program • 6–2, *page 8*
Limitations and restrictions • 6–3, *page 8*
Oversight and management • 6–4, *page 9*
Nonmilitary individual replacement deployment operations • 6–5, *page 9*
Execution coordination • 6–6, *page 9*
Contractor-acquired property • 6–7, *page 9*

Duration of Logistics Civil Augmentation Program services • 6–8, *page 9*

**Appendixes**

**A.** References, *page 10*

**B.** Requesting Use of the Logistics Civil Augmentation Program Services, *page 13*

**C.** Considerations for transition from or discontinuation of Logistics Civil Augmentation Program Services, *page 20*

**D.** Internal Control Evaluation, *page 21*

**Table List**

Table B–1: Data elements , *page 17*

**Figure List**

Figure B–1: Logistics Civil Augmentation Program predecisional process chart, *page 14*
Figure B–2: Sample format for Logistics Civil Augmentation Program, *page 15*
Figure B–3: Routing requests for Logistics Civil Augmentation Program support chart, *page 16*
Figure B–4: Logistics Civil Augmentation Program acquisition process chart, *page 18*
Figure B–5: Logistics Civil Augmentation Program execution chart, *page 19*

**Glossary**

# Chapter 1
# Introduction

## 1–1. Purpose
This regulation establishes the Logistics Civil Augmentation Program (LOGCAP) as a Department of the Army (DA) Regulatory Program to augment the force by providing a service capability to meet externally driven operational requirements for rapid contingency augmentation support. The LOGCAP plans for and executes contracted support services in conjunction with the Army Field Support Brigade and contracting support brigade (CSB) for deployed forces performing missions directed or supported by the Department of Defense (DOD) during global contingency operations.

## 1–2. References
See appendix A.

## 1–3. Explanation of abbreviations and terms
See the glossary.

## 1–4. Responsibilities
Responsibilities are listed in chapter 2.

# Chapter 2
# Responsibilities

## 2–1. Assistant Secretary of the Army for Installations, Energy and Environment
The ASA (IE&E) will identify, formulate, coordinate, and disseminate environmental policy and guidance regarding LOGCAP.

## 2–2. Assistant Secretary of the Army for Acquisition, Logistics and Technology
The ASA (ALT) will—
*a.* Identify, formulate, coordinate, and disseminate acquisition policy and guidance.
*b.* Advise U.S. Army Training and Doctrine Command (TRADOC) regarding integration of LOGCAP information, as a subset of operational contract support (OCS), in professional military education (PME) and other training and exercises.
*c.* Assist TRADOC in the preparation of LOGCAP-related doctrine.

## 2–3. Deputy Chief of Staff, G–1
The DCS, G–1 will—
*a.* Include LOGCAP policies and procedures in theater administrative planning and force programming.
*b.* Assist the U.S. Army Materiel Command (AMC) in determining LOGCAP personnel service capabilities in support of the total Army analysis (TAA) process.

## 2–4. Deputy Chief of Staff, G–3/5/7
The DCS, G–3/5/7 will—
*a.* Incorporate LOGCAP force enabler capabilities into Planning, Programming, Budgeting, and Executing System (PPBES), as applicable.
*b.* Serve as the Headquarters, Department of the Army (HQDA) staff lead for LOGCAP nonmilitary individual replacement deployment operations (N-m IRDO) sites and certify scope and quality of deployment process.
*c.* Assist the Deputy Chief of Staff, G–4 (DCS, G–4) in formulating LOGCAP policy and disseminating guidance to Army service component commands (ASCCs).
*d.* Assist AMC in determining LOGCAP capabilities in support of the TAA process.

## 2–5. Deputy Chief of Staff, G–4
The DCS, G–4 will—
*a.* Serve as HQDA proponent for LOGCAP and office of primary responsibility for program policy, guidance, and direction.

*b.* Serve as the proponent and HQDA point of contact for the management decision evaluation package (MDEP) for LOGCAP.

*c.* Serve as the approval authority for the use of LOGCAP for global contingency operations.

*d.* Assist AMC in determining LOGCAP sustainment capabilities in support of the TAA process.

*e.* Assist AMC in conducting the Annual Logistics Civil Augmentation Program Worldwide Requirements Meeting (LWRM) to coordinate, prioritize, and synchronize LOGCAP support to ASCC operations plan (OPLAN) development, training, and exercises.

*f.* Coordinate LOGCAP contractor-operated N-m IRDO with the DCS, G–3/5/7 (DAMO–ODM); the Commander, U.S. Army Medical Command (MEDCOM); the Commander, Human Resources Command (HRC); and the Executive Director, program management office (PMO) for LOGCAP at least 30 days prior to implementation.

*g.* Facilitate staffing and approval of requests for exceptions or waivers from standard procedures as contained in this regulation.

## 2–6. Deputy Chief of Staff, G–8

The DCS, G–8 will facilitate the funding of validated and prioritized LOGCAP requests in the Army Requirement and Resourcing Board and PPBES process.

## 2–7. Assistant Chief of Staff for Installation Management

The ACSIM will—

*a.* Consider LOGCAP implications when developing the ACSIM missions, policies, plans, programs, and support requirements.

*b.* Review appropriate Army regulations regarding LOGCAP for potential impact on ACSIM responsibilities.

## 2–8. The Surgeon General and/or Commander, U.S. Army Medical Command

TSG and the Commander, MEDCOM will—

*a.* Assess the effect of LOGCAP on health service support policies, programs, and requirements during contingency operations.

*b.* Assist AMC in determining LOGCAP health service capabilities in support of the TAA process.

*c.* Provide technical expertise and medical standards under LOGCAP task orders.

## 2–9. Chief of Engineers

The COE will—

*a.* Assess the effect of LOGCAP on theater construction policies, programs, and requirements.

*b.* Assist AMC in determining LOGCAP engineering capabilities in support of the TAA process.

## 2–10. Chief, Army Reserve

The CAR will—

*a.* Advise Army staff in formulating and developing DA policies affecting support to LOGCAP.

*b.* Man and resource a LOGCAP Support Brigade capable of meeting the demand for LOGCAP support.

## 2–11. The Judge Advocate General

TJAG will—

*a.* Provide  prompt legal review to the DCS, G–4 of requests for initial use of LOGCAP.

*b.* Assist with training on issues such as contracting, funding, personnel, and the Defense Base Act.

Advise ASCCs on funding and requirements development pertaining to LOGCAP task orders.

## 2–12. Commanding General, U.S. Army Materiel Command

The CG, AMC will—

*a.* Serve as the lead agent for overall LOGCAP administration, management, and execution.

