IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| Charlotte Loquasto, et al.,<br>          Plaintiffs,<br>v.<br><br>Fluor Corporation, Inc., et al.<br>          Defendants. | §<br>§<br>§<br>§     Civil Action No. 3:19-cv-01455-B<br>§     **(Consolidated with Civil Action No.**<br>§     **3:19-cv-01624-B)**<br>§ |

**THE FLUOR DEFENDANTS' RESPONSE TO
PLAINTIFFS' SUR-REPLY AND SUR-REPLY APPENDIX [DOC. 78]**

Defendants Fluor Corporation, Inc., Fluor Enterprises, Inc., Fluor Intercontinental, Inc., and Fluor Government Group International, Inc. ("Fluor") submit this response to Plaintiffs' sur-reply to Defendants' motion to dismiss (Doc. No. 78).

Although the Court's order stated that "[n]o surreply appendix will be allowed," Doc. No. 73, Plaintiffs attached the three recent deposition transcripts to their sur-reply. Had Plaintiffs sought leave to file a sur-reply appendix containing these transcripts, Fluor would not have opposed. Fluor wholeheartedly believes the transcripts should be considered by the Court, as the testimony is highly relevant to Fluor's motion to dismiss and reinforces the factual bases for dismissal set forth in the declarations. But Fluor opposes Plaintiffs' mischaracterizations of the testimony and the relevant law. Fluor submits this response to address the most egregious mischaracterizations.

**I.     Plaintiffs Ignore the Relevant Legal Framework and Wrongly Claim Witnesses Lack Personal Knowledge.**

In discussing the witness's testimony, Plaintiffs never mention the preemption tests and legal precedents cited by Fluor. Plaintiffs then make illogical claims that witnesses lack "personal knowledge." Plaintiffs' arguments are contradicted by the testimony, as viewed through the prism of the relevant legal doctrines.

1

To be meaningful, the testimony must be considered within the legal framework that has been established by multiple appellate courts and presented by the U.S. Solicitor General in briefs submitted to the Supreme Court. As these precedents explain, the fundamental rationale for Fluor's preemption defense is "eliminating tort concepts from the battlefield"[1] in order to protect "the federal interest inherent in the combatant-activities exception: that *actions arising out of the Nation's conduct of military operations* should not be regulated by tort law."[2] The broad preemption tests that have been developed to protect these federal interests are triggered when a contractor is "integrated" into the military's operations[3], performing work "within the scope" of its contract.[4] Rather than address these critical principles, Plaintiffs ask this Court to adopt legal positions that no appellate court has ever endorsed. *See infra* at III. And Plaintiffs completely ignore that the Fifth Circuit has directed all district courts in this circuit to resolve Fluor's combatant-activities defense "at an early stage."[5]

Eschewing the relevant legal framework, Plaintiffs argue in conclusory fashion that each witness lacks "personal knowledge." Plaintiffs impose a nonsensical standard of "personal knowledge" untethered to the facts pertinent to Fluor's motion, and Plaintiffs ignore that each witness explained the basis of their knowledge. Ron Riley was Fluor's in-theater contracts manager who was physically present at Bagram for nearly all of the past decade (2010 through present). He directly observed Fluor's performance at the time of the November 2016 attack and in the preceding years. Lindsay Weindruch was the Army's lead contracting officer at the time of

---

[1] *Saleh v. Titan Corp.*, 580 F. 3d 1, 7 (D.C. Cir. 2009).
[2] Br. for the U.S. as Amicus Curiae, *KBR, Inc. v. Metzgar*, No. 13-1241, 2014 WL 7185601, at *16-17 (U.S. Dec. 16, 2014) (emphasis added); *see also id.* at *14 ("The military's effectiveness would be degraded if its contractors were subject to the tort law of multiple States for actions occurring in the course of performing their contractual duties arising out of combat operations.").
[3] *See*, *e.g.*, *Saleh*, 580 F. 3d at 7.
[4] S*ee*, *e.g.*, Br. for United States as Amicus, *Metzgar*, 2014 WL 7185601, at * 15.
[5] *Martin v. Halliburton*, 618 F.3d 476, 478 (5th Cir. 2010).

the attack. She gained the factual knowledge set forth in her sworn declaration—a declaration that was approved by Army legal counsel—based on her extensive experience interacting with Fluor and Military personnel on the ground in Bagram via daily phone calls, emails, reports, memoranda, and other inputs. Finally, Lt. Gen. (Ret.) Mick Bednarek's testimony was introduced to explain fundamental LOGCAP concepts and the manner in which Army commanders integrate contractors like Fluor into operations. He gained the factual knowledge set forth in his sworn declaration—which was also approved by Army counsel—based on his decades of Army service and experience with the LOGCAP program.

