UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE LOQUASTO, *et al.*, | § § § § § § § § § § | |
| Plaintiffs, | | |
| v. | | CIVIL ACTION NO. 3:19-CV-1455-B (Consolidated with 3:19-CV-1624-B) |
| FLUOR CORPORATION, INC., *et al.*, | | |
| Defendants. | | |

MEMORANDUM OPINION AND ORDER

Before the Court is a Motion to Dismiss for Lack of Jurisdiction and Motion for Summary Judgment in the Alternative (Doc. 45) filed by Defendants Fluor Corporation, Inc., Fluor Enterprises, Inc., Fluor Intercontinental, Inc., and Fluor Government Group International, Inc. (collectively, "Fluor" or the "Fluor Defendants") and Alliance Project Services, Inc. ("Alliance"). For the reasons that follow, the Court **GRANTS** the motion insofar as it seeks dismissal for lack of subject-matter jurisdiction.

I.

BACKGROUND

A.  *Factual Background*

This is a personal-injury case arising out of a suicide bombing that occurred on Veterans' Day 2016 at a United States Military base in Afghanistan. *See* Doc. 1-3, Pls.' Pet., 2.[1] Plaintiffs include

---

[1] In July 2019, the Court consolidated this action with Civil Action No. 3:19-cv-1624-B (the "Branch Action"). The Branch Action is a similar personal-injury action brought by Marvin T. Branch, a soldier injured in the same 2016 bombing. Pet. at 4, *Branch v. Fluor Corp., Inc.*, No. 3:19-cv-1624-B, (N.D. Tex. July 5, 2019), ECF No. 1-3. Because the allegations in the Branch petition are essentially identical to the

-1-

injured civilians and soldiers, as well as family members of those injured and killed in the bombing. Doc. 1-3, Pls.' Pet., 5–19. The Fluor Defendants are military contractors, and Alliance is a subcontractor. *Id.* at 22.

"Fluor provides base operations support" to the United States military at Bagram Airfield ("Bagram"), a military base in Afghanistan. Doc. 45-1, Defs.' App., 2–3. The support Fluor provides includes "facilities management, hazardous material and hazardous waste management, . . . power generation and distribution, water supply, sewage, sanitation, . . . waste management, maintenance operations, and motor pool[.]" *Id.* at 3. Fluor provides such services at Bagram pursuant to a task order under the "Logistics Civil Augmentation Program ('LOGCAP') IV contract," the contract that governs its relationship to the military and its conduct at Bagram. *Id.* at 2.

The military personnel at Bagram are engaged in the Afghan First Program, a counterinsurgency ("COIN") strategy. *Id.* at 136; 45-3, Defs.' App., 556. The Afghan First Program aims to "increase opportunities for Afghan socio-economic development and expansion" and requires bases in Afghanistan to "use available Afghan services and products" and "provid[e] Afghans with training which will add marketable skills to [their] population." Doc. 45-1, Defs.' App., 136. COIN efforts like the Afghan First Program aim to "get the people to accept" their legitimate government's authority over the authority of insurgents, "tak[e] charge of their own affairs," and "consent[] to the government's rule." Doc. 45-3, Defs.' App., 558. In that vein, an important aspect of COIN is affording local nationals ("LNs") economic footing and, in turn, power to reject insurgents. *See id.* Part and parcel of the Afghan First Program, Fluor's task order required it to "hire [LNs] to the

---

allegations in Plaintiffs' petition, the Court refers only to Plaintiffs' petition in this Order.

maximum extent possible in performance of [the] contract[.]" Doc. 45-1, Defs.' App., 40. Fluor subcontracted with Alliance to hire LNs to work at Bagram. *Id.* at 16. Importantly, Alliance "typically recruit[ed] and hire[d] individuals who were initially part of the military labor pool who were vetted through local village police departments, tribal elders, and the military." *Id.* at 17 (citations omitted); *see also* Doc. 45-4, Defs.' App., 844.