*b.* Establish and maintain a PMO for LOGCAP to manage and synchronize program training, planning, execution, and oversight.

*c.* Determine manning requirements for a LOGCAP Support Brigade capable of meeting the demand for LOGCAP support, in coordination with the Chief, Army Reserve and/or CG, U.S. Army Reserve Command (USARC).

*d.* Assist TRADOC with formulating concepts and doctrine related to LOGCAP.

*e.* Assist TRADOC, Defense Acquisition University, and other appropriate organizations with incorporating LOGCAP-related training into programs of instruction.

*f.* Coordinate mission-related internal training for personnel involved with LOGCAP to include the LOGCAP support officers (LSOs).

*g.* Coordinate training, planning, and LOGCAP execution with external agencies.

*h.* In coordination with the DCS, G–4, conduct an annual LWRM to coordinate, prioritize, and synchronize LOGCAP support to ASCC OPLAN development, training, and exercises.

*i.* Provide LOGCAP forward presence at key commands and installations to assist with program coordination, integration, planning, and training, as required.

*j.* Coordinate the integration of LOGCAP into ASCC OPLANs and operation orders (OPORDs).

*k.* Coordinate the inclusion of LOGCAP as a subset of OCS into Joint and Army exercises, as appropriate.

*l.* Provide LOGCAP assistance and training assessment visits.

*m.* Validate contractor readiness, capabilities, and risk mitigation plans.

*n.* Provide or coordinate contracting and contract administration services in support of the program.

*o.* Coordinate technical assistance, expertise, and early assessments from U.S. Army Corps of Engineers (USACE) or other design-construction agency, as needed, to ensure consistent and proper approach to real property transfer and subsequent operation and maintenance.

*p.* Coordinate requests for military construction services with USACE as specified in DODD 4270.5.

*q.* Coordinate forward LOGCAP management and contractor equipment and personnel time-phased force deployment data with ASCCs. This applies to Government-provided transportation, as well as contractor-provided transportation.

*r.* Coordinate transportation and life support for forward LOGCAP management personnel with the supported operational commander.

*s.* With the assistance of the DCS, G–1 and the ASA (ALT), ensure compliance with the Defense Federal Acquisition Regulation Supplement on using the syncronized predeployment and operational tracking (SPOT) to account for and verify identity of LOGCAP contractor personnel during contingency operations.

*t.* Incorporate LOGCAP observations, insights, and lessons (OILs) into the formal Army Lessons Learned Program in accordance with AR 11–33.

*u.* Provide LOGCAP contract support capability data in support of the TAA process.

*v.* Coordinate reimbursement to USACE for all LOGCAP support, as applicable.

## 2–13.  Commanding General, U.S. Army Training and Doctrine Command

The CG, TRADOC will—

*a.* Include LOGCAP policies and procedures as a part of OCS in the development of Army concepts and doctrine.

*b.* Include LOGCAP policies and procedures as a part of OCS in TRADOC school instruction and training publications.

## 2–14.  Commanding General, U.S. Army Corps of Engineers

The CG, USACE will—

*a.* Provide advice and assistance on construction and engineering support services, as required, to include being a member of the forward LOGCAP management team during planning, exercises, and contingencies.

*b.* When required, provide a construction contracting officer's representative (COR) for staffing, planning, exercise support, and during contingencies.

*c.* Support LOGCAP-related exercises, as appropriate.

*d.* Provide engineering technical expertise and construction standards under LOGCAP task orders to include design, construction, and engineering services required for military construction, maintenance, or repairs, as requested, in support of planning, exercises, and contingencies.

*e.* Provide administrative contracting officer support, as delegated, in writing, by the LOGCAP procurement contracting officer, for LOGCAP-related military construction and facility repair contracts.

*f.* Perform project management and prepare a program management plan to specify all roles and responsibilities in support of project execution under LOGCAP for all military construction.

*g.* Manage funds for military construction projects to include upward reporting of project expenditures and obligations as mandated by Congress and others.

*h.* Coordinate with AMC all USACE engineering and construction support for nonmilitary construction work performed under LOGCAP.

*i.* Coordinate all reimbursable USACE costs for applicable LOGCAP support with AMC.

**2–15. Commander, U.S. Army Reserve Command**

The Commander, USARC will—

*a.* Submit LOGCAP Support Brigade manning requirements to the DCS, G–3/5/7 for inclusion in the TAA process.

*b.* Man and resource a LOGCAP Support Brigade capable of meeting the demand for LOGCAP support.

*c.* Incorporate AMC LOGCAP-specific training guidance into the overall LOGCAP Support Brigade training strategy.

*d.* Plan for and provide LSOs in support of LOGCAP training, exercises, and contingencies in coordination with AMC.

*e.* Ensure timely alert, training, and mobilization processes are implemented in compliance with Secretary of Defense policies on employment of Reserve forces to ensure no degradation of LOGCAP support.

**2–16. Commanders, Army service component service commands**

The Commanders, ASCCs will—

*a.* Conduct OCS planning; if LOGCAP is determined to be the course of action, integrate LOGCAP in the contract support integration plans (CSIPs) and contractor management plans (CMPs), in support of geographic combatant commander (CCDR) guidance and established DOD and Army policy (see AR 715–9). Figure B–1 demonstrates the process for ASCCs and requiring activities to consider prior to planning for or requesting initial use of LOGCAP to meet mission requirements.

*b.* Incorporate force protection support to the forward LOGCAP management team and LOGCAP contractors in plans and operations.

*c.* Incorporate health service support to the forward LOGCAP management team and LOGCAP contractors in plans and operations.

*d.* Integrate LOGCAP planners in the review and development of OPLANs and/or OPORDs.

*e.* In coordination with AMC, include forward LOGCAP management and contractor personnel and equipment in time-phased force development data that are identified as a force capability in applicable OPLANs and/or OPORDs in accordance with Chairman of the Joint Chiefs of Staff Manual 3122.02C. This applies to Government-provided transportation, as well as contractor-provided transportation.

*f.* Provide recommendations on force structure planning based on use of LOGCAP.

*g.* Ensure subordinate units nominate technically qualified CORs, to be appointed by the cognizant contracting officer, and track appointed CORs for all LOGCAP services provided.

*h.* Include LOGCAP activities in situation reports and other summary documents, as applicable.

*i.* Plan for the incorporation of LOGCAP participation in applicable Joint and Army exercises in which the command participates.

*j.* Identify and program personnel, equipment, training, and funding requirements through PPBES.