One has to ask: If the Army's lead contracting officer, Ms. Weindruch, and Fluor's in-theater contracts manager, Mr. Riley, lack "personal knowledge" of Fluor's performance under the contract, then who *would* pass Plaintiffs' test?

**II.     The Witnesses Confirmed That Fluor Was Integrated and Performed Within Scope.**

Despite Plaintiffs' mischaracterizations, *see* Pls.' Sur-Reply at 3-4, Ms. Weindruch repeatedly rejected Plaintiffs' attempts to portray her as unknowledgeable regarding the facts in her sworn declaration. Ms. Weindruch instead emphasized that, through her experience as the Army's lead contracting officer at the time of the attack, she gained extensive firsthand knowledge of Fluor's integration and performance within the scope of the contract because, in her words, "obviously, I oversee the contract on a daily basis." *See* Doc. No. 78-1 at 20:12-19. Ms. Weindruch had daily interactions with Fluor personnel and numerous Military personnel at Bagram, and these daily interactions, over the course of years, provided her with more than ample experience to conclude that Fluor was integrated and acting within the scope of the contract:

- "I do have knowledge of the contract and what is within scope of the contract; and then I've talked to many individuals located in Afghanistan on the performance. And…we have ACOs, Administrative Contracting Officers, all over…Afghanistan that oversee[] performance, along with quality, personnel, and property, et cetera." *Id*. at 20:20-21:9.

3

- "I would talk to Fluor almost probably on a daily basis. And then the Administrative Contracting Officers and the LOGCAP Support Officers and even DCMA…. That's, essentially, that's their function. And, like I said, we would talk to them some -- like on a daily basis. And…they would go out and coordinate with Fluor personnel at Bagram. You know, they would be doing their quality checks. They would do…contractual matters, issue Letters of Technical Direction or undefinitized change orders, which, …at the time, those are daily occurrences on the contract." *Id*. at 22:21-23:11.

- "[W]e have daily communications, you know, with the military on the ground, you know, ACOs, et cetera, that, you know, work with Fluor." *Id*. at 18:4-11.

- "[W]e have regular communications…with people located at Bagram. Like our ACOs are military. Some of the requiring activity obviously is military. So…Fluor works alongside them, the military, for different, you know, jobs that they do." *Id*. at 17:18-18:3.

Plaintiffs' one-sentence summary of Mr. Riley's testimony, *see* Pls.' Sur-Reply at 6-7, is incredibly misleading. Plaintiffs do not mention that they devoted all of 23 minutes to Mr. Riley's deposition. Yet, as his detailed, 29-paragraph declaration explained, Mr. Riley spent nearly a decade at Bagram and was physically present on the base at the time of the suicide bombing attack and for years preceding the attack—all the while serving as Fluor's lead interface with numerous Military's contracting officials on a daily basis.[6] Plaintiffs' strategic decision to avoid asking about Mr. Riley's on-the-ground personal experience does not negate its existence. In their 23-minute cursory examination, Plaintiffs simply chose not to inquire about or challenge Mr. Riley's core testimony—that Fluor's performance of "force protection screening cell and security functions" at the time of the attack was "[w]ithin the scope of the contract," and carried out while Fluor was "integrated into the military's operations," "work[ing] shoulder to shoulder with military personnel" with "constant interaction and collaboration." *See*, *e.g.*, Doc. No. 68-1 , Riley Decl. ¶¶ 3-4, 18, 27-29 ("Based on my experience, such integration is a reality during contract

---

[6] *See*, *e.g.*, Doc. No. 68-1, Riley Decl. ¶ 8 ("I worked closely, on a daily basis, with military Administrative Contracting Officers ("ACOs"), Procuring Contracting Officers ("PCOs"), LOGCAP Support Officers ("LSOs"), and various other military representatives, including personnel within the Defense Contracting Management Agency ("DCMA") and Army Contracting Command ("ACC").").

execution…In performing these functions, Fluor personnel work shoulder to shoulder with military personnel."). Mr. Riley's declaration remains undisputed on these and numerous other points. For example, Mr. Riley explained:

- "Fluor worked closely with the military, on a day-to-day basis, in order to coordinate and synchronize execution of Fluor's essential support services." *Id*. ¶ 18.