Qari Naeb Hafezi, also known as Nayeb, was one such LN hired to work at Bagram pursuant to the Afghan First Program. Doc. 45-1, Defs.' App., 12 & n.10. Former Taliban ties ordinarily disqualify an LN from participation in the Afghan First Program. *See id.* at 18. Even so, Nayeb, who was known to be a former Taliban member,[2] was sponsored by the military for training and, in December 2011, began to work at Bagram. *Id.* at 18, 22, 138. Approximately five years later, on November 12, 2016, he detonated a bomb strapped to his chest killing himself and at least five other people and injuring many more. *Id.* at 29; Doc. 1-3, Pls.' Pet., 6–11.

Nayeb worked at Bagram in the HAZMAT area of the non-tactical vehicle yard. Doc. 45-1, Defs.'s App., 22. "He worked with benign substances and did not have access to explosives[.]" *Id.* at 23. But a military investigation report states that "Nayeb likely smuggled small quantities of homemade explosive[s] onto Bagram Airfield over approximately four months" and assembled the "suicide vest" at his workstation using materials readily available to him. Doc. 45-4, Defs.' App., 855. Then, instead of leaving the premises after his November 11, 2016, night shift, he remained on the

---

[2] Fluor posits that the military did not apprise it or Alliance of Nayeb's Taliban ties. *Id.* at 18. Plaintiffs do not dispute this. *See generally* Doc. 57, Pls.' Resp.

base and detonated the bomb "a little over a mile" away from his workstation. Doc. 57-1, Pls.' Ex. A, 32–33.

Pursuant to its task order, Fluor was "responsible for ensuring all personnel supporting [the task order] compl[ied] with the standards of conduct, and all terms/conditions set forth in [the performance work statement] and the Basic Contract." Doc. 45-1, Defs.' App., 40. Fluor was also responsible for "provid[ing] the necessary supervision for personnel required to perform" the contract. *Id.* This means that Fluor supervised Nayeb's "day-to-day work[.]" Doc. 57-1, Pls.' Ex. A, 18.[3] Fluor was also responsible for transporting and escorting Nayeb around the base as needed for his job. *See* Doc. 45-1, Defs.' App., 45. Importantly, Fluor was required to ensure Nayeb was escorted in compliance with the military's base-access policy if he left his work area, and the military determined that Fluor failed to do so on the morning of the bombing, given that Nayeb was able to leave his work area and detonate the bomb elsewhere on the base. *See* Doc. 57-1, Pls.' Ex. A(2), 2.

The United States military, on the other hand, was responsible for force protection at Bagram. Doc. 45-1, Defs.' App., 6, 40. "The [m]ilitary's [f]orce [p]rotection obligation included issuing security badges to [LNs like Nayeb,] . . . who worked at [Bagram]." *Id.* at 6. Thus, the military determined "who may enter and remain on" Bagram. *Id.* Prior to issuing security badges to LNs, the military screened them by checking their identifications, scanning their irises "for biometric check against a watchlist," collecting their fingerprints and DNA, and interviewing them. *Id.* at 7–8. Once an LN received a security badge, it was the military's "responsibility to determine whether [he] may continue to access" Bagram. *Id.* This means the military continuously vetted LNs even after they

---

[3] Though Alliance participated in the hiring of Afghan nationals for work at Bagram, Alliance took no part in supervising those individuals once they were hired. Doc. 57-2, Pls.' Ex. B, 25.

were hired. *Id.* Fluor took no part in screening LNs for base access, and it was not privy to the information the military maintained on Bagram's Afghan workforce. *Id.* at 9. "The [m]ilitary also completely and exclusively control[led] what materials enter[ed] [Bagram] through physical searches of all vehicles and personnel entering [Bagram]." *Id.* at 9. "No LNs subcontracted to Fluor through [Alliance] stay[ed] at [Bagram] full-time, so all [those] entering . . . [had to] traverse the [m]ilitary-run security control points every day." *Id.* at 10.