*k.* Comply with DFARS on using SPOT to account for and verify identity of LOGCAP contractor personnel during contingency operations.

*l.* Ensure subordinate Army force command(s) compliance with this regulation when the ASCC is not serving as the Army force headquarters in ongoing operations.

*m.* Provide LOGCAP OILs to AMC for incorporation into formal Army Lessons Learned Program in accordance with AR 11–33.

*n.* Ensure AMC is notified of ASCC and higher level changes to orders and directives affecting LOGCAP or overall OCS.

# Chapter 3
# Program Administration

**3–1. Concept**

The LOGCAP capabilities are to—

*a.* Provide a single organization responsible for the central management of LOGCAP to enhance planning, training, requirements development assistance, and rapid augmentation of base support and logistics services through contract instruments during program execution.

*b.* Establish a standing team of LOGCAP Government subject matter experts who can deploy rapidly to provide the core structure for centralized LOGCAP execution.

*c.* Promulgate knowledge and information regarding LOGCAP capabilities through education and training.

*d.* Provide a viable option for logistics and base support services for contingency planning and operations.

**3–2. Base program objectives**

Base program objectives are to—

*a.* Provide LOGCAP-specific training, education, and exercise support as a subset of OCS.

*b.* Integrate LOGCAP services into OPLANs and OPORDs.

*c.* Coordinate contracted logistics and base services in support of global contingencies to include mobilization, when requested.

*d.* Conduct overall program management.

### 3–3. Program authority

*a. Program type.* LOGCAP is a DA Regulatory Program to provide full-spectrum logistics and base support services through the use of contracts. LOGCAP is a major subset of OCS as described in AR 715–9. LOGCAP requires support from other organizations such as the Defense Contract Management Agency (DCMA), Defense Contract Audit Agency, AMC, USACE, U.S. Army Reserve, requiring activities, and/or designated supported units to fully execute its mission.

*b. Program proponent.* DCS, G–4 is the Army proponent for LOGCAP and will serve as the office of primary responsibility for program policy, guidance, and direction. Additionally, the DCS, G–4 will serve as the LOGCAP MDEP program manager proponent and approval authority for the use of LOGCAP services.

*c. Program lead agent.* DCS, G–4 designates AMC as the lead agent for overall LOGCAP administration, management, and execution, to include the following:

(1) Hosting, in conjunction with the DCS, G–4, an annual LWRM to integrate, synchronize, and prioritize ASCC-related LOGCAP support plans and training requirements.

(2) Conducting an annual LOGCAP board of directors (BOD) to review and approve the results and recommendations of the LWRM and strategic direction of LOGCAP.

*d. Program management office.* AMC will establish a PMO to integrate, coordinate, and synchronize day-to-day LOGCAP administration, planning, management, training, and execution. PMO will provide LOGCAP forward presence at key commands and installations to assist with program coordination, integration, planning, and training. Coordination will include the integration of LOGCAP into ASCC OPLANs and OPORDs through—

(1) Supporting ASCC OPLAN and/or OPORD development.

(2) Developing and managing LOGCAP worldwide and regional contingency support plans in support of ASCC OPLANs.

(3) Advising commanders and requiring activities on the use, reduction, transition, and discontinuation of LOGCAP support.

### 3–4. Force structure adjustments

For current and out year planning and programming, LOGCAP augmentation to Army force structure will be based on awarded contingency contracts and contingency clauses included in peacetime contracts. The LOGCAP augmentation used to meet Army requirements will be accounted for in the DCS, G–4 Strategic Partner Analysis.

### 3–5. Program funding

*a.* AMC will input their LOGCAP resource requirements through PPBES. The DCS, G–4 will monitor and assist AMC in their submissions and will incorporate LOGCAP funding and manpower requirements into the program objective memorandum in accordance with applicable regulations, policies, and guidance.

*b.* The Army will fund the base program through the LOGCAP MDEP using operations and maintenance, Army funds. Base program funding will apply to—

(1) PMO for LOGCAP table of distribution and allowances, Government personnel salaries.

(2) PMO for LOGCAP operating and overhead costs to include travel, training, and facilities.

(3) LOGCAP support contract.

(4) LOGCAP performance contractor program management costs.

(5) LOGCAP support plans.

(6) LOGCAP training and exercise support participation.

*c.* Funding for contingency task order execution will not be included in the LOGCAP Base Program. Requiring activities will be responsible for coordinating contingency support funding and must comply with the Antideficiency Act and all other applicable fiscal law principles and regulatory guidance.

## Chapter 4
## Planning

### 4–1. Program planning

PMO for LOGCAP will develop collaborative plans to manage and integrate LOGCAP contractor capabilities in support of ASCC planning, exercises, and contingency operations. PMO will provide a central management structure that manages

baseline program functions to support ASCC requirements. A key program component is the integration of organizations and agencies to support program planning and contract execution such as DCMA, USACE, USARC, LOGCAP Support Brigade, CSB, Army Field Support Brigade, and the LOGCAP contractors.

## 4–2. Execution planning

Planning is critical for the integration and management of LOGCAP-contracted sustainment services in support of deployed forces during contingency operations. The CSB will coordinate common contract support provided by the Army, to include LOGCAP. The ASCC-aligned CSB will assist OCS planners in developing the ASCC and/or subordinate Army Forces command-level CSIP in coordination with the ASCC and/or Army Forces Command G–4 and senior sustainment command support operations officer. ASCCs will incorporate LOGCAP-contracted sustainment services into the ASCC CSIP and the associated CMP portions of OPLANs and OPORDs, as prescribed in AR 715–9. Staff planners at all levels must actively involve CSB and LOGCAP planners early on in the planning process to develop a responsive approach and identify potential commercial sources of support. Planning for LOGCAP will enable AMC to—

*a.* Assist the ASCC through the CSB in the operational level planning for the use of contracted services, including LOGCAP.

*b.* Determine LOGCAP support plan requirements.

*c.* Validate the integration of LOGCAP plans in existing OPLANs and OPORDs.

## 4–3. Annual Logistics Civil Augmentation Program Worldwide Requirements Meeting and board of directors

*a.* The CG, AMC, in conjunction with the DCS, G–4, will conduct an annual LWRM to coordinate, prioritize, and synchronize LOGCAP support to ASCC OPLAN development, training, and exercises. The scheduling of the LWRM must allow for input to the program objective memorandum cycle.

*b.* The ASCCs will identify prioritized OPLAN development actions, as well as training and exercise events planned for the next 36 months with associated cost estimates at the LWRM.