- "The practical reality on the ground is that…there is an informal, real-time sharing of information between U.S. military and Army contract personnel and Fluor, and a constant dialogue between the various members of 'Team LOGCAP,' which consists of Fluor and various military and Army civilian contract representatives. This constant dialogue and collaboration between Fluor and the military/contractual apparatus enables the process to work smoothly and, ultimately, ensures mission success." *Id*. ¶ 20.

- "In my experience, covering almost a decade in Bagram, including the time leading up to, during, and after the November 2016 suicide bombing incident, at no time did any ACO or PCO suggest any service being performed by Fluor was outside the scope of the contract." *Id*. ¶ 24.

Plaintiffs' attack on Gen. (Ret.) Bednarek's testimony, *see* Pls.' Sur-Reply at 4-6, ignores the substance of his relevant personal knowledge. Gen. (Ret.) Bednarek provided detailed firsthand experience regarding the design and purpose of the LOGCAP program, under which Fluor performed at Bagram, and the essential role of LOGCAP contractors, like Fluor, that are integrated by design into the Army's "total force" at overseas bases. *See* Doc. 68-1, Bednarek Decl. ¶¶ 4, 10-20. These are facts. They are relevant to and supportive of Fluor's defenses. Gen. (Ret.) Bednarek did not need to see Fluor's performance each day at Bagram in order to testify as to their veracity.

### III. Plaintiffs' Remaining Legal Arguments Are Meritless.

Plaintiffs claim the Fifth Circuit has not recognized combatant-activities preemption. *See* Pls.' Sur-Reply at 7. That is misleading at best. In *Martin*, the Fifth Circuit addressed the combatant-activities preemption defense, and the court: (i) directed district courts to "take care to develop and resolve such defenses at an early stage while avoiding, to the extent possible, any interference with military prerogatives," 618 F.3d at 478, and (ii) noted that its holding that it lacked jurisdiction "renders it unnecessary for us to decide what must be shown to support

preemption under the combatant activities exception," *id*. at 477 n.17. The *only* way to read this decision is that the Fifth Circuit recognized that the preemption defense *exists* (and should be resolved early on in a case), but did not resolve *which* preemption test to adopt.[7] No appellate court has ever refused to recognize the combatant-activities preemption defense, as urged by Plaintiffs here. On the other hand, the United States believes the defense is critical to national security because "[t]he military's effectiveness would be degraded if its contractors were subject to the tort law of multiple States for actions occurring in the course of performing their contractual duties arising out of combat operations."[8]

Contrary to Plaintiffs' other musings, no appellate court has ever limited combatant-activities preemption to procurement contracts. *See* Pls.' Sur-Reply at 8-9. The United States advocated for preemption in several cases involving the LOGCAP contract—the same *services* type contract at issue here.[9] Numerous appellate courts have adopted the D.C. Circuit's *Saleh* preemption test, which on its face is designed to bar claims against "private *service* contractor[s]."[10] Again, Plaintiffs left unchallenged core facts presented by Fluor's witnesses demonstrating Fluor's "integration" and performance of services within scope.[11]

Plaintiffs' claims arise out of a deadly attack by an enemy Taliban operative inside a Military base in Afghanistan in November 2016. Yet Plaintiffs incredibly argue this suit does *not*

---

[7] *See also McManaway v. KBR, Inc.*, 554 F. Appx. 347, 354 (5th Cir. 2014) (Jones, J., dissenting from Denial of Rehearing En Banc) ("Even a pinched reading of the combatant activities exception should shield [the contractor] and, indirectly, the United States from jurors' state law-based second-guessing.").