The military also "prescribe[d] the rules under which LNs [were] escorted while on base from [the entry point] to their places of work, and back. The [m]ilitary, not Fluor, train[ed] and certifie[d] all escorts." *Id.* at 11. At the time of the bombing, the military issued three levels of badges, and LNs were eligible to hold two of those three types. *Id.* at 11–12. LNs who held red badges were required to be escorted in all areas on Bagram, except at their work facility. *Id.* at 12. LNs who held yellow badges[4] were permitted to "traverse the base unescorted and" to serve as escorts for other LNs who held only red badges. *Id.* at 11. The military determined which level of badge an LN would hold. *See id.* Nayeb held a red badge. *Id.* at 12. This meant that Nayeb was required to be escorted everywhere on Bagram except in his work facility, the non-tactical vehicle yard. *See id.* The military did not require Fluor to keep "eyes-on supervision" over Nayeb while he was in his work facility. *Id.* at 12–13. In fact, "no LOGCAP provision provided Fluor any discretion or authorization to provide security supervision or escort over and above that for which the [Bagram] Access Policy . . . allowed or provided." *Id.* at 13.

---

[4] Since the bombing, the military has amended its base-access policy, and LNs are no longer eligible to hold yellow badges. *Compare* Doc. 49, Defs.' Sealed App., 17 ("A Yellow badge is the highest level badge of citizens of countries to which Special Security Regulations Apply[.]"), *with id.* at 65 (reflecting that a green badge is "[t]he only badge authorized for" LNs).

B.  *Procedural Background*

Plaintiffs filed this suit in the 14th District Court of Dallas County on May 14, 2019. Doc. 1-3, Pls.' Pet., 1. Defendants removed the suit to this Court on June 19, 2019, invoking the Court's jurisdiction under 28 U.S.C. § 1442 "because [the suit] involves an action against a person acting under an officer of the United States." Doc. 1, Notice of Removal, 4 (citing, *inter alia*, 28 U.S.C. § 1442(a)(1)). Fluor filed a motion for leave to designate responsible third parties (Doc. 20) on August 19, 2020. The motion sought permission to designate the military as an entity responsible for Plaintiffs' injuries. Doc. 20, Mot. Leave, 7. Plaintiffs did not oppose this motion, Doc. 30, Notice, 1, and the Court granted it. *See* Doc. 31, Order.

Fluor initially filed a motion to dismiss for lack of subject-matter jurisdiction (Doc. 21) on August 20, 2019, but the Court granted Plaintiffs' request to conduct limited jurisdictional discovery and afforded Defendants the opportunity to file a renewed motion to dismiss once such discovery was completed. *See* Doc. 38, Mem. Op. & Order, 1; Doc. 39, Order. Fluor filed the pending motion to dismiss (Doc. 45) on March 23, 2020, seeking dismissal for lack of subject-matter jurisdiction under the political question-doctrine or, in the alternative, summary judgment on the basis of combatant-activities preemption. All parties consent to Alliance's joining of Fluor's motion, Doc. 83, Certificate of Conference, so the Court considers it as a motion filed by all Defendants. The Court has received all briefing on the motion, including supplemental briefing. Thus, the motion is ripe for determination. Because the case presents a political question, the Court **GRANTS** the motion insofar as it seeks dismissal for lack of subject-matter jurisdiction.

## II.

## LEGAL STANDARD

"Federal courts are courts of limited jurisdiction." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). For that reason, they can adjudicate claims only when subject-matter jurisdiction "is expressly conferred by the Constitution and federal statute. Federal Rule of Civil Procedure 12(b)(1) provides the vehicle through which" a party may challenge federal jurisdiction. *Armstrong v. Tygart*, 886 F. Supp. 2d 572, 584 (W.D. Tex. 2012) (citations omitted).

"A Rule 12(b)(1) motion can mount either a facial or factual challenge." *MacKenzie v. Castro*, 2016 WL 3906084, at *2 (N.D. Tex. July 19, 2016). A facial challenge occurs "when a party files a Rule 12(b)(1) motion without including evidence." *Id.* A factual challenge, by contrast, occurs when a party supports its Rule 12(b)(1) motion with evidence. *Id.*

In both cases, the burden of proof "is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam). Yet that is no high bar: "[I]t is extremely difficult to dismiss a claim for lack of subject matter jurisdiction." *Santerre v. AGIP Petrol. Co.*, 45 F. Supp. 2d 558, 566 (S.D. Tex. 1999) (quoting *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1260 (11th Cir. 1997)).