*c.* The LWRM will identify and prioritize LOGCAP support plans for review or development and prioritize LOGCAP support to ASCC training and exercises.

*d.* The AMC will present the following LWRM prioritized outputs to the LOGCAP BOD for approval—

(1) The LOGCAP support to ASCC OPLAN review and development.

(2) The LOGCAP support plan review and development.

(3) The LOGCAP support to ASCC training and exercises.

## 4–4. Army service component command planning

LOGCAP, in coordination with the supporting CSB, will assist in ASCC CSIP and CMP development.  The ASCCs, in conjunction with CSB planners, must integrate LOGCAP into all ASCC plans development efforts.  AR 715–9 defines ASCC CSIP and CMP development responsibilities and provides general planning guidance for the use of contracted support.

## 4–5. Logistics Civil Augmentation Program plans development process

*a.* LOGCAP can provide expansive contracted support capability during contingency operations through prioritized planning.  LOGCAP planners will support the contingency and crisis action planning processes.

*b.* The PMO for LOGCAP will provide guidance and oversight for the contractor-developed LOGCAP support plans in support of specific ASCC OPLANs and/or OPORDs based on LOGCAP BOD-approved priorities and available funding.

*c.* The PMO for LOGCAP, in coordination with AMC or the appropriate ASCC, will review and approve LOGCAP support plans.

*d.* The ASCCs will begin crisis action planning with the identification of a specific mission.  The LOGCAP planners will use existing LOGCAP support plans to assist ASCCs during crisis action planning and execution of contingencies.

## 4–6. Logistics Civil Augmentation Program support plans validation

The LOGCAP support plans will be validated through internal audits and exercises.  AMC will assess the feasibility of LOGCAP support plans to meet ASCC OPLAN requirements.

## Chapter 5
## Doctrine and Training

### 5–1. General
*a.* The formal integration of key LOGCAP functions and capabilities into peacetime and predeployment training and PME is essential to increasing proficiency, knowledge, and the effective use of LOGCAP during contingency operations. The primary objectives of training and doctrinal development are to—
(1) Capture LOGCAP specific information across applicable Joint and Army doctrinal publications, as appropriate.
(2) Educate key leaders and units.
(3) Establish habitual relationships.
(4) Validate the integration of LOGCAP plans in existing OPLANs and/or OPORDs and CSIPs.
*b.* AMC will provide relevant OILs to TRADOC and other organizations, as required, in order to update, validate, and expand existing LOGCAP-related doctrine. AMC will develop and implement an overall training strategy to integrate LOGCAP operations into collective training events and exercises, selected individual training courses, and selected PME courses. The training strategy will include elements of the LOGCAP team such as LSOs, acquisition personnel, legal, and PMO for LOGCAP personnel.

### 5–2. Doctrine development
TRADOC, with the assistance and input from AMC, will incorporate LOGCAP-related organizational structure, tactics, techniques, and procedures across all applicable publications. All LOGCAP-related information will be integrated as a critical component of OCS doctrine.

### 5–3. Collective training
The ASCCs will incorporate LOGCAP training into Joint and Army training exercises and events, such as mission rehearsal exercises and command post exercises, whenever feasible. Additionally, LOGCAP training will be incorporated into Mission Command Training Program and Combat Training Center training exercises and scenarios, as appropriate. The key to training is establishing relevant and realistic objectives and goals that incorporate previously captured LOGCAP OILs.

### 5–4. Individual training courses
The LOGCAP specific information, processes, and procedures will be incorporated into designated TRADOC courses (for example, Operational Contract Support Course, Theater Logistics Studies Program, and COR Course), where appropriate.

### 5–5. Professional military education
TRADOC will incorporate LOGCAP-specific information into all OCS-related blocks of instruction in officer, warrant officer, and noncommissioned officer Active Army and Reserve Component PME, as appropriate.

### 5–6. Contractor training
All deploying LOGCAP contractor personnel must complete predeployment training requirements in accordance with AR 715–9.

## Chapter 6
## Execution

### 6–1. General
LOGCAP supports scalable, ready, and responsible logistics and base support services by integrating contracted private sector capabilities to fulfill the operational commander's requirements. Operational commanders identify their requirements and request LOGCAP, as appropriate, to meet mission needs. The PMO for LOGCAP is the focal point for overseeing the program in coordination with requiring activities, contracting activities, contingency contract administration service activities, and compliance organizations. Operational commanders determine the type, duration, and conditions for LOGCAP services in a contingency.

**6–2. Requesting use of Logistics Civil Augmentation Program**

The DCS, G–4 is the approval authority for the initial use of LOGCAP for global contingency operations. A LOGCAP process flow chart that maps the predecisional process is at figure B–1. A sample request for initial use of LOGCAP is at figure B–2.

*a.* Army organizations will use the following process to request approval for initial use of LOGCAP:

(1) Requiring activities identify contract support requirements and determine if providing such services are part of its mission.

(2) The commander of the requiring activity will submit a request for LOGCAP support through the AMC PMO for LOGCAP to the DCS, G–4. The request will include the following:

*(a)* Basic description of requested LOGCAP services.

*(b)* Unit(s) that will provide the COR(s).

*(c)* Identification of types of forces to be supported (for example, U.S. military forces, Government agencies, multinational forces, host nation forces).

*(d)* Justification of how LOGCAP services meet mission requirements.

*(e)* Source and availability of funding for task order at startup.

(3) AMC will—

*(a)* Ensure request is within scope of contract.

*(b)* Perform legal review.

*(c)* Endorse and forward request to the DCS, G–4 for decision.

(4) DCS, G–4 will staff the request and provide decision to the requiring activity and AMC.

*b.* Requiring activities both internal and external to DOD are encouraged to follow the routing request process depicted in figure B–3 to facilitate prompt consideration of requests for initial use of LOGCAP; the DCS, G–4 will ensure requests incorporate the acquisition process depicted in figure B–4.

*c.* Significant deviations from approved requests must be submitted to the DCS, G–4 for authorization. Examples include the following:

(1) Provision of services not in scope of approved request. For example, if the initial request is approved to provide base life support, a new requirement for non-tactical wheel vehicle maintenance constitutes a major deviation requiring the DCS, G–4 authorization.

(2) Provision of services to support non-DOD personnel or organizations. For example, if the initial request is approved to provide services in support of DOD personnel, a requirement to provide the same support to Department of State personnel is a major deviation requiring the DCS, G–4 authorization.

**6–3. Limitations and restrictions**

*a.* LOGCAP is primarily designed to support deployed forces performing DOD-directed and DOD-supported missions, and may, when directed by the DCS, G–4, be used to provide support to requirements of other Services, multinational partners, and other Government agencies.