[8] Br. for United States as Amicus, *Metzgar*, 2014 WL 7185601 at *14.

[9] *See*, *e.g.*, Br. for United States as Amicus, *Metzgar*, 2014 WL 7185601 at *11-14.

[10] *Saleh*, 580 F.3d at 9 ("During wartime, where a private *service* contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted.") (emphasis added); *accord In re KBR, Inc. Burn Pit Litig.*, 744 F.3d 326, 351 (4th Cir. 2014); *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 480 (3d Cir. 2013).

[11] In addition to the testimony noted above, Plaintiffs also do not meaningfully challenge the testimony of Bryan Wilson, which likewise demonstrated the integration of Fluor's personnel within the Military's operations at Bagram and Fluor's in-scope performance. *See* Doc. No. 45-1, Ex. 1. Mr. Wilson's detailed descriptions of Fluor's contractual obligations and the limitations imposed by the Army on Fluor's performance also illustrate some of the "specific conflicts created if tort suits are permitted" and a non-federal tort duty is imposed on Fluor. *See Saleh*, 580 F.3d at 8.

arise out of "combatant activities" because in March 2020 a Navy Captain on a routine mission in the Pacific Ocean said, while addressing the Covid-19 pandemic, "we are not at war." *See* Pls.' Sur-Reply at 10-11. That is facially absurd. What is more, soldiers involved in the attack—and many others who served in Afghanistan over the past two decades—were appropriately awarded Bronze Star Medals and other decorations specifically for their heroic actions *in a combat zone*. *See*, *e.g.*, Army Reg. 600-8-22 (Mar. 2019) at 3-16(e) ("the [Bronze Star Medal] is a combat related award and service or achievement under combat conditions is inherent to the medal"). Several Plaintiffs received Purple Hearts after the attack, which they were rightly entitled to, because they were wounded in "an action against an enemy of the United States." *See id*. at 2-8. Beyond that, the Fifth Circuit has rejected the legal premise underlying Plaintiffs' baseless contention, holding: "This exception is applicable to claims *even in the absence of a formal declaration of war*." *Arnold v. United States*, 140 F.3d 1037 (5th Cir. 1998) (emphasis added).[12]

      At bottom, Plaintiffs do not dispute any of the facts set forth in Fluor's declarations or in the witness's deposition testimony. Based on those facts, and for other reasons set forth in Fluor's prior briefing, the Court should dismiss Plaintiffs' claims.

---

[12] *See also*, *e.g.*, Doc. No. 68-1, Bednarek Decl. ¶12 ("Since 9/11 and the U.S. invasion of Afghanistan that followed, the United States has had an ongoing presence in Afghanistan, and U.S. troops have faced the constant threat of hostilities from the Taliban and other enemy organizations.").

Respectfully submitted,

**HARTLINE BARGER LLP**

*/s/ Darrell L. Barger*
Darrell L. Barger (*Attorney-in-charge*)
State Bar No. 01733800
J. Reid Simpson
State Bar No. 24072343
1980 Post Oak Blvd.
Suite 1800
Houston, Texas 77056
(713) 759-1990
(713)652-2419 (Fax)
dbarger@hartlinebarger.com
rsimpson@hartlinebarger.com

Brian Rawson
State Bar No. 24041754
8750 N. Central Expy.
Suite 1600
Dallas, Texas 75231
(214) 369-2100
(214) 369-2118 (Fax)
brawson@hartlinebarger.com

**COVINGTON & BURLING LLP**

**RAYMOND B. BIAGINI**
DC Bar No. 480967 (*admitted pro hac vice*)
rbiagini@cov.com
**DANIEL L. RUSSELL JR.**
DC Bar No. 491655 (*admitted pro hac vice*)
drussell@cov.com
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Phone: 202-662-6000
Fax: 202-662-6291

*Counsel for the Fluor Defendants*

8

**Certificate of Service**

       The undersigned certifies that on November 12, 2020, Fluor served a true and correct copy of the foregoing document on all known counsel of record via the Northern District's CM/ECF filing service under the Federal Rules of Civil Procedure and the Northern District Local Rules.

                                                 */s/ Darrell L. Barger*
                                                 Darrell L. Barger