For a facial challenge, courts consider just "the allegations in the complaint because they are presumed to be true." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). But this is a factual challenge. Plaintiffs enjoy no presumption of truthfulness here. *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981). Instead, they must "prove subject matter jurisdiction by a preponderance of the evidence." *MacKenzie*, 2016 WL 3906084, at *2 (citing *Paterson*, 644 F.2d at 523). To that

end, each party may submit affidavits, testimony, and other evidentiary materials in support of their positions. *Paterson*, 644 F.3d at 523.

## III.

## ANALYSIS

Defendants challenge the Court's subject-matter jurisdiction on the ground that this case presents a political question.

"Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in [the] court." *Marbury v. Madison*, 5 U.S. 137, 170 (1803). "This 'political question' doctrine reflects the principle that, under our Constitution, there are some questions that cannot be answered by the judicial branch." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). Political questions are nonjusticiable. *Id.* (citing *Baker v. Carr*, 369 U.S. 186, 198 (1962)). But the doctrine "is one of 'political questions,' not one of 'political cases.'" *Baker*, 369 U.S. at 217. The Supreme Court requires a "discriminating inquiry into the precise facts and posture of the particular case" before deeming a matter nonjusticiable under the political-question doctrine. *Id.* at 217. The following "formulations . . . may help determine whether a particular case raises a political question[:]

> (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department;
> (2) a lack of judicially discoverable and manageable standards for resolving it;
> (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
> (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;
> (5) an unusual need for unquestioning adherence to a political decision already made;
> (6) or the potentiality of embarrassment from multifarious pronouncements by

various departments on one question."

*Lane*, 529 F.3d at 558 (internal quotation marks omitted) (quoting *Baker*, 369 U.S. at 217). "[T]he inextricable presence of one or more of these factors will render the case nonjusticiable under . . . Article III[.]" *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196, 1203 (5th Cir. 1978).

As a preliminary matter, Defendants advocate for application of the plenary-control test to determine whether this case presents a political question. *See* Doc. 45, Defs.' Mot., 28. Under such test, "a [m]ilitary contractor suit will raise a political question if the [m]ilitary exercised direct, plenary control over the contractor's conduct at issue." *Id.* at 29 (citing *In re: KBR, Inc.*, 893 F.3d 241, 260 (4th Cir. 2018)). Defendants devote much of their brief to describing the degree of control the military enjoyed over Defendants' conduct at Bagram and arguing that such control was plenary. *See id.* at 30–61. But Plaintiffs point out, and Defendants do not dispute, that the Fifth Circuit has not adopted the plenary-control test. Doc. 57, Pls.' Resp., 12; *see generally* Doc. 66, APS Reply; Doc. 67, Fluor Defs.' Reply. Rather, in the Fifth Circuit, a court must "analyze [the case] as it would be tried," *Occidental*, 577 F.2d at 1202, to determine whether one or more *Baker* factors is "inextricable from the case[.]" *Baker*, 369 U.S. at 217. This entails an analysis of the plaintiffs' claims and the defendants' defenses to determine whether a political question will emerge. *See Lane*, 529 F.3d at 565; *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 339 (4th Cir. 2014).

Analyzing this case as it would be tried, the Court determines that a political question will emerge because Defendants' proportionate-liability defense raises an issue "textually . . .

commit[ted]" to the military, and the Court lacks "discoverable and manageable standards for resolving it[.]" *Baker*, 369 U.S. at 217.

A.      *This Case Presents Issues Textually Committed to the Political Branches of Government.*

Defendants raise proportionate responsibility under Texas Civil Practices and Remedies Code § 33.003 as an affirmative defense. Doc. 3, APS Answer, 19–20; Doc. 45, Defs.' Br., 68–69. And Fluor properly designated the military a responsible third party under § 33.004. Doc. 31, Order, 1.[5] Accordingly, in deciding this case, the Court or jury may assign fault to the military. Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004. Such a finding, in turn, would require the Court to inquire into the propriety of the military's approval of Nayeb for base access and the soundness of the military's security screenings at base entry points. As explained below, these are decisions related to control and access to a military base and are textually committed to the political branches of government.