*b.* LOGCAP may not be used to perform personal services, inherently governmental functions, or services restricted by any other applicable law, policy, or regulation. LOGCAP contracts are governed by the Federal Acquisition Regulation (FAR).

*c.* LOGCAP will not be used as a source of supply.

*d.* LOGCAP will not be used to provide armed security services.

*e.* LOGCAP may generally be used in threat level I without restrictions. LOGCAP can be utilized in threat level II conditions if LOGCAP contractor personnel (including subcontractor personnel) are provided sufficient force protection. LOGCAP services should not be used in any operation, or in specific locations within an operational area, where there is an ongoing or anticipated level III threat (see Joint Publication (JP) 3–10).

*f.* The requiring activity and/or supported organization is responsible for providing LOGCAP personnel and/or contractor with force protection.

*g.* According to applicable U.S., host nation, or international law; relevant status of forces agreements; applicable security agreements; international agreements; or other arrangements with local authorities and on a case-by-case basis when military force protection and legitimate civil authority are deemed unavailable or insufficient, the CCDR (or a designee no lower than the general or flag officer level) may authorize LOGCAP contractor personnel to be armed for individual self-defense. When armed for personal protection, LOGCAP contractor personnel are authorized to use force only for individual self-defense. For more information on arming policy related to contractors (see AR 715–9).

*h.* Standardized support requirements will be determined by Joint standards of life support as supplemented by the geographic CCDR's published or adopted engineering and support requirements to the maximum extent possible.

### 6–4. Oversight and management

*a.* AMC will provide strategic program direction and develop standardized planning and oversight methods to drive decentralized day-to-day decisions and oversight. Implementing oversight methods will increase readiness, reduce costs, and improve the quality of service while minimizing risks to operations.

*b.* The PMO for LOGCAP will deploy a forward program management team responsible for providing centralized LOGCAP management structure and ensuring the responsible execution of LOGCAP requirements within the operational area.

*c.* The forward LOGCAP management team, requiring activities, and appropriate acquisition personnel will use a teaming approach to manage requirements and oversee contractor performance.

*d.* Commanders will support contract management requirements primarily through their nomination of a properly trained and qualified individual for appointment as a COR by the cognizant contracting officer. LOGCAP CORs will execute only authorities specifically delegated in the appointment letter signed by the contracting officer. The COR will provide the operational commander a primary point of contact for assessing whether the contracted support is being executed in accordance with the performance requirements of the contract.

*e.* In accordance with AR 715–9, LOGCAP contractor personnel are not part of the operational chain of command, but are supervised through their own management chain consistent with the terms and conditions of their contract. Commanders have authority over contractor personnel working on military facilities in matters of safety, security, environmental, health, and welfare.

### 6–5. Nonmilitary individual replacement deployment operations

AR 715–9 authorizes LOGCAP performance contractors to establish and operate N-m IRDOs in order to process authorized employees for deployment. AMC will ensure that LOGCAP contractors receive all requirements and guidance for establishment and maintenance of N-m IRDOs. DCS, G–4 will initiate LOGCAP performance contractor N-m IRDOs approval process, to include coordination with the DCS, G–3/5/7; CG, HRC; and CG, MEDCOM, at least 30 days prior to operation.  DCS, G–3/5/7 will coordinate site inspections of N-m IRDOs to ensure contractor predeployment processing meets the same standards as Army-run continental U.S. replacement centers as prescribed by Army Personnel Policy Guidance. AR 715–9 provides additional requirements and procedures pertinent to overseas deployment of contractor personnel supporting contingency operations.

### 6–6. Execution coordination

*a.* Forward-deployed LOGCAP management personnel will coordinate actions in accordance with local command policy, to include participation in appropriate OCS-related boards and centers such as acquisition review boards and contracting support boards.

*b.* Forward-deployed LOGCAP management personnel will allocate LSOs, as appropriate, to requiring activities, such as corps and division headquarters, expeditionary sustainment commands, and sustainment brigades with significant LOGCAP requirements to facilitate LOGCAP planning and management coordination.

### 6–7. Contractor-acquired property

Unless otherwise directed by law, LOGCAP contractor-acquired property no longer required for continued performance of the task order for which it was purchased will be reviewed for use on other LOGCAP contract requirements and transferred by the contracting officer, as appropriate. The FAR prescribes policies and procedures for the reporting, reutilization, and disposal of contractor inventory excess to contracts.

### 6–8. Duration of Logistics Civil Augmentation Program services

The duration of a LOGCAP task order or the decision to transition to other support or discontinue LOGCAP services is a determination driven by operational requirements. The senior operational commander's assessment should be based on considerations identified in appendix C and other operational needs in coordination with the cognizant contracting officer.

## Appendix A

## References

### Section I

### Required Publications

**AR 11–33**
Army Lesson Learned Program  (Cited in para 2–10*t*.)

**AR 715–9**
Operational Contract Support Planning and Management  (Cited in paras 2–13*a*.)

**DODD 4270.5**
Military Construction  (Cited in para 2–10*p*.) (Available at http://www.dtic.mil/whs/directives/.)

**Joint Publication: JP 3–10**
Joint Security Operations in Theater  (Cited in para 6–3*e*.) (Available at http://www.dtic.mil/doc-trine/new_pubs/jp3_10.pdf.)

### Section II

### Related Publications

A related publication is a source of additional information. The user does not have to read it to understand this regulation. CFRs are available at http://www.ecfr.gov. USCs are available at http://www.gpo.gov/fdsys.

**AR 11–2**
Managers' Internal Control Program

**AR 15–1**
Boards, Commissions, and Committees Department of the Army Federal Advisory Committee Management Program

**AR 25–2**
Information Assurance

**AR 25–30**
Army Publishing Program

**AR 380–5**
Department of the Army Information Security Program

**AR 380–49**
Industrial Security Program

**AR 380–67**
Personnel Security Program

**AR 550–51**
International Agreements

**AR 570–9**
Host Nation Support

**ATTP 4–10**
Operational Contract Support Tactics, Techniques, and Procedures

**Chairman of the Joint Chiefs of Staff Manual: CJCSM 3122.02C**
Joint Operations Planning and Execution System (JOPES) Volume III (Crisis Action Time-Phased Force and Deployment Data Development and Deployment Execution  (Available at http://www.dtic.mil/cjcs_directives/cjcs/manuals.htm.)