"The Constitution emphatically confers authority over the military upon the executive and legislative branches of government." *Am. K-9 Detection Servs., LLC v. Freeman*, 556 S.W.3d 246, 254 (Tex. 2018) (alterations omitted) (quoting *Aktepe v. United States*, 105 F.3d 1400, 1403 (11th Cir. 1997)). Indeed, "[t]he complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject

---

[5] "[O]nce leave has been granted to designate a responsible third party, that designated party is available for apportionment of fault by *any defendant*[.]" *Coachmen Indus., Inc. v. Alt. Serv. Concepts, L.L.C.*, 2008 WL 2787310, at *3 (S.D. Tex. July 15, 2008) (emphasis added). Though Alliance did not move to designate the military as a responsible third party, it may nonetheless seek to apportion fault to the military. *See id.* (interpreting Texas Civil Practice and Remedies Code § 33.004 and holding that responsible-third-party designations are not movant-specific).

to electoral accountability." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (emphasis in original). And "[t]he control of access to a military base is clearly within the constitutional powers granted to both Congress and the President." *Cafeteria & Rest. Workers Union, Loc. 473 v. McElroy*, 367 U.S. 886, 890 (1961). But "[n]ot all cases involving the military are foreclosed by the political question doctrine. Ordinary tort suits, for example," may not present political questions, "even when touching on military matters[.]" *Am. K-9*, 556 S.W.3d at 254 (citations omitted). Importantly, however, if a case will require a court to "examine the [military's] contribution to causation, 'political question' will loom large." *Lane*, 529 F.3d at 561.

As government contractors, Defendants are "not part of a coordinate branch of the federal government." *Id.* at 560. But they may "invoke the 'textual commitment' factor" if they meet the "double burden" of first "demonstrat[ing] that the claims against [them] will require reexamination of a decision by the military" and "[t]hen . . . demonstrat[ing] that the military decision at issue is . . . insulated from judicial review." *Id.* (emphasis omitted and quoting *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1359 (11th Cir. 2007)). Defendants have done both here.

This case would require the Court to examine the military's contribution to causation because the military is a properly designated responsible third party.[6] Responsible third parties are persons "alleged to have caused or contributed to causing . . . the harm for which recovery of damages is sought, whether by negligent act or omission, . . . by other conduct or activity that violates an applicable legal standard, or by any combination of these." Tex. Civ. Prac. & Rem. Code § 33.0011(6). Designating a responsible third party "enables a defendant 'to introduce evidence

---

[6] Though the military is immune from suit, it may be designated a responsible third party under Texas law. *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 868 n.6 (Tex. 2009) (citation omitted).

regarding a responsible third party's fault and to have the jury apportion responsibility to the third party even if that person has not been joined as a party to the lawsuit.'" *In re Dawson*, 550 S.W.3d 625, 628 (Tex. 2018) (quoting *Withers v. Schneider Nat'l Carriers, Inc.*, 13 F. Supp. 3d 686, 688 (E.D. Tex. 2014)). In other words, one of Defendants' affirmative defenses allows them to assert that *the military* was at least partially at fault for Plaintiffs' harm, thus mitigating the damages available to Plaintiffs from Defendants. *See* §§ 33.003(a), 33.004(a); *In re Dawson*, 550 S.W.3d at 628.

Determining the degree of the military's fault here necessarily entails a determination of the extent to which its negligence caused Plaintiffs' harm. In turn, such determination would require evaluating the wisdom of the military's decisions contributing to the circumstances surrounding the bombing. In particular, the Court would have to assess the propriety of the military's approving of Nayeb for participation in the Afghan First Program and permitting him base access. The military made the decision to sponsor Nayeb to become part of the labor pool for Bagram, approve him for base access, continue to re-certify him for base access each time he was re-vetted, and permit him to enter through the security checkpoint at Bagram every day. These are all military judgments that are textually committed to the political branches of government, as they clearly concern "control of access to a military base[.]" *McElroy*, 367 U.S. at 890; *see also Smith v. Halliburton Co.*, 2006 WL 2521326, at *5–6 (S.D. Tex. Aug. 30, 2006) (finding negligence case arising out of suicide bombing at military base presented political question where security measures were at issue, in part because military's control over base access was textually committed to political branches). Evaluating Defendants' proportionate-liability defense would require the Court to review these military judgments, and the Court cannot do so.