**Class Deviation – Implementation Guidance for the SPOT to Account for Contractor Personnel Performing in the U.S. Central Command Area of Responsibility**
(Available at www.acq.osd.mil/dpap.)

**Defense Federal Acquisition Regulation Supplement**
(Available at http://www.acq.osd.mil/dpap/dars/dfarspgi/current/index.html.)

**DFAS–IN 37–100 Manual**
Financial Management, The Army Management Structure Fiscal Year 2012  (Available at http://asafm.army.mil/offices/bu/dfas37100.aspx?officecode=1200.)

**DOD 7000.14–R**
Department of Defense Financial Management Regulation  (Available at http://www.dtic.mil/whs/directives.)

**DODD 5530.3**
International Agreements   (Available at www.dtic.mil/whs/directives.)

**DODI 1100.22**
Policy and Procedures for Determining Workforce Mix  (Available at http://www.dtic.mil/whs/directives.)

**FAR**
(Available at http://www.acquisition.gov/far/.)

**FM 4–92**
Contracting Support Brigade

**JP 3–16**
Multinational Operations  (Available at http://www.dtic.mil/doctrine/new_pubs/jp3_16.pdf.)

**JP 4–10**
Operational Contract Support  (Available at http://www.dtic.mil/doctrine/new_pubs/jp4_10.pdf.)

**20 CFR 701**
General; Administering Agency; Definitions and Use of Terms

**20 CFR 702**
Administration and Procedure

**20 CFR 703**
Insurance Regulations

**20 CFR 704**
Special Provisions for Longshore and Harbor Workers' Compensation Act Extensions

**48 CFR 28.305**
Overseas Workers' Compensation and War-Hazard Insurance

**48 CFR 52.228–3**
Workers' Compensation Insurance (Defense Base Act)

**48 CFR 52.228–4**
Workers' Compensation and War-Hazard Insurance Overseas

**10 USC 688**
Retired members: authority to order to active duty; duties

**10 USC12301(a)**
Reserve components generally

**10 USC 12302**
Ready Reserve

**10 USC 12304**
Selected Reserve and certain Individual Ready Reserve members; order to active duty other than during war or national emergency

**10 USC 12305**
Authority of President to suspend certain laws relating to promotion, retirement, and separation

**10 USC 12406**
National Guard in Federal service: call

**31 USC 501**
Federal Activities Inventory Reform Act

**31 USC 1341**
Antideficiency Act

**31 USC 1535**
Economy Act

**33 USC 901–33 USC 950**
Longshore and Harbor Worker's Compensation Act

**42 USC 1651–42 USC 1654**
Defense Base Act

**Section III**

**Prescribed Forms**
This section contain no entries.

**Section IV**

**Referenced Forms**
Unless otherwise indicated below, DA Forms are available on the Army Publishing Directorate Web site (http://www.apd.army.mil).

**DA Form 11–2**
Internal Control Evaluation Certification

**DA Form 2028**
Recommended Changes to Publications and Blank Forms

**Appendix B**

**Requesting Use of the Logistics Civil Augmentation Program Services**

**B–1. Purpose**
Appendix B explains the LOGCAP process from predecisional phase to contract closeout phase and includes a sample request letter for initial use of LOGCAP.

**B–2. Logistics Civil Augmentation Program process flow chart**
Figure B–1 depicts the predecisional process for consideration when planning for and/or requesting the use of LOGCAP.



Figure B–1. Logistics Civil Augmentation Program predecisional process chart

AR 700–137 • 23 March 2017

**B–3.  Sample request letter**
Figure B–2 provides a sample request letter for the initial use of LOGCAP.

---



**DEPARTMENT OF THE ARMY**
ORGANIZATION NAME/TITLE
STANDARDIZED STREET ADDRESS
CITY, STATE, AND ZIP + 4 CODE

REPLY TO
ATTENTION OF

*[Date]*

MEMORANDUM THRU LOGCAP Executive Director, 1 Rock Island Arsenal, Rock Island, Illinois 61299-6500

FOR Department of the Army, Deputy Chief of Staff for Logistics (HQDA G-4/DALO-ORC), 500 Army Pentagon, Washington, D.C. 20310-0547

SUBJECT: Request for LOGCAP Support *[Command, Federal Agency, or mission being supported]*

1.  <u>References</u>: Performance Work Statement

2.  <u>Requirement</u>: To provide *[brief description of requested support services]*.

3.  <u>Discussion</u>: This headquarters has determined that it cannot support *[Command, Federal Agency, or mission being supported]* with current force structure for the duration of this mission. Therefore, *[Command, Federal Agency, or mission being supported]* requests the use of LOGCAP support for the estimated duration of *[estimated duration of LOGCAP support]*.

4.  <u>Impact</u>: Disapproval of this request will negatively impact *[defensible description of adverse effect on mission]*.

5.  <u>Funding</u>: Mission will be funded by the responsible service component *[identify source of funds to be identified and transmitted, to include funding point of contact]*

6.  The point of contact for this memorandum is *[name]* at DSN *[xxx-xxxx]* or commercial *[(xxx)-xxx-xxxx]* and *[e-mail address]*.

*[Signature Block]*

**Figure B–2.  Sample format for Logistics Civil Augmentation Program**

---

**B–4.  Routing requests for Logistics Civil Augmentation Program support**
Figure B–3 provides an informational overview of the process for routing requests for LOGCAP support.

Routing Requests for LOGCAP Support



Note: Depending on requiring activity, follow appropriate routing activity

Figure B–3. Routing requests for Logistics Civil Augmentation Program support chart

AR 700–137 • 23 March 2017

16

**42**

**B–5.  Routing requests for Logistics Civil Augmentation Program support**
Table B–1 lists the data elements pertinent to the DCS G–4's review of initial requests for LOGCAP support.

| | Federal Agencies (DOD and non-DOD) | Federal Agencies Requesting Support for Allied Forces | Federal Agencies Requesting Support for Coalition Forces |
|---|---|---|---|
| Basic description of requested LOGCAP services | X | X | X |
| Sponsoring Cabinet-level agency | | X | X |
| Government Agency or unit designated as the requiring activity | X | X | X |
| Government Agency or unit(s) that will provide CORs | X | X | X |
| Types of forces to be supported and estimated duration of support | X | X | X |
| Justification of how LOGCAP services meet mission requirements | X | X | |
| Justification of how LOGCAP services meet multinational requirements | | | X |
| Applicable international agreements* | | X | X |
| Source and availability of funding for task order or startup | X | X | X |
| *For example, umbrella agreements, implementing arrangements, and acquisition and cross-servicing agreements, to include cost reimbursement provisions. | | | |

**B–6.  Logistics Civil Augmentation Program acquisition and execution process**
Figures  B–4 and B–5 depict the LOGCAP acquisition and execution processes.