*American K-9* illustrates how the proportionate-liability defense will implicate military decision-making in this case. In *American K-9*, an explosive-detection dog owned by the defendant but provided to the Army escaped from her pen and bit a military contractor's civilian employee. 556 S.W.3d at 250. The dog was able to escape by jumping a wall of her pen, which was built by the Army. *Id.* at 251. The plaintiff sued the private entity that owned the dog for negligence. *Id.* The defendant designated the Army a responsible third party, asserting that the Army caused the plaintiff's injuries by designing and building the dog's pen without a roof. *Id.* at 251. In concluding that the case presented a political question, the Texas Supreme Court noted that the defendant's proportionate-liability defense would require the factfinder to evaluate the Army's designing the pen without a roof, which was contrary to the Army's internal requirements. *Id.* at 258. Even though the plaintiff argued that it was only the defendant's "negligent failure to train and control" the dog that caused her injury, the court found that "[t]he Army's design decisions would be front and center at trial." *Id.* And "[t]he Army's decisions about designing and constructing the kennels are unreviewable military decisions because they go to the equipping of the military, constitutionally committed to the federal political branches." *Id.*

This case presents similar issues. The evidence here suggests that, like the Army in *American K-9* constructed the pen without a top contrary to its internal requirements, the military approved Nayeb, who had known Taliban ties, for base access contrary to its standard procedures. Doc. 45-1, Defs.' App., 18, 138. That decision "would be front and center at trial," as would the military's decision to re-certify Nayeb for base access numerous times and its daily decisions related to screening him prior to base entry. *Am. K-9*, 556 S.W.3d at 258. These are decisions textually

-13-

committed to the political branches of government, as they involve the military's control over base access.

In sum, Defendants' proportionate-liability defense plainly requires an examination of the military's contribution to causation, which will require examination of military decisions. Particularly, the Court would have to assess the soundness of military judgments related to approving Nayeb for base access and the propriety of his continued admission. These are military decisions related to control over base access. Thus, they are insulated from judicial review. *Lane*, 529 F.3d at 560. Accordingly, this case presents a political question under the first *Baker* factor—a textually demonstrable constitutional commitment of the issue to a coordinate political department—and is nonjusticiable. The Court lacks subject-matter jurisdiction.

B.  *The Court Lacks Discoverable and Manageable Standards to Evaluate Issues Presented in This Case.*

Moreover, there is a lack of judicially discoverable and manageable standards to resolve this case. If the Court were to undergo the inquiries into military judgment identified above, it would have to decide which military judgments are sound and which are not. For example, the Court would have to assess the military's weighing of the potential risks associated with approving Nayeb for base access against its interest in counterinsurgency efforts. In addition, the Court would have to decide whether the military's screening procedures for LNs at Bagram entry points are reasonable. But the Court lacks the "expertise[] and standards necessary" to make these determinations. *Smith*, 2006 WL 2521326, at *6. Indeed, Plaintiffs do not cite, and the Court is not aware of, any standard in statutes, case law, or otherwise by which the Court could evaluate whether military conduct is reasonable. For example, the Court is aware of no standards by which it could evaluate which LNs should or should

not have been approved for base access, let alone whether the military should have allowed Nayeb base access despite his known Taliban ties. Likewise, there are no judicially manageable standards to evaluate the reasonableness of the military's daily security screenings at Bagram. *See, e.g.*, *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 412 & n.13 (4th Cir. 2011) (finding political question present where solider was electrocuted while working on machinery with contractor-defendant because the court lacked standards to evaluate "how electric power is supplied to a military base . . . or who should be authorized to work on the generators supplying that power").

Plaintiffs emphasize that it was Defendants' responsibility to supervise the transportation of LNs on Bagram and supervise Nayeb in his work facility. Doc. 57, Pls.' Resp., 6, 8. Plaintiffs argue that their claims arise out of Defendants' failure to supervise Nayeb as required and not out of the military's securing of the base. *Id.* at 13–14. According to Plaintiffs, they can pursue their negligent supervision tort theory without involving the military's role, and the Court can employ ordinary negligence standards to the case. *Id.* at 16. Plaintiffs acknowledge that the military has been designated a responsible third party, but they argue the Court would not have to assess the military's fault because the "military's negligence, if it were negligent, would be too remote to be considered a proximate cause under Texas law[.]" *Id.* at 18.