**Figure B-4. Logistics Civil Augmentation Program acquisition process chart**



**Figure B-5. Logistics Civil Augmentation Program execution chart**

AR 700–137 • 23 March 2017

**Appendix C**

**Considerations for transition from or discontinuation of Logistics Civil Augmentation Program Services**

**C–1. Purpose**

Appendix C provides considerations to aid the senior operational commander's decision to transition from or discontinue LOGCAP services. The senior operational commander's decision to transition from or discontinue LOGCAP services is based on operational needs and national policy and will be coordinated with the cognizant contracting officer to execute any necessary contract actions.

**C–2. Decision questions to transition from or discontinue Logistics Civil Augmentation Program services**

*a.* Are alternative sources available?

*b.* Will an alternate contracting source save money?

*c.* Will an alternate contracting source provide the Government with the best value?

*d.* Will an alternate contracting source lessen Government risk?

*e.* Will the transfer of Government-furnished and/or Government-purchased equipment facilitate the movement to an alternate contracting source?

*f.* Will an alternate contracting source provide the same quality of support?

*g.* Is funding available to move to an alternate contracting source?

*h.* Is there staff available to move to an alternate contracting source?

*i.* Are there sufficient processes in place to move to an alternative contracting source?

*j.* Is the area of operations secure enough to allow for an alternative contracting source?

*k.* Have supported command requirements for an alternate contracting source been identified and approved?

*l.* Are there other financial, staffing, procedural, operational, political, military, or diplomatic reasons that would prevent or encourage movement to an alternative contracting source?

**Appendix D**

**Internal Control Evaluation**

**D–1. Function**
The function covered by this evaluation is LOGCAP.

**D–2. Purpose**
The purpose of this evaluation checklist is to assist the AMC, ASCCs, and other applicable organizations in evaluating key internal controls listed below. It is not intended to cover all controls.

**D–3. Instructions**
Answers must be based on actual testing of key internal controls such as document analysis, direct observation, sampling, and simulation. Answers that indicate deficiencies must be explained and corrective action indicated in supporting documentation. Although not every section is required by each organization, these internal controls must be evaluated at least once every 5 years. Certification that this evaluation has been conducted must be accomplished on DA Form 11–2 (Internal Control Evaluation Certification).

**D–4. Test questions**
*a.* Are formal agreements and procedures established to facilitate coordination among the various organizations required to manage and execute LOGCAP (for example, AMC, DCMA, and contracting community)?
*b.* Are LOGCAP support plans and contractor capabilities validated during applicable Joint and Army exercises?
*c.* Are LOGCAP support plans developed, updated, and available to support applicable ASCC OPLANs and OPORDs?
*d.* Are there formalized processes, procedures, or scheduled reviews for continuous program improvement?
*e.* Have metrics or key performance indicators been developed to measure program LOGCAP readiness and capability to support contingency operations?
*f.* Is LOGCAP addressed in ASCC OPLAN and/or OPORD, CSIPs, and CMPs?
*g.* Is LOGCAP considered as an option to provide logistics and base support service during ASCC planning?
*h.* Is LOGCAP integrated in the planning and execution of applicable ASCC deliberate planning exercises and associated planning conferences?
*i.* Is the LWRM held annually to capture and prioritize LOGCAP support to ASCC planning and training requirements?
*j.* Is there a process and/or repository to capture lessons learned to improve the integration of LOGCAP in ASCC plans, exercise support, and programmatic impacts?

**D–5. Supersession**
Not applicable.

**D–6. Comments**
Help make this a better tool for evaluating internal controls. Submit comments to the Headquarters, Department of the Army, Deputy Chief of Staff, G–4 (DALO–ORS–C), 500 Army Pentagon, Washington, DC 20310–0500.

## Glossary

**Section I**

**Abbreviations**

**ACSIM**
Assistant Chief of Staff for Installation Management

**AMC**
U.S. Army Materiel Command

**ASA (ALT)**
Assistant Secretary of the Army (Acquisition, Logistics and Technology)

**ASA (IE&E)**
Assistant Secretary of the Army (Installations, Energy and Environment)

**ASCC**
Army service component command

**BOD**
board of directors

**CAAF**
contractors authorized to accompany the force

**CAR**
Chief, Army Reserve

**CCDR**
combatant commander

**CFR**
code of federal regulation

**CG**
Commanding General

**CMP**
contractor management plan

**COR**
contracting officer's representative

**CSB**
contracting support brigade

**CSIP**
contract support integration plan

**DA**
Department of the Army

**DCMA**
Defense Contract Management Agency

**DCS, G–1**
Deputy Chief of Staff, G–1

**DCS, G–3/5/7**
Deputy Chief of Staff, G–3/5/7

**DCS, G–4**
Deputy Chief of Staff, G–4

**DCS, G–8**
Deputy Chief of Staff, G–8

**DOD**
Department of Defense

**HQDA**
Headquarters, Department of the Army

**HRC**
Human Resources Command

**JP**
Joint publication

**LOGCAP**
Logistics Civil Augmentation Program

**LSO**
LOGCAP support officer

**MDEP**
management decision evaluation package

**MEDCOM**
U.S. Army Medical Command

**NATO**
North Atlantic Treaty Organization

**N–m IRDO**
nonmilitary individual replacement deployment operations

**OCS**
operational contract support

**OILs**
observations, insights, and lessons

**OPLAN**
operations plan

**OPORD**
operation order

**PME**
professional military education

**PMO**
program management office

**PPBES**
Planning, Programming, Budgeting, and Executing System

**SPOT**
synchronized predeployment and operational tracking

**TAA**
total Army analysis

**TJAG**
The Judge Advocate General

**TRADOC**
U.S. Army Training and Doctrine Command

**TSG**
The Surgeon General

**USACE**
U.S. Army Corps of Engineers

**USARC**
U.S. Army Reserve Command

**USC**
United States Code

**USD (AT&L)**
Under Secretary of Defense (Acquisition, Technology and Logistics)

## Section II

## Terms

**Alliance**
The relationship that results from a formal agreement (for example, a treaty) between two or more nations for broad, long-term objectives that further the common interests of the members.

**Antideficiency Act**
The Act prohibits Federal employees from (1) entering into contracts that exceed the enacted appropriations for the year and (2) purchasing services and merchandise before appropriations are enacted.