First, the Court disagrees with Plaintiffs that their claim can be couched as one for ordinary negligent supervision. Plaintiffs fail to recognize what the Fifth Circuit has noted: if a case will require a court to "examine the [military's] contribution to causation, 'political question' will loom large." *Lane*, 529 F.3d at 561. The military's designation as a responsible third party will require the Court to assess its contribution to causation, as explained above. *See supra* Part III.A.

Second, Defendants have submitted evidence tending to support a finding of fault on the part of the military; thus, either the Court or the jury would have to assess the military's contribution to Plaintiffs' damages under § 33.003.[7] In support of their argument to the contrary, Plaintiffs cite two cases, but neither is availing. Doc. 57, Pls.' Resp., 19–20.

In the first case, *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470 (Tex. 1991), a worker was allegedly mending a blinking-arrow sign on the side of the road when a driver asleep at the wheel struck the sign. *Id.* at 471. The sign fell on the worker and killed him. *Id.* The plaintiffs sued the sign manufacturer for making a defective sign. *Id.* They alleged that if the sign did not need to be fixed, the worker would not have been fixing the sign when the sleeping driver struck it. *Id.* at 472. The plaintiffs' suit failed, however, because the manufacturer's conduct, if any, was "too remotely connected with" the accident "to constitute legal cause." *Id.*

In the other case cited by Plaintiffs, *IHS Cedars Treatment Center v. Mason*, 143 S.W.3d 794 (Tex. 2004), the plaintiff was a patient at a mental health facility who was discharged. *Id.* at 796. Her roommate at the facility was also discharged. *Id.* at 796. After discharge, the plaintiff was riding in the car with her roommate when the roommate "flew into an angry rage" and crashed the car. *Id.* at 797. The plaintiff sued the facility and its personnel for, among other things, negligent discharge of the roommate. *Id.* The plaintiff's suit failed because the defendants' conduct, if anything, "merely creat[ed] the condition that ma[de the plaintiff's] harm possible." *Id.* at 800. This, the court held, "falls short as a matter of law of satisfying the substantial factor test." *Id.*

---

[7] Section 33.003 "does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission." § 33.003(b).

*Perez* and *Mason* stand for the same proposition: cause that is too tenuous to the plaintiff's injuries cannot constitute proximate cause. *See, e.g.*, *id.* at 803. The military's alleged contribution to causation here is not so tenuous, and Defendants' defenses will require the Court or the jury to assess that contribution. As discussed above, the military determined in an investigation that Nayeb "likely smuggled small quantities of homemade explosive[s] onto Bagram Airfield over approximately four months" in order to construct the suicide vest at his workstation. Doc. 45-4, Defs.' App., 855. If Nayeb smuggled explosives onto Bagram, he did so through the military security screening checkpoints—and thus on the military's watch. Doc. 45-1, Defs.' App., 10. And explosives were clearly a necessary ingredient in constructing the bomb. Moreover, the military, and the military alone, approved Nayeb to work at Bagram in the first place and granted him base access. Accordingly, the military's contribution to causation is not limited to "creat[ing] a condition that allowed the Defendants' negligence to cause the injury." Doc. 57, Pls.' Resp., 19.

In sum, Plaintiffs cannot confine their claim to ordinary negligent-supervision standards when the military's fault is at issue. And Defendants have presented evidence tending to support a finding of fault on the part of the military. Thus, evaluation of Defendants' proportionate-liability defense would require the Court to assess the military's contribution to Plaintiffs' injuries. This, in turn, will require an inquiry into the soundness of military decisions related to base-access privileges and security screening. There is a lack of judicially discoverable and manageable standards for the Court to determine the reasonableness of such decisions. Thus, this case presents a political question under the second *Baker* factor. Political questions are nonjusticiable, and the Court lacks subject-matter jurisdiction.