**Army service component command**
An Army force, designated by the Secretary of the Army, comprised primarily of operational organizations serving as the Army component of a combatant command or subunified command. If directed by the CCDR, serves as a Joint Force Land Component Command or Joint Task Force.  Command responsibilities are those assigned to the CCDR and delegated to the ASCC and those established by the Secretary of the Army.

**Coalition**
An ad hoc arrangement between two or more nations for common action.

**Contingency clause**
A clause in a contract for peacetime performance that would afford an option to require continuation of the performance, in whole or specified part, in a wartime situation. If such a situation occurs, a duly appointed contracting officer would exercise the option.

**Contingency contract**
A contract for goods and services awarded by military or DOD contracting officers deployed to the operational area, as well as other service contracts that have a prescribed area of performance within a designated contingency area.  Contingency contracts include theater support, external support, and system support contracts.

**Contingency operation**
A military operation that is designated by the Secretary of Defense as an operation in which members of the Armed Forces are or may become involved in military actions, operations, or hostilities against an enemy of the U.S. or against an opposing military force; or results in the call or order to, or retention on, Active duty of members of the uniformed services under 10 USC 688, 10 USC 12301(a), 10 USC 12302, 10 USC 12304, 10 USC 12305, or 10 USC 12406, or any other provision of law during a war or during a national emergency declared by the President or Congress.

**Contracting officer**
Contracting officer is the Government official (uniformed or civilian) with the legal authority to enter into, administer, and/or terminate contracts.

**Contracting officer's representative**
Government employee (either military or civilian), appointed, in writing, by the contracting officer, to perform contract surveillance, perform other duties specified by their appointment letter, and to act as liaison between the contracting officer and the contractor.

**Contractor**
Any individual, firm, corporation, partnership, association, or other legal non-Federal entity that enters into a contract directly with DOD to furnish services, supplies, or construction.  Foreign governments, representatives of foreign governments, or foreign corporations wholly owned by foreign governments that have entered into contracts with DOD are not defense contractors.

**Contractor employees**
Prime contractors, their employees, and subcontractors at all tiers (including third-country national and local national personnel) supporting U.S. Armed Forces under such contracts.  They are also referred to as "contractor personnel."

**Contractor management plan**
A plan focused on mission-specific contractor management requirements such as personnel accountability, force protection, use of private security contracts, and Government-furnished equipment.

**Contractor support integration plan**
The planning mechanism to ensure effective and efficient contract support to a particular operation.  The CSIP serves as the mechanism for providing detailed guidance on OCS for a specific military operation and covers the function of acquiring (contracting for) theater support contracting and nonfacility (an engineer staff function) support related information on external support contracts, such as LOGCAP, in support of a particular operation.

**Contractor–acquired property**
Property acquired, fabricated, or otherwise provided by the contractor for performing a contract and to which the Government has title.

**Defense Base Act**
The Defense Base Act provides workers' compensation protection to civilian employees working outside the U.S. on U.S. military bases or under a contract with the Government for public works or for national defense. Related statutes include the Defense Base Act (42 USC 1651–54) and the Longshore and Harbor Workers' Compensation Act (33 USC 901–50). Implementing regulations are available at 20 CFR 701, 20 CFR 702, 20 CFR 703, and 20 CFR 704. The FAR also sets the workers' compensation insurance requirements for all overseas contracts at 48 CFR 28.305, 48 CFR 52.228–3, and 48 CFR 52.228–4.

**External support contracts**
External support contracts are pre-arranged contracts or contracts awarded during a contingency from contracting organizations whose contracting authority does not derive directly from the contingency operation or system support contracting authority. The largest and most commonly used external support contracts are the Services' Civil Augmentation Program contracts including the Army's LOGCAP, the Air Force Contract Augmentation Program, and the Navy's Global Construction Capability Contract and Global Contingency Construction Contract. External support contracts normally include a mix of U.S. citizens, third-country nationals, and local national contractor employees.

**Funding document**
The funding document provides written assurance from a responsible fiscal authority that funds are legally available for the purpose of the contract action.

**Global**
Within and outside the continental United States.

**Host nation support**
Civil and military assistance rendered in peace and operations other than war by a host nation to allied forces, which are located on or in transition through the host nation's territory. The basis for such commitments is bilateral or multilateral agreements concluded between the host nation and the nation(s) having forces operating on the host nation's territory.

**International agreements**
Agreements concluded with one or more foreign governments.

**Logistics Civil Augmentation Program**
The LOGCAP is a DA Regulatory Program to augment the force by providing a service capability to meet externally driven operational requirements for rapid contingency augmentation support. LOGCAP plans for and executes contracted support services in conjunction with the Army Field Support Brigade and CSB for deployed forces performing missions directed or supported by the DOD during global contingency operations.

**Logistics Civil Augmentation Program forward management team**
The senior program management team that provides a central management structure to ensure integration and execution of LOGCAP requirements.  Components of the team are: CSBs, LOGCAP Support Brigade, USACE, DCMA, PMO for LOGCAP, and the Rock Island Contracting Center.

**Multinational**
Between two or more forces or agencies of two or more nations or coalition partners.

**Performance work statement**
Addresses the quality of work in terms of desired outcome and accurately reflects the actual Government's requirement, including performance standards.

**Requiring unit or activity**
A military or other designated supported organization that identifies and receives contracted support during military operations (see supported unit).

**Support**
Includes combat support and combat service support functions.

**Support unit**
The unit, activity, or organization receiving dedicated contracted support.  The supported unit is usually the sponsoring unit.

**Synchronized Predeployment and Operational Tracker**
The Joint Enterprise System for all contingency contracts and contractors authorized to accompany the force (CAAF). SPOT provides by name visibility of deployed CAAF and contract capability information for CCDRs.  Defense contracting agencies are required to register acquisition information into the SPOT or its successor system when contingency contracts are awarded. Thereafter, defense contractor companies populate the SPOT or its successor with their employee's personal data via a Web-based application.  Once an individual is selected for deployment duty, the SPOT allows for generation of a standardized, digitally signed letter of appreciation. Predeployment processing compliance, travel to the area of responsibility, in-theater movements, and redeployment activities are annotated in SPOT. Government agencies use the SPOT to analyze available contract services and to support their mission needs. Defense contractors use the SPOT to process and track CAAF who deploy to provide required capabilities. The CCDRs use the SPOT reports to maintain overall visibility of contractors within their area of responsibility, determine their support requirements, and integrate contractor support into their operational plans.

## Section III

## Special Abbreviations and Terms

**LWRM**
Logistics Civil Augmentation Program Worldwide Requirements Meeting