C.  *Plaintiffs' Supplemental Authority Does Not Persuade the Court That Subject-Matter Jurisdiction Exists.*

After they filed their response to Defendants' motion, but before any reply was filed, Plaintiffs filed an unopposed motion for leave to file a supplemental response (Doc. 60). The motion calls to the Court's attention a case styled *Hencely v. Fluor Corp., Inc.*, 2020 WL 2838687 (D.S.C. June 1, 2020). *Hencely* is another case arising out of the November 12, 2016, bombing at Bagram. Doc. 60-1, Suppl. Resp., 1. The sole plaintiff in that case "sued Fluor for negligence, claiming [it failed] to properly supervise . . . Nayeb[.]" *Id.* at 2. As in this action, Fluor filed a motion to dismiss invoking the political-question doctrine. *Id.* The District of South Carolina denied Fluor's motion, and Plaintiffs advocate that this Court do the same. *See generally id.* Though the facts in *Hencely* are identical to those here, this Court does not follow *Hencely*.

The *Hencely* court found that the political-question doctrine did not apply because the military did not exercise plenary control over Fluor's conduct at Bagram and neither the plaintiff's claims nor Fluor's defenses would require the court to evaluate military judgments. 2020 WL 2838687, at *7, *13–14. As relevant here, Fluor indicated that it would "assert that the military's negligence was the sole proximate cause of the alleged incident and . . . that the military's negligence was a superseding cause; new and independent cause; and/or intervening cause of Plaintiff's incident and injury." *Id.* at *14 (quoting Fluor's pleadings). But Fluor's causation defenses in *Hencely* did not present a political question because:

> (1) the United States is immune from suit and as a matter of South Carolina law [could not] be found to be the proximate case of Plaintiff's injuries, so no evaluation of military decisions by the [c]ourt [was] required; [and] (2) even if the United States were not immune, as a matter of South Carolina law fault cannot be apportioned to

>the United States as a nonparty, so no evaluation of the reasonableness of military decisions [was] required.

*Id.* Thus, "[t]he factfinder, after the presentation of Fluor's causation defenses, could find that the actions and decisions for which Fluor blame[d] the Army—and not Fluor's alleged conduct—caused Plaintiff's injuries, but this factual determination *would not require the factfinder to evaluate the reasonableness of the Army's decisions.*" *Id.* (emphasis added). *Hencely* distinguishes South Carolina's negligence regime from those states that employ "a proportional liability system that allocates liability based on fault." *Id.* (quoting *Burn Pit*, 744 F.3d at 340–41).

This Court does not follow *Hencely*. Plaintiffs here brought their negligence claims in Texas under Texas law. *See generally* Doc. 1-3, Pls.' Pet. Unlike South Carolina, Texas employs "a proportional liability system that allocates liability based on fault." *See Hencely*, 2020 WL 2838687, at *15 (citation omitted). And, as explained above, in Texas, defendants *can* seek to have the jury apportion responsibility to a nonparty under the responsible-third-party doctrine. *In re Dawson*, 550 S.W.3d at 628 (citing, *inter alia*, § 33.004(a)). And unlike in South Carolina, in Texas, the military *can* be designated a responsible third party even though it is immune from suit. *Galbraith Eng'g*, 290 S.W.3d at 868 n.6 (citation omitted); *see also Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 475–77 (3d Cir. 2013) (finding case might present political question based on which state law applied and distinguishing Texas law, which permits apportionment of fault to nonparties like the military, from law of other states where such is not permitted).

Thus, insofar as the *Hencely* court determined subject-matter jurisdiction existed on the basis of Fluor's inability to assign fault to the military, *Hencely* is distinguishable due to these fundamental differences in the relevant states' available negligence defenses. Insofar as the *Hencely* court

determined subject-matter jurisdiction existed based on the lack of plenary control by the military over Fluor's conduct or based on any findings related to the plaintiff's theory of negligence, it is inapposite.

## IV.

## CONCLUSION

For the reasons stated, Defendants' motion (Doc. 45) is **GRANTED** insofar as it seeks dismissal of Plaintiffs' claims for lack of subject-matter jurisdiction.

**SO ORDERED.**

**SIGNED: January 8, 2021.